**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AYMAN SAIED JOUMAA, <br><br> Plaintiff, <br><br> v. <br><br> STEVEN MNUCHIN, *et al.*, <br><br> Defendants. | Civil Action No. 17-2780 (TJK) |

**<u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION………...…………………………………………..……………………….……1

BACKGROUND……………………………………………………………………………...…..3

    A.  Statutory Background…………………………………………………….…..……3

    B.  Factual Background …………………………………………………...…………....6

    C.  Plaintiff's Complaint…………………………………………......…………....12

LEGAL STANDARDS OF REVIEW…………………………………………………..…13

DISCUSSION……………………………………………………………………...…..…15

    I.     JOUMAA'S CLAIM OF UNREASONABLE DELAY IS MOOT AND WITHOUT MERIT …15

    II.    JOUMAA HAS FAILED TO ESTABLISH THAT OFAC'S DECISION REGARDING HIS DESIGNATION IS ARBITRARY AND CAPRICIOUS…………………………………17

        A.  Joumaa Has Not Stated A Claim For Relief Related To OFAC's "Maintenance" Of His Designation And "The Continued Blocking Of His Assets"……………………………………………...………………..…18

        B.  OFAC's Decision Not to Delist Joumaa Is Not Arbitrary And Capricious…..22

    III.   OFAC'S DESIGNATION OF JOUMAA ACCORDS WITH DUE PROCESS. ……….…..27

        A.  Joumaa Does Not Having Standing To Assert Constitutional Rights……….28

        B.  Joumaa's Fifth Amendment Due Process Argument Fails On The Merits….29

        C.  OFAC Has Provided Joumaa A Reasoned Explanation For Its Decision…...36

CONCLUSION…………………………………………………..…………………………38

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*32 County Sovereignty Committee v. Department of State,*
    292 F.3d 797 (D.C. Cir. 2002) .................................................................... 28

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury,*
    686 F.3d 965 (9th Cir. 2012) ................................................................... 35

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .......................................................................... 13, 14

*Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.,*
    564 F.3d 462 (D.C. Cir. 2009) ................................................................. 29

*Banner Health v. Sebelius,*
    797 F. Supp. 2d 97 (D.D.C. 2011) .......................................................... 19

*Bark v. U.S. Forest Serv.,*
    37 F. Supp. 3d 41 (D.D.C. 2014) ............................................................ 19

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 554 (2007) ............................................................................... 14

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................................... 21

*Cal. Sportfishing Prot. All. v. U.S. Bureau of Reclamation,*
    2015 WL 6167521 (E.D. Cal. Oct. 20, 2015) ......................................... 19

*Citizens to Preserve Overton Park v. Volpe,*
    401 U.S. 402 (1971) ......................................................................... 22, 26

*Cobell v. Norton,*
    240 F.3d 1081 (D.C. Cir. 2001) .............................................................. 19

*Conant v. Wells Fargo Bank, N.A.,*
    60 F. Supp. 3d 99 (D.D.C. 2014) ..................................................... 14, 29

*DTTC Data Repository (U.S.) LLC v. U.S. Commodity Futures Trading Comm'n,*
    25 F. Supp. 3d 9 (D.D.C. 2014) .............................................................. 19

*\*Fares v. Smith,*
    249 F. Supp. 3d 115 (D.D.C. 2017) .......................................... 29, 30, 33, 34

*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) ............................................................. 22

*Fund for Animals, Inc. v. BLM,*
  460 F.3d 13 (D.C. Cir. 2006) ........................................... 18, 19

*Harris v. FAA,*
  353 F.3d 1006 (D.C. Cir. 2004) ............................................ 17

*Hinton v. Corr. Corp. of Am.,*
  624 F. Supp. 2d 45 (D.D.C. 2009) ....................................... 14

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) ............................................................... 23

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
  219 F. Supp. 2d 57 (D.D.C. 2002) ....................................... 23

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
  333 F.3d 156 (D.C. Cir. 2003) ......................................... 23, 25

*Honig v. Doe,*
  484 U.S. 305 (1988) ............................................................ 15

*Jifry v. FAA,*
  370 F.3d 1174 (D.C. Cir. 2004) ...................................... 28, 30

*Johnson v. Eisentrager,*
  339 U.S. 763 (1950) ............................................................ 28

*\*Kadi v, Geithner,*
  42 F. Supp. 3d 1 (D.D.C. 2012) .................................... *passim*

*KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner,*
  647 F. Supp. 2d 857 (N.D. Ohio 2009) ............................... 35

*Lujan v. Defenders of Wildlife,*
  497 U.S. 871 (1990) .................................................. 18, 19, 20

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ............................................................ 13

*Mathews v. Eldridge,*
  424 U.S. 319 (1976) ...................................................... 29, 34

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
    463 U.S. 29 (1983) ................................................................ 22, 24, 36

*N. Air Cargo v. U.S. Postal Serv.*,
    674 F.3d 852 (D.C. Cir. 2012) ............................................... 27

*Nat'l Council of Resistance of Iran v. Dep't of State*,
    251 F.3d 192 (D.C. Cir. 2001) ............................................... 28

*Nat'l Shooting Sports Found., Inc. v. Jones*,
    716 F.3d 200 (D.C. Cir. 2013) ............................................... 36

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ...................................................... 16, 18, 19, 20

*NTCH, Inc. v. FCC*,
    841 F.3d 497 (D.C. Cir. 2016) ............................................... 15

*Orlov v. Howard*,
    523 F. Supp. 2d 30 (D.D.C. 2007) .......................................... 16

*Perrigo Research & Dev. Co. v. U.S. FDA*,
    2017 WL 6017349 (D.D.C. Dec. 1, 2017) .................................. 21

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
    324 F.3d 726 (D.C. Cir. 2003) ............................................... 21

*Rhea Lana, Inc. v. Dep't of Labor*,
    824 F.3d 1023 (D.C. Cir. 2016) ............................................. 21

*Sprint Nextel Corp. v. FCC*,
    508 F.3d 1129 (D.C. Cir. 2007) ....................................... 19, 20, 21

*Trudeau v. Fed. Trade Comm'n*,
    456 F.3d 178 (D.C. Cir. 2006) ............................................... 18

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ........................................................... 28

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
    435 U.S. 519 (1978) ........................................................... 36

*Vill. of Bald Head Island v. U.S. Army Corps of Engineers*,
    714 F.3d 186 (4th Cir. 2013) ............................................... 20

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
  750 F. Supp. 2d 150 (D.D.C. 2010) ................................................................. 23

*Zevallos v. Obama*,
  793 F.3d 106 (D.C. Cir. 2015) ................................................... *passim*

*Zevallos v. Obama*,
  10 F. Supp. 3d 111 (D.D.C. 2014) ................................................. *passim*

## UNITED STATES CONSTITUTION                                           PAGE(S)

U.S. Const. amend. V ....................................................... 13, 27, 28

## FEDERAL STATUTES AND RULES                                           PAGE(S)

5 U.S.C. § 551 ........................................................................ 18

5 U.S.C. § 704 ................................................................... 18, 21

5 U.S.C. § 706 ................................................................... *passim*

21 U.S.C. § 1901 ............................................................... 3, 4, 16

21 U.S.C. § 1903 ................................................................ 4, 5, 16

21 U.S.C. § 1904 ................................................................... 5, 20

21 U.S.C. § 1907 ...................................................................... 4

50 U.S.C. §§ 1701-1707… ......................................................... 3, 4

Fed. R. Civ. P. 12 ............................................................... *passim*

Fed. R. Civ. P. 56 ............................................................... *passim*

## EXECUTIVE ORDERS                                                     PAGE(S)

Exec. Order 12,987,
  60 Fed. Reg. 54,579 (Oct. 21, 1995) ............................................. 3, 4

## LEGISLATIVE MATERIALS                                                PAGE(S)

H.R. Rep. No. 106-457 (Nov. 9, 1999) ............................................. 3, 4

## ADMINISTRATIVE MATERIALS                                           PAGE(S)

31 C.F.R. § 501.807 ............................................................................................................ *passim*

31 C.F.R. § 598.314 ......................................................................................................................5

31 C.F.R. § 598.803 ......................................................................................................................5

80 Fed. Reg. 29,201 (May 15, 2015) ............................................................................................5

## INTRODUCTION

As the leader of an international criminal network, Plaintiff Ayman Saied Joumaa ("Joumaa") coordinated multi-ton shipments of cocaine from South America and laundered hundreds of millions of dollars in narcotics proceeds through a variety of channels, from Lebanese exchange houses to bulk cash smuggling in Mexico to the purchase and export of used vehicles to West Africa.   Following an investigation that uncovered his large-scale narcotics trafficking and money laundering activities, the Office of Foreign Assets Control ("OFAC") designated Joumaa as a Specially Designated Narcotics Trafficker ("SDNT") pursuant to the Foreign Narcotics Kingpin Designation Act ("Kingpin Act") on January 26, 2011.  Later that year, Joumaa was also indicted in the U.S. District Court for the Eastern District of Virginia on two counts for his role in narcotics distribution and money laundering.

In May of 2016, Joumaa requested that OFAC reconsider his designation and remove him from the list of Specially Designated Nationals and Blocked Persons ("SDN List"). Categorically denying that he has ever been involved in narcotics trafficking or money laundering, he claimed that OFAC lacked a sufficient basis to designate him in 2011. Alternatively, he argued that OFAC lacks "current" information to justify the "maintenance" of his designation and "the continued blocking of his assets."  After Joumaa filed this action, OFAC denied his delisting request based on its determination that Joumaa continues to meet the criteria for designation under the Kingpin Act and thus should remain on the SDN List.

Though Joumaa remains a fugitive from the charges pending against him in the Eastern District of Virginia, he now seeks to avail himself of the authority of this Court in order to contest his designation.  He raises three arguments in support of his Complaint, all without merit.

1

First, Joumaa argues that OFAC unreasonably delayed its decision on his request for reconsideration.  But that claim is now moot in light of OFAC's denial of his request, and in any event is unsupported by either the Administrative Procedure Act ("APA") or OFAC's regulations implementing the Kingpin Act.  Further, the timing of OFAC's decision can hardly be described as unreasonable, particularly given Joumaa's repeated supplementation of his petition and the rigorous review required by OFAC.

Second, Joumaa contends that the "maintenance" of his designation and "the continued blocking of his assets" are arbitrary and capricious because OFAC allegedly lacks "current information" to support his designation.  This argument, however, fails as a matter of law, as OFAC's "maintenance" of designations and "the continued blocking of [] assets" are neither agency actions nor final agency actions subject to judicial review under the APA.  Joumaa's claim also fails on the merits, as the administrative record fully supports the only reviewable decision, namely OFAC's denial of Joumaa's request for reconsideration.

Third, according to Joumaa, OFAC violated his purported rights under the Constitution and the APA by inadequately notifying him of the basis for his continued designation.  Again, his argument fails on multiple grounds.  As a foreign national without substantial contacts with the United States, Joumaa lacks standing to assert constitutional rights.  Moreover, OFAC's various disclosures—including a redacted administrative record, press release, press chart, correspondence, and non-privileged and unclassified summaries of otherwise privileged information—more than adequately apprise him of the basis for his designation and the denial of his request for reconsideration.

Accordingly, and for the reasons discussed more fully below, the Court should dismiss Joumaa's claims or, in the alternative, grant summary judgment in favor of the government.

# BACKGROUND

### A.      Statutory Background

In 1999, Congress enacted the Kingpin Act to address "a national emergency resulting

from the activities of international narcotics traffickers and their organizations."  21 U.S.C.

§ 1901(a)(4).  The statute aims "to protect the national security, foreign policy, and economy of

the United States" from the dangers of the global drug trade by "apply[ing] economic and other

financial sanctions to significant foreign narcotics traffickers and their organizations worldwide."

*Id.* § 1901(b).

Congress modeled the Kingpin Act on the successful application of the International

Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, to international

narcotics traffickers in Colombia.  H.R. Rep. No. 106-457 at 42 (Nov. 9, 1999), *as reprinted in*

1999 U.S.C.C.A.N. 304.  IEEPA authorizes the President to declare a national emergency

resulting from "any unusual and extraordinary threat, which has its source in whole or substantial

part outside the United States, to the national security, foreign policy, or economy of the United

States," and to deal with that threat through, *inter alia*, designations for economic and financial

sanctions.  *Id.* §§ 1701-1702.  The President has exercised the broad spectrum of powers that

IEEPA provides by issuing Executive Orders that address different national emergencies.  In

October 1995, pursuant to IEEPA, President Clinton issued Executive Order 12,978, which

declared a national emergency resulting from international narcotics trafficking centered in

Colombia and associated violence and corruption.  Exec. Order No. 12,978, 60 Fed. Reg. 54,579

(Oct. 21, 1995) (Blocking Assets and Prohibiting Transactions with Significant Narcotics

Traffickers).  Executive Order 12,978 ordered the blocking of the assets of foreign persons

identified in an annex to the Executive Order and of foreign persons designated by the Secretary

of the Treasury as playing a significant role in such narcotics trafficking or providing material support or being owned or controlled by designated traffickers. *Id.* Implementation of this Executive Order is credited with the downfall of the Cali Cartel kingpins. H.R. Rep. No. 106-457 at 43.

The Kingpin Act expressly states that it is Congress's desire to apply similar efforts against international narcotics traffickers worldwide. 21 U.S.C. § 1901(a)(3) ("IEEPA was successfully applied to international narcotics traffickers in Colombia and based on that successful case study, Congress believes similar authorities should be applied worldwide."); *see also* H.R. Rep. No. 106-457 at 42-43. The House Conference Report on the Kingpin Act explains that "[i]f effectively implemented, this strategy will disrupt these criminal organizations and bankrupt their leadership." H.R. Rep. No. 106-457 at 42. "The targets of this legislation are not only the drug kingpins, but those involved in their illicit activities, such as: money laundering, acquiring chemical precursors to manufacture narcotics, manufacturing the drugs, transporting narcotics from the drug source countries to the United States, and managing the assets of these criminal enterprises." *Id.* at 43.

To that end, the Kingpin Act authorizes the President to identify foreign persons whom he determines to be significant foreign narcotics traffickers, meaning "foreign person[s] that play[] a significant role in international narcotics trafficking." 21 U.S.C. §§ 1903(b), 1907(7); *see also id.* § 1907(3) (defining "narcotics trafficking" as "any illicit activity to cultivate, produce, manufacture, distribute, sell, finance, or transport narcotic drugs, controlled substances, or listed chemicals, or otherwise endeavor or attempt to do so, or to assist, abet, conspire, or collude with others to do so"). The statute further authorizes the Secretary of the Treasury, in consultation with the Attorney General, the Director of Central Intelligence, the Director of the

Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, the

Secretary of Defense, and the Secretary of State, to designate foreign persons "as materially

assisting in, or providing financial or technological support for or to, or providing goods or

services in support of, the international narcotics trafficking activities of a significant foreign

narcotics trafficker," *id.* § 1904(b)(2); "as owned, controlled, or directed by, or acting for or on

behalf of, a significant foreign narcotics trafficker," *id.* §1904(b)(3); or "as playing a significant

role in international narcotics trafficking," *id.* § 1904(b)(4).  The Secretary of the Treasury has

delegated designation authority to OFAC.  31 C.F.R. § 598.803.[1]  OFAC's regulations refer to

such foreign persons, as well as presidentially identified significant foreign narcotics traffickers,

as SDNTs.  *Id.* § 598.314.

 For all SDNTs, the Kingpin Act operates to block all assets subject to United States

jurisdiction that are owned or controlled by the SDNT and all interests in such property.  21

U.S.C. § 1904(b).  United States persons as well as persons within the United States are

generally prohibited from engaging in any transaction with or dealing in any property or interests

in property of SDNTs as well as from engaging in any transaction that evades or avoids the

Kingpin Act's prohibitions.  *Id.* § 1904(c).

 Once designated, a SDNT may "seek administrative reconsideration" of his designation,

or may "assert that the circumstances resulting in the designation no longer apply."  31 C.F.R.

§ 501.807.  In doing so, the SDNT "may submit arguments or evidence that the person believes

establishes that insufficient basis exists for the designation," and may also "propose remedial

steps on the person's part . . . which the person believes would negate the basis for designation."

---

[1] On May 15, 2015, the President delegated to the Secretary of the Treasury the functions
conferred by 21 U.S.C. § 1903(b), (c), (g), and (h).  Delegation of Functions Under the Foreign
Narcotics Kingpin Designation Act, 80 Fed. Reg. 29,201 (May 15, 2015).

*Id.* § 501.807(a).  Additionally, the SDNT may request a meeting with the agency.  31 C.F.R.

§ 501.807(c).  After conducting a review, OFAC will "provide a written decision" to the SDNT.

*Id.* § 501.807(d).  OFAC's regulations do not limit the number of times a SDNT may seek to

challenge his designation administratively.  *See generally id.* § 501.807.

### B.      Factual Background

On January 26, 2011, OFAC designated Joumaa, a Lebanese and Colombian national, as

a SDNT based on the agency's determination that he plays a significant role in international

narcotics trafficking.  Admin. R. ("A.R.") at 23-24, 67.  Investigations by the Drug Enforcement

Administration ("DEA") revealed that Joumaa "coordinated the transportation, distribution, and

sale of multi-ton shipments of cocaine from South America and [] laundered the proceeds from

the sale of cocaine in Europe and the Middle East."  *Id.* at 67.  Specifically, Joumaa and his

organization—the Joumaa Money Laundering Organization / Drug Trafficking Organization,

also designated by OFAC, *id.* at 24—operated in Lebanon, West Africa, Panama, and Colombia

to launder as much as $200 million per month in illicit proceeds, *id.* at 67.  Joumaa and his

organization utilized a variety of channels to further his money laundering activities, "including

bulk cash smuggling operations and Lebanese exchange houses."  *Id.* at 67.  Joumaa's drug

trafficking and money laundering organization also exported vehicles from the United States to

West Africa to launder drug proceeds.  *Id.* at 27, 67.  Also on January 26, 2011, OFAC

designated individuals and entities connected to Joumaa's organization as SDNTs, including

three Lebanon-based money exchanges used to launder illicit proceeds; individuals affiliated

with these money exchanges; companies in Lebanon, Benin, and the Democratic Republic of the

Congo involved in the sale of used cars in Africa; Joumaa's brothers; a hotel used by Joumaa's

organization as a location to broker drug trafficking and money laundering activities; and various companies owned or controlled by members of Joumaa's criminal network.  *Id.* at 23-25, 67.

In June of 2011, a DEA Special Agent submitted an affidavit in support of a criminal complaint in the U.S. District Court for the Eastern District of Virginia charging Joumaa and another individual with conspiracy to distribute more than five kilograms of cocaine for the purpose of unlawful importation into the United States.  *Id.* at 72.  The Special Agent had been involved in an investigation into Joumaa that included "extensive interviews with cooperating defendants and DEA confidential sources as well as undercover operations in Colombia, Denmark, and Germany."  *Id*.  According to the Special Agent, based on information from a confidential source, Joumaa "would arrange for the laundering of drug related proceeds from Mexico, Europe (predominantly Spain), and West Africa to Colombia."  *Id.* at 73.  Charging a fee of approximately thirteen percent, Joumaa and members of his organization would launder these proceeds, in the form of U.S. currency, and return them in Colombia.  *Id.*  Joumaa would also receive the delivery of bulk U.S. currency from the sale of cocaine shipped to the United States; following delivery of these proceeds, Joumaa would pay laundered proceeds in different currencies within five days.  *Id.* at 73-74.

The DEA Special Agent also averred, based on information from a separate confidential source, that Joumaa would launder proceeds from the sale of cocaine bound for the United States by way of Colombia, Guatemala, Honduras, and the Los Zetas trafficking organization in Mexico, and then repay these proceeds in Colombia and Venezuela.  *Id.* at 74.  Joumaa would charge a fee of approximately thirteen percent to launder these funds.  *Id.* at 74-75.

In November of 2011, Joumaa was indicted in the Eastern District of Virginia for conspiracy to distribute five or more kilograms of cocaine, knowing and intending that it would

be unlawfully imported into the United States, as well as for conspiracy to commit money laundering. *Id.* at 77-83.  The Indictment charges in part that Joumaa "coordinated the shipment of at least tens of thousands of kilograms of cocaine from Colombia, through Central America and Mexico, to the United States, including but not limited to 85,000 kilograms of cocaine shipped from Colombia for sale to [the] Los Zetas drug cartel from in and around 2005 through in and around 2007." *Id.* at 79-80; *see also id.* at 80 (charging that Joumaa "coordinated the shipment of multi-thousand kilogram quantities of cocaine from Colombia to Guatemala, Honduras, and Mexico for sale to [the] Los Zetas drug cartel in Mexico" that were ultimately destined for the United States).

The Indictment further charges that Joumaa "laundered at least hundreds of millions of dollars in proceeds of illegal drug sales in the United States and elsewhere, including but not limited to an amount in excess of $250 million in drug related proceeds representing cocaine sales in the United States, Mexico, Central America, and Europe, which [Joumaa] laundered from in and around 1997 through in and around September 2010." *Id.* at 80.  Specifically, after being contacted by email, Blackberry PIN, or telephone, Joumaa would receive, launder, and return drug-related proceeds to cocaine suppliers in Colombia, while charging a fee between eight percent and fourteen percent. *Id.*  Joumaa also received deliveries of bulk cash—typically $2 million to $4 million in drug proceeds—in Mexico, which he then laundered and paid out in Venezuela or Colombia within one to five days. *Id.* at 80-81; *see also id.* at 81 (further detailing movement of drug proceeds).  Joumaa has not returned from Lebanon to face these charges. *Id.* at 4, 84-85.

On May 18, 2016, Joumaa, through counsel, requested that OFAC reconsider his designation as a SDNT pursuant to the Kingpin Act. *Id.* at 87-90.  Also on May 18, 2016,

Joumaa requested access to the administrative record on which his designation was based.  *Id.* at
92-98.  That same day, OFAC acknowledged receipt of Joumaa's requests and advised Joumaa's
counsel that "the review process can be lengthy, and it is likely that OFAC will seek additional
information from your client before a final determination is made concerning your client's
designation as a SDNT."  *Id.* at 99.  OFAC subsequently provided Joumaa a request for
additional information on July 27, 2016, *id.* at 100-05, to which Joumaa partially responded on
October 25, 2016, *id.* at 106-42.  That response included a categorical denial that Joumaa is or
has ever been involved in narcotics trafficking or related money laundering.  *Id.* at 131, 139.

By letter dated November 18, 2016, OFAC provided Joumaa a redacted version of the
administrative record on which his designation was based, as well as the U.S. Department of the
Treasury press release and press chart related to his designation.  *Id.* at 26-66.  OFAC redacted
the classified and privileged information, including law enforcement sensitive information, as
well as information that did not pertain to Joumaa's designation.  *Id.* at 26.  The agency
nevertheless provided a non-privileged and unclassified summary of otherwise privileged
information.  *Id.* at 27.  OFAC also advised that if additional releasable information became
available it would be provided to Joumaa.  *Id.* at 26.

On April 24, 2017, Joumaa supplemented his delisting petition with additional
information and responses to OFAC's request for information.  *Id.* at 397-410.  Joumaa again
supplemented his petition on August 24, 2017, arguing that "[t]he lack of any contemporaneous
evidence linking [Joumaa] to narcotics trafficking activities—even at the time of OFAC's
January 26, 2011 designation—renders OFAC's decision to continue [his] designation as
factually and legally suspect."  *Id.* at 1397.  OFAC responded by letter dated October 16, 2017,
stating that Joumaa's request for reconsideration was under review.  *Id.* at 1418.  The agency

9

explained that its decision regarding the delisting petition "includes careful review of the documents you have thus far submitted" and that "[t]he quantity of reconsideration cases and the complexity of these cases can make this a lengthy process." *Id.* OFAC further stated that "the reconsideration decision for all such requests requires U.S. federal government inter-agency consultation and legal review," which "has delayed our response time." *Id.* On December 27, 2017, Joumaa filed this action. Complaint for Declaratory and Injunctive Relief ("Complaint" or "Compl."), ECF No. 1 (Dec. 27, 2017).

On March 2, 2018, OFAC denied Joumaa's request for reconsideration. A.R. at 1-21, 1612-14.[2] Relying on a variety of sources, OFAC determined that Joumaa's claims that he is not, and never has been, a narcotics trafficker are not credible. *Id.* at 4-9, 1612-14. Contrary to Joumaa's disavowal of narcotics trafficking, OFAC observed that he is subject to narcotics trafficking-related charges in the Eastern District of Virginia. *Id.* at 5-7, 1612 (referencing indictment and affidavit in support of arrest warrant and criminal complaint). Additionally, and also contrary to Joumaa's denials, OFAC explained that Joumaa worked with SDNT Pedro Mejia Salazar as part of a global drug money laundering operation. *Id.* at 9-11, 1613. The agency further concluded that Joumaa's request for reconsideration "is not supported by credible evidence to establish that there was an insufficient basis for the January 26, 2011 designation, or that circumstances resulting in the designation no longer apply such that removal from the [SDN List] is warranted." *Id.* at 1613.

In support of this conclusion, OFAC addressed the numerous exhibits submitted by Joumaa, many of which concerned the Hassan Ayash Exchange Company and the New Line

---

[2] OFAC's decision is based in part on classified and law enforcement sensitive information. *Id.* at 1612, 1614. OFAC intends to lodge a copy of the unredacted record with the Court when the parties file the joint appendix required by Local Civil Rule 7(n).

Exchange Trust Co.—two Lebanon-based entities used by Joumaa in connection with his money laundering activities—as well as Goldi Electronics S.A.—a Panama-based entity owned or controlled by Joumaa. *Id.*; *see also id.* at 14-16, 67. For purposes of deciding Joumaa's request for reconsideration, OFAC accepted that the operations of or his relationship to these entities ceased after his designation. *Id.* at 15, 1613 n.1. Nevertheless, OFAC reasoned that the documents submitted by Joumaa do not rebut OFAC's own evidence that Joumaa had previously laundered money through the Hassan Ayash Exchange Company and the New Line Exchange Trust Co. *Id.* at 15, 1613. The documents also fail to "address the other aspects of Mr. Joumaa's drug trafficking and money laundering network that served as the basis for his designation, such as the Ellissa Exchange Company." *Id.* at 1613; *see also id.* at 15. Nor had Joumaa addressed all of OFAC's findings regarding his money laundering through channels outside of Lebanon, including by means not involving business entities. *Id.* at 15, 1613. And while OFAC duly considered an independent report indicating that the New Line Exchange Trust Co. appeared to comply with certain provisions to prevent money laundering, the agency noted that Joumaa did not submit similar reports regarding the Hassan Ayash Exchange Company or the Ellissa Exchange Company. *Id.* at 15-16, 1613.

OFAC also addressed the remaining arguments advanced by Joumaa in his counsel's correspondence to OFAC dated October 25, 2016. *Id.* at 13-16, 1613. In response to Joumaa's concern about "mistaken designations," OFAC stated that "Joumaa has provided no evidence to indicate that his designation was due to mistaken identity." *Id.* at 14, 1613. And with respect to Joumaa's challenge to the credibility of sources relied upon by OFAC, the agency explained that Joumaa had not "provided any information to impugn the accuracy and integrity of OFAC's fact finding process." *Id.* at 14, 1613.

Accordingly, OFAC concluded that it is appropriate to continue to designate Joumaa as a SDNT under the Kingpin Act. *Id.* at 16-17, 1612.[3]

## C.      Plaintiff's Complaint

Joumaa filed this action against Defendants Steven Mnuchin, in his official capacity as Secretary of the U.S. Department of the Treasury, and OFAC. *See* Compl. at 1. Joumaa's Complaint advances three theories concerning his designation as a SDNT. *See id.* ¶¶ 33-45. First, Joumaa contends that OFAC has unreasonably delayed a decision regarding his request for removal from the SDN List. *Id.* ¶¶ 33-35. He therefore requests that the Court "[d]eclar[e] and/or order[] Defendants to issue a written, reasoned decision on Plaintiff's request for administrative reconsideration of his Kingpin Act designation" pursuant to the APA, 5 U.S.C. § 706(1). Compl., Relief Requested.

Second, Joumaa claims that OFAC's "maintenance of Plaintiff's designation under the Kingpin Act and the continued blocking of his assets" violate the APA and the Kingpin Act because OFAC allegedly lacks evidence that Joumaa "is currently engaged in international narcotics trafficking activities" and therefore cannot designate Joumaa as a SDNT. *Id.* ¶¶ 38-39[4] (citing 5 U.S.C. § 706(2)(A)); *see also id.* ¶ 40 (alleging "Defendants lack a statutory basis to maintain Plaintiff's designation in the absence of contemporary evidence linking Plaintiff to activities in support of international narcotics trafficking") (citing 5 U.S.C. § 706(2)(C)). Joumaa accordingly requests that the Court "[d]eclar[e] and/or order[] Defendants to rescind

---

[3] After issuing its decision, OFAC provided Joumaa with non-privileged and unclassified summaries of otherwise privileged information regarding his initial designation as well as the denial of his request for reconsideration. A.R. at 1615-17.

[4] The Complaint contains two paragraphs designated as paragraph 39. *See* Compl. at 15-16.

Plaintiff's designation under the Kingpin Act and to remove his name from the SDN List."

Compl., Relief Requested.

Third, Joumaa asserts due process claims grounded in both the Fifth Amendment and the

APA. *See id.* ¶¶ 39, 41, 43-45. According to Joumaa, the information provided to him by OFAC

does not sufficiently describe—and therefore constitutes inadequate notice of—the basis for his

designation. *Id.* (citing U.S. CONST. amend. V; 5 U.S.C. § 706(2)(B), § 706(2)(D)). He also

claims that the timing of OFAC's decision on his request for reconsideration infringes on his

rights under the Fifth Amendment. Compl., ¶ 45. As to this claim, Joumaa requests that the

Court "[d]eclare and/or order [] Defendants to disclose to Plaintiff any and all information,

documents, evidence, or other material related to or serving as a basis for Defendants' continued

maintenance of Plaintiff's designation under the Kingpin Act." Compl., Relief Requested.

## LEGAL STANDARDS OF REVIEW

On a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing

the court's subject-matter jurisdiction. *E.g.*, *Zevallos v. Obama*, 10 F. Supp. 3d 111, 116 (D.D.C.

2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

561 (1992)). In deciding a Rule 12(b)(1) motion, a court may consider materials outside the

pleadings. *Id.* (explaining that "[b]ecause subject matter jurisdiction focuses on the Court's

power to hear a claim, the Court must give the plaintiff's factual allegations closer scrutiny than

would be required for a 12(b)(6) motion for failure to state a claim"). A court lacks subject-

matter jurisdiction over claims that are moot, and moot claims are properly dismissed on that

ground. *See id.* at 123-24.

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted).  For purposes of a Rule 12(b)(6) motion, the "complaint" also includes matters incorporated therein.  *E.g.*, *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009) ("Matters that are not 'outside' the pleadings a court may consider on a motion to dismiss include 'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint,' . . . or documents 'upon which the plaintiff's complaint necessarily relies' even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss.") (citations omitted).

Rule 12(d) authorizes the court to treat a Rule 12(b)(6) motion as a motion for summary judgment under Rule 56 where the defendants rely on matters outside the pleadings, provided that all parties have a reasonable opportunity to present all material pertinent to the motion.  Fed. R. Civ. P. 12(d); *Conant v. Wells Fargo Bank, N.A.*, 60 F. Supp. 3d 99, 106 (D.D.C. 2014). Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Conant*, 60 F. Supp. 3d at 107.  In the context of an APA claim, "[s]ummary judgment [] serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Zevallos*, 10 F. Supp. 3d at 117 (quoting *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012)); *see also id.* (noting the court's "limited role" "in reviewing the administrative record" and explaining that "[w]hen assessing a summary judgment motion in an APA case, 'the district judge sits as an appellate tribunal'") (citation omitted).

14

**DISCUSSION**

**I.     JOUMAA'S CLAIM OF UNREASONABLE DELAY IS MOOT AND WITHOUT MERIT.**

Count I of Joumaa's Complaint is premised on the lack of a decision by OFAC regarding

his administrative request for reconsideration.  *See* Compl., ¶¶ 33-35.  Specifically, Joumaa

alleges under 5 U.S.C. § 706(1) that OFAC has "unreasonably delay[ed] a decision regarding

Plaintiff's request to be removed from the SDN List" and requests that the Court "[d]eclar[e]

and/or order[] Defendants to issue a written, reasoned decision on Plaintiff's request for

administrative reconsideration of his Kingpin Act designation." *Id.*, Relief Requested.

Joumaa's claim is moot.  Pursuant to Article III of the Constitution, "[f]ederal courts are

authorized to adjudicate only 'actual, ongoing controversies' that are within the jurisdiction of

the court." *NTCH, Inc. v. FCC*, 841 F.3d 497, 504 (D.C. Cir. 2016) (quoting *Honig v. Doe*, 484

U.S. 305, 317 (1988)).  "A live controversy must exist at all stages of judicial review, not only

when a complaint is filed." *Id.* (citation omitted).  "If events outrun the controversy such that the

court can grant no meaningful relief, the [claim] must be dismissed as moot." *Id.* (citation

omitted).

As discussed above, OFAC has now issued its decision on Joumaa's request for

reconsideration and has declined to remove him from the SDN List.  A.R. at 1-21, 1612-14.

"Though that is not the result [Joumaa] hoped for, it is still a decision." *Zevallos*, 10 F. Supp. 3d

at 123.  The Court can therefore award no relief under Joumaa's § 706(1) claim beyond that

already provided by OFAC.  *See id.* ("All this Court can do is 'compel agency action . . .

unreasonably delayed,' i.e., compel OFAC to issue a decision—which it has already done.")

(quoting 5 U.S.C. § 706(1)).  Accordingly, and consistent with the court's decision in *Zevallos*,

Count I of the Complaint is moot and must be dismissed for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1).  *See id.*

In addition to being moot, Joumaa's unreasonable delay claim is unsupported by the Kingpin Act or OFAC's regulations.  "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("*SUWA*").  "The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law . . . ."  *Id.*  Nothing in the Kingpin Act provides a deadline by which OFAC must decide a request for reconsideration and removal.  *See* 21 U.S.C. §§ 1901 *et seq.*  And § 501.807 of OFAC's regulations, on which Joumaa relies, *see* Compl., ¶¶ 20-22, 24, provides the procedures governing delisting petitions but does not establish a period of time within which OFAC must issue a decision.  *See* 31 C.F.R. § 501.807.  Joumaa therefore cannot demonstrate that OFAC was required to decide his request within a specific period of time.  *Cf. Orlov v. Howard*, 523 F. Supp. 2d 30, 37 (D.D.C. 2007) ("Here, there are no statutory guidelines compelling USCIS to adjudicate adjustment of status applications within a certain period of time. Thus, plaintiff plainly cannot assert that USCIS has failed to adjudicate his application within a time period in which it was *required* to do so.").

Moreover, Joumaa's claim of unreasonable delay fails on the merits.  Joumaa initially sought reconsideration of his designation in May of 2016.  A.R. at 87-90.  At Joumaa's request, *id.* at 89-90, OFAC provided him a questionnaire to which he could respond with specific information, *id.* at 100-05.  Joumaa submitted a partial response in October of 2016, and then supplemented his response and petition in April and August of 2017, *id.* at 106-42, 397-410, 1394-1403.  Additionally, and as OFAC explained, "the review process [regarding a request for

reconsideration] can be lengthy," *id.* at 99, as it includes "careful review of the documents" submitted by SDNTs, *id.* at 1418, as well as "U.S. federal government inter-agency consultation and legal review," *id.*  OFAC's ability to respond by a date satisfactory to Joumaa is further impeded by "[t]he quantity of reconsideration cases and the complexity of these cases." *Id.* Under these circumstances, OFAC's decision cannot be properly characterized as unreasonably delayed.

But even if the decision were to be considered unreasonably delayed, Joumaa identifies no harm resulting from the length of time his petition was pending.  Any such delay therefore would amount to harmless error.  *See* 5 U.S.C. § 706 (requiring courts reviewing agency action to take "due account . . . of the rule of prejudicial error"); *Zevallos*, 10 F. Supp. 3d at 124 ("[W]hether OFAC took one month, one year, or one decade to decide his case, the length of time it took did not change the outcome for him at all . . . .").

The Court should therefore dismiss Count I of the Complaint under Rule 12(b)(1). Alternatively, the Court should dismiss Count I under Rule 12(b)(6) or enter summary judgment on Count I in Defendants' favor under Rule 56.

## II.   JOUMAA HAS FAILED TO ESTABLISH THAT OFAC'S DECISION REGARDING HIS DESIGNATION IS ARBITRARY AND CAPRICIOUS.

Joumaa does not contend that OFAC acted arbitrarily and capriciously when it designated him as a SDNT on January 26, 2011.  *See* Compl., ¶¶ 36-41.  Nor could he, as such a claim would be time-barred.  *See Harris v. FAA*, 353 F.3d 1006, 1009-10 (D.C. Cir. 2004) (explaining that, pursuant to 28 U.S.C. § 2401, challenge must be brought within six years of date of final agency action); *Zevallos*, 10 F. Supp. 3d at 129 n.16 (noting challenge to Kingpin Act designation brought after more than eight years "is likely beyond the six-year statute of limitations").  Thus, too late to contest his initial designation, Joumaa challenges the

"maintenance" of his designation and "the continued blocking of his assets" as arbitrary and capricious and in excess of OFAC's statutory authority.  Compl., ¶¶ 38-41 (citing 5 U.S.C. § 706(2)(A), § 706(2)(C)).  But as explained below, that challenge was premature and thus unreviewable, because "maintenance" and "continued blocking" do not constitute agency actions, let alone final agency actions, under the APA.  Accordingly, Joumaa's claim should be dismissed for failure to state a claim.  Further, the only decision on which Joumaa could seek review—OFAC's decision to deny Joumaa's request for removal from the SDN List—readily withstands scrutiny under the applicable APA standards; thus, if the Court were to reach the merits, it should grant summary judgment to Defendants.

### A.  Joumaa Has Not Stated A Claim For Relief Related To OFAC's "Maintenance" Of His Designation And "The Continued Blocking Of His Assets"

The APA expressly limits judicial review to "final agency action."  5 U.S.C. § 704.[5] Courts "have long recognized" that the term "agency action," while "expansive," "is not so all-encompassing as to authorize . . . judicial review over everything done" by an agency.  *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 19 (D.C. Cir. 2006).  The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. §§ 551(13), 701(b)(2).  The APA then further defines each of these categories of action.  *See id.* §§ 551(4), (6), (8), (10), (11).  Common among all categories is that they "involve circumscribed, discrete agency actions."  *SUWA*, 542 U.S. at 62; *see also Lujan*, 497 U.S. at 891 ("Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm.").

---

[5] Final agency action is not a jurisdictional requirement.  *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 184 (D.C. Cir. 2006).  Accordingly, this issue is properly resolved on a motion under Rule 12(b)(6), not Rule 12(b)(1).  *See id.* at 187.

OFAC's "maintenance" of Joumaa's designation and "the continued blocking of his assets" are not agency actions within the meaning of the APA. "[T]here is no agency decision, reasoning, or record for the Court to assess" such ongoing activities related to the implementation and enforcement of OFAC's designation. *See DTCC Data Repository (U.S.) LLC v. U.S. Commodity Futures Trading Comm'n*, 25 F. Supp. 3d 9, 18 (D.D.C. 2014) (citing *Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1133 (D.C. Cir. 2007)). Indeed, such activities are, by definition, not discrete. *See Lujan*, 497 U.S. at 890 (holding challenge to "continuing . . . operations of agency," as with a challenge to a DEA "drug interdiction program," did not sufficiently identify an agency action for APA review); *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (stating that, under the APA, a plaintiff may challenge "a single step or measure" but not "an on-going program or policy"); *Fund for Animals*, 460 F.3d at 20 ("activities that comprise the common business of managing government programs" are not final agency actions); *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (APA "requires more" than "amorphous description of [agency's] practices"); *Banner Health v. Sebelius*, 797 F. Supp. 2d 97, 110 (D.D.C. 2011) ("Plaintiffs' vague and non-specific allegations challenging the Secretary's overall 'implementation' and 'enforcement' of the outlier payment system plainly 'lack the specificity requisite for agency action.'") (quoting *SUWA*, 542 U.S. at 66); *Cal. Sportfishing Prot. All. v. U.S. Bureau of Reclamation*, No. 115CV00912, 2015 WL 6167521, at *6 (E.D. Cal. Oct. 20, 2015) (concluding agency's implementation of orders approving petitions was not agency action).

The flaw in Joumaa's argument stands in even sharper relief when taken to its logical end. By Joumaa's reasoning, OFAC must continually update its repository of information about

every individual on the SDN List—which spans more than 1,100 pages[6]—and constantly

reevaluate and justify every one of its designation decisions.  Such a theory overlooks the limited

resources of OFAC and the agencies from which it gathers information; controverts OFAC's

established procedures governing removal requests, *see* 31 C.F.R. § 501.807 (placing the burden

on the SDNT to establish that removal from the SDN List is warranted); and, most importantly,

amounts to a "broad programmatic attack" on OFAC's administration of sanctions, which the

APA does not permit, *see SUWA*, 542 U.S. at 64; *see also Lujan*, 497 U.S. at 891 (explaining

that "respondent cannot seek wholesale improvement of this program by court decree, rather than

in the offices of the Department or the halls of Congress, where programmatic improvements are

normally made"); *Vill. of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186, 194

(4th Cir. 2013) (holding "performance in maintaining [project] was not action that was

circumscribed and discrete," and explaining that a court is "obvious[ly]" unable "to function in []

a day-to-day managerial role over agency operations").

Even if the Court were to conclude that the "maintenance" of Joumaa's designation and

"the continued blocking of his assets" constitute agency actions under the APA, Joumaa has

nonetheless failed to state a claim for two additional reasons.  First, the continued listing and

blocking are functions of the congressionally enacted Kingpin Act.  *See* 21 U.S.C. § 1904(b)

(stating that "there are blocked . . . all such property and interests in property within the United

States, or within the possession or control of any United States person, which are owned or

controlled by" a designated person).  Accordingly, while OFAC may be responsible for the

initial decision to designate Joumaa, "Congress has spelled out the legal effect."  *Cf. Sprint*

---

[6] *See* Specially Designated Nationals and Blocked Persons List, available at
https://www.treasury.gov/ofac/downloads/sdnlist.pdf (last visited March 8, 2018).

*Nextel Corp.*, 508 F.3d at 1132.  The consequences of Joumaa's designation are thus attributable to action by Congress, not OFAC, and so are not agency actions for purposes of APA review. *See id.*

Second, even if Joumaa's challenge implicated agency action, and even if that action were attributable to OFAC, Joumaa has failed to establish the finality of that action as required by 5 U.S.C. § 704.   Pursuant to the APA, agency action is not final unless it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1026-27 (D.C. Cir. 2016) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  OFAC acknowledges that it completed its decisionmaking processes—and therefore engaged in final agency action—on January 26, 2011 and March 2, 2018, when it designated Joumaa as a SDNT and denied his request for reconsideration, respectively.  *See* A.R. at 16-17, 23-24, 1612-14.  But Joumaa's insistence that each moment between those actions, i.e., the "maintenance" of his designation and "the continued blocking of his assets," constitutes a separate final agency action subject to judicial review, *e.g.*, Compl., ¶ 38, not only renders the finality requirement meaningless, but also cannot be reconciled with OFAC's consideration of requests for removal, *see Perrigo Research & Dev. Co. v. U.S. FDA*, No. CV 17-2517 (ABJ), 2017 WL 6017349, at *8 (D.D.C. Dec. 1, 2017) ("When the agency gives an indication that its decision is subject to further consideration or possible modification, its action is not final."); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003) (conducting investigation is not final agency action).

Thus, Joumaa has not established that OFAC's "maintenance" of his designation and "the continued blocking of his assets" constitute final agency actions subject to judicial review, and the Court should therefore dismiss his claims based on those theories pursuant to Rule 12(b)(6).

### B.      OFAC's Decision Not to Delist Joumma Is Not Arbitrary And Capricious

When evaluating claims brought pursuant to the APA, a court reviews an agency decision based on the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)).  A court should uphold an agency decision unless it is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law."  5 U.S.C. § 706(2).

Under this deferential standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park*, 401 U.S. at 416.  An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).  The court may not "substitute its judgment for that of the agency."  *Id*.  Rather, the agency's decision should be affirmed as long as it is supported by a rational basis.  *Id.*; *see also Zevallos*, 10 F. Supp. 3d at 118-19.

This deference is further heightened in cases, such as this one, that involve national security and foreign affairs.  Indeed, the Supreme Court has emphasized the need for courts to grant this heightened deference even when considering constitutional claims; such deference is required because courts should respect the Executive's expertise in the national security and foreign policy arenas.  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010).  Cases involving blocking orders, whether issued under the Kingpin Act or IEEPA, are no exception. *Zevallos*, 10 F. Supp. 3d at 119 (recognizing additional deference beyond that typically accorded to an agency under the APA); *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) ("courts owe a substantial measure of 'deference to the political branches in matters of foreign policy,' including cases involving blocking orders") (citation omitted); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference.").

Applying the highly deferential standard of review required by the APA and the national security and foreign policy nature of Joumaa's SDNT designation, the Court should, if it reaches the merits, uphold the only potentially reviewable agency action—OFAC's decision to deny Joumaa's request for removal from the SDN List.  The administrative record fully supports OFAC's conclusion that he continues to warrant SDNT designation.[7]

The March 2, 2018 decision explains that Joumaa should remain on the SDN List because, based on the information available to OFAC, including classified and law enforcement

---

[7] To reiterate, Joumaa does not, and cannot, seek to challenge his 2011 designation under the APA as the claim is time-barred.

sensitive information, he continues to meet the criteria for designation under the Kingpin Act. A.R. at 1-21; *see also* 1612-14, 1617.  Contrary to Joumaa's claim regarding the "absence of contemporary evidence," Compl., ¶ 40; *see also id.* ¶¶ 38-39, OFAC's conclusion is entirely consistent with the evidence before the agency, *see State Farm*, 463 U.S. at 43.  For example, the agency found that Joumaa, subsequent to his designation, "is associated with a designated SDNT individual in the pick up of bulk drug proceeds in Europe to launder to Colombia"; "oversees money laundering operations between Lebanon, Colombia, and Venezuela"; and "is noted to currently be the leader of a group of money launderers."  A.R. at 1617.

OFAC's decision also took due account of the documents and arguments submitted by Joumaa, as well as his responses to the questionnaire provided by OFAC.  As to Joumaa's claims that he has never been involved in narcotics trafficking or money laundering, OFAC found such denials lack credibility.  *Id.* at 4-7; *see also id.* at 1617.  Supporting OFAC's determination were the affidavit in support of Joumaa's arrest and complaint, as well as the criminal indictment against him, which detailed, through multiple sources, the methods, locations, and amounts of Joumaa's illicit activities.  *Id.* at 5-7, 69-83; *see Zevallos*, 10 F. Supp. 3d at 122 (holding that OFAC's denial decision was based on substantial evidence, and observing that the agency relied on an indictment in the U.S. District Court for the Southern District of Florida for, *inter alia*, money laundering).

OFAC likewise determined that Joumaa's statements about the nature and extent of prior relationships with other SDNTs lacked credibility.  A.R. at 9-12.  For example, Joumaa admitted that he had "a business relationship with Pedro Claver Mejia Salazar," but he did not acknowledge that he worked with Mejia as part of Mejia's global drug money laundering operation, *id.* at 9-11, 113, 1613, 1617; *see also id.* at 131, 139.

24

The agency also took into account, and reasonably rejected, the various arguments made by Joumaa concerning the date and reliability of OFAC's evidence, as well as the supposed "danger of a mistaken designation." *Id.* at 14, 1613; *see also id.* at 138-40. OFAC's fact finding followed its standard practice, which prior decisions in this Circuit have upheld against similar challenges,[8] and Joumaa's arguments failed "to impugn the accuracy and integrity" of that process. *Id.* at 14, 1613. Nor was there any basis to suggest that Joumaa's designation was due to a case of mistaken identity. *Id.* at 14, 1613.

Further, OFAC considered the numerous documents submitted by Joumaa in support of his request for reconsideration. *Id.* at 14-16, 1613; *see also id.* at 1615 n.1 (explaining OFAC's review of translated and untranslated materials). The agency reasonably determined, however, that those documents were insufficient to demonstrate that Joumaa's removal from the SDN List is warranted. *See id.* On the one hand, OFAC accepted, for purposes of deciding Joumaa's request, that the operations of or Joumaa's relationship to the Hassan Ayash Exchange Company, the New Line Exchange Trust Co., and Goldi Electronics S.A. ceased after his designation. *Id.* at 15, 1613 n.1. OFAC also credited a report prepared by the Banking Control Commission, which purportedly found that the New Line Exchange Trust Co. appeared to comply with certain anti-money laundering provisions. *Id.* at 16 n.34, 1613.

---

[8] *E.g., Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003) (rejecting challenge to OFAC's use of hearsay evidence); *Zevallos*, 10 F. Supp. 3d at 123 n.9 (finding unpersuasive plaintiff's argument that "OFAC relied on outdated, biased, and incredible sources"; plaintiff "made these arguments to OFAC, [] OFAC concluded that the evidence before it was credible, [and] [i]t is not the province of this Court to reweigh the evidence and reconsider [plaintiff's] arguments on appeal"); *Kadi*, 42 F. Supp. 3d at 13-23 (holding OFAC's designation was supported by substantial evidence, notwithstanding plaintiff's argument that "the evidence underlying OFAC's decision is unreliable").

25

However, any operations (or lack thereof) of the Hassan Ayash Exchange Company and the New Line Exchange Trust Co. subsequent to Joumaa's designation do not rebut the specific evidence available to OFAC establishing that Joumaa previously used these entities to launder narcotics proceeds.  *Id.* at 15-16, 1613; *see also id.* at 1617.  Additionally, Joumaa did not submit any independent reports concerning anti-money laundering measures implemented by the Hassan Ayash Exchange Company or the Ellissa Exchange Company.  *Id.* at 16, 1613.  Indeed, Joumaa did not even attempt to submit documents to rebut all the allegations concerning the Ellissa Exchange Company or other aspects of Joumaa's vast drug trafficking and money laundering network, including those outside of Lebanon and those not involving business entities.  *Id.* at 15, 1613.

Given the absence of such rebuttal evidence, and in light of the information otherwise available to OFAC, the agency's decision to deny Joumaa's request for reconsideration readily satisfies the highly deferential APA standard that the Court must apply.  *See Zevallos*, 10 F. Supp. 3d at 123 n.9 (explaining court must uphold OFAC's decision if "the evidence OFAC relied upon as a whole 'adequately supports its ultimate decision'") (quoting *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010)).  Moreover, the evidence bears on facts that Congress expressly intended the agency to consider.  *See Citizens to Preserve Overton Park*, 401 U.S. at 416; *Zevallos*, 10 F. Supp. 3d at 122 (noting Kingpin Act's broad definition of "narcotics trafficking" and concluding that "evidence pointing to both Mr. Zevallos's involvement with drug trafficking itself, as well as his connection to the laundering and management of assets tied to drug trafficking (including his own prior drug trafficking), both . . . formed a rational basis for OFAC's decision").  Accordingly, there is no basis to conclude

26

that OFAC's denial decision is arbitrary and capricious under 5 U.S.C. § 706(2)(A) or in excess of statutory authority under 5 U.S.C. § 706(2)(C).

The Court should therefore dismiss Joumaa's claims regarding the "maintenance" of his designation and "the continued blocking of his assets" under Rule 12(b)(6) or, alternatively, grant Defendants summary judgment on these claims under Rule 56.[9]

## III.    OFAC'S DESIGNATION OF JOUMAA ACCORDS WITH DUE PROCESS.

Joumaa alleges that OFAC infringed upon his Fifth Amendment right to due process by inadequately notifying him of and explaining the basis for maintaining his designation, as well as by not deciding his request for reconsideration within a reasonable time.  Compl., ¶ 45.  He similarly invokes the APA to challenge the process he received.  *Id.* ¶ 44; *see id.* ¶ 39 (arguing that the Court should set aside the designation under 5 U.S.C. § 706(2)(B), because OFAC's "maintenance of his designation and the continued blocking of his assets violates [sic] Plaintiff's due process rights"), ¶ 41 (alleging that the "maintenance of Plaintiff's designation . . . and the continued blocking of his assets is [sic] without observance of procedure required by law[,] 5 U.S.C. § 706(2)(D), as Plaintiff has been denied an effective opportunity to respond to the allegations leveled against him in support of his designation under the Kingpin Act").

Joumaa's arguments are without merit.  First, as a foreign person without substantial contacts with the United States, Joumaa does not have standing to assert any constitutional

---

[9] If the Court were to find to the contrary, under the APA the proper remedy would be remand to the agency, and not an order directing Defendants to rescind the SDNT designation as Joumaa asserts, Compl., Relief Requested.  *See, e.g.*, *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal.").

rights.  Second, whether viewed in the context of the Fifth Amendment or the APA, the notice

provided by OFAC accords with any process that Joumaa may be due.

### A.        Joumaa Does Not Having Standing To Assert Constitutional Rights

"[N]on-resident aliens who have insufficient contacts with the United States are not

entitled to Fifth Amendment protections."  *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004);

*accord Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950).  A limited exception may apply when

aliens "have come within the territory of the United States and developed substantial connections

with this country."  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).  Although the

D.C. Circuit has not directly addressed substantial connection claims within the context of an

OFAC narcotics sanctions case, the Circuit's discussion of the issue in Foreign Terrorist

Organization ("FTO") cases is instructive.  *Cf. Kadi*, 42 F. Supp. 3d at 25-26.  In the FTO case

*National Council of Resistance of Iran v. Department of State*, the D.C. Circuit concluded that

two Iranian organizations could bring a due process challenge because they had an "overt

presence within the National Press Building in Washington, D.C." and a "claim[] [of] an interest

in a small bank account."  251 F.3d 192, 201 (D.C. Cir. 2001).  Conversely, in *32 County*

*Sovereign Committee v. Department of State*, the D.C. Circuit rejected the petitioners' claim to

constitutional rights where they "demonstrated neither a property interest nor a presence in this

country."  292 F.3d 797, 799 (D.C. Cir. 2002).

Here, Joumaa is a foreign national, and the Complaint alleges neither a physical presence

in the United States nor a substantial connection between him and this country.  *See* Compl.,

¶ 12.  While Joumaa claims that "certain of [his] assets are indeed blocked in the United States,"

*id.* at 9 n.7, this allegation is insufficient to demonstrate that he is entitled to due process

protections, *see Verdugo-Urquidez*, 494 U.S. at 271.  Further, the Complaint is wholly without

supporting details as to what these assets are and whether they are actually owned by Joumaa, as well as any facts demonstrating that the asset freezing is a result of the Kingpin Act designation. *See generally* Compl.  Accordingly, Joumaa has not set forth a basis for this Court to apply the Fifth Amendment, particularly in the context of a summary judgment motion.  *See Conant*, 60 F. Supp. 3d at 107 ("Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.") (citing *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009)).

Because Joumaa has not demonstrated standing to assert any rights under the Constitution, the Court should dismiss his Fifth Amendment claim for lack of subject-matter jurisdiction.

**B.      Joumaa's Fifth Amendment Due Process Argument Fails On The Merits**

In the event the Court were to find that Joumaa has standing to assert a Fifth Amendment claim, it should nevertheless hold that OFAC's disclosures satisfy due process.  "The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'"  *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). When viewed through the lens of the Fifth Amendment, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands."  *Gilbert v. Homar*, 520 U.S. 924, 930 (1997).  In the context of OFAC's designation of a SDNT—where, as the D.C. Circuit has held, pre-deprivation notice is not required, *Zevallos*, 793 F.3d at 116—due process mandates only that OFAC provide Joumaa with "a basis from which to understand his designation, and thereby offer rebuttal arguments and evidence in response."  *Zevallos*, 10 F. Supp. 3d at 131; *see also Fares*, 249 F. Supp. 3d at 125-28 (holding that "the total body of information provided by OFAC to Plaintiffs"—which included the redacted administrative

29

record, press release, and non-privileged summaries of law enforcement sensitive information—

"satisfied due process").[10]

Here, OFAC's disclosures gave Joumaa sufficient notice of the agency fact findings

underlying his 2011 designation, as well as a meaningful opportunity to rebut those findings.

Contrary to Joumaa's claim that the facts underlying his designation "remain obscured to him

and [his] counsel," Compl., ¶ 25, OFAC described not only the illicit activities undertaken by

Joumaa, *see* A.R. at 67 ("Joumaa has coordinated the transportation, distribution, and sale of

multi-ton shipments of cocaine from South America and has laundered the proceeds from the

sale of cocaine in Europe and the Middle East"); *see also id.* at 34, 36; but also the specific

methods Joumaa used to launder these proceeds, *id.* at 67 (describing "bulk cash smuggling

operations and Lebanese exchange houses"), 27 ("The export of vehicles . . . was a method used .

. . ."); *see also id.* at 36.  OFAC's disclosures further detail the geographic extent of Joumaa's

operations, *id.* at 36 ("Lebanon, West Africa, Panama and Colombia"), 27 (Joumaa exported cars

"from the United States to West Africa"); as well as a location used to "broker drug trafficking

and money laundering activities," *id.* at 67 (Caesar's Park Hotel).  Additionally, OFAC specified

the amount of money laundered by Joumaa and his organization, *id.* at 67 ("as much as $200

million per month"), 27 ("hundreds of millions of dollars"); the identities of Joumaa's criminal

---

[10] Joumaa does not contend that OFAC cannot rely on classified or law enforcement sensitive information.  He does, however, imply that he is entitled to receive such information.  *See* Compl., Relief Requested (requesting order requiring Defendants "to disclose to Plaintiff any and all information" concerning designation).  He is not.  *Zevallos*, 793 F.3d at 113 (explaining that "the safety of investigators or informants might be put at hazard were their testimony made available as part of the administrative record"); *Kadi*, 42 F. Supp. 3d at 10, 23-24 (rejecting argument that plaintiff could not respond to motion for summary judgment without access to classified record); *see also Jifry*, 370 F.3d at 1183-84; *Fares*, 249 F. Supp. 3d at 128-29.

associates and front companies, *id.* at 66-67; as well as his relationship to these persons as "the leader" of a drug trafficking and money laundering organization, *id.* at 27, 66-67.

These disclosures alone are sufficient, but any doubt as to the adequacy of the notice provided to Joumaa is removed by the additional unclassified summary produced to Joumaa on March 9, 2018.  In that summary, OFAC provided additional detail as to the locations, methods, and amounts of Joumaa's illicit activities.  *Id.* at 1617.  For instance, OFAC described the use of the Hassan Ayash Exchange Company and the Ellissa Exchange Company in his money laundering operations, linking those entities to Joumaa's "transfer [of] funds derived from the proceeds of drug trafficking to the United States through various used car dealerships."  *Id.*; *see id.* ("Vehicles are subsequently purchased and shipped to the Middle East.").  The agency also discussed a specific transaction in or around 2007 involving "a pickup of 100,000 euros in France."  *Id.*  Additionally, OFAC explained that Joumaa "was involved in laundering drug proceeds by smuggling cashier's checks into Lebanon.  The checks were payments for loads of cocaine smuggled into Lebanon.  The drugs were traced back to Maicao, Colombia."  *Id.*

To the extent the Fifth Amendment applies to such a decision, OFAC has likewise provided adequate notice of the basis for its denial of Joumaa's request for reconsideration. OFAC's letter dated March 2, 2018 explains the reasons for OFAC's conclusion that Joumaa has failed to establish an insufficient basis for the designation or that circumstances have changed such that the designation is no longer warranted.  *Id.* at 1612-14; *see* 31 C.F.R. § 501.807. OFAC first stated that it did not find credible Joumaa's claim that he is not currently involved in narcotics trafficking.  A.R. at 1612.  OFAC also explained Joumaa's "designation was based on reliable and corroborated information that he led a drug trafficking and money laundering organization moving hundreds of millions of dollars in narcotics proceeds from the United States

31

to Lebanon." *Id*.  OFAC additionally cited the 2011 indictment against Joumaa and the affidavit

in support of Joumaa's arrest and criminal complaint—with its accompanying details regarding

the methods, amounts, and locations of Joumaa's illicit activities—as further evidence in support

of the agency's conclusion.  *Id*.  OFAC also determined that Joumaa's responses regarding his

relationship to previously designated SDNTs—including Pedro Mejia Salazar and his sons—

lacked credibility.  *Id.* at 1613.

OFAC then described the reasons that the documents submitted by Joumaa were

insufficient to demonstrate that Joumaa's removal from the SDN List is warranted.  *Id.*

Crediting Joumaa's claims regarding the operations of, or his involvement with, certain

designated entities, as well as a report from the Banking Control Commission concerning anti-

money laundering controls in place at one of those entities, OFAC nevertheless explained that

the submitted documents failed to rebut OFAC's evidence regarding these entities and also

neglected to address other aspects of Joumaa's activities that resulted in his designation.  *Id.*

Finally, OFAC addressed Joumaa's remaining arguments about the supposed potential that

Joumaa's designation was based on a mistake of identity, as well as the reliability of OFAC's

evidence.  *Id.*  OFAC explained that both arguments are unpersuasive.  *Id.*

Bolstering these disclosures, OFAC has also produced to Joumaa the redacted

administrative record on which its denial decision was based, as well as a non-privileged and

unclassified summary of otherwise privileged information.  *Id.* at 1615-17.  These documents

further detail why Joumaa continues to warrant SDNT designation.  For example, the

administrative record addresses at length Joumaa's challenge to the reliability of OFAC's

evidence.  *Id.* at 12.  It also discusses information submitted by Joumaa concerning certain

Lebanese legal proceedings, and explains why the conclusion reached by a Lebanese panel does

not affect OFAC's determination.  *Id.* at 13.  With respect to the unclassified summary, OFAC

provided information as to the methods of Joumaa's illicit activities, *id.* at 1617 (including

"money pick-ups," "pick up of bulk drug proceeds," "utiliz[ing] a shipping company," and

"mov[ing] cars from the U.S. to Europe and Africa"); as well as their location, *id.* (Europe,

Colombia, Lebanon, Venezuela, Africa, and the United States); dates, *id.* (July 2011 through

November 2016); amounts, *id.* ($200 million per month); and Joumaa's role, *id.* (Joumaa "is

noted to currently be the leader of a group of money launderers").

These disclosures more than satisfy due process, as Joumaa has "been apprised . . . of the

government's view regarding the basis for [his] designation[], and as such, can meaningfully

'proffer rebuttal evidence and arguments to OFAC to contest [his] designation[].'"  *Fares*, 249 F.

Supp. 3d at 127 (quoting *Zevallos*, 10 F. Supp. 3d at 131).  Indeed, Joumaa's submissions to

OFAC, including initial and supplemental responses to OFAC's request for information, only

confirm that he was able to challenge the basis of OFAC's designation and submit additional

evidence and arguments for OFAC's consideration.  *Cf. Kadi*, 42 F. Supp. 3d at 29 (noting that

designated individual was able to rebut evidence "through his own submissions to OFAC,"

including in response to requests for information).  "That OFAC did not ultimately agree with

[Joumaa's] characterization of the evidence against him does not mean that he was not provided

with due process."  *Zevallos*, 10 F. Supp. 3d at 129-30.

Joumaa's remaining arguments regarding due process are unpersuasive.  First, Joumaa

complains that "[t]he redacted version of the evidentiary memorandum [regarding his initial

designation] contained even less detail than that released in OFAC's press statement at the time

of Plaintiff's designation."  Compl., ¶ 27.  But OFAC redacted information from the evidentiary

memorandum because it contained classified and law enforcement sensitive information (as well

as irrelevant information), A.R. at 26, and OFAC's press release, along with the press chart and non-privileged and unclassified summaries of otherwise privileged information, complements the evidentiary memorandum by providing additional notice to Joumaa regarding the basis for his designation. *See Fares*, 249 F. Supp. 3d at 125-28.

Second, Joumaa contends that "to the extent that OFAC has indeed taken steps to supplement the administrative record, OFAC has failed to disclose any such supplemental information or allegations to Plaintiff so as to permit him adequate notice of the basis for OFAC's maintenance of his designation and a meaningful opportunity to respond to that supplemental information as part of the reconsideration process." Compl., ¶ 28. This argument fails on multiple grounds. As an initial matter, and as explained above, OFAC does not—and is not required to—"supplement the administrative record" with respect to each of its designations; rather, once it receives a request for reconsideration, the agency evaluates the request in light of currently available information. *See* 31 C.F.R. § 501.807. Further, the premises underlying Joumaa's claim—that maintaining a designation is a deprivation, that OFAC must continually update its information regarding SDNTs, and those SDNTs are entitled to receive such information on a rolling basis—are unsupported by any requirement of procedural due process and therefore fail to establish a claim under the Fifth Amendment. Indeed, in light of the resources required to implement the system imagined by Joumaa, it is difficult to discern how such a set of requirements could survive the Supreme Court's test in *Mathews v. Eldridge*. *See* 424 U.S. 319, 335 (1976) (instructing that courts must consider "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail"). Moreover, OFAC has provided Joumaa with the reasons for denying his request for reconsideration, and as discussed above those reasons

provide ample notice regarding the basis of the agency's decision.  Thus, even if the Court were to conclude that OFAC should have provided the more recent materials to Joumaa before issuing its decision, any error is harmless.  *See Zevallos*, 793 F.3d at 117.

Third, Joumaa states that OFAC has violated his Fifth Amendment rights "by failing to render a decision on [his] reconsideration case in a reasonable period of time."  Compl., ¶ 45. For the reasons explained above, however, the timing of OFAC's decision was eminently reasonable.  Additionally, the D.C. Circuit rejected an almost identical argument in *Zevallos*. 793 F.3d at 117.  As the court explained in that case, such a challenge turns on whether OFAC promptly provided a SDNT with an unclassified administrative record, and whether OFAC allowed the SDNT to respond.  *Id.*  Here, OFAC provided Joumaa the administrative record regarding his initial designation only five months after it was requested and allowed him to respond (and supplement his response).  *See* A.R. at 26, 92-98, 106-42, 397-410, 1394-1403; *compare Zevallos*, 10 F. Supp. 3d at 131 (providing record six months after request did not violate due process).  Accordingly, this case is unlike the out-of-Circuit cases on which Joumaa has relied in his correspondence to OFAC asserting a Fifth Amendment violation, *see* A.R. at 94. *Contrast Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 984-85 (9th Cir. 2012) (finding that OFAC "refus[ed] to disclose its reasons for investigating and designating [the petitioner], leaving [the petitioner] unable to respond adequately to the agency's unknown suspicions"); *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857, 904 (N.D. Ohio 2009) (finding that the petitioner was "largely uninformed about the basis for the government's actions"); *see Zevallos*, 793 F.3d at 117 ("Unlike the petitioners in *Al Haramain* and *KindHearts* who never fully understood why they had been designated, Zevallos was fully equipped to rebut Treasury's rationale.").  Further, and as explained above, any error

35

associated with the timing of OFAC's decision would ultimately be harmless.  *See Zevallos*, 793

F.3d at 117.

Because OFAC adequately informed Joumaa of the basis for his designation, as well as

the basis for the denial of his request for reconsideration, his claimed Fifth Amendment violation

fails.  Thus, even if the Court were to reach the merits of this issue, Defendants would be entitled

to summary judgment.

### C.       OFAC Has Provided Joumaa A Reasoned Explanation For Its Decision

The APA requires an agency to "'examine the relevant data and articulate a satisfactory

explanation for its action including a rational connection between the facts found and the choice

made' to allow [a reviewing court] to evaluate the agency's decision-making process." *Nat'l*

*Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (quoting *State Farm*,

463 U.S. at 43).  The procedural requirements for reasoned decisionmaking vary depending on

the agency action involved.  *See Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 548

(1978)).  Further, a court must "uphold a decision of less than ideal clarity if the agency's path

may reasonably be discerned."  *Nat'l Shooting Sports Found.*, 716 F.3d at 214 (quoting *State*

*Farm,* 463 U.S. at 43).

Invoking § 706(2)(B) and § 706(2)(D) of the APA, Joumaa raises two arguments

contesting the adequacy of OFAC's explanation of the "maintenance" of his designation.  Both

are without merit.  First, Joumaa's claim under § 706(2)(B), which allows a court to set aside

agency action "contrary to constitutional right, power, privilege, or immunity," relies on the

same argument as his claim under the Fifth Amendment, *compare* Compl., ¶ 39 *with id.* ¶¶ 44-

45, and fails for the same reasons.  It also fails because, as described above, OFAC's

"maintenance" of a designation and "the continued blocking of [] assets" are not final agency actions subject to judicial review under the APA.

Second, with respect to his claim under § 706(2)(D), which permits a court to set aside agency action "without observance of procedure required by law," Joumaa contends that he "has been denied an effective opportunity to respond to the allegations leveled against him in support of his designation under the Kingpin Act." Compl., ¶ 41. It is unclear which purportedly required procedure or law Joumaa is referencing. Regardless, Joumaa has failed to state a claim for relief, as he has not demonstrated that the challenged activities—the "maintenance" of his designation and "the continued blocking of his assets," *id.*—are final agency actions subject to judicial review. Further, as discussed above, Joumaa received more than adequate notice of the basis for his designation and the subsequent denial of his request for reconsideration, and, in light of the correspondence he has submitted, he can hardly complain that he has been denied an opportunity to respond to OFAC's decision to designate him as a SDNT. *See* A.R. at 90-98, 106-42, 397-410, 1394-1408; *cf. Zevallos*, 10 F. Supp. 3d at 131 ("Mr. Zevallos's meaningful opportunity to be heard is further evidenced by the 2009 questionnaire OFAC sent to him in response to his renewal of his reconsideration request, and his opportunity to respond to that."); *Kadi*, 42 F. Supp. 3d at 29 ("Kadi's opportunity to be meaningfully heard is evidenced by the extensive submissions he made to challenge his continued designation."). Moreover, Joumaa's argument under 5 U.S.C. § 706(2)(D) fails because he cannot demonstrate that any error was prejudicial. *See Zevallos*, 739 F.3d at 114-15.

The Court should therefore dismiss Joumaa's claims under 5 U.S.C. § 706(2)(B) and § 706(2)(D) pursuant to Rule 12(b)(6) or, in the alternative, grant summary judgment in favor of Defendants pursuant to Rule 56.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss or, in the

alternative, for summary judgment, and enter judgment in favor of Defendants on all claims.

Dated March 9, 2018                    Respectfully submitted,

                                       CHAD A. READLER
                                       Acting Assistant Attorney General

                                       JOHN R. GRIFFITHS
                                       Branch Director

                                       DIANE KELLEHER
                                       Assistant Branch Director

                                       */s/Stuart J. Robinson*
                                       STUART J. ROBINSON
                                       Trial Attorney
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       450 Golden Gate Ave.
                                       San Francisco, CA 94102
                                       Tel: (415) 436-6635
                                       Fax: (415) 436-6632
                                       Email: stuart.j.robinson@usdoj.gov
                                       Cal. Bar No. 267183

                                       Counsel for Defendants