**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AYMAN SAIED JOUMAA,

Plaintiff,

v.

STEVEN MNUCHIN, *et al.*,

Defendants.

Civil Action No. 17-2780 (TJK)

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION .......... 1

BACKGROUND .......... 2

A. Statutory Background .......... 2

B. Factual Background .......... 5

1. OFAC's Initial Designation of Joumaa .......... 5

2. Joumaa's Indictment .......... 6

3. Joumaa's Delisting Request .......... 8

4. OFAC's Denial of Joumaa's Delisting Request .......... 9

C. Plaintiff's First Amended Complaint .......... 12

LEGAL STANDARDS OF REVIEW .......... 13

DISCUSSION .......... 14

I. JOUMAA HAS FAILED TO ESTABLISH THAT OFAC'S DECISION DENYING HIS DELISTING REQUEST IS ARBITRARY AND CAPRICIOUS. .......... 14

II. OFAC'S DENIAL OF JOUMAA'S DELISTING REQUEST ACCORDS WITH DUE PROCESS. .......... 23

A. Joumaa Does Not Have Standing To Assert Constitutional Rights .......... 24

B. Joumaa's Fifth Amendment Due Process Argument Fails On The Merits .......... 25

C. OFAC Has Not Arbitrarily And Capriciously Deprived Joumaa Of His Property .......... 31

CONCLUSION .......... 31

## TABLE OF AUTHORITIES

**CASES** **PAGE**

*32 County Sovereign Committee v. Department of State*,
292 F.3d 797 (D.C. Cir. 2002) .......... 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 13

*Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*,
564 F.3d 462 (D.C. Cir. 2009) .......... 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 13

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971) .......... 15, 19

*Conant v. Wells Fargo Bank, N.A.*,
60 F. Supp. 3d 99 (D.D.C. 2014) .......... 14, 25

**Fares v. Smith*,
249 F. Supp. 3d 115 (D.D.C. 2017), *appeal filed*,
No. 17-5075 (D.C. Cir. April 17, 2017) .......... 26, 30

*Fla. Gas Transmission Co. v. FERC*,
604 F.3d 636 (D.C. Cir. 2010) .......... 19

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) .......... 15

*Gilbert v. Homar*,
520 U.S. 924 (1997) .......... 26

*Harris v. FAA*,
353 F.3d 1006 (D.C. Cir. 2004) .......... 14

*Hinton v. Corr. Corp. of Am.*,
624 F. Supp. 2d 45 (D.D.C. 2009) .......... 13

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .......... 16

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) .......... 16

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
333 F.3d 156 (D.C. Cir. 2003)........................................................................................ 18

*Jifry v. FAA*,
370 F.3d 1174 (D.C. Cir. 2004) ............................................................................... 24, 26

*Johnson v. Eisentrager*,
339 U.S. 763 (1950)........................................................................................................ 24

**Kadi v. Geithner*,
42 F. Supp. 3d 1 (D.D.C. 2012)............................................................................. *passim*

*Khadr v. United States*,
529 F.3d 1112 (D.C. Cir. 2008)...................................................................................... 13

*Mathews v. Eldridge*,
424 U.S. 319 (1976)................................................................................................... 25, 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........................................................................................ 15, 16, 17, 22

*N. Air Cargo v. U.S. Postal Serv.*,
674 F.3d 852 (D.C. Cir. 2012)........................................................................................ 23

*National Council of Resistance of Iran v. Department of State*,
251 F.3d 192 (D.C. Cir. 2001) ....................................................................................... 24

*Nat'l Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013)........................................................................................ 22

*New Life Evangelistic Ctr., Inc. v. Sebelius*,
753 F. Supp. 2d 103 (D.D.C. 2010)................................................................................ 21

*Prisology v. Fed. Bureau of Prisons*,
74 F. Supp. 3d 88 (D.D.C. 2014), *aff'd*, 852 F.3d 1114 (D.C. Cir. 2017) ...................... 13

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990)................................................................................................... 24, 25

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
750 F. Supp. 2d 150 (D.D.C. 2010) ............................................................................... 16

*Zevallos v. Obama*,
793 F.3d 106 (D.C. Cir. 2015)................................................................................... 14, 26

**Zevallos v. Obama*,
10 F. Supp. 3d 111 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015)........................ *passim*

**STATUTES**

5 U.S.C. § 706 ........ *passim*

21 U.S.C. § 1901 ........ 2, 3

21 U.S.C. § 1903 ........ 4

21 U.S.C. § 1904 ........ 4, 5, 20

21 U.S.C. § 1907 ........ 4

28 U.S.C. § 2401 ........ 14

50 U.S.C. §§ 1701-1707 ........ 2

**REGULATIONS**

31 C.F.R. § 501.807 ........ 5, 28

31 C.F.R. § 598.314 ........ 4

31 C.F.R. § 598.803 ........ 4

**RULES**

Fed. R. Civ. P. 12 ........ 13, 14, 31

Fed. R. Civ. P. 56 ........ 14, 31

Local Civ. R. 7 ........ 9

**UNITED STATES CONSTITUTION**

U.S. CONST. amend. V ........ 12

**OTHER AUTHORITIES**

Delegation of Functions Under the Foreign Narcotics Kingpin Designtion Act,
80 Fed. Reg. 29,201 (May 15, 2015) ........ 4

Exec. Order No. 12,978,
60 Fed. Reg. 54,579 (Oct. 21, 1995) ........ 3

H.R. Rep. No. 106-457 (Nov. 9, 1999), *as reprinted in* 1999 U.S.C.C.A.N. 304 ........ 2, 3

## INTRODUCTION

As the leader of an international criminal network, Plaintiff Ayman Saied Joumaa ("Joumaa") coordinated multi-ton shipments of cocaine from South America and laundered hundreds of millions of dollars in narcotics proceeds through a variety of channels, from exchange houses in Lebanon to bulk cash smuggling in Mexico to the export and sale of used vehicles in West Africa. Following an investigation that uncovered his large-scale narcotics trafficking and money laundering activities, the Office of Foreign Assets Control ("OFAC") designated Joumaa as a Specially Designated Narcotics Trafficker ("SDNT") pursuant to the Foreign Narcotics Kingpin Designation Act ("Kingpin Act") on January 26, 2011. Later that year, Joumaa was also indicted in the U.S. District Court for the Eastern District of Virginia on two counts for his role in narcotics distribution and money laundering.

In May of 2016, Joumaa requested that OFAC reconsider his designation and remove him from the list of Specially Designated Nationals and Blocked Persons ("SDN List"). Categorically denying that he has ever been involved in narcotics trafficking or money laundering, Joumaa claimed that OFAC lacked a sufficient basis to designate him in 2011. Alternatively, he argued that OFAC lacks current information to justify his continued designation. After Joumaa filed this lawsuit, OFAC denied his delisting request based on its determination that Joumaa continues to meet the criteria for designation under the Kingpin Act and thus should remain on the SDN List.

Joumaa remains a fugitive from the charges pending against him in the Eastern District of Virginia. Nevertheless, invoking the Administrative Procedure Act ("APA") and the Fifth Amendment to the Constitution, he now seeks to avail himself of the authority of this Court in order to contest OFAC's denial of his delisting request. But Joumaa's conclusory denials of

narcotics trafficking or money laundering do nothing to undermine the reasonableness of OFAC's decision, which is fully supported by the administrative record. Moreover, even if Joumaa had standing to assert rights under the Fifth Amendment—which he does not—the various disclosures provided by OFAC more than adequately apprise him of the basis of the agency's denial of his delisting request.

Accordingly, and for the reasons discussed more fully below, the Court should dismiss Joumaa's claims or, in the alternative, grant summary judgment in favor of Defendants.

## BACKGROUND

### A. Statutory Background

In 1999, Congress enacted the Kingpin Act to address "a national emergency resulting from the activities of international narcotics traffickers and their organizations." 21 U.S.C. § 1901(a)(4). The statute aims "to protect the national security, foreign policy, and economy of the United States" from the dangers of the global drug trade by "apply[ing] economic and other financial sanctions to significant foreign narcotics traffickers and their organizations worldwide." *Id.* § 1901(b).

Congress modeled the Kingpin Act on the successful application of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, to international narcotics traffickers in Colombia. H.R. Rep. No. 106-457 at 42 (Nov. 9, 1999), *as reprinted in* 1999 U.S.C.C.A.N. 304. IEEPA authorizes the President to declare a national emergency resulting from "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," and to deal with that threat through, *inter alia*, designations for economic and financial sanctions. 50 U.S.C. §§ 1701-1702. The President has exercised the broad spectrum of powers

that IEEPA provides by issuing Executive Orders that address different national emergencies. In October 1995, pursuant to IEEPA, President Clinton issued Executive Order 12,978, which declared a national emergency resulting from international narcotics trafficking centered in Colombia and associated violence and corruption. Exec. Order No. 12,978, 60 Fed. Reg. 54,579 (Oct. 21, 1995) (Blocking Assets and Prohibiting Transactions with Significant Narcotics Traffickers). Executive Order 12,978 ordered the blocking of the assets of foreign persons identified in an annex to the Executive Order and of foreign persons designated by the Secretary of the Treasury as playing a significant role in such narcotics trafficking or providing material support or being owned or controlled by designated traffickers. *Id.* Implementation of this Executive Order is credited with the downfall of the Cali Cartel kingpins. H.R. Rep. No. 106-457 at 43.

The Kingpin Act expressly states that it is Congress's desire to apply similar efforts against international narcotics traffickers worldwide. 21 U.S.C. § 1901(a)(3) ("IEEPA was successfully applied to international narcotics traffickers in Colombia and based on that successful case study, Congress believes similar authorities should be applied worldwide."); *see also* H.R. Rep. No. 106-457 at 42-43. The House Conference Report on the Kingpin Act explains that "[i]f effectively implemented, this strategy will disrupt these criminal organizations and bankrupt their leadership." H.R. Rep. No. 106-457 at 42. "The targets of this legislation are not only the drug kingpins, but those involved in their illicit activities, such as: money laundering, acquiring chemical precursors to manufacture narcotics, manufacturing the drugs, transporting narcotics from the drug source countries to the United States, and managing the assets of these criminal enterprises." *Id.* at 43.

To that end, the Kingpin Act authorizes the President to identify foreign persons whom he determines to be significant foreign narcotics traffickers, meaning "foreign person[s] that play[] a significant role in international narcotics trafficking." 21 U.S.C. §§ 1903(b), 1907(7); *see also id.* § 1907(3) (defining "narcotics trafficking" as "any illicit activity to cultivate, produce, manufacture, distribute, sell, finance, or transport narcotic drugs, controlled substances, or listed chemicals, or otherwise endeavor or attempt to do so, or to assist, abet, conspire, or collude with others to do so"). The statute further authorizes the Secretary of the Treasury, in consultation with the Attorney General, the Director of Central Intelligence, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, the Secretary of Defense, and the Secretary of State, to designate foreign persons "as materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of a significant foreign narcotics trafficker," *id.* § 1904(b)(2); "as owned, controlled, or directed by, or acting for or on behalf of, a significant foreign narcotics trafficker," *id.* §1904(b)(3); or "as playing a significant role in international narcotics trafficking," *id.* § 1904(b)(4). The Secretary of the Treasury has delegated designation authority to OFAC. 31 C.F.R. § 598.803.[1] OFAC's regulations refer to such foreign persons, as well as presidentially identified significant foreign narcotics traffickers, as SDNTs. *Id.* § 598.314.

For all SDNTs, the Kingpin Act operates to block all assets subject to United States jurisdiction that are owned or controlled by the SDNT and all interests in such property. 21 U.S.C. § 1904(b). United States persons as well as persons within the United States are

[1] On May 15, 2015, the President delegated to the Secretary of the Treasury the functions conferred by 21 U.S.C. § 1903(b), (c), (g), and (h). Delegation of Functions Under the Foreign Narcotics Kingpin Designation Act, 80 Fed. Reg. 29,201 (May 15, 2015).

generally prohibited from engaging in any transaction with or dealing in any property or interests in property of SDNTs as well as from engaging in any transaction that evades or avoids the Kingpin Act's prohibitions. *Id.* § 1904(c).

Once designated, a SDNT may "seek administrative reconsideration" of his designation, or may "assert that the circumstances resulting in the designation no longer apply." 31 C.F.R. § 501.807. In doing so, the SDNT "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation," and may also "propose remedial steps on the person's part . . . which the person believes would negate the basis for designation." *Id.* § 501.807(a). Additionally, the SDNT may request a meeting with OFAC. 31 C.F.R. § 501.807(c). After conducting a review, OFAC will "provide a written decision" to the SDNT. *Id.* § 501.807(d). OFAC's regulations do not limit the number of times a SDNT may seek to challenge his designation administratively. *See generally id.* § 501.807.

## B. Factual Background

### 1. OFAC's Initial Designation of Joumaa

On January 26, 2011, OFAC designated Joumaa, a Lebanese and Colombian national, as a SDNT based on the agency's determination that he plays a significant role in international narcotics trafficking. Admin. R. ("A.R.") at 23-24, 67. Investigations by the Drug Enforcement Administration ("DEA") revealed that Joumaa "coordinated the transportation, distribution, and sale of multi-ton shipments of cocaine from South America and [] laundered the proceeds from the sale of cocaine in Europe and the Middle East." *Id.* at 67. Specifically, Joumaa and his organization—the Joumaa Money Laundering Organization / Drug Trafficking Organization, also designated by OFAC, *id.* at 24—operated in Lebanon, West Africa, Panama, and Colombia to launder as much as $200 million per month in illicit proceeds, *id.* at 67. Joumaa and his

organization utilized a variety of channels to further his money laundering activities, "including bulk cash smuggling operations and Lebanese exchange houses." *Id.* at 67. Joumaa's drug trafficking and money laundering organization also exported vehicles from the United States to West Africa to launder drug proceeds. *Id.* at 27, 67.[2]

**2. Joumaa's Indictment**

In June of 2011, a DEA Special Agent submitted an affidavit in support of a criminal complaint in the U.S. District Court for the Eastern District of Virginia charging Joumaa and another individual with conspiracy to distribute more than five kilograms of cocaine for the purpose of unlawful importation into the United States. *Id.* at 72. The Special Agent had been involved in an investigation into Joumaa that included "extensive interviews with cooperating defendants and DEA confidential sources as well as undercover operations in Colombia, Denmark, and Germany." *Id.* According to the Special Agent, based on information from a confidential source, Joumaa "would arrange for the laundering of drug related proceeds from Mexico, Europe (predominantly Spain), and West Africa to Colombia." *Id.* at 73. Charging a fee of approximately thirteen percent, Joumaa and members of his organization would launder these proceeds, in the form of U.S. currency, and return them in Colombia. *Id.* Joumaa would also receive the delivery of bulk U.S. currency from the sale of cocaine shipped to the United

[2] Also on January 26, 2011, OFAC designated individuals and entities connected to Joumaa's organization as SDNTs, including three Lebanon-based money exchanges used to launder illicit proceeds; individuals affiliated with these money exchanges; companies in Lebanon, Benin, and the Democratic Republic of the Congo involved in the sale of used cars in Africa; Joumaa's brothers; a hotel used by Joumaa's organization as a location to broker drug trafficking and money laundering activities; and various companies owned or controlled by members of Joumaa's criminal network. *Id.* at 23-25, 67. OFAC subsequently removed five individuals and two entities from the SDN List. *See* OFAC, Sanctions Pursuant to the Foreign Narcotics Kingpin Designation Act, at 12-13, *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/narco_sanctions_kingpin.pdf.

States; following delivery of these proceeds, Joumaa would pay laundered proceeds in different currencies within five days.  *Id.* at 73-74.

The DEA Special Agent also averred, based on information from a separate confidential source, that Joumaa would launder proceeds from the sale of cocaine bound for the United States by way of Colombia, Guatemala, Honduras, and the Los Zetas trafficking organization in Mexico, and then repay these proceeds in Colombia and Venezuela.  *Id.* at 74.  Joumaa would charge a fee of approximately thirteen percent to launder these funds.  *Id.* at 74-75.

In November of 2011, Joumaa was indicted by a grand jury in the Eastern District of Virginia for conspiracy to distribute five or more kilograms of cocaine, knowing and intending that it would be unlawfully imported into the United States, as well as for conspiracy to commit money laundering.  *Id.* at 77-83.  The Indictment charges in part that Joumaa "coordinated the shipment of at least tens of thousands of kilograms of cocaine from Colombia, through Central America and Mexico, to the United States, including but not limited to 85,000 kilograms of cocaine shipped from Colombia for sale to [the] Los Zetas drug cartel from in and around 2005 through in and around 2007."  *Id.* at 79-80; *see also id.* at 80 (charging that Joumaa "coordinated the shipment of multi-thousand kilogram quantities of cocaine from Colombia to Guatemala, Honduras, and Mexico for sale to [the] Los Zetas drug cartel in Mexico" that were ultimately destined for the United States).

The Indictment further charges that Joumaa "laundered at least hundreds of millions of dollars in proceeds of illegal drug sales in the United States and elsewhere, including but not limited to an amount in excess of $250 million in drug related proceeds representing cocaine sales in the United States, Mexico, Central America, and Europe, which [Joumaa] laundered from in and around 1997 through in and around September 2010."  *Id.* at 80.  Specifically, after

being contacted by email, Blackberry PIN, or telephone, Joumaa would receive, launder, and return drug-related proceeds to cocaine suppliers in Colombia, while charging a fee between eight percent and fourteen percent. *Id.* Joumaa also received deliveries of bulk cash—typically $2 million to $4 million in drug proceeds—in Mexico, which he then laundered and paid out in Venezuela or Colombia within one to five days. *Id.* at 80-81; *see also id.* at 81 (further detailing movement of drug proceeds). Joumaa has not returned from Lebanon to face these charges. *Id.* at 4, 84-85.

**3. Joumaa's Delisting Request**

On May 18, 2016, Joumaa, through counsel, requested that OFAC reconsider his designation as a SDNT pursuant to the Kingpin Act. *Id.* at 87-90. Also on May 18, 2016, Joumaa requested access to the administrative record on which his designation was based. *Id.* at 92-98. That same day, OFAC acknowledged receipt of Joumaa's requests and advised Joumaa's counsel that "the review process can be lengthy, and it is likely that OFAC will seek additional information from your client before a final determination is made concerning your client's designation as a[] SDNT." *Id.* at 99. OFAC subsequently provided Joumaa a request for additional information on July 27, 2016, *id.* at 100-05, to which Joumaa partially responded on October 25, 2016, *id.* at 106-42. That response included a categorical denial that Joumaa is or has ever been involved in narcotics trafficking or related money laundering. *Id.* at 131, 139.

By letter dated November 18, 2016, OFAC provided Joumaa a redacted version of the administrative record on which his designation was based, as well as the U.S. Department of the Treasury press release and press chart related to his designation. *Id.* at 26-66. OFAC redacted the classified and privileged information, including law enforcement sensitive information, as well as information that did not pertain to Joumaa's designation. *Id.* at 26. The agency

nevertheless provided a non-privileged and unclassified summary of otherwise privileged information. *Id.* at 27. OFAC also advised that if additional releasable information became available it would be provided to Joumaa. *Id.* at 26.

On April 24, 2017, Joumaa supplemented his delisting request with additional information and responses to OFAC's request for information. *Id.* at 397-410. Joumaa again supplemented his request on August 24, 2017, arguing that "[t]he lack of any contempora[neous] evidence linking [Joumaa] to narcotics trafficking activities—even at the time of OFAC's January 26, 2011 designation—renders OFAC's decision to continue [his] designation as factually and legally suspect." *Id.* at 1397. OFAC responded by letter dated October 16, 2017, stating that Joumaa's request for reconsideration was under review. *Id.* at 1418. The agency explained that its decision regarding the delisting request "includes careful review of the documents you have thus far submitted" and that "[t]he quantity of reconsideration cases and the complexity of these cases can make this a lengthy process." *Id.* OFAC further stated that "the reconsideration decision for all such requests requires U.S. federal government inter-agency consultation and legal review," which "has delayed our response time." *Id.* On December 27, 2017, Joumaa filed this lawsuit. Complaint for Declaratory and Injunctive Relief ("Complaint" or "Compl."), ECF No. 1 (Dec. 27, 2017).

**4. OFAC's Denial of Joumaa's Delisting Request**

On March 2, 2018, OFAC denied Joumaa's delisting request. A.R. at 1-21, 1612-14.[3] Relying on a variety of sources, OFAC determined that Joumaa's claims that he is not, and never

---

[3] OFAC's decision is based in part on classified and law enforcement sensitive information. A.R. at 1612, 1614. OFAC intends to lodge, on an *ex parte, in camera* basis, a copy of the unredacted record, as well as an affidavit explaining its assertions of the law enforcement privilege, with the Court when the parties file the joint appendix required by Local Civil Rule 7(n).

has been, a narcotics trafficker are not credible.  *Id.* at 4-9, 1612-14.  Contrary to Joumaa's

disavowal of narcotics trafficking, *id.* at 131, 139, OFAC observed that he is subject to narcotics

trafficking-related charges in the Eastern District of Virginia, *id.* at 5-7, 1612 (referencing

indictment and affidavit in support of arrest warrant and criminal complaint).  Additionally, and

also contrary to Joumaa's denials, OFAC explained that Joumaa worked with SDNT Pedro Mejia

Salazar as part of a global drug money laundering operation.  *Id.* at 9-11, 113, 1613.  The agency

further concluded that Joumaa's delisting request "is not supported by credible evidence to

establish that there was an insufficient basis for the January 26, 2011 designation, or that

circumstances resulting in the designation no longer apply such that removal from the [SDN

List] is warranted."  *Id.* at 1613; *see also id.* at 17.

    In support of this conclusion, OFAC addressed the numerous exhibits submitted by

Joumaa, many of which concerned the Hassan Ayash Exchange Company and the New Line

Exchange Trust Co.—two Lebanon-based entities used by Joumaa in connection with his money

laundering activities—as well as Goldi Electronics S.A.—a Panama-based entity owned or

controlled by Joumaa.  *Id.* at 14-16, 67, 1613.  For purposes of deciding Joumaa's delisting

request, OFAC accepted that the operations of or his relationship to these entities ceased after his

designation.  *Id.* at 15, 1613 n.1.  Nevertheless, OFAC reasoned that the documents submitted by

Joumaa do not rebut OFAC's own evidence that Joumaa had previously laundered money

through the Hassan Ayash Exchange Company and the New Line Exchange Trust Co.  *Id.* at 15,

1613.  The documents also fail to "address the other aspects of Mr. Joumaa's drug trafficking

and money laundering network that served as the basis for his designation, such as the Ellissa

Exchange Company."  *Id.* at 1613; *see also id.* at 15.  Nor had Joumaa addressed all of OFAC's

findings regarding his money laundering through channels outside of Lebanon, including by

means not involving business entities. *Id.* at 15, 1613. And while OFAC duly considered a report from the Banking Control Commission of the Central Bank of Lebanon indicating that the New Line Exchange Trust Co. appeared to comply with certain provisions to prevent money laundering, *id.* at 403-04, 1283-98, OFAC noted that Joumaa did not submit similar reports regarding the Hassan Ayash Exchange Company or the Ellissa Exchange Company, *id.* at 15-16, 1613. Likewise, OFAC considered information submitted by Joumaa regarding certain Lebanese legal proceedings, *id.* at 406-07, but determined that such information was not probative because "the court did not possess information available to the United States," *id.* at 13.

OFAC also addressed the remaining arguments advanced by Joumaa in his counsel's correspondence to OFAC dated October 25, 2016. *Id.* at 13-16, 1613. The agency disagreed with Joumaa's assertion that the evidence provided to him is "conclusory in nature," *id.* at 139, explaining that all relevant, non-privileged, and unclassified information had been provided to Joumaa, in addition to a non-privileged and unclassified summary of otherwise privileged information, *id.* at 13-14. In response to Joumaa's concern about "mistaken designations," *id.* at 140-41, OFAC stated that "Joumaa has provided no evidence to indicate that his designation was due to mistaken identity," *id.* at 14, 1613. And with respect to Joumaa's challenge to the credibility of sources relied upon by OFAC, *id.* at 139, the agency explained that Joumaa had not "provided any information to impugn the accuracy and integrity of OFAC's fact finding process," *id.* at 14, 1613; *see also id.* at 12-13.

Accordingly, OFAC concluded that it is appropriate to continue to designate Joumaa as a SDNT under the Kingpin Act. It specifically determined that

> According to information available to OFAC, JOUMAA continues to meet the criteria for designation as a[] SDNT pursuant to the Kingpin Act. Information available to OFAC indicates that JOUMAA continues to play a significant role in international narcotics

> trafficking. Therefore, JOUMAA's reconsideration request and removal from the SDN List should be denied.

*Id.* at 17; *see also id.* at 16, 1612.[4]

### C. Plaintiff's First Amended Complaint

Joumaa filed this lawsuit against Defendants Steven Mnuchin, in his official capacity as Secretary of the U.S. Department of the Treasury, and OFAC. *See* Compl. at 1. On March 9, 2018, Defendants filed a motion to dismiss or, in the alternative, for summary judgment. ECF No. 7 (March 9, 2018). Joumaa subsequently amended his complaint on April 6, 2018. Amended Complaint for Declaratory and Injunctive Relief ("Amended Complaint" or "Am. Compl."), ECF No. 9 (April 6, 2018).

Joumaa's Amended Complaint advances two theories concerning OFAC's denial of his delisting request. *See id.* ¶¶ 38-58. First, Joumaa claims that OFAC's decision is arbitrary and capricious and in excess of its statutory authority, and therefore in violation of the APA and the Kingpin Act, because OFAC allegedly failed to consider certain information, did not adequately explain its decision, and based its decision on improper factors and insufficient evidence. *Id.* ¶¶ 38-51 (citing 5 U.S.C. § 706(2)(A), 706(2)(C)). Second, Joumaa asserts due process claims grounded in both the Fifth Amendment at the APA. *See id.* ¶¶ 54-58. According to Joumaa, the information provided to him by OFAC does not sufficiently describe—and therefore constitutes inadequate notice of—the basis for OFAC's decision. *Id.* ¶¶ 56, 58 (citing U.S. CONST. amend. V; 5 U.S.C. § 706(2)(C)). He also claims OFAC violated his Fifth Amendment rights "by failing to identify how the information contained in OFAC's unprivileged and unclassified summary of

---

[4] After issuing its decision, OFAC provided Joumaa with non-privileged and unclassified summaries of otherwise privileged information regarding his initial designation as well as the denial of his delisting request. A.R. at 1615-17.

otherwise privileged information contained in the administrative record corresponds to the redacted portions of the administrative record." *Id.* ¶ 58. Joumaa seeks a variety of declaratory and injunctive relief. Am. Compl., Relief Requested.

**LEGAL STANDARDS OF REVIEW**

On a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing the court's subject matter jurisdiction. *E.g.*, *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). "Standing is a necessary predicate to any exercise of federal jurisdiction, and if it is lacking, then the dispute is not a proper case or controversy under Article III, and federal courts do not have subject matter jurisdiction to decide the case." *Prisology v. Fed. Bureau of Prisons*, 74 F. Supp. 3d 88, 93 (D.D.C. 2014), *aff'd*, 852 F.3d 1114 (D.C. Cir. 2017). Thus, where a plaintiff lacks standing to assert a particular claim, the court must dismiss that claim pursuant to Rule 12(b)(1). *See id.*

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). For purposes of a Rule 12(b)(6) motion, the "complaint" also includes matters incorporated therein. *E.g.*, *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009) ("Matters that are not 'outside' the pleadings a court may consider on a motion to dismiss include 'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint,' . . . or documents 'upon which the

plaintiff's complaint necessarily relies' even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss.") (citations omitted).

Rule 12(d) authorizes the court to treat a Rule 12(b)(6) motion as a motion for summary judgment under Rule 56 where the defendants rely on matters outside the pleadings, provided that all parties have a reasonable opportunity to present all material pertinent to the motion. Fed. R. Civ. P. 12(d); *Conant v. Wells Fargo Bank, N.A.*, 60 F. Supp. 3d 99, 106 (D.D.C. 2014). Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Conant*, 60 F. Supp. 3d at 107. In the context of an APA claim, "[s]ummary judgment [] serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014) (quoting *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012)), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015); *see also id.* (noting the court's "limited role" "in reviewing the administrative record" and explaining that "[w]hen assessing a summary judgment motion in an APA case, 'the district judge sits as an appellate tribunal'") (citation omitted).

## DISCUSSION

### I. JOUMAA HAS FAILED TO ESTABLISH THAT OFAC'S DECISION DENYING HIS DELISTING REQUEST IS ARBITRARY AND CAPRICIOUS.

Joumaa does not contend that OFAC acted arbitrarily and capriciously when it designated him as a SDNT on January 26, 2011. *See* Am. Compl. ¶¶ 38-58. Nor could he, as such a claim would be time-barred. *See Harris v. FAA*, 353 F.3d 1006, 1009-10 (D.C. Cir. 2004) (explaining that, pursuant to 28 U.S.C. § 2401, challenge must be brought within six years of date of final agency action); *Zevallos*, 10 F. Supp. 3d at 129 n.16 (noting challenge to Kingpin Act

designation brought after more than eight years "is likely beyond the six-year statute of limitations"). Instead, Joumaa seeks review only of OFAC's decision to deny his delisting request, claiming that the decision is arbitrary and capricious and in excess of OFAC's statutory authority. Am Compl. ¶¶ 38-51. But as explained below, OFAC's decision readily withstands scrutiny under the applicable APA standards.

When evaluating claims brought pursuant to the APA, a court reviews an agency decision based on the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)). A court should uphold an agency decision unless it is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2).

Under this deferential standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416. An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The court may not "substitute its judgment for that of the agency." *Id.* Rather, the agency's decision should be

affirmed as long as it is supported by a rational basis. *Id.*; *see also Zevallos*, 10 F. Supp. 3d at 118-19.

This deference is further heightened in cases, such as this one, that involve national security and foreign affairs. Indeed, the Supreme Court has emphasized the need for courts to grant this heightened deference even when considering constitutional claims; such deference is required because courts should respect the Executive's expertise in the national security and foreign policy arenas. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010). Cases involving blocking orders, whether issued under the Kingpin Act or IEEPA, are no exception. *Zevallos*, 10 F. Supp. 3d at 119 (recognizing additional deference beyond that typically accorded to an agency under the APA); *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) ("courts owe a substantial measure of 'deference to the political branches in matters of foreign policy,' including cases involving blocking orders") (citation omitted); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002) ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference."), *aff'd,* 333 F.3d 156 (D.C. Cir. 2003).

Applying the highly deferential standard of review required by the APA and the national security and foreign policy nature of Joumaa's SDNT designation, the Court should uphold OFAC's decision to deny Joumaa's request for removal from the SDN List. The administrative record fully supports OFAC's conclusion that he continues to warrant SDNT designation.

OFAC's decision explains that Joumaa should remain on the SDN List because, based on the information available to OFAC, including classified and law enforcement sensitive information, he continues to meet the criteria for designation under the Kingpin Act. A.R. at 1-

21, 1612-14, 1617. OFAC's conclusion is entirely consistent with the evidence before the agency. *See State Farm*, 463 U.S. at 43. For example, OFAC found that Joumaa, subsequent to his designation, "is associated with a designated SDNT individual in the pick up of bulk drug proceeds in Europe to launder to Colombia"; "oversees money laundering operations between Lebanon, Colombia, and Venezuela"; and "is noted to currently be the leader of a group of money launderers." A.R. at 1617.

OFAC's decision also took due account of the documents and arguments submitted by Joumaa, as well as his responses to the questionnaire provided by OFAC. As to Joumaa's claims that he has never been involved in narcotics trafficking or money laundering, *id.* at 131, 139, OFAC found such denials lack credibility based on the information available to OFAC, *id.* at 4-7, 1612, 1617. Supporting OFAC's determination were the affidavit in support of Joumaa's arrest and criminal complaint, as well as the criminal indictment against him, which detailed, through multiple sources, the methods, locations, and amounts of Joumaa's illicit activities. *Id.* at 5-7, 69-83; *see Zevallos*, 10 F. Supp. 3d at 122 (holding that OFAC's denial decision was based on substantial evidence, and observing that the agency relied on an indictment in the U.S. District Court for the Southern District of Florida for, *inter alia*, money laundering). OFAC likewise determined that Joumaa's statements about the nature and extent of his prior relationships with other SDNTs lacked credibility. A.R. at 9-12, 1613. For example, Joumaa admitted that he had "a business relationship with Pedro Claver Mejia Salazar"; however, Joumaa did not acknowledge that he worked with Mejia as part of Mejia's global drug money laundering operation. *Id.* at 9-11, 113, 1613, 1617; *see also id.* at 131, 139.

The agency also considered, and reasonably rejected, the various arguments made by Joumaa concerning the date and reliability of OFAC's evidence, as well as the supposed "danger

of a mistaken designation." *Id.* at 12-14, 139-40, 1613. OFAC's fact finding followed its standard practice, which prior decisions in this Circuit have upheld against similar challenges,[5] and Joumaa's arguments failed "to impugn the accuracy and integrity" of that process. *Id.* at 13-14, 1613. Nor was there any basis to suggest that Joumaa's designation was due to a case of mistaken identity. *Id.* at 14, 1613.

Further, OFAC considered the numerous documents submitted by Joumaa in support of his delisting request. *Id.* at 14-16, 1613; *see also id.* at 1615 n.1 (explaining OFAC's review of translated and untranslated materials). The agency reasonably determined, however, that those documents were insufficient to demonstrate that Joumaa's removal from the SDN List is warranted. *See id.* On the one hand, OFAC accepted, for purposes of deciding Joumaa's request, that the operations of or Joumaa's relationship to the Hassan Ayash Exchange Company, the New Line Exchange Trust Co., and Goldi Electronics S.A. ceased after his designation. *Id.* at 15, 118, 401, 405, 1613 n.1. OFAC also credited a report prepared by the Banking Control Commission, which purportedly found that the New Line Exchange Trust Co. appeared to comply with certain anti-money laundering provisions. *Id.* at 16 n.34, 403-04, 1283-98, 1613.[6]

---

[5] *E.g., Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003) (rejecting challenge to OFAC's use of hearsay evidence); *Zevallos*, 10 F. Supp. 3d at 123 n.9 (finding unpersuasive plaintiff's argument that "OFAC relied on 'outdated, biased, and incredible sources'"; plaintiff "made these arguments to OFAC, [] OFAC concluded that the evidence before it was credible, [and] [i]t is not the province of this Court to reweigh the evidence and reconsider [plaintiff's] arguments on appeal"); *Kadi*, 42 F. Supp. 3d at 13-23 (holding OFAC's designation was supported by substantial evidence, notwithstanding plaintiff's argument that "the evidence underlying OFAC's decision is unreliable").

[6] The Commission's findings appear to be limited to determinations regarding document retention, cash exchange, and transaction information. A.R. at 1297. These small measures of compliance with some of the most basic features of anti-money laundering controls do not provide any support for the wholesale conclusory assertions Joumaa makes about his lack of involvement in illicit activities.

However, any operations (or lack thereof) of the Hassan Ayash Exchange Company and the New Line Exchange Trust Co. subsequent to Joumaa's designation do not rebut the specific evidence available to OFAC establishing that Joumaa previously used these entities to launder narcotics proceeds. *Id.* at 15-16, 1613; *see also id.* at 1617. Additionally, Joumaa did not submit any independent reports concerning anti-money laundering measures implemented by the Hassan Ayash Exchange Company or the Ellissa Exchange Company. *Id.* at 16, 1613. Indeed, Joumaa did not even attempt to submit documents to rebut all the allegations concerning the Ellissa Exchange Company or other aspects of Joumaa's vast drug trafficking and money laundering network, including those outside of Lebanon and those not involving business entities. *Id.* at 15, 1613. And while OFAC acknowledged that Joumaa had submitted seemingly exculpatory information related to certain Lebanese legal proceedings, the agency determined that such information was not probative because "the court did not possess information available to the United States." *Id.* at 13 ("Such information, from a variety of sources . . . indicates that JOUMAA laundered funds as part of a narcotics trafficking scheme and continues to do so.").

Given the absence of such rebuttal evidence, and in light of the information otherwise available to OFAC, the agency's decision to deny Joumaa's delisting request readily satisfies the highly deferential APA standard that the Court must apply. *See Zevallos*, 10 F. Supp. 3d at 123 n.9 (explaining court must uphold OFAC's decision if "the evidence OFAC relied upon as a whole 'adequately supports its ultimate decision'") (quoting *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010)). Moreover, the evidence bears on facts that Congress expressly intended the agency to consider. *See Citizens to Preserve Overton Park*, 401 U.S. at 416; *Zevallos*, 10 F. Supp. 3d at 122 (noting Kingpin Act's broad definition of "narcotics trafficking" and concluding that "evidence pointing to both Mr. Zevallos's involvement with

drug trafficking itself, as well as his connection to the laundering and management of assets tied to drug trafficking (including his own prior drug trafficking), both . . . formed a rational basis for OFAC's decision"). Accordingly, there is no basis to conclude that OFAC's denial decision is arbitrary and capricious under 5 U.S.C. § 706(2)(A) or in excess of statutory authority under 5 U.S.C. § 706(2)(C).

Joumaa's arguments in support of his APA claim, raised in Counts I, II, and III of his Amended Complaint, are without merit. First, Joumaa alleges that "OFAC denied Plaintiff's reconsideration request solely on the basis of its conclusion that Plaintiff's representations to the agency were not 'credible,'[7] as opposed to basing its denial on evidence that Plaintiff 'is playing a significant role in international narcotics trafficking.'" Am. Compl. ¶ 40 (quoting 21 U.S.C. § 1904(b)(4)); *see also id.* ¶ 48 (similar). But OFAC expressly explained that Joumaa's delisting request should be denied because "[a]ccording to information available to OFAC, JOUMAA continues to meet the criteria for designation as an SDNT pursuant to the Kingpin Act," and because "[i]nformation available to OFAC indicates that JOUMAA continues to play a significant role in international narcotics trafficking." A.R. at 17; *see also id.* at 1612 ("Mr. Joumaa's request for reconsideration of his designation is denied because he continues to meet the criteria under the Kingpin Act."). Moreover, OFAC supported its decision not only on the basis of determinations about the credibility of representations made by Joumaa, *e.g.*, *id.* at 5, 7, 9, but also in light of evidence obtained independently by the agency that directly contradicted his claims, *e.g.*, *id.* at 5-7, 1617.

---

[7] Joumaa appears to no longer contest OFAC's credibility determinations. *Compare* A.R. at 139 *with* Am. Compl. ¶¶ 38-51. Nor could he, for the reasons discussed in note 5, *supra* at 18.

Second, Joumaa contends that "OFAC failed to consider evidence in its possession demonstrating an insufficient basis exists for the designation and/or the circumstances resulting in the designation no longer apply." Am. Compl. ¶ 41; *see also id.* ¶ 47 (similar). But Joumaa does not even attempt to allege what evidence OFAC supposedly overlooked, which alone warrants dismissal of his claim. *See New Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 125 (D.D.C. 2010) ("To put it generously, New Life's generalized, conclusory, and wholly unsupported allegations of agency bad faith fall short of the circumstances that would justify overcoming this presumption [of regularity] and concluding that New Life has discharged its burden of proof."). And assuming Joumaa is referring to his "representations made . . . during the reconsideration process that he is not engaged in international narcotics trafficking and does not meet the criteria for designation under the Kingpin Act," Am. Compl. ¶ 5, there can be no serious dispute that OFAC did in fact consider these conclusory statements but rejected them in light of other information available to the agency, *see* A.R. at 4-9, 1612-14, 1617. Moreover, the administrative record extensively discussed the other documentation referred to by Joumaa in his Amended Complaint, including that regarding Joumaa's "divestment from entities through which OFAC had alleged that he engaged in international narcotics trafficking," other entities over which Joumaa "exercised ownership or control," and "legal judgments from foreign courts." Am. Compl. ¶ 26; *compare* A.R. at 13-16. Indeed, and as Joumaa acknowledges, Am. Compl. ¶ 33, OFAC explained that it "carefully reviewed and considered JOUMAA's responses to the questionnaire provided by OFAC, as well as the additional documents, arguments, and evidence he provided," A.R. at 4. Joumaa therefore has failed to demonstrate that OFAC did not consider relevant evidence in its possession.

Third, according to Joumaa, "OFAC failed to explain its basis for accepting as true certain statements made by Plaintiff in the course of the reconsideration matter, while summarily concluding that Plaintiff's lack of credibility justified denial of his reconsideration petition." Am. Compl. ¶ 42. Again, Joumaa mischaracterizes OFAC's decision, which was based on its determination that he continues to meet the criteria under the Kingpin Act, not simply that he lacks credibility. A.R. at 17, 1612. And in any event, Joumaa's argument is belied by the administrative record. OFAC's assessment of Joumaa's arguments and documentation was "[b]ased on the information available to OFAC." *Id.* at 4; *see also id.* at 1612 (explaining that OFAC reached its decision "[a]fter reviewing all of the evidence before OFAC, including the information that [Joumaa] provided, and law enforcement sensitive, classified, and open source information"). Similarly, OFAC did not "summarily conclud[e]" that Joumaa's arguments lacked credibility, but rather made that determination after a reasoned analysis of all the information available to the agency. *See id.* at 4-16, 1612-13. This explanation readily meets the requirements under the APA. *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (a court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" (quoting *State Farm*, 463 U.S. at 43)).

Fourth, Joumaa argues that "OFAC's denial letter and the evidentiary record underlying OFAC's denial of Plaintiff's reconsideration request fails to evidence the requisite facts showing that the circumstances resulting in the designation remain applicable." Am. Compl. ¶ 43; *see also id.* ¶ 46 (similar), ¶ 51 (similar). But as discussed above, OFAC has explained that Joumaa should remain on the SDN List because he continues to meet the criteria for designation under the Kingpin Act. A.R. at 1-21, 1612-14, 1617. OFAC reached this conclusion based on all the evidence before the agency, including evidence that he "is associated with a designated SDNT

individual in the pick up of bulk drug proceeds in Europe to launder to Colombia"; "oversees money laundering operations between Lebanon, Colombia, and Venezuela"; and "is noted to currently be the leader of a group of money launderers." *Id.* at 1617. OFAC also considered the arguments and documents submitted by Joumaa and reasonably determined that they were insufficient to warrant Joumaa's removal from the SDN List. *See id.* at 4-16, 1612-13, 1617. Joumaa has therefore has failed to demonstrate that the agency's decision is arbitrary and capricious or in excess of statutory authority.

Finally, Joumaa cannot establish that, even if OFAC erred in its analysis of some of the evidence before it, such an error was prejudicial. Given the totality of evidence before the agency, any such error would be harmless and therefore insufficient to warrant the relief sought by Joumaa. *See* 5 U.S.C. § 706 (requiring courts reviewing agency action to take "due account . . . of the rule of prejudicial error").

The Court should therefore grant Defendants summary judgment on Count I, Count II, and Count III of the Amended Complaint.[8]

## II. OFAC'S DENIAL OF JOUMAA'S DELISTING REQUEST ACCORDS WITH DUE PROCESS.

In Count IV of his Amended Complaint, Joumaa alleges that OFAC infringed upon his Fifth Amendment right to due process by inadequately notifying him of and explaining the basis for denying his delisting request. Am. Compl. ¶ 58. He further contends that "[b]y denying Plaintiff's request for reconsideration of his Kingpin Act designation and continuing to block

[8] If the Court were to find to the contrary, under the APA the proper remedy would be remand to the agency, and not an order directing Defendants to rescind the SDNT designation as Joumaa asserts, Am. Compl., Relief Requested. *See, e.g.*, *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal.").

Plaintiff's assets, Defendants acted arbitrarily and capriciously in depriving Plaintiff of his property." *Id.* ¶ 57; *see also id.* ¶ 55 (citing 5 U.S.C. 706(2)(C)), ¶ 56 (citing 5 U.S.C. § 706).

Joumaa's arguments are without merit.  First, as a foreign person without substantial contacts with the United States, Joumaa does not have standing to assert any constitutional rights.  Second, whether viewed in the context of the Fifth Amendment or the APA, the notice provided by OFAC accords with any process that Joumaa may be due.

### A.      Joumaa Does Not Have Standing To Assert Constitutional Rights

"[N]on-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections."  *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004); *accord Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950).  A limited exception may apply when aliens "have come within the territory of the United States and developed substantial connections with this country."  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).  Although the D.C. Circuit has not directly addressed substantial connection claims within the context of an OFAC narcotics sanctions case, the Circuit's discussion of the issue in Foreign Terrorist Organization ("FTO") cases is instructive.  *Cf. Kadi*, 42 F. Supp. 3d at 25-26.  In the FTO case *National Council of Resistance of Iran v. Department of State*, the D.C. Circuit concluded that two Iranian organizations could bring a due process challenge because they had an "overt presence within the National Press Building in Washington, D.C." and a "claim[] [of] an interest in a small bank account."  251 F.3d 192, 201 (D.C. Cir. 2001).  Conversely, in *32 County Sovereign Committee v. Department of State*, the D.C. Circuit rejected the petitioners' claim to constitutional rights where they "demonstrated neither a property interest nor a presence in this country."  292 F.3d 797, 799 (D.C. Cir. 2002).

Here, Joumaa is a foreign national, and the Amended Complaint alleges neither a physical presence in the United States nor a substantial connection between him and this country. *See* Am. Compl. ¶ 12. While Joumaa claims that "Defendants' actions have caused Plaintiff significant personal and financial harm, including the blocking of two wire transfers of funds totaling approximately $340,000.00," *id.* ¶ 10, this allegation is insufficient to demonstrate that he is entitled to due process protections, *see Verdugo-Urquidez*, 494 U.S. at 271. Further, the Amended Complaint is wholly without supporting details as to Joumaa's precise interest in these funds, as well as any facts demonstrating that the asset freezing is a result of the Kingpin Act designation. *See generally* Am. Compl. Accordingly, Joumaa has not set forth a basis for this Court to apply the Fifth Amendment, particularly in the context of a summary judgment motion. *See Conant*, 60 F. Supp. 3d at 107 ("Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.") (citing *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009)).

Because Joumaa has not demonstrated standing to assert any rights under the Constitution, the Court should dismiss his Fifth Amendment claim for lack of subject-matter jurisdiction.

**B. Joumaa's Fifth Amendment Due Process Argument Fails On The Merits**

In the event the Court were to find that Joumaa has standing to assert a Fifth Amendment claim, it should nevertheless hold that OFAC's disclosures satisfy due process. "The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (citation omitted). When viewed through the lens of the Fifth Amendment, "[d]ue process is

flexible and calls for such procedural protections as the particular situation demands." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). In the context of OFAC's designation of a SDNT—where, as the D.C. Circuit has held, pre-deprivation notice is not required, *Zevallos v. Obama*, 793 F.3d 106, 116 (D.C. Cir. 2015)—due process mandates only that OFAC provide Joumaa with "a basis from which to understand his designation, and thereby offer rebuttal arguments and evidence in response." *Zevallos*, 10 F. Supp. 3d at 131; *see also Fares v. Smith*, 249 F. Supp. 3d 115, 125-28 (D.D.C. 2017) (holding that "the total body of information provided by OFAC to Plaintiffs"—which included the redacted administrative record, press release, and non-privileged summaries of law enforcement sensitive information—"satisfied due process"), *appeal filed*, No. 17-5075 (D.C. Cir. April 17, 2017).[9]

Here, OFAC's disclosures gave Joumaa sufficient notice of the agency fact findings underlying his 2011 designation, as well as a meaningful opportunity to rebut those findings. OFAC described not only the illicit activities undertaken by Joumaa, *see* A.R. at 67 ("Joumaa has coordinated the transportation, distribution, and sale of multi-ton shipments of cocaine from South America and has laundered the proceeds from the sale of cocaine in Europe and the Middle East"); *see also id.* at 34, 36; but also the specific methods Joumaa used to launder these proceeds, *id.* at 67 (describing "bulk cash smuggling operations and Lebanese exchange

[9] Joumaa does not contend that OFAC cannot rely on classified or law enforcement sensitive information. He does, however, imply that he is entitled to receive such information. *See* Am. Compl., Relief Requested (requesting order requiring Defendants "to disclose the evidence underlying" OFAC's decision). He is not. *Zevallos*, 793 F.3d at 113 (explaining that "the safety of investigators or informants might be put at hazard were their testimony made available as part of the administrative record"); *Kadi*, 42 F. Supp. 3d at 10, 23-24 (rejecting argument that plaintiff could not respond to motion for summary judgment without access to classified record); *see also Jifry*, 370 F.3d at 1183-84; *Fares*, 249 F. Supp. 3d at 128-29. Rather, he is entitled only to non-privileged and unclassified information, and OFAC has provided all such releaseable information to Joumaa. *See* A.R. at 1615-17.

houses”), 27 (“The export of vehicles . . . was a method used . . . .”); *see also id.* at 36. OFAC’s disclosures further detail the geographic extent of Joumaa’s operations, *id.* at 67 (“Lebanon, West Africa, Panama and Colombia”), 27 (Joumaa exported cars “from the United States to West Africa”); as well as a location used to “broker drug trafficking and money laundering activities,” *id.* at 67 (Caesar’s Park Hotel). Additionally, OFAC specified the amount of money laundered by Joumaa and his organization, *id.* at 67 (“as much as $200 million per month”), 27 (“hundreds of millions of dollars”); the identities of Joumaa’s criminal associates and front companies, *id.* at 66-67; and his relationship to these persons as “the leader” of a drug trafficking and money laundering organization, *id.* at 27, 66-67.

These disclosures alone are sufficient, but any doubt as to the adequacy of the notice provided to Joumaa is removed by the non-privileged and unclassified summary of otherwise privileged information produced to Joumaa on March 9, 2018. In that summary, OFAC provided additional detail as to the locations, methods, and amounts of Joumaa’s illicit activities. *Id.* at 1617. For instance, OFAC described the use of the Hassan Ayash Exchange Company and the Ellissa Exchange Company in his money laundering operations, linking those entities to Joumaa’s “transfer [of] funds derived from the proceeds of drug trafficking to the United States through various used car dealerships.” *Id.*; *see id.* (“Vehicles are subsequently purchased and shipped to the Middle East.”). The agency also discussed a specific transaction in or around 2007 involving “a pickup of 100,000 euros in France.” *Id.* Additionally, OFAC explained that Joumaa “was involved in laundering drug proceeds by smuggling cashier’s checks into Lebanon. The checks were payments for loads of cocaine smuggled into Lebanon. The drugs were traced back to Maicao, Colombia.” *Id.*

To the extent the Fifth Amendment applies to a delisting decision—which after all, maintains the status quo and does not effectuate a distinct deprivation—OFAC has likewise sufficiently described and provided adequate notice of the basis for its denial of Joumaa's delisting request. OFAC's letter dated March 2, 2018 explains the reasons for OFAC's conclusion that Joumaa failed to establish an insufficient basis for the designation or that circumstances have changed such that the designation is no longer warranted. *Id.* at 1612-14; *see* 31 C.F.R. § 501.807. Based on the information available to the agency, OFAC first stated that it did not find credible Joumaa's claim that he is not currently involved in narcotics trafficking. A.R. at 1612; *see also id.* at 131, 139. OFAC also explained that Joumaa's "designation was based on reliable and corroborated information that he led a drug trafficking and money laundering organization moving hundreds of millions of dollars in narcotics proceeds from the United States to Lebanon." *Id.* OFAC additionally cited the 2011 indictment against Joumaa and the affidavit in support of Joumaa's arrest and criminal complaint—with its accompanying details regarding the methods, amounts, and locations of Joumaa's illicit activities—as further evidence that his delisting request should be denied. *Id.* Moreover, OFAC determined that Joumaa's responses regarding his relationship to previously designated SDNTs—including Pedro Mejia Salazar and his sons—lacked credibility. *Id.* at 1613; *see also id.* at 113, 399.

OFAC then described the reasons that the documents submitted by Joumaa were insufficient to demonstrate that Joumaa's removal from the SDN List is warranted. *Id.* at 1613. Crediting Joumaa's claims regarding the operations of, or his involvement with, certain designated entities, as well as a report from the Banking Control Commission concerning anti-money laundering controls in place at one of those entities, OFAC nevertheless explained that the submitted documents failed to rebut OFAC's evidence regarding these entities and also

neglected to address other aspects of Joumaa's activities that resulted in his designation. *Id.* at 1613; *see also id.* at 118, 401, 403-05, 1283-98. Finally, OFAC addressed Joumaa's remaining arguments about the supposed potential that Joumaa's designation was based on a mistake of identity, as well as the reliability of OFAC's evidence. *Id.* at 1613; *see also id.* at 139-41. OFAC explained that both arguments are unpersuasive. *Id.* at 1613.

Bolstering these disclosures, OFAC has also produced to Joumaa the redacted administrative record on which its denial decision was based, *id.* at 1-21, as well as a non-privileged and unclassified summary of otherwise privileged information, *id.* at 1615-17. These documents further detail why Joumaa continues to warrant SDNT designation. For example, the administrative record addresses at length Joumaa's challenge to the reliability of OFAC's evidence. *Id.* at 12; *see also id.* at 139. It also discusses information submitted by Joumaa concerning certain Lebanese legal proceedings, and explains why the conclusion reached by a panel in those proceedings does not affect OFAC's determination. *Id.* at 13; *see also id.* at 406-07. With respect to the non-privileged and unclassified summary, OFAC provided information as to the methods of Joumaa's illicit activities, *id.* at 1617 (including "money pick-ups," "pick up of bulk drug proceeds," "utiliz[ing] a shipping company," and "mov[ing] cars from the U.S. to Europe and Africa"); as well as their location, *id.* (Europe, Colombia, Lebanon, Venezuela, Africa, and the United States); dates, *id.* (July 2011 through November 2016); amounts, *id.* ($200 million per month); and Joumaa's role, *id.* (Joumaa "is noted to currently be the leader of a group of money launderers").

Contrary to Joumaa's assertion, *see* Am. Compl. ¶ 58, these disclosures more than satisfy due process, as Joumaa has "been apprised . . . of the government's view regarding the basis for [his] designation[], and as such, can meaningfully 'proffer rebuttal evidence and arguments to

OFAC to contest [his] designation[].'" *Fares*, 249 F. Supp. 3d at 127 (quoting *Zevallos*, 10 F. Supp. 3d at 131).  Indeed, Joumaa's submissions to OFAC, including initial and supplemental responses to OFAC's request for information, only confirm that he was able to challenge the basis of OFAC's designation and submit additional evidence and arguments for OFAC's consideration.  *Cf. Kadi*, 42 F. Supp. 3d at 29 (noting that designated individual was able to rebut evidence "through his own submissions to OFAC," including in response to requests for information).  "That OFAC did not ultimately agree with [Joumaa's] characterization of the evidence against him does not mean that he was not provided with due process." *Zevallos*, 10 F. Supp. 3d at 129-30.

Joumaa's remaining Fifth Amendment argument is unpersuasive.  According to Joumaa, OFAC infringed upon his Fifth Amendment rights "by failing to identify how the information contained in OFAC's unprivileged and unclassified summary of otherwise privileged information contained in the administrative record corresponds to the redacted portions of the administrative record."  Am. Compl. ¶ 58.  Joumaa identifies no such obligation to do so on OFAC's part, and by definition, the non-privileged and unclassified summary represents the extent of information releaseable at this time.  *See* A.R. at 1615-16.  Any cross-references to the corresponding classified or privileged material would simply lead Joumaa to a redacted page, and would not provide any additional information regarding the basis of Joumaa's designation; as such, Joumaa cannot establish that there is any "value . . . [to] [the] additional or substitute procedural safeguards" that he suggests, and is therefore unable to demonstrate that they are required by the Fifth Amendment.  *See Mathews*, 424 U.S. at 335.

Because OFAC adequately informed Joumaa of the basis for his designation, as well as the basis for the denial of his delisting request, his claimed Fifth Amendment violation fails.

Thus, even if the Court were to reach the merits of this issue, Defendants would be entitled to summary judgment.

### C. OFAC Has Not Arbitrarily And Capriciously Deprived Joumaa Of His Property

Finally, Joumaa claims that OFAC's decision constitutes an arbitrary and capricious deprivation of his property. Am. Compl. ¶ 57. This argument, however, appears to be premised on the same theory underlying Joumaa's other APA claims, *see id.* ¶ 55 (citing 5 U.S.C. 706(2)(C), which allows a court to set aside agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"), and fails for the same reasons.

The Court should therefore dismiss Joumaa's claims in Count IV pursuant to Rule 12(b)(1) or, in the alternative, grant summary judgment in favor of Defendants pursuant to Rule 56.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss or, in the alternative, for summary judgment, and enter judgment in favor of Defendants on all claims.

Dated April 20, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JOHN R. GRIFFITHS
Branch Director

DIANE KELLEHER
Assistant Branch Director

*/s/Stuart J. Robinson*
STUART J. ROBINSON
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Ave.

San Francisco, CA 94102
Tel: (415) 436-6635
Fax: (415) 436-6632
Email: stuart.j.robinson@usdoj.gov
Cal. Bar No. 267183

Counsel for Defendants