SECRET████

## (U) Ayman Saied Joumaa Document Index

|  | Document | Bates Stamp |
|---|---|---|
| A. (S████) | Delisting denial evidentiary memorandum for Ayman Saied Joumaa, March 2, 2018 | 1-21 |
| B. (U) | Exhibits to the Delisting Denial Evidentiary Memorandum for Ayman Saied Joumaa | |
| 1. (U) | 76 Fed. Reg. 5858, January 26, 2011 | 22-25 |
| 2. (U) | Letter from OFAC to JOUMAA, November 18, 2016 | 26-66 |
| 3. (U) | U.S. Department of the Treasury website, January 26, 2011 | 67-68 |
| 4. (U) | U.S.A. v. Ayman Joumaa, et. al., June 17, 2011 | 69 |
| 5. (U) | Affidavit in Support of Arrest Warrant & Criminal Complaint, In the Matter of U.S.A. v. Ayman Joumaa, June 17, 2011 | 70-76 |
| 6. (U) | U.S.A. v. Ayman Joumaa, November 3, 2011 | 77-83 |
| 7. (U) | Criminal Docket, In the Matter of U.S.A. v. Joumaa, November 23, 2011 | 84-86 |
| 8. (U) | Letter from JOUMAA to OFAC, May 18, 2016 | 87-90 |
| 9. (U) | Email from JOUMAA to OFAC, May 18, 2016 | 91 |
| 10. (U) | Letter from JOUMAA to OFAC, May 18, 2016 | 92-98 |
| 11. (U) | Email from OFAC to JOUMAA, May 18, 2016 | 99 |
| 12. (U) | Letter from OFAC to JOUMAA, June 27, 2016 | 100-105 |
| 13. (U) | Letter from JOUMAA to OFAC, October 25, 2016 | 106-392 |
| 14. (U) | Letter from JOUMAA to OFAC, November 14, 2016 | 393-396 |
| 15. (U) | Letter from JOUMAA to OFAC, April 24, 2017 | 397-1393 |
| 16. (U) | Letter from JOUMAA to OFAC, August 24, 2017 | 1394-1403 |
| 17. (U) | Letter from JOUMAA to OFAC, August 29, 2017 | 1404-1408 |
| 18. (U) | Email from OFAC to JOUMAA, September 5, 2017 | 1409 |
| 19. (U) | Email from OFAC to JOUMAA, September 1, 2017 | 1410 |
| 20. (U) | Email from OFAC to JOUMAA, September 1, 2017 | 1411 |
| 21. (U) | Email from JOUMAA to OFAC, October 2, 2017 | 1412 |
| 22. (U) | Email from OFAC to JOUMAA, October 2, 2017 | 1413 |

SECRET████

SECRET

23. (U)        Letter from JOUMAA to OFAC, September 27, 2017        1414-1416
24. (U)        Letter from OFAC to JOUMAA, October 2, 2017           1417
25. (U)        Letter from OFAC to JOUMAA, October 16, 2017          1418-1419
26. (U)        31 C.F.R. Section 501.807                             1420-1423
27. (U)        The White House, Press Release, April 15, 2009        1424-1426
28. (U)        76 Fed. Reg. 51125, August 11, 2011                   1427-1428
29. (S         1429-1431
30. (U)        Politico, December 22, 2017                           1432-1479
31. (U//LES)   1480-1484
32. (U//LES)   1485-1490
33. (S         1491-1496
34. (U//LES)   1497-1499
35. (U)        1500-1509
36. (U)        1510-1513
37. (U)        1514-1516
38. (U)        Google Maps, Lala, Lebanon                            1517
39. (U)        Department of Justice, June 9, 2015                   1518
40. (U//LES)   1519-1526
41. (U//LES)   1527-1536
42. (U)        U.S. Department of the Treasury website, July 1, 2014  1537
43. (U)        U.S. Department of Justice, May 5, 2017               1538-1539
44. (U)        Boston Globe, September 7, 2017                       1540-1541
45. (U)        79 Fed. Reg. 40839, July 1, 2014                      1542-1546
46. (U//LES)   1547-1550
47. (U//LES)   1551-1553
48. (U//LES)   1554-1556
49. (U//LES)   1557-1562
50. (U//LES)   1563-1570
51. (U//LES)   1571-1577



SECRET

SECRET ████████

52. (U//LES) ████████████████████ 1578-1582
53. (U)    82 Fed. Reg. 41091, August 22, 2017    1583-1588
54. (U)    80 Fed. Reg. 60436, October 1, 2015    1589-1593
55. (U)    82 Fed. Reg. 22721, May 9, 2017    1594-1598
56. (S) ████████████████████    1599-1602
57. (U//LES) ████████████████████    1603-1611

C. (U)    Letter from OFAC to JOUMAA, March 2, 2018    1612-1614
D. (U)    Letter from OFAC to JOUMAA, March 9, 2018    1615-1617

SECRET ████████



SECRET ███████

## DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C. 20220

(U) Case ID FNK-7782

### (U) OFFICE OF FOREIGN ASSETS CONTROL

### (U) EVIDENTIARY MEMORANDUM

(U) MEMORANDUM FOR: Andrea M. Gacki *AMG 3·2·2018*
Acting Director
Office of Foreign Assets Control

(U) THROUGH: Gregory T. Gatjanis ███████
Associate Director
Office of Global Targeting *3/1/18*

Todd Conklin ███ ███ *3/1/18*
Deputy Associate Director
Office of Global Targeting

Mark Samara *MA.S— 3/1/2018*
Assistant Director
Global Crime and Narcotics Division

(U) FROM: ████████████
Sanctions Investigator *3/1/2018*
Global Crime and Narcotics - Eastern Hemisphere

(U) SUBJECT: Recommendation to deny the request for reconsideration and removal of AYMAN SAIED JOUMAA[1] from the list of Specially Designated Nationals and Blocked Persons

## (U) I. **INTRODUCTION**

(U) This memorandum recommends denying the request for reconsideration and removal of AYMAN SAIED JOUMAA (JOUMAA) from the list of Specially Designated Nationals and Blocked Persons (SDN List).

## (U) II. **BACKGROUND**

---

[1] (U) The name of the petitioner will appear in ALL CAPITAL letters. Throughout this memorandum, an asterisk* following a name denotes an individual or entity whose property and interests in property is blocked.



1

SECRET ███████

SECRET ██████████

(U) On January 26, 2011, the Office of Foreign Assets Control (OFAC) designated JOUMAA as a Specially Designated Narcotics Trafficker (SDNT) pursuant to the Foreign Narcotics Kingpin Designation Act (Kingpin Act) [Exhibit 1, pp. 2-3] for playing a significant role in international narcotics trafficking. [Exhibit 2, p. 9]

(U) OFAC designated JOUMAA as a SDNT for coordinating the transportation, distribution, and sale of multi-ton shipments of cocaine from South America, and laundering the proceeds from the sale of cocaine in Europe and the Middle East. JOUMAA and his organization, operating in Lebanon, West Africa, Panama and Colombia, laundered proceeds from their illicit activities – as much as $200 million per month – through various channels, including bulk cash smuggling operations and Lebanese exchange houses.[2] [Exhibit 3, p. 1]

## (U) III. **CHRONOLOGY OF EVENTS**

(U) On June 17, 2011, a sealed complaint was filed in the U.S. District Court for the Eastern District of Virginia charging JOUMAA and another individual with conspiracy to distribute five kilograms or more of cocaine. [Exhibit 4] Supporting the complaint was an affidavit in support of an arrest warrant and criminal complaint, which was also sealed. [Exhibit 5]

(U) On November 23, 2011, a sealed indictment was filed charging JOUMAA and another individual with one count of conspiracy to distribute five or more kilograms of cocaine, knowing and intending that it would be unlawfully imported into the United States, and one count of conspiracy to commit money laundering. [Exhibit 6, pp. 3-6] On December 12, 2011, the matter was unsealed upon motion by the United States. [Exhibit 7, p. 2]

(U) In a letter dated May 18, 2016, JOUMAA requested administrative reconsideration of his designation and removal of his name from the SDN List. [Exhibit 8, p. 1] He further requested that OFAC provide him "specific inquiries and questions that address the factual basis underlying" his designation. [Exhibit 8, pp. 3-4] This request was also made via email with the correspondence attached. [Exhibit 9]

(U) In a separate letter dated May 18, 2016, JOUMAA requested that OFAC disclose any and all portions of the administrative record relied upon in the designation process, as well as any releasable exhibits attached to the administrative record. [Exhibit 10, p. 1]

(U) On May 18, 2016, OFAC acknowledged receipt of the correspondence from JOUMAA dated May 18, 2016, requesting both a copy of the administrative record and reconsideration of his designation as a SDNT. [Exhibit 11]

(U) On July 27, 2016, OFAC sent JOUMAA a letter seeking certain information in response to his reconsideration request. [Exhibit 12]

---

[2] (U) On January 26, 2011, OFAC also designated nine individuals and eight entities connected to JOUMAA's drug trafficking and money laundering organization pursuant to the Kingpin Act. [Exhibit 1, p. 2] The press release erroneously states that 19 entities were sanctioned. [Exhibit 3] Only eight entities were sanctioned on January 26, 2011 with JOUMAA. [Exhibit 1, p. 2]

SECRET ██████████

2

~~SECRET~~ ████████

(U) On October 25, 2016, JOUMAA submitted a partial response to OFAC's letter seeking information, as well as additional arguments pertaining to his request for reconsideration. [Exhibit 13]

(U) On November 14, 2016, JOUMAA submitted a second request for the administrative record related to his January 26, 2011 designation. [Exhibit 14, p. 1]

(U) On November 18, 2016, OFAC provided JOUMAA with a copy of the administrative record related to his January 26, 2011 designation, redacted to protect classified, law enforcement, and other privileged information. The administrative record included OFAC's evidentiary memorandum, certain exhibits, a non-privileged and unclassified summary of otherwise privileged information, OFAC's press release, and OFAC's press chart. [Exhibit 2][3]

(U) On April 24, 2017, JOUMAA submitted a supplement to his petition for reconsideration. [Exhibit 15] The supplement included additional information and documents not provided in his response dated October 25, 2016. [Exhibit 15]

(U) On September 1, 2017, OFAC received correspondence from JOUMAA dated August 24, 2017. [Exhibit 19] In this correspondence, which was also mailed to OFAC via FedEx tracking number 8106 5197 5724, JOUMAA provided a supplement to his petition for reconsideration, which included an analysis of OFAC's basis for the continuing designation of JOUMAA. [Exhibit 16, pp. 6-9]

(U) Also on September 1, 2017, OFAC received correspondence from JOUMAA dated August 29, 2017. [Exhibit 20] In this correspondence, which was also mailed to OFAC via FedEx tracking number 8016 5197 5713, JOUMAA submitted a request to enter into a Terms of Removal Agreement with OFAC. [Exhibit 17]

(U) On September 5, 2017, OFAC acknowledged receipt of JOUMAA's correspondence dated August 24 and August 29, 2017. [Exhibit 18]

(U) On October 2, 2017, OFAC received correspondence from JOUMAA dated September 27, 2017. [Exhibit 21] In this correspondence, which was also mailed to OFAC via FedEx tracking number 8106 5197 5584, JOUMAA requested an update as the status of his reconsideration petition. [Exhibit 23]

(U) On October 2, 2017, OFAC acknowledged receipt of his October 2, 2017 correspondence. [Exhibit 22]

(U) On October 2, 2017, OFAC denied JOUMAA's request to enter into a Terms of Removal Agreement, explaining that reconsideration of JOUMAA's designation was under review. [Exhibit 24]

---

[3] (U) Information redacted from the administrative record does not contain exculpatory information. In addition, information that is not relevant to JOUMAA was also redacted.

~~SECRET~~ ████████

~~SECRET~~ ████████

(U) On October 16, 2017, OFAC acknowledged receipt of JOUMAA's correspondence, dated September 27, 2017, requesting an update of the status of his reconsideration request. OFAC informed JOUMAA that his request was under consideration and that the process was lengthy to determine whether he continued to meet the criteria. JOUMAA was also informed that a careful review of the documents submitted was being performed. [Exhibit 25]  In addition to his responses to the questionnaire, JOUMAA had submitted more than 1,200 pages of materials to OFAC. [Exhibits 13 and 15]

(U) As of March 2018, JOUMAA has not faced the charges against him in the U.S. District Court for the Eastern District of Virginia, [Exhibit 5][4] nor has he notified OFAC of his intent or willingness to return to the United States to face those charges.

## (U) IV. ARGUMENTS

(U) A person may seek administrative reconsideration of his, her or its designation by submitting arguments or evidence that the person believes establishes that insufficient basis exists for the designation or the circumstances resulting in the designation no longer apply.  In addition, a person may propose remedial steps that would negate the basis for the designation. [Exhibit 26, p. 31]  OFAC has carefully reviewed and considered JOUMAA's responses to the questionnaire provided by OFAC, as well as the additional documents, arguments, and evidence he provided. Based on the information available to OFAC, JOUMAA's arguments fail to demonstrate a basis for removal from the SDN List.

### (U) 1.  JOUMAA unpersuasively denies that he was involved in narcotics trafficking activities at any time.

(U) In JOUMAA's May 18, 2016 request for reconsideration, he stated that he "does not play a role in narcotics trafficking activities," "dispute[d] the factual basis underlying his continued designation," and "assert[ed] that an insufficient basis exists for the designation." [Exhibit 8, p. 1]

(U) Similarly, in JOUMAA's May 18, 2016 request for the administrative record, he stated that "he does not play a role in any activities related to or in support of international narcotics trafficking." [Exhibit 10, p. 1]

(U) In JOUMAA's October 25, 2016 response to OFAC's request for information, he stated that he "ha[d] not been involved in the cultivation, production, manufacture, distribution, selling, financing, or transport of narcotic drugs or any other controlled substances, nor ha[d] he ever attempted or conspired with others to do so."  JOUMAA also stated that he was "not aware of the laundering of drug proceeds or assets undertaken in his name."[5] [Exhibit 13, p. 26]  Finally,

---

[4] (U) JOUMAA also acknowledges that the indictment remains "pending in the Eastern District of Virginia." [Exhibit 13, p. 27]
[5] (U) JOUMAA is inconsistent regarding his denials of narcotics trafficking and money laundering.  In his October 25, 2016 response to OFAC he categorically denies having ever been involved in drug trafficking, money laundering, or conspiring with others to do so. [Exhibit 13, pp. 26, 35]  However, he also seems to suggest at other points that he at one time did engage in narcotics trafficking or money laundering.  For example, in his May 18, 2016 request for the administrative record, JOUMAA states that access to the administrative record "is intended to

~~SECRET~~ ██████████

JOUMAA stated that his disclosure of information will serve as evidence that he "is not and has not engaged in activities related to narcotics trafficking, but has been an active business person involved in multiple lines of work," and that he "is not and has not been involved in activities related to narcotics trafficking or money laundering in support of narcotics trafficking." [Exhibit 13, p. 35]

(U) JOUMAA's claim that he was never involved in money laundering and drug trafficking is not credible. His designation was based upon reliable and corroborated information that he led a drug trafficking and money laundering organization moving hundreds of millions of dollars in narcotics proceeds from the United States to Lebanon. Known narcotics traffickers and money launderers worked with JOUMMA to coordinate drug money laundering in Florida. In addition, JOUMAA exported vehicles from the United States to West Africa to launder procceeds. [Exhibit 2, p. 2]

(U) Not only was JOUMAA designated for such illicit activities by OFAC, but he was also indicted by a federal grand jury for such activities in the U.S. District Court for the Eastern District of Virginia. The 2011 indictment charged JOUMAA with one count of conspiracy to distribute five or more kilograms of cocaine, knowing and intending that it would be unlawfully imported into the United States, and one count of conspiracy to commit money laundering. The indictment charges that JOUMAA and his co-conspirators "coordinated the shipment of at least tens of thousands of kilograms of cocaine from Colombia, through Central America and Mexico, to the United States, including 85,000 kilograms of cocaine shipped from Colombia for sale to Los Zetas[6] drug cartel" from approximately 2005 through 2007. [Exhibit 6, pp. 3-4] The indictment futher states that JOUMAA and his co-conspirators "laundered at least hundreds of millions of dollars in proceeds of illegal drug sales in the United States and elsewhere, including but not limited to an amount in excess of $250 million in drug related proceeds representing cocaine sales in the United States, Mexico, Central America, and Europe," which JOUMAA laundered from 1997 to approximately September 2010. [Exhibit 6, p. 4]

(U) Additionally, the indictment states JOUMAA and his co-conspirators "coordinated the shipment of multi-thousand kilogram quantities of cocaine from Colombia to Guatemala, Honduras, and Mexico for sale to Los Zetas drug cartel in Mexico," which was intended for final shipment to the United States. JOUMAA "would arrange for the laundering of drug-related proceeds from Mexico, Europe (predominantly Spain), and West Africa to Colombia." JOUMAA's co-conspirators would contact him in order "to arrange for the delivery of drug related proceeds to members" of JOUMAA's organization. JOUMAA and members of his organization "would then launder these proceeds and return them to the cocaine suppliers in Colombia." JOUMAA "would charge a fee between 8% and 14% for the laundering of these proceeds." These drug proceeds received by JOUMAA and his associates were "in the form of

---

assist [him] in remediating any behavior that might have served as the basis for his designation." [Exhibit 10, p. 2] In his letter dated August 24, 2017, he argues OFAC has not provided evidence that he is *currently* involved in drug trafficking or money laundering. [Exhibit 16, p. 2]. And in his October 25, 2016 response, JOUMAA argues that he "is not and has not been for some time involved in any transactions that could be deemed to fall under the Kingpin Act's definition of 'narcotics trafficking.'" [Exhibit 13, p. 37]

[6] (U) On April 15, 2009, the President identified Los Zetas* as a significant foreign narcotics trafficker pursuant to the Kingpin Act. [Exhibit 27] In addition, on August 11, 2011, OFAC designated Los Zetas* pursuant to Executive Order 13581 ("*Blocking Property of Transnational Criminal Organizations*"). [Exhibit 28, p. 2]

5

~~SECRET~~ ██████████

SECRET ████████

United States currency and represented proceeds from the sale of cocaine in the United States." [Exhibit 6, p. 4]

(U) Furthermore, the indictment states that JOUMAA and his co-conspirators "would receive bulk deliveries of United States currency." "These deliveries of bulk cash, which represented proceeds of the sale of cocaine in the United States, were made in Mexico City, Mexico." "Once the drug proceeds were delivered to [JOUMAA] and his co-conspirators, the laundered proceeds would be paid out in Venezuela or Colombia to drug traffickers." JOUMAA would then launder these funds and make payment within five days from the date of delivery of the United States currency in Mexico. During the course of the conspiracy, JOUMAA "typically picked up between $2 and 4 million at a time in Mexico City." [Exhibit 6, pp. 4-5]

(U) Finally, the indictment further notes that JOUMAA and his co-conspirators would "pick up drug-related proceeds in Mexico, Europe, and West Africa." JOUMAA and his co-conspirators would "pick up United States currency in Mexico City, Mexico." JOUMAA would "launder these proceeds and repay them to drug traffickers in Colombia and Venezuela." The United States currency laundered by JOUMAA "represented the proceeds of the sale of cocaine shipped from Colombia to Guatemala, Honduras, and Mexico, for sale to the Los Zetas trafficking organization in Mexico. The ultimate destination of the cocaine shipped to Los Zetas drug cartel was the United States." [Exhibit 6 p. 5]

(U) Details regarding JOUMAA's drug trafficking and money laundering are also laid out in a June 17, 2011 affidavit in support of his arrest warrant and criminal complaint by a Special Agent, who at the time had approximately 15 years of experience with the Drug Enforcement Administration (DEA). The affidavit indicates that the DEA had been investigating JOUMAA since March 2010 and during the course of the investigation extensive interviews[7] were conducted and undercover operations were peformed. [Exhibit 5, pp. 1-3] For example, the affidavit states that in 2004 a confidential source (CS-1)[8] began working with JOUMAA and JOUMAA would arrange for the laundering of narcotics related proceeds from Mexico, Europe, and West Africa to Colombia. CS-1 would contact JOUMAA to "arrange for the delivery of drug related proceeds to members of JOUMAA's organization." According to the affidavit's recitation of information from CS-1, "JOUMAA and members of his organization would launder these proceeds and return them in Colombia." [Exhibit 5, p. 4]

(U) The affidavit further states, based on information provided by CS-1, that "JOUMAA would charge a fee of approximately 13% for the laundering of these proceeds," which were from the sale of cocaine in the U.S. and were in the form of U.S. currency. In addition, CS-1 would arrange for the delivery of the drug proceeds in bulk in U.S. currency to JOUMAA and members

---

[7] (U) DEA Special Agents write reports of investigation based on the Department of Justice's and DEA's promulgated policies for developing, using, and managing sources or informants (according to "*The Attorney General's Guidelines Regarding the Use of Confidential Informants*" and the "*DEA Agent's Manual*"), which specify practices for quality assurance in vetting and corroborating sources.

[8] (U) At the time the affidavit was executed, CS-1 had pled guilty to federal narcotics trafficking offenses and was awaiting sentencing. CS-1 had participated in a conspiracy to ship multi-thousand kilogram quantities of cocaine from Colombia, to Guatemala, Honduras, and Mexico for sale to Los Zetas*. The ultimate destination for this cocaine was the United States. CS-1 is cooperating with law enforcement with the anticipation of obtaining a reduction in his/her sentence. [Exhibit 5, pp. 3-4]

SECRET ████████

~~SECRET~~ ███████████

of his organization. CS-1 advised that "JOUMAA typically picked up between 2 to 4 million dollars at a time" from CS-1 in Mexico City and that he laundered drug related proceeds for CS-1 until 2008. [Exhibit 5, pp. 4-5]

(U) According to another source, CS-2[9], who began working with JOUMAA in 2004, CS-2 would contact JOUMAA and "arrange for JOUMAA and members of his organization to pick up drug related proceeds in Mexico, Europe, and West Africa." CS-2 would coordinate with JOUMAA to "arrange the pick up of United States currency in Mexico City, Mexico." JOUMAA would then launder these proceeds and charge a 13 percent fee. The currency that JOUMAA laundered, according to CS-2, was from the proceeds of the sale of cocaine shipped from Colombia to Guatemala, Honduras, and Mexico for sale to Los Zetas*. CS-2 stated that the ultimate destination of the cocaine shipped to Los Zetas* was the United States. CS-2 continued to use the laundering services of JOUMAA until approximately 2008.[10] [Exhibit 5, pp. 5-6][11]

(U) 2. **JOUMAA continues to be involved in money laundering activities, and his claims to the contrary are not credible.**

(U) In an April 24, 2017 letter to OFAC, JOUMAA stated that he "has not been involved with foreign currency exchange transactions since at least in or around 2011 when he was placed on OFAC's [SDN] list." [Exhibit 15, pp. 12-13]

(U) On August 24, 2017, JOUMAA stated that "OFAC lacks a factual and legal basis upon which to maintain [his] designation, as the allegations leveled at [him] are historical in nature and lack connection to [his] current activities." [Exhibit 16, p. 2]

(U) Based on the information available to OFAC, JOUMAA's claim that he is not currently involved in money laundering is not credible.

(U) ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[9] (U) At the time the affidavit was executed, CS-2 was cooperating with law enforcement, including agents from U.S. Customs and Immigration Enforcement. CS-2 was a member of a drug trafficking and money laundering organization and worked extensively with CS-1. [Exhibit 5, p. 5]

[10] (U) Both CS-1 and CS-2 knew JOUMAA by his alias, Junior. [Exhibit 5 pp. 4-5] JOUMAA has confirmed that his alias is Junior. [Exhibit 13, p. 2]

[11] (U) JOUMAA's trafficking is also detailed in a 2017 Politico article. JOUMAA is described as a Medellin-based Lebanese businessman who led one of the biggest money laundering networks DEA had ever seen. The article goes on to describe JOUMAA's international money laundering scheme. As stated in the article, JOUMAA's network worked with Mexican drug trafficking organization, Los Zetas* "to move multi-ton loads of cocaine directly into the United States, and wash[ed] $200 million a month in criminal proceeds with the help of 300 or so used car dealerships. The network would funnel huge amounts of money to the dealerships to purchase used cars, which would then be shipped to Benin, on Africa's west coast." [Exhibit 30, p. 17]

[12] (U//LES) ████████

~~SECRET~~ ███████████

SECRET ██████

██████████████████████████████████████

[Exhibit 29, p. 1]

(U//LES)

[Exhibit 31, p. 3]

(U//LES)

[Exhibit 32, p. 1]

16 [Exhibit 32, p. 2]

[Exhibit 32, pp. 1-2]

[Exhibit 32, pp. 4-5]

[Exhibit 32, p. 5]

(S

13 (U)

[Exhibit 35, pp. 1 & 4]

[Exhibit 36, pp. 1 & 4]

[Exhibit 37, p. 1 & 3]

14 (U//LES)

[Exhibit 31, p. 1]

[Exhibit 31 p. 2]

[Exhibit 5]

15 (U//LES)

Exhibit 5.

16 (U) JOUMAA confirmed that he is from this area of Lebanon in his October 25, 2016 response. He noted that he was born and currently lives in Lala Village, West Bekaa, Lebanon. [Exhibit 13, p. 2] Lala and Chtaura are located near each other. [Exhibit 38]

17 (U//LES)

[Exhibit 39]

[Exhibit 40]

8

SECRET ██████

SECRET ███████



[Exhibit 33, pp. 2-3]

[Exhibit 33, p. 3]

(U//LES)

[Exhibit 34, p. 2]

[Exhibit 34, p. 1]

(U//LES)

[Exhibit 41, pp. 2-3]

[Exhibit 41, p. 7]

[Exhibit 41, p. 2]

(U) 3.  **JOUMAA's claims about his relationships, business or otherwise, with previously designated individuals are not credible.**

(U) a. **Pedro Claver Mejia Salazar\*, Victor Gabriel Mejia Alzate\*, and Juan Carlos Mejia Alzate\***[21]

(U) In his October 25, 2016 letter to OFAC, JOUMAA stated that he has a "business relationship" with Pedro Claver Mejia Salazar\*, "knew him fairly well," and that he was a "dealer in commercial goods" who provided JOUMAA with "lots of credit in his own business." Although JOUMAA stated that Pedro Claver Mejia Salazar\* was "the first person to begin selling [JOUMAA] U.S. dollars," JOUMAA did not admit that he engaged in any illicit activities such as money laundering with or on behalf of Pedro Claver Mejia Salazar\*. [Exhibit 13, p. 8]

(U) In his April 24, 2017 letter to OFAC, JOUMAA stated that he has known Victor Gabriel\* and Juan Carlos Mejia Alzate\* since childhood "but has never been involved in a business relationship" with them. JOUMAA did not admit that he engaged in any illicit activities such as money laundering with or on behalf of Victor Gabriel\* or Juan Carlos Mejia Alzate\*. [Exhibit 15, p. 3]

---

[18] (U//LES) ███████

[19] (U//LES) ███████ Exhibit 31, p. 3]

[20] (U//LES) ███████
[Exhibit 41, p. 2]
[21] (U) On July 1, 2014, OFAC designated Pedro Claver Mejia Salazar\*, Victor Gabriel Mejia Alzate\*, and Juan Carlos Mejia Alzate\* pursuant to the Kingpin Act. [Exhibit 45, pp. 2-3]

9

FNK 7782 0009

SECRET ███████

(U) Based on the information available to OFAC, JOUMAA's denials are not credible.

(U) Victor Gabriel* and Juan Carlos Mejia Alzate* are the sons of Pedro Mejia Salazar*. Pedro Mejia Salazar* primarily laundered narcotics proceeds on behalf of La Oficina de Envigado*.[22] Pedro Mejia Salazar* relied upon a network of trusted family members to carry out his money laundering transactions, including his sons Victor Gabriel* and Juan Carlos Mejia Alzate*. He also worked with JOUMAA as part of his global drug money laundering operations. [Exhibit 42]

(U) Given that Pedro Mejia Salazar* worked with JOUMAA as part of his global drug money laundering operations and relied upon a network of family members to carry out his money laundering transactions, including his sons Victor Gabriel* and Juan Carlos Mejia Alzate*, JOUMAA's statements are not credible.

(U) On May 4, 2017, Pedro Mejia Salazar* pleaded guilty in U.S. District Court for the District of Massachusetts for his role in a conspiracy to launder drug proceeds for and on behalf of La Oficina de Envigado* using his family business. [Exhibit 43, p. 1] The investigation surrounding Pedro Mejia Salazar* targeted money launderers who use the international financial system and the black market peso exchange to return drug proceeds collected in the U.S. and other countries. [Exhibit 43, p. 2] On September 6, 2017, Pedro Mejia Salazar* was sentenced to a 50-month prison term. [Exhibit 44, p. 1]

(U//LES) ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████ [Exhibit 46, p. 2]

(U//LES) ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████ [Exhibit 47, p. 1]

(U//LES) ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[22] (U) On June 26, 2014, OFAC designated La Oficina de Envigado* pursuant to the Kingpin Act. [Exhibit 42]
[23] (U//LES) ██████████████████████████████████████████████████████
██████████████████████████████████ Exhibits 46, 47, 48, and 49]
███████████████████████ [Exhibit 48, p. 2] ████████████████ [Exhibit 49, p. 2] ██████████████ [Exhibit 49 p. 3]

SECRET ███████

10

FNK 7782 0010

SECRET ███████



[Exhibit 48, p. 2]

(U//LES) ███████

[Exhibit 49, p. 3]

(U//LES) ███████

[Exhibit 50, pp. 3-4]

[Exhibit 50, p. 4]

(U//LES) ███████

[Exhibit 50, p. 4]

### (U) b. Merhi Ali Abou Merhi, Atef Merhi Abou Merhi, and Hana Merhi Abou Merhi

(U) In his October 25, 2016 response to OFAC's request for information, JOUMAA denied having a relationship, business or otherwise, with Merhi Ali Abou Merhi, Atef Merhi Abou Merhi, and Hana Merhi Abou Merhi.[28]  [Exhibit 13, pp. 10-11]

---

[24] (U//LES) ███████

[Exhibit 41, p. 7]

[25] (U) ███████

[26] (U//LES) ███████

[Exhibit 50, p. 1]

[27] (U) ███████

[Exhibit 42]

[Exhibit 53, pp. 2-3]

[28] (U) On October 1, 2015, OFAC designated Merhi Ali Abou Merhi, Atef Merhi Abou Merhi (Atef Abou Merhi), and Hana Merhi Abou Merhi (Hana Abou Merhi) pursuant to the Kingpin Act.  [Exhibit 54, pp. 2-3]  On May 9,

11

SECRET ███████

~~SECRET~~ ███████

(U) Based on the information available to OFAC, JOUMAA's denial is not credible.

(U//FES)



[Exhibit 51, p. 3]

(U//FES)

[Exhibit 52, p. 2]

[Exhibit 52, p. 3]

(U) 4. **The Information Relied upon by OFAC Is Reliable.**

(U) In his October 25, 2016 correspondence, JOUMAA states that "the publicly-available evidence appears to be primarily reliant on three confidential sources, at least two of whom were either pending trial or sentencing before a U.S. federal court." According to JOUMAA, due to the fact that their cooperation with U.S. government authorities led to reductions in their sentences, these sources were likely motivated to provide information, whether true or not. JOUMAA believes that "the fact that the cooperation of these sources was motivated by expected reductions in sentencing should render suspect the information provided." While initially questioning the credibility of the information used to designate him, JOUMAA then proceeds to argue that unless OFAC has contemporaneous evidence tying him to narcotics trafficking and money laundering activities, the Kingpin Act does not support maintaining him on the SDN List. [Exhibit 13, p. 34]

(U) The DEA is charged with conducting drug trafficking investigations. During the course of an investigation, the DEA relies upon seized documents, confidential sources or informants, undercover operations, intercepted telephone calls, and other methods to research and document the operations of a drug trafficking organization.

---

2017, OFAC removed Merhi Ali Abou Merhi, Atef Abou Merhi, and Hana Abou Merhi from the SDN List. [Exhibit 55, pp. 2-3]

12

SECRET████████

(U) OFAC considers the information and sources in the DEA reports of investigation as reliable based on DOJ's and DEA's promulgated policies for developing, using, and managing sources or informants (the *Attorney General's Guidelines Regarding Use of Confidential Informants* and the *DEA Agent's Manual*). Pursuant to these policies, OFAC considers the DOJ's and DEA's practices for quality assurance in vetting and corroborating their sources to be reliable. Accordingly, when a source's information is documented in a DEA report of investigation, the source's reliability has already been taken into consideration and the source has been deemed reliable.

(U) Here, the nature of the information from a variety of sources establishes that the information is reliable. Further, JOUMAA has not provided any evidence to substantiate his claim that the DEA erroneously characterized its sources as reliable or misstated the information provided by these sources. By contrast, JOUMAA has provided demonstrably false and misleading information to OFAC in the course of requesting his removal from the SDN List.

(U) 5. <u>**The Lebanese legal proceedings are not relevant since the court did not possess information available to the United States.**</u>

(U) JOUMAA provided OFAC with information regarding a 2016 Lebanese court proceeding that was affirmed by a panel of judges in February 2017, which purportedly found there was "a lack of evidence to support the indictment and prosecution" of JOUMAA for the crime of money laundering. [Exhibit 15, pp. 10-11] JOUMAA claims that the court considered evidence presented in the case and the findings of an investigative commission, including deposits made and withdrawals from accounts held by JOUMAA and his brother since 1998. [Exhibit 15, p. 10] According to JOUMAA, the court did not find evidence indicating "anything unlawful or otherwise untoward about these check deposits" and they were "ordinary for the type of bank accounts." In addition, the court purportedly reviewed transactions involving New Line Exchange Trust Co. According to JOUMAA, "the court could find no evidence supporting OFAC's allegations and lamented the failure of the U.S. government to turn over evidence to Lebanese authorities." [Exhibit 15, p. 11]

(U) While OFAC does not dispute the summary of the proceedings as provided by JOUMAA, they are not probative for purposes of assessing JOUMAA's request for reconsideration. As stated by JOUMAA, the Lebanese court was not in possession of the body of evidence available to the United States. Such information, from a variety of sources, is detailed above and clearly indicates that JOUMAA laundered funds as part of a narcotics trafficking scheme and continues to do so. The Lebanese proceedings are not dispositive and have no relevance upon the instant determination.

(U) 6. <u>**JOUMAA's remaining arguments are without merit.**</u>

(U) JOUMAA makes several other arguments that are without merit. In his October 25, 2016 letter to OFAC, he argues that the evidence that has been made publicly available is conclusory in nature and the underlying evidence supporting the allegations has not been provided. [Exhibit 13, p. 34]

13

SECRET████████

S̶E̶C̶R̶E̶T̶ ███████

(U) Evidence was withheld from JOUMAA to the extent that it was classified, law enforcement sensitive or otherwise privileged information, or irrelevant or non-responsive. Nevertheless, the press release and press chart issued on the date of JOUMAA's designation provided detailed information regarding the basis of his designation, describing JOUMAA's illicit activities, the methods he and his organization used, the amount of money laundered, and the identities of his criminal associates and front companies. [Exhibit 3]  In addition, on November 18, 2016, JOUMAA received a redacted copy of the administrative record of his designation. [Exhibit 2]  Included with the administrative record was a non-privileged and unclassified summary of otherwise privileged information. [Exhibit 2, p. 2]  Thus, notwithstanding that JOUMAA has not been afforded the opportunity to review classified or privileged information in the administrative record, the information disclosed to JOUMAA is certainly not conclusive and provides ample basis to understand the facts underlying his designation.

███████████████████████████████████████████
███████████ [Exhibits 31, 32, 34, 41, 46-52] ████████████████
███████████████████████████ [Exhibits 29 and 33].

(U) Likewise, JOUMAA argues that "[m]istaken designations are a threat to the confidence with which the public and private sector place in the integrity of OFAC's administration of U.S. sanctions programs" and that "it is essential that all parties have confidence in the accuracy and integrity of OFAC's fact-finding process." [Exhibit 13, p. 35]  JOUMAA has provided no evidence to indicate that his designation was due to mistaken identity.  Nor has he provided any information to impugn the accuracy and integrity of OFAC's fact finding process.  OFAC has relied upon a variety of sources to establish that JOUMAA continues to engage in money laundering and narcotics trafficking.

(U) JOUMAA argues that "OFAC should work in good-faith with [him] to pinpoint the conduct at issue and to detail how [he] can take action to instill confidence in OFAC that [he] is not engaged in activities related to narcotics trafficking." [Exhibit 13, p. 36]  In order to be removed from the SDN List, it would need to be established that an insufficient basis exists for the designation or that the circumstances resulting in the designation no longer apply. [Exhibit 26]  OFAC has sufficiently described the illicit activity engaged in by JOUMAA, and JOUMAA has not demonstrated, nor does the available evidence establish, that he has ceased activities related to narcotics trafficking, including money laundering.

(U) Finally, JOUMAA suggests that OFAC does not have "full faith and confidence in the evidence underlying its decision to designate and maintain [his] designation." [Exhibit 13, p. 36]  For the reasons stated above, OFAC has full confidence in the reliability of the evidence relied upon in designating JOUMAA, and its review of the information currently available—including classified and law enforcement sensitive information, which JOUMAA has not reviewed—confirms that his continued designation is warranted.

(U) 7. **Submission of documents by JOUMAA to OFAC**

14



SECRET█████

(U) As part of his correspondence with OFAC, JOUMAA submitted numerous exhibits as attachments to his October 25, 2016 and April 24, 2017 responses.

(U) On October 25, 2016, JOUMAA responded to questions from OFAC regarding relationships he had to certain individuals and companies. As part of his responses, JOUMAA attached two exhibits totaling approximately 250 pages. One exhibit consisted of copies of his passports (Colombia, Lebanon, and Venezuela). The second exhibit consisted of corporate formation documents of Goldi Electronics S.A.*,[29] bank statements for the accounts of Goldi Electronics S.A.*, invoices and shipping documents, and certain Society for Worldwide Interbank Financial Telecommunications (SWIFT) messages. [Exhibit 13] JOUMAA noted in his October 25, 2016 response to OFAC that he started Goldi Electronics S.A.* in 2008 and operated the company until his designation in 2011. [Exhibit 13, p. 13]

(U) In addition, on April 24, 2017, JOUMAA attached twenty-six exhibits, totaling approximately 1,000 pages, as part of his follow-up response to the questionnaire. The exhibits consisted of corporate documents and invoices related to the Hassan Ayash Exchange Company* and the New Line Exchange Trust Co.*[30], as well as additional corporate documents related to Goldi Electronics S.A.* [Exhibit 15]

(U) JOUMAA noted in this April 24, 2017 response to OFAC that his relationship with the Hassan Ayash Exchange Company* began around 2005 and continued until his designation. [Exhibit 15, p. 5] JOUMAA also described his business relationship with the New Line Exchange Trust Co.* which was established on January 16, 2008 at his "behest" and has not engaged in any operations since August 2011. [Exhibit 15, pp. 5-9]

(U) Based on the information currently available to OFAC, including the documents provided by JOUMAA, OFAC accepts, for purposes of deciding JOUMAA's request for reconsideration, his claims that the New Line Exchange Trust Co.* has not engaged in any operations since August of 2011, that his relationship with the Hassan Ayash Exchange Company* ceased after his designation, and that he ceased operating Goldi Electronics S.A.* after his designation. Nevertheless, the documents JOUMAA submitted do not establish that an insufficient basis exists for the 2011 designation. As noted in the press release, JOUMAA used the Hassan Ayash Exchange Company*, the Ellissa Exchange Company*,[31] and the New Line Exchange Trust Co.* in connection with his money laundering activities. [Exhibit 3, p. 40]

(U) First, the documents submitted by JOUMAA do not rebut OFAC's evidence that he used the Hassan Ayash Exchange Company* and the New Line Exchange Trust Co.* in connection with his money laundering activities. Second, the documents do not address the other aspects of JOUMAA's drug trafficking and money laundering network that served as the basis for his designation, such as the Ellissa Exchange Company*. In addition, JOUMAA used channels outside of Lebanon, including by means that did not involve business entities, to launder funds.

---

[29] (U) Goldi Electronics S.A.* was designated on January 26, 2011 pursuant to the Kingpin Act. [Exhibit 3]
[30] (U) New Line Exchange Trust Co.* and the Hassan Ayash Exchange Company were designated on January 26, 2011 pursuant to the Kingpin Act. [Exhibit 3]
[31] (U) Ellissa Exchange Company* was designated on January 26, 2011 pursuant to the Kingpin Act. [Exhibit 3]

15

FNK 7782 0015

SECRET████████

[Exhibit 3; Exhibit 6, pp. 3-5][32]  Third, while the invoices show examples of specific apparent transactions,[33] JOUMAA did not submit an independent audit[34] of the Hassan Ayash Exchange Company* or the Ellissa Exchange Company*.

(U) Finally, the evidence available to OFAC, as discussed above, establishes that JOUMAA continues to be involved in money laundering activities, and his claims to the contrary are not credible.  Accordingly, while JOUMAA may have either ceased his relationship with the New Line Exchange Trust Co.*, Hassan Ayash Exchange Company* or Goldi Electronics S.A.*, or these entities may no longer be operational, this does not establish that JOUMAA has ceased laundering money or that he no longer engages in narcotics trafficking.  Thus, the circumstances resulting in the designation still apply, and the documents do not demonstrate that removal from the SDN List is warranted.

(U) 8. **Other Information Relevant to Credibility**



[Exhibit 56, pp. 1-2]

[Exhibit 56, p. 2]

(U) V. **CONCLUSION**

[32] (U//FSO) ████████
[Exhibit 40, p. 60] ████████
[Exhibit 57, p. 5; see also Exhibit 48, p. 2; Exhibit 50, p. 4]
[33] (U) For example, two invoices show the exchange of 1.25 million euros to approximately $2 million U.S. dollars. However, there is no information regarding the source of the customer's euros or the purpose of the transfer to dollars. [Exhibit 15, Exhibits A, p. 16 and H, p. 67]  Another invoice shows the sale of appliances, such as washing machines and air conditioners. [Exhibit 15, Exhibit G, p. 51] A third invoice shows a credit to M/S. Global Energy Food Industries in the amount of $60,000 for the product "biscuit", by order of Ramani Distribution Co. [Exhibit 15, Exhibit N, p. 109] Lastly, a transfer of funds by the New Line Exchange Trust Co.* is reflected in an "Order Transfer" in the amount of $7,300 for "thread as raw material." [Exhibit 15, Exhibit N, p. 144]
[34] (U) One document is a Banking Control Commission report regarding the New Line Exchange Trust Co.*, dated March 20, 2015, which does note that the company appeared to comply with certain provisions to fight money laundering, which require the maintenance of documents related to clients who conduct operations exceeding $10,000. [Exhibit 15, Exhibit S, p. 901]  However, given the various methods and entities used by JOUMAA and his organization to engage in money laundering, as well as the evidence that JOUMAA continues to be involved in money laundering activities, OFAC does not consider this report sufficient to warrant JOUMAA's removal from the SDN List.

16

SECRET████████

SECRET █████████

(U) According to information available to OFAC, JOUMAA continues to meet the criteria for designation as an SDNT pursuant to the Kingpin Act.  Information available to OFAC indicates that JOUMAA continues to play a significant role in international narcotics trafficking. Therefore, JOUMAA's reconsideration request and removal from the SDN List should be denied.

(U) <u>Recommendation</u>:  That you sign the attached letter informing AYMAN SAEID JOUMAA of OFAC's decision to deny his request for reconsideration and removal from the SDN List.

(U) Agree: ___✓ AMG 3.?.2018___   Disagree: _____   Discuss: _____

SECRET █████████

17

~~SECRET~~ ███████

## Exhibit List[35]

| (U) | Exhibit 1 | Sanctions Actions Pursuant to the Foreign Narcotics Kingpin Designation Act, 76 Fed. Reg. 5858 (January 26, 2011). |
| --- | --- | --- |
| (U) | Exhibit 2 | Letter, OFAC to Erich C. Ferarri, [FNK-7782], November 18, 2016. |
| (U) | Exhibit 3 | U.S. Department of the Treasury website, Press Release, "Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network," January 26, 2011, available at www.treasury.gov/press-center/press-releases/Pages/tg1035.aspx. |
| (U) | Exhibit 4 | Criminal Complaint, *U.S.A. v. Ayman Joumaa, et. al.*, Case No. 11-mj-467 (EDVA, June 17, 2011). |
| (U) | Exhibit 5 | Affidavit in Support of Arrest Warrant & Criminal Complaint, *U.S.A. v. Ayman Joumaa,* 11-mj-467, (EDVA, June 17, 2011). |
| (U) | Exhibit 6 | Indictment, *U.S.A. v. Ayman Joumaa*, Case No. 11-CR-560, (EDVA, November 3, 2011). |
| (U) | Exhibit 7 | Criminal Docket, *U.S.A. v. Ayman Joumaa*, 11-CR-560, (EDVA, November 23, 2011). |
| (U) | Exhibit 8 | Letter, Ferrari & Associates, P.C. on behalf of Ayman Joumaa to OFAC, May 18, 2016. |
| (U) | Exhibit 9 | Email, Ferrari & Associates, P.C. on behalf of Ayman Joumaa to OFAC, May 18, 2016. |
| (U) | Exhibit 10 | Letter, Ferrari & Associates, P.C. on behalf of Ayman Joumaa to OFAC, May 18, 2016. |
| (U) | Exhibit 11 | Email, OFAC to Ferrari & Associates, P.C., May 18, 2016. |
| (U) | Exhibit 12 | Letter, OFAC to Ferrari & Associates, P.C., June 27, 2016. |
| (U) | Exhibit 13 | Letter, Ferrari & Associates, P.C. on behalf of Ayman Joumaa to OFAC, October 25, 2016. |
| (U) | Exhibit 14 | Letter, Ferrari & Associates, P.C. on behalf of Ayman Joumaa to OFAC, November 14, 2016. |
| (U) | Exhibit 15 | Letter, Ferrari & Associates, P.C. on behalf of Ayman Joumaa to OFAC, April 24, 2017. |
| (U) | Exhibit 16 | Letter, Ferrari & Associates, P.C. on behalf of Ayman Joumaa to OFAC, August 24, 2017. |

---

[35] (U) Information redacted from exhibits is not exculpatory and is not relevant.

~~SECRET~~ ███████

SECRET█████

| (U) | Exhibit 17 | Letter, Ferrari & Associates, P.C. on behalf of Ayman Joumaa to OFAC, August 29, 2017. |
| (U) | Exhibit 18 | Email, OFAC to Ferrari & Associates, P.C., September 5, 2017. |
| (U) | Exhibit 19 | Email, Ferrari & Associates, P.C. to OFAC, September 1, 2017. |
| (U) | Exhibit 20 | Email, Ferrari & Associates, P.C. to OFAC, September 1, 2017. |
| (U) | Exhibit 21 | Email, Ferrari & Associates, P.C. to OFAC, October 2, 2017. |
| (U) | Exhibit 22 | Email, OFAC to Ferrari & Associates, P.C., October 2, 2017. |
| (U) | Exhibit 23 | Letter, Ferrari & Associates, P.C. on behalf of Ayman Joumaa to OFAC, September 27, 2017. |
| (U) | Exhibit 24 | Letter, OFAC to Ferrari & Associates, P.C., October 2, 2017. |
| (U) | Exhibit 25 | Letter, OFAC to Ferrari & Associates, P.C., October 16, 2017. |
| (U) | Exhibit 26 | 31 C.F.R. Section 501.807 (1999). |
| (U) | Exhibit 27 | White House website, Office of the Press Secretary, "Overview of Foreign Narcotics Kingpin Designation Act," April 15, 2009. |
| (U) | Exhibit 28 | Sanctions Actions Pursuant to Executive Order 13581, 76 Fed. Reg. 51125 (August 11, 2011). |
| (S█████ | Exhibit 29 | ████████████████████████ |
| (U) | Exhibit 30 | Politico, "The Secret Backstory of How Obama Let Hezbollah off the Hook," Josh Meyer, December 22, 2017, available at http://www.politico.com/interactives/2017/obama-hezbollah-drug-trafficking-investigation/. |
| (U//LES) | Exhibit 31 | ████████████████████████ |
| (U//LES) | Exhibit 32 | |
| (S█████ | Exhibit 33 | |
| (U//LES) | Exhibit 34 | |

19

SECRET█████

SECRET ████████

(U)        Exhibit 35        ████████████████████████

(U)        Exhibit 36

(U)        Exhibit 37

(U)        Exhibit 38        Google Maps, Lala, Lebanon.

(U)        Exhibit 39        Department of Justice, "Organized Crime Drug
                             Enforcement Task Forces," June 9, 2015.

(U//LES)   Exhibit 40        ████████████████████████

(U//LES)   Exhibit 41

(U)        Exhibit 42        U.S. Department of the Treasury website, Press Release,
                             "Treasury Designates a Medellin, Colombia-based Drug
                             Money Laundering Network with Ties to La Oficina de
                             Envigado and Ayman Saied Joumaa," July 1, 2014,
                             available at www.treasury.gov/press-center/press-
                             releases/pages/jl250.aspx.

(U)        Exhibit 43        U.S. Department of Justice, "Colombian National Pleads
                             Guilty to International Money Laundering," May 5, 2017,
                             available at www.justice.gov/usao-ma/pr/colombian-
                             national-pleads-guilty-international-money-laundering.

(U)        Exhibit 44        Boston Globe, "Man who laundered cash for crime ring
                             linked to Pablo Escobar sentenced in Boston," September
                             7, 2017, available at
                             www.bostonglobe.com/metro/2017/09/07/Colombian-man-
                             who-laundered-cash-for-crime-ring-linked-to-pablo-
                             escobar-sentenced-
                             boston/oPxFxa7InmPTJtbFYK4RtI/story.html.

(U)        Exhibit 45        Sanctions Actions Pursuant to the Foreign Narcotics
                             Kingpin Designation Act, 79 Fed. Reg. 40839, July 1,
                             2014.

(U//LES)   Exhibit 46        ████████████████████████

(U//LES)   Exhibit 47

(U//LES)   Exhibit 48

(U//LES)   Exhibit 49

(U//LES)   Exhibit 50

(U//LES)   Exhibit 51

(U//LES)   Exhibit 52

20

SECRET ████████

SECRET ███████

| (U) | Exhibit 53 | Sanctions Actions Pursuant to Foreign Narcotics Kingpin Designation Act, 82 Fed. Reg. 41091, August 22, 2017. |
| (U) | Exhibit 54 | Sanctions Actions Pursuant to Foreign Narcotics Kingpin Designation Act, 80 Fed. Reg. 60436, October 1, 2015. |
| (U) | Exhibit 55 | Sanctions Actions Pursuant to Foreign Narcotics Kingpin Designation Act, 82 Fed. Reg. 22721, May 9, 2017. |
| (S███) | Exhibit 56 | ████████████████████████ |
| (U//LES) | Exhibit 57 | ████████████████████████ |

SECRET ██████

21

# Additional Designations, Foreign Narcotics Kingpin Designation Act

A Notice by the Foreign Assets Control Office on 02/02/2011

## DOCUMENT DETAILS

**Printed version:**
PDF (https://www.gpo.gov/fdsys/pkg/FR-2011-02-02/pdf/2011-2181.pdf)

**Publication Date:**
02/02/2011 (/documents/2011/02/02)

**Agencies:**
Office of Foreign Assets Control (https://www.federalregister.gov/agencies/foreign-assets-control-office)

**Dates:**
The designation by the Director of OFAC of the 9 individuals and 8 entities identified in this notice pursuant to section 805(b) of the Kingpin Act is effective on January 26, 2011.

**Effective Date:**
01/26/2011

**Document Type:**
Notice

**Document Citation:**
76 FR 5858

**Page:**
5858-5859 (2 pages)

**Document Number:**
2011-2181

DOCUMENT DETAILS

PUBLISHED DOCUMENT

## AGENCY:

Office of Foreign Assets Control, Treasury.

## ACTION:

Notice.

## SUMMARY:

The Treasury Department's Office of Foreign Assets Control ("OFAC") is publishing the names of 9 individuals and 8 entities whose property and interests in property have been blocked pursuant to the Foreign Narcotics Kingpin Designation Act ("Kingpin Act") (21 U.S.C. 1901 (https://api.fdsys.gov/link?

FNK 7782 0022

collection=uscode&title=21&year=mostrecent&section=1901&type=usc&link-type=html)-1908, 8 U.S.C.
1182 (https://api.fdsys.gov/link?
collection=uscode&title=8&year=mostrecent&section=1182&type=usc&link-type=html)).

## DATES:

The designation by the Director of OFAC of the 9 individuals and 8 entities identified in this notice pursuant
to section 805(b) of the Kingpin Act is effective on January 26, 2011.

## FOR FURTHER INFORMATION CONTACT:

Assistant Director, Compliance Outreach & Implementation, Office of Foreign Assets Control, Department
of the Treasury, Washington, DC 20220, tel.: 202/622-2490.

## SUPPLEMENTARY INFORMATION:

### Electronic and Facsimile Availability

This document and additional information concerning OFAC are available on OFAC's Web site
(http://www.treas.gov/ofac (http://www.treas.gov/ofac)) or via facsimile through a 24-hour fax-on-
demand service, tel.: (202) 622-0077.

### Background

The Kingpin Act became law on December 3, 1999. The Kingpin Act establishes a program targeting the
activities of significant foreign narcotics traffickers and their organizations on a worldwide basis. It provides
a statutory framework for the President to impose sanctions against significant foreign narcotics traffickers
and their organizations on a worldwide basis, with the objective of denying their businesses and agents
access to the U.S. financial system and the benefits of trade and transactions involving U.S. companies and
individuals.

The Kingpin Act blocks all property and interests in property, subject to U.S. jurisdiction, owned or
controlled by significant foreign narcotics traffickers as identified by the President. In addition, the Secretary
of the Treasury consults with the Attorney General, the Director of the Central Intelligence Agency, the
Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration,
the Secretary of Defense, the Secretary of State, and the Secretary of Homeland Security when designating
and blocking the property and interests in property, subject to U.S. jurisdiction, of persons who are found to
be: (1) Materially assisting in, or providing financial or technological support for or to, or providing goods or
services in support of, the international narcotics trafficking activities of a person designated pursuant to the
Kingpin Act; (2) owned, controlled, or directed by, or acting for or on behalf of, a person designated pursuant
to the Kingpin Act; or (3) playing a significant role in international narcotics trafficking.

On January 26, 2011, the Director of OFAC designated 9 individuals and 8 entities whose property and
interests in property are blocked pursuant to section 805(b) of the Foreign Narcotics Kingpin Designation
Act.

The list of additional designees is as follows:

FNK 7782 0023

1. JOUMAA, Ayman Saied (a.k.a. JOMAA KHARFAN, Aiman Said; a.k.a. JOMAA, Aymen; a.k.a. JOUMAA, Aymen Saeid; a.k.a. JOUMAA, Aiman; a.k.a. JOUMAA, Eiman; a.k.a. JOUMHA, Aymen), Lebanon; Maicao, Colombia; Medellin, Colombia; DOB 21 Jun 1964; alt. DOB 15 Jun 1976; POB Al Karouan, Lebanon; alt. POB Barranquilla, Colombia; citizen Lebanon; alt. citizen Colombia; nationality Lebanon; alt. nationality Colombia; Cedula No. 84075050 (Colombia); Passport RL 0235074 (Lebanon); alt. Passport P013331 (Colombia) (individual) [SDNTK]

2. JOUMAA, Akram Saied (a.k.a. JOMAA YOUSSEF, Akram Said), Lebanon; DOB 07 Jun 1956; POB Al Karouan, Lebanon; nationality Lebanon; Passport 11869936 (Venezuela); RUC # 3-NT-1-6255 (Panama) (individual) [SDNTK]

3. JOUMAA, Anwar Saied (a.k.a. JOMAA, Anmar; a.k.a. JOMAA, Anwar Said), Lebanon; POB Al Karouan, Lebanon; nationality Lebanon; Cedula No. 84072009 (Colombia); Passport 392065 (Panama) (individual) [SDNTK]

4. JOUMAA, Mohamad Said (a.k.a. JOMAA, Mohamed Said), Lebanon; DOB 06 Apr 1977; POB Lala, Lebanon; Cedula No. 84076630 (Colombia) (individual) [SDNTK]

5. YOUSSEF, Ismael Mohammed (a.k.a. YOUSSEF ABDALLAH, Ismael; a.k.a. YOUSSEF, Ismail Mohammad), Lebanon; DOB 12 Sep 1979; POB Santa Marta, Colombia; alt. POB Lebanon; citizen Colombia; nationality Colombia; alt. nationality Lebanon; Cedula No. 17900973 (Colombia); Passport AF038564 (Colombia); alt. Passport AK037837 (Colombia) (individual) [SDNTK]

6. YOUSSEF, Ziad Mohamad, Lebanon; DOB 22 Sep 1976; POB West Bekaa, Baaloul, Lebanon; citizen Lebanon; nationality Lebanon (individual) [SDNTK]

7. AYASH, Hassan (a.k.a. AYACHE, Mahmoud Hassan), Beirut, Lebanon; DOB 1943; POB Miziara, Lebanon; nationality Lebanon (individual) [SDNTK]

8. AYACHE, Hassan Mahmoud (a.k.a. AYACH, Hassan; a.k.a. AYACHE, Hassan Mohamad; a.k.a. AYASH, Hassan; a.k.a. AYASH, Hassan Muhammad; a.k.a. AYASH, Hassane), Beirut, Lebanon; DOB 01 May 1963; POB Beirut, Lebanon; citizen Lebanon; nationality Lebanon; Passport RL0361632 (Lebanon) (individual) [SDNTK]

9. KHAROUBI, Jamal Mohamad, Lebanon; DOB 01 Nov 1976; POB Saida, Lebanon; citizen Lebanon; Passport RL0068313 (Lebanon) (individual) [SDNTK]

10. JOUMAA MONEY LAUNDERING ORGANIZATION/DRUG TRAFFICKING ORGANIZATION (a.k.a. "JOUMAA MLO/DTO"); Beirut, Lebanon; Maicao, Colombia; (ENTITY) [SDNTK]

11. HASSAN AYASH EXCHANGE COMPANY (a.k.a. HASSAN AYAS PARTNER EXCHANGE CO; a.k.a. AYASH XCHANGE CO.; a.k.a. AYASH EXCHANGE COMPANY SARL; a.k.a. MAKDESSI SAYRAFI COMPANY; a.k.a. HASSANE AYASH EXCHANGE CO. SARL; a.k.a. HASSAN AYACH EXCHANGE); Madame Curie St., Hamra St., Beirut, Lebanon; (ENTITY) [SDNTK]

12. ELLISSA EXCHANGE COMPANY (a.k.a. ELESSA EXCHANGE; a.k.a. ELISSA EXCHANGE); Sarafand, Lebanon; (ENTITY) [SDNTK]

FNK 7782 0024

13. PHENICIA SHIPPING OFFSHORE SARL, Beirut, Lebanon; (ENTITY) [SDNTK]

14. NEW LINE EXCHANGE TRUST CO., 2901 Omar and Khaled Richani Building, Beirut, Lebanon; 2901 Icaria, Ras Beirut, Lebanon; (ENTITY) [SDNTK]

15. CAESAR'S PARK HOTEL (a.k.a. CEASAR'S PARK HOTEL; a.k.a. ☐ CEASERS PARK HOTEL); Madame Curie St., Beirut, Lebanon; (ENTITY) [SDNTK]

☐ Start Printed
Page 5859

16. GOLDI ELECTRONICS S.A., Colon, Panama; RUC # 1476422-1-642962 (Panama); (ENTITY) [SDNTK]

17. ZONA LIBRE INTERNATIONAL MARKET S.A., Colon, Panama; RUC # 66161-20-363386 (Panama); (ENTITY) [SDNTK]

Dated: January 26, 2011.

Adam J. Szubin,

Director, Office of Foreign Assets Control.

[FR Doc. 2011-2181 (/a/2011-2181) Filed 2-1-11; 8:45 am]

BILLING CODE 4810-AL-P

**PUBLISHED DOCUMENT**

FNK 7782 0025

Exhibit 2



Case ID FNK-7782

## DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C. 20220

Erich C. Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Avenue, NW
Suite 400
Washington, DC 20004

NOV 1 8 2016

Re: Ayman Saied Joumaa

Dear Mr. Ferrari:

This is in response to your letters dated May 18, 2016 and November 14, 2016 to the Office of Foreign Assets Control (OFAC), requesting a copy of your client's administrative record related to his designation as a Specially Designated Narcotics Trafficker pursuant to Section 805 of the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. § 1904(b).

Processing such a request requires interagency consultation in order to comply with U.S. government regulations regarding the protection of classified, privileged, and otherwise protected information. Enclosed, please find bates stamped pages FNK-7782 0001-0039, which includes the redacted administrative record upon which the designation was based and the U.S. Department of the Treasury press release and press chart. The redacted portions of the administrative record contain classified, law enforcement sensitive, or otherwise privileged information, or information not responsive to your request. Additionally, please find a non-privileged and unclassified summary of otherwise privileged information attached. Should additional unclassified, non-privileged, or otherwise releasable information become available, it shall be provided to you.

Please refer to Case ID FNK-7782 in all future correspondence. For expediency purposes, please direct all questions and correspondence to OFAC via the following email: OFAC.Reconsideration@treasury.gov. You may also write, call, or fax OFAC at the following:

U.S. Department of the Treasury
Office of Foreign Assets Control
ATTN: Office of Global Targeting
1500 Pennsylvania Avenue, N.W. (Freedman's Bank Building)
Washington, DC 20220

Telephone: 202-622-2420
Fax: 202-622-5390

Thank you for your cooperation.

Sincerely,

Mark Samara
Assistant Director
Crime/Narcotics & Western Hemisphere Division
Office of Foreign Assets Control

Enclosure

FNK 7782 0026

**<u>Non-Privileged and Unclassified Summary of Otherwise Privileged Information</u>**

The JOUMAA drug trafficking and money laundering organization has moved hundreds of millions of dollars in narcotics proceeds from the United States to Lebanon. Known narcotics traffickers and money launderers worked with Ayman JOUMAA to coordinate drug money laundering in Florida. The export of vehicles from the United States to West Africa was a method used by the JOUMAA drug trafficking and money laundering organization to launder drug proceeds. Ayman JOUMAA is the leader of the JOUMAA drug trafficking and money laundering organization.

(SECRET) 



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

FAC No.: FNK -- 468737

## (U) OFFICE OF FOREIGN ASSETS CONTROL (OFAC)

### (U) EVIDENTIARY MEMORANDUM

**(U) MEMORANDUM FOR ADAM J. SZUBIN**
DIRECTOR
OFFICE OF FOREIGN ASSETS CONTROL
Dated 1/25/2011

**(U) THROUGH:**   J. R. MCBRIEN
ASSOCIATE DIR
OFFICE OF GLOBAL TARGETING

1.25.2011

MICHAEL SWANSON
ASSISTANT DIRECTOR
GLOBAL COUNTER NARCOTICS DIVISION

**(U) FROM:**   1/21/11
Section Chief
International Narcotics Targeting

1/21/11
Sanctions Investigator
International Narcotics Targeting

**(U) SUBJECT:**   Treasury-led Kingpin Act Tier I Designation: Ayman Saied Joumaa
Network

## I.   (U) SUMMARY

(U) Evidence presented in this memorandum and the related attachments provides reason to
believe that the individuals and entities identified below are "foreign persons" that are:

- materially assisting in, or providing financial or technological support for or to, or
  providing goods and services in support of, the international narcotics trafficking
  activities of a SDN, and/or



(SECRET)

(SECRET)

- owned, controlled, or directed by, or acting for or on behalf of, a Specially Designated National (SDN), and/or
- playing a significant role in international narcotics trafficking

and therefore meet the statutory criteria for designation pursuant to section 805(b)(2), (3), and/or (4) of the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), 21 U.S.C. 1904(b)(2-4). See Exhibit 1 (Kingpin Act, 21 U.S.C., (U), at pages 6-7). Following appropriate interagency clearance, the names of these individuals and entities[1] should be published in the Federal Register.

(U)   KEY DRUG TRAFFICKING INDIVIDUALS AND ENTITIES

1. JOUMAA MONEY LAUNDERING ORGANIZATION / DRUG TRAFFICKING ORGANIZATION ("JOUMAA MLO/DTO"); Beirut, Lebanon; Maicao, Colombia; (ENTITY) [SDNTK]

2. JOUMAA, Ayman Saied (a.k.a. JOUMAA, Aiman; a.k.a. JOUMAA, Eiman; a.k.a. JOMAA, Aymen; a.k.a. JOUMHA, Aymen; a.k.a. JOMAA, Aymen Saeid; a.k.a. JOMAA KHARFAN, Aiman Said); Lebanon; Maico, Colombia; Medellin, Colombia; DOB 21 Jun 1964; Alt. DOB 15 June 1976; POB Al Karouan, Lebanon; Alt. POB Barranquilla, Colombia; Citizen Lebanon; Alt. Citizen Colombia; Nationality Lebanon; Alt. Nationality Colombia; Passport RL 0235074 (Lebanon); Cedula No. 84075050 (Colombia); Passport P013331 (Colombia); (INDIVIDUAL) [SDNTK]



Non-Responsive

<hr>

[1] Throughout this memorandum an asterisk ("*") following a name denotes a company or an individual who has been previously identified by the President or designated by the Secretary of the Treasury as a Significant Foreign Narcotics Trafficker pursuant to the Kingpin Act and who is thus currently subject to sanctions under the Kingpin Act, Title 21 United States Code, sections 1901-1908. Names of individuals and/or entities that are bolded denote an individual or entity that is proposed for designation in this memorandum.

(SECRET)

(SECRET)



Non-Responsive

(U) The evidence supporting this proposed designation includes:



(SECRET)

3



(SECRET) ██████████████████████████

(S███)  2.  ██ *News reports and testimony.* Various news sources, testimony, and other public statements were used for background information ████████████████████
██████████████████████████████████████████████

(S███)  3.  ████████████████████████████████████████████████

(U//FOUO)  4.  ████████████████████████████████████

(U//SBU)  5.  ███████████████████

II.   (U) **BACKGROUND**

(S██) ██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████ See Exhibit 2 ████████████████████████████
████ (S██ at pages 1-2)

(LES) ████████████████████████████████████████████
████████████████████████████████████████████████
See Exhibit 5 ██████████████████████ (LES), at pages 1-2)

(S██) ████████████████████████████████████████████
████████████████████████████████████████████████
See Exhibit 2 ████████████████████████
(S██ , at page 2) █████████████████████████
See Exhibit 4 ████████████████████████
(LES), at page 2) ██████████████████████████
See Exhibit 2 ████████████████████████████
(S██ at pages 2-3) ████████████████████████
████████████████████████████████████████████
See Exhibit 5 ██████████████
(LES), at pages 3-4) ██████████████████████████

(LES) ████████████████████████████████████████

(SECRET) ████████████████████████████     4

(SECRET)



See Exhibit 4

(LES), at pages 2-3)

See Exhibit 5

(LES), at pages 2-3, 7-8)

See Exhibit 5

(LES); at pages 2-3, 6) and See Exhibit 13     (LES), at pages 14-15)

(LES)             See Exhibit 5         (LES), at pages 2,8)

(U) Evidence presented herein therefore provides reason to believe that Ayman JOUMAA and the foreign persons (i.e., individuals and entities) listed below meet the criteria for designation as set forth in the Kingpin Act, 21 U.S.C. 1904(b)(2-4).

III.    (U) TARGETS PROPOSED FOR DESIGNATION

1. **JOUMAA MONEY LAUNDERING ORGANIZATION / DRUG TRAFFICKING ORGANIZATION ("JOUMAA MLO/DTO");** Beirut, Lebanon; Maicao, Colombia; (ENTITY) [SDNTK]

(U) Summary

(U) This memorandum and the accompanying exhibits provide reason to believe that the **JOUMAA MONEY LAUNDERING ORGANIZATION / DRUG TRAFFICKING ORGANIZATION ("JOUMAA MLO/DTO")** plays a significant role in international narcotics trafficking and thus meets the criteria for designation under section 805(b)(4) of the Kingpin Act, 21 U.S.C. 1904(b)(4).

(U) Basis for Designation



(SECRET)                          5

(SECRET) ████████████████████████



See Exhibit 2
(S███), at page 2)
See Exhibit 4
(LES), at page 2)

(LES)

See Exhibit 4
(LES), at pages 2-3) and See Exhibit 5
(LES), at pages 2-3, 7-8)
See Exhibit 5
(LES), at pages 4,7)

(LES)

See Exhibit 7
(LES), at page 8)

(LES)

See Exhibit 4
(LES), at pages 1-2)

(LES)

See Exhibit 5 ████ (LES), at page 6)

(U) Additional Information

(LES) See Exhibit
(LES), at pages 2, 8)

3 (U)

4 (LES)
5 (LES)

(SECRET) ████████████

(SECRET) ██████████████████████

(LES) ████████████████████████████████████
████████████████████████████████████████
████████████████ See Exhibit 7 ████████████████ (LES), at pages 5-6)

(U) Identifying Information

(LES) A.k.a.          JOUMAA MONEY LAUNDERING ORGANIZATION /
                      DRUG TRAFFICKING ORGANIZATION ("JOUMAA
                      MLO/DTO")
(LES) Address:        Beirut, Lebanon
(LES) Alt. Address:   Maicao, Colombia
                      See Exhibit 7 ████████████████████████ (LES), at
                      pages 10-11)

2. JOUMAA, Ayman Saied (a.k.a. JOUMAA, Aiman; a.k.a. JOUMAA, Eiman; a.k.a.
   JOMAA, Aymen; a.k.a. JOUMHA, Aymen; a.k.a. JOMAA, Aymen Saeid; a.k.a. JOMAA
   KHARFAN, Aiman Said); Lebanon; Maico, Colombia; Medellin, Colombia; DOB 21 Jun
   1964; Alt. DOB 15 June 1976; POB Al Karouan, Lebanon; Alt. POB Barranquilla,
   Colombia; Citizen Lebanon; Alt. Citizen Colombia; Nationality Lebanon; Alt. Nationality
   Colombia; Passport RL 0235074 (Lebanon); Cedula No. 84075050 (Colombia); Passport
   P013331 (Colombia); (INDIVIDUAL) [SDNTK]

(U) Summary

(U) This memorandum and the accompanying exhibits provide reason to believe that Ayman
Saied JOUMAA ("Ayman JOUMAA") plays a significant role in international narcotics
trafficking and thus meets the criteria for designation under section 805(b)(4) of the Kingpin Act,
21 U.S.C. 1904(b)(4).

(U) Basis for Designation

(S) ████████████████████████████████████████████████
████████████████████████████████████████████████████
See Exhibit 2 ████████████████████████████████████ (S) at
page 2)
████████████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

(U) Control over Narcotics Trafficking Activities

(SECRET) ████████████████████████



(SECRET)

(LES)

See Exhibit 4 ████████████████████ (LES),
at pages 1-2) and See Exhibit 5 ██████ (LES), at page 2)

(S█

See Exhibit 7█
(S████ at page 2)█
See Exhibit 4
(LES), at page 2)

(LES)

See Exhibit 5 ████████ (LES), at page 8)

(S█

See Exhibit 2
(S████, at page 2)

(LES)

See Exhibit
5█ ██████ (LES), at page 7)

(LES)

○ (LES)
10 See Exhibit 7 ████████ (LES),
at page 16)
○ (LES) 11

6 (U)
7 (U)
8 (S
. See Exhibit 2
(S███ at page 2) █
See Exhibit
3█ at pages 2-5, 10-11)
9 (U)
10 (LES)
(SECRET) 8



(SECRET)

See Exhibit 8

(LES), at page 4)

(U) Control over Narcotics Traffickers

(S

See Exhibit 5                                        (LES),
at pages 3-4)

(LES)

See Exhibit 13                              (LES), at pages 1, 8-9, and 13-15)

(LES)

See Exhibit 10

(LES), at pages 1, 4)

(LES)

See Exhibit 9                                    (LES), at page 6)

(LES)

See Exhibit 9                                    (LES), at page 6)

(U) Bulk Cash Smuggling and Control in the Laundering of Drug Proceeds;

[11] (LES)                                   (LES), at page 4)
   See Exhibit 8
[12]                                         See Exhibit 63
   at page 2)
[13] (LES)                    , See Exhibit 9
   (LES), at page 6)
[14] (S)

(SECRET)                                                9

FNK-7782 0009

FNK 7782 0036



(SECRET)

(LES)

See Exhibit 4
(LES), at pages 2-3) and See Exhibit 5
, (LES), at pages 2-3, 7-8

See Exhibit 5
(LES), at page 7)

(LES)

See Exhibit 9
(LES), at pages 7-8)

(LES)

See Exhibit 9
(LES), at page 17)

(C

See Exhibit 86
(C at page 1)

(LES)

See Exhibit 19                                         (LES),
at pages 1-2)

(LES)

[15] (LES)                           See Exhibit 9
(LES), at page 17)
[16] (LES)
See Exhibit 9                            (LES), at pages
7-8)        (SECRET)

10

FNK-7782 0010

FNK 7782 0037



(SECRET)

See Exhibit 7

(LES), at page 2) and See Exhibit 44

(SBU), at pages 1, 3)

(LES)

See Exhibit 17

(LES), at pages 5-7, 22)

(S

See Exhibit 41          , (S            at page 1) and See Exhibit 17          (LES), at page 7)

(S

See Exhibit 20          (LES), at page 1) and See Exhibit 86          (S at page 2).

, See Exhibit 20

(LES), at page 1) and See Exhibit 37

(S    ), at page 3) and See Exhibit 86

(C        at page 2)

See Exhibit 99

(LES), at pages 1-3)

See Exhibit 22

(S        , at pages 2-3)]

(LES)

[17] (LES)

See Exhibit 17

(LES), at pages 1, 5, 12)

See Exhibit 9

[18] (LES)

(LES), at page 6)

(SECRET)

FNK-7782 0011

(U) Please note: All references to Exhibit 37 should read "Exhibit 38". Exhibit 38 was unused.

FNK 7782 0038



(SECRET)

See Exhibit 14
(LES), at pages 1-4)

(LES)

(LES)
See Exhibit 8                                         (LES),
at page 6)

(LES)
See Exhibit 7
(LES), at page 14)

(LES)                                    [19]                        [20]

See Exhibit 7                              (LES), at page 8)
(LES)                          [21]        . See Exhibit 7
(LES), at page 3)

(LES)

See Exhibit 9                              (LES), at
page 5)

(S)                                              [22]

See Exhibit 23                    (S), at page 3)

[19] (LES)                                        See Exhibit 8
(LES), at page 3)
[20] (LES)
[21] (LES)
[22] (LES)

(SECRET)

(SECRET) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(U) Additional Information

(LES) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓ See Exhibit 7 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (LES), at pages 5-6)

(LES) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ See Exhibit
5 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓(LES), at pages 2, 8)

(U) Identifying Information

| | |
|---|---|
| (LES) Name: | JOUMAA, Ayman Saied |
| (LES) A.k.a.: | Aiman JOUMAA, Eiman JOUMAA, Aymen JOMAA, Aymen JOUMHA, Aymen Saeid JOMAA |
| | See Exhibit 5 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (LES), at page 1) |
| (U) A.k.a.: | Aiman Said JOMAA KHARFAN |
| | See Exhibit 51 (Registro Publico de Panama, Mercantil: Sociedades Anonimas, Records for Zona Libre International Market S.A., Retrieved on 10 August 2009, Excerpted, (U), at page 2) |
| (LES) DOB: | 21 June 1964 |
| (LES) POB: | Al Karouan[23], Lebanon |
| (LES) Nationality: | Lebanon |
| (LES) Citizenship: | Lebanon |
| (LES) Passport: | RL 0235074 (Lebanon) |
| | See Exhibit 5 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (LES), at page 1) and See Exhibit 9 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓(LES), at page 18) |
| (U) Alt. DOB: | 15 June 1976 |
| (U) Alt. POB: | Barranquilla, Colombia |
| (U) Alt. Nationality: | Colombia |
| (U) At. Citizenship: | Colombia |
| (U) Alt. Address: | Maicao, Colombia |
| | See Exhibit 91 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓ (U), at page 1) |
| (U) Cedula No: | 84075050, Colombia |
| | See Exhibit 12 (Colombian RUE, Records for JOMMA KHORFAN, Aiman Said, Retrieved on 20 October 2009, (U), at page 1) and See Exhibit 91 (▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ (U), at page 1) |
| (U) Alt. Passport: | P013331, Colombia |
| | See Exhibit 90 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓ at page 7)   (U//LES) |

---

[23] (U) Variant spelling is "Al Karaoun."

(SECRET) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

FNK-7782 0013

FNK 7782 0040

(SECRET)

(U) Alt. Address:

Medellin, Colombia
See Exhibit 75 (
(U), at page 1)

Non-Responsive and pages 15-43 Non-Responsive

(SECRET)

14



(SECRET) ███████████████████████

(U) **EXHIBITS** [91]

Exhibit 1   Kingpin Act, 21 U.S.C., (U)
Exhibit 2   ████████████████████████████████
            █████ (S█
Exhibit 3   Unused
Exhibit 4   ████████████████████████████████
            ████ (LES)
Exhibit 5   ██████████████████████████ (LES)
Exhibit 6   Non-Responsive ████████████████████
Exhibit 7   ███████████████████ (LES)
Exhibit 8   ████████████████████ (LES)
Exhibit 9   ████████████████████ (LES)
Exhibit 10  ████████████████████ (LES)
Exhibit 11  Non-Responsive ███████████████
Exhibit 12  Colombian RUE, Records for JOMMA KHORFAN, Aiman Said, Retrieved on 20
            October 2009, (U)
Exhibit 13  ████████████████████ (LES)
Exhibit 14  ████████████████████ (LES)
Exhibit 15  Non-Responsive ████████████████
Exhibit 16  Non-Responsive ████████████████
Exhibit 17  ████████████████████ (LES)
Exhibit 18  Non-Responsive ████████████████████
Exhibit 19  ████████████████ (LES)
Exhibit 20  ████████████████ (LES) [92]
Exhibit 21  Unused
Exhibit 22  ████████████████ (S█
Exhibit 23  ████████████████ (S█
Exhibit 24  Unused
Exhibit 25  Unused
Exhibit 26  Unused
Exhibit 27  Unused
Exhibit 28  Unused
Exhibit 29  Unused
Exhibit 30  Non-Responsive ████████████
Exhibit 31  Unused
Exhibit 32  Non-Responsive ████████████████
Exhibit 33  ███████████████████████
            ████████ (U)
Exhibit 34  Unused

[9] Non-Responsive ████████████████████████
[ ] (LES) ████████████████████████████
(SECRET) ███████████████████████████

FNK-7782 0015

FNK 7782 0042

(SECRET) 

| | |
|---|---|
| Exhibit 35 | Unused |
| Exhibit 36 | Non-Responsive |
| Exhibit 37 | Unused |
| Exhibit 38 | |
| Exhibit 39 | Unused |
| Exhibit 40 | Unused |
| Exhibit 41 | (S |
| Exhibit 42 | Unused |
| Exhibit 43 | Unused |
| Exhibit 44 | |
| | (SBU) |
| Exhibit 45 | Non-Responsive |
| Exhibit 46 | Non-Responsive |
| Exhibit 47 | Non-Responsive |
| Exhibit 48 | Unused |
| Exhibit 49 | Non-Responsive |
| Exhibit 50 | Non-Responsive |
| Exhibit 51 | Registro Publico de Panama, Mercantil: Sociedades Anonimas, Records for Zona Libre International Market S.A., Retrieved on 10 August 2009, Excerpted, (U) |
| Exhibit 52 | Non-Responsive |
| Exhibit 53 | Non-Responsive |
| Exhibit 54 | Unused |
| Exhibit 55 | Non-Responsive |
| Exhibit 56 | Non-Responsive |
| Exhibit 57 | Non-Responsive |
| Exhibit 58 | Non-Responsive |
| Exhibit 59 | Non-Responsive |
| Exhibit 60 | Non-Responsive |
| Exhibit 61 | Non-Responsive |
| Exhibit 62 | Non-Responsive |
| Exhibit 63 | (U) |
| Exhibit 64 | Unused |
| Exhibit 65 | Non-Responsive |
| Exhibit 66 | Unused |
| Exhibit 67 | Unused |
| Exhibit 68 | Unused |
| Exhibit 69 | Non-Responsive |

(SECRET)

FNK-7782 0016

FNK 7782 0043

(U) Please note: All references to Exhibit 37 should read "Exhibit 38". Exhibit 38 was unused.

(SECRET)



Exhibit 70   Non-Responsive
Exhibit 71   Non-Responsive

Exhibit 72   Non-Responsive

Exhibit 73   Non-Responsive

Exhibit 74   Non-Responsive

Exhibit 75                                    (U)
Exhibit 76   Non-Responsive
Exhibit 77   Non-Responsive
Exhibit 78   Non-Responsive

Exhibit 79   Non-Responsive
Exhibit 80   Non-Responsive

Exhibit 81   Non-Responsive
Exhibit 82   Unused
Exhibit 83   Non-Responsive
Exhibit 84   Non-Responsive

Exhibit 85   Non-Responsive
Exhibit 86

             (C/
Exhibit 87   Non-Responsive
Exhibit 88   Non-Responsive
Exhibit 89   Non-Responsive

Exhibit 90                                    (U//LES)
Exhibit 91                                    (U)
Exhibit 92   Non-Responsive

Exhibit 93   Non-Responsive
Exhibit 94   Non-Responsive
Exhibit 95   Non-Responsive
Exhibit 96   Non-Responsive
Exhibit 97   Non-Responsive
Exhibit 98   Non-Responsive
Exhibit 99                 (LES)
Exhibit 100  Non-Responsive

(SECRET)                                      46

Exhibit 1

FNK-7782 0018

FNK 7782 0045

EX 1

United States Code
Title 21
Chapter 24. International Narcotics Trafficking

§ 1901. Findings and policy

(a) Findings

Congress makes the following findings:

(1) Presidential Decision Directive 42, issued on October 21, 1995, ordered agencies of the executive branch of the United States Government to, inter alia, increase the priority and resources devoted to the direct and immediate threat international crime presents to national security, work more closely with other governments to develop a global response to this threat, and use aggressively and creatively all legal means available to combat international crime.

(2) Executive Order No. 12978 of October 21, 1995, provides for the use of the authorities in the International Emergency Economic Powers Act (IEEPA) (50 U.S.C. 1701 et seq.) to target and apply sanctions to four international narcotics traffickers and their organizations that operate from Colombia.

(3) IEEPA was successfully applied to international narcotics traffickers in Colombia and based on that successful case study, Congress believes similar authorities should be applied worldwide.

(4) There is a national emergency resulting from the activities of international narcotics traffickers and their organizations that threatens the national security, foreign policy, and economy of the United States.

(b) Policy

It shall be the policy of the United States to apply economic and other financial sanctions to significant foreign narcotics traffickers and their organizations worldwide to protect the national security, foreign policy, and economy of the United States from the threat described in subsection (a)(4).

§ 1902. Purpose

FNK-7782 0010

1

EX 1

The purpose of this chapter is to provide authority for the identification of, and application of sanctions on a worldwide basis to, significant foreign narcotics traffickers, their organizations, and the foreign persons who provide support to those significant foreign narcotics traffickers and their organizations, whose activities threaten the national security, foreign policy, and economy of the United States.

§ 1903. Public identification of significant foreign narcotics traffickers and required reports

(a) Provision of information to the President

The Secretary of the Treasury, the Attorney General, the Secretary of Defense, the Secretary of State, and the Director of Central Intelligence shall consult among themselves and provide the appropriate and necessary information to enable the President to submit the report under subsection (b) of this section. This information shall also be provided to the Director of the Office of National Drug Control Policy.

(b) Public identification and sanctioning of significant foreign narcotics traffickers

Not later than June 1, 2000, and not later than June 1 of each year thereafter, the President shall submit a report to the Permanent Select Committee on Intelligence, and the Committees on the Judiciary, International Relations, Armed Services; and to the Select and Ways and Means of the House of Representatives; and to the Select Committee on Intelligence, and the Committees on the Judiciary, Foreign Relations, Armed Services, and Finance of the Senate—

(1) identifying publicly the foreign persons that the President determines are appropriate for sanctions pursuant to this chapter; and

(2) detailing publicly the President's intent to impose sanctions upon these significant foreign narcotics traffickers pursuant to this chapter.

The report required in this subsection shall not include information on persons upon which United States sanctions imposed under this chapter, or otherwise on account of narcotics trafficking, are already in effect.

2

FNK-7782 0020

EX 1

(c) Unclassified report required

The report required by subsection (b) of this section shall be submitted in unclassified form and made available to the public.

(d) Classified report

(1) Not later than July 1, 2000, and not later than July 1 of each year thereafter, the President shall provide the Permanent Select Committee on Intelligence of the House of Representatives and the Select Committee on Intelligence of the Senate with a report in classified form describing in detail the status of the sanctions imposed under this chapter, including the personnel and resources directed towards the imposition of such sanctions during the preceding fiscal year, and providing background information with respect to newly-identified significant foreign narcotics traffickers and their activities.

(2) Such classified report shall describe actions the President intends to undertake or has undertaken with respect to such significant foreign narcotics traffickers.

(3) The report required under this subsection is in addition to the President's obligations to keep the intelligence committees of Congress fully and currently informed pursuant to the provisions of the National Security Act of 1947.

(e) Exclusion of certain information

(1) Intelligence

Notwithstanding any other provision of this section, the reports described in subsections (b) and (d) of this section shall not disclose the identity of any person, if the Director of Central Intelligence determines that such disclosure could compromise an intelligence operation, activity, source, or method of the United States.

(2) Law enforcement

Notwithstanding any other provision of this section, the reports described in subsections (b) and (d) of this section shall

3

FNK-7782 0021

not disclose the name of any person if the Attorney General, in coordination as appropriate with the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, and the Secretary of the Treasury, determines that such disclosure could reasonably be expected to—

(A) compromise the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution that furnished information on a confidential basis;

(B) jeopardize the integrity or success of an ongoing criminal investigation or prosecution;

(C) endanger the life or physical safety of any person; or

(D) cause substantial harm to physical property.

(f) Notification required

(1) Whenever either the Director of Central Intelligence or the Attorney General makes a determination under subsection (e) of this section, the Director of Central Intelligence or the Attorney General shall notify the Permanent Select Committee on Intelligence of the House of Representatives and the Select Committee on Intelligence of the Senate, and explain the reasons for such determination.

(2) The notification required under this subsection shall be submitted to the Permanent Select Committee on Intelligence of the House of Representatives and the Select Committee on Intelligence of the Senate not later than July 1, 2000, and on an annual basis thereafter.

(g) Determinations not to apply sanctions

(1) The President may waive the application to a significant foreign narcotics trafficker of any sanction authorized by this chapter if the President determines that the application of sanctions under this chapter would significantly harm the national security of the United States.

(2) When the President determines not to apply sanctions that are authorized by this chapter to any significant foreign narcotics trafficker, the President shall notify the Permanent Select

EX 1

FNK-7782 0022

EX 1

Committee on Intelligence, and the Committees on the Judiciary, International Relations, Armed Services, and Ways and Means of the House of Representatives, and the Select Committee on Intelligence, and the Committees on the Judiciary, Foreign Relations, Armed Services, and Finance of the Senate, not later than 21 days after making such determination.

(b) Changes in determinations to impose sanctions

(1) Additional determinations

(A) If at any time after the report required under subsection (b) of this section the President finds that a foreign person is a significant foreign narcotics trafficker and such foreign person has not been publicly identified in a report required under subsection (b) of this section, the President shall submit an additional public report containing the information described in subsection (b) of this section with respect to such foreign person to the Permanent Select Committee on Intelligence, and the Committees on the Judiciary, International Relations, Armed Services, and Ways and Means of the House of Representatives, and the Select Committee on Intelligence, and the Committees on the Judiciary, Foreign Relations, Armed Services, and Finance of the Senate.

(B) The President may apply sanctions authorized under this chapter to the significant foreign narcotics trafficker identified in the report submitted under subparagraph (A) as if the significant foreign narcotics trafficker were originally included in the report submitted pursuant to subsection (b) of this section.

(C) The President shall notify the Secretary of the Treasury of any determination made under this paragraph.

(2) Revocation of determination

(A) Whenever the President finds that a foreign person that has been publicly identified as a significant foreign narcotics trafficker in the report required under subsection (b) of this section or this subsection no longer engages in those activities for which sanctions under this chapter may be applied, the President shall issue public notice of such a finding.

(B) Not later than the date of the public notice issued pursuant to subparagraph (A), the President shall notify, in writing

FNK-7782 0023

FNK 7782 0050

EX 1

and in classified or unclassified form, the Permanent Select Committee on Intelligence, and the Committees on the Judiciary, Armed Services, and Ways and Means of the House of Representatives, and the Select Committee on Intelligence, and the Committees on the Judiciary, Foreign Relations, Armed Services, and Finance of the Senate of actions taken under this paragraph and a description of the basis for such actions.

§ 1904. Blocking assets and prohibiting transactions

(a) Applicability of sanctions

A significant foreign narcotics trafficker publicly identified in the report required under subsection (a) or (h)(1) of section 1903 of this title and foreign persons designated by the Secretary of the Treasury pursuant to subsection (b) of this section shall be subject to any and all sanctions as authorized by this chapter. The application of sanctions on any foreign person pursuant to subsection (b) or (h)(1) of section 1903 of this title or subsection (b) of this section shall remain in effect until revoked pursuant to section 1903(h)(2) of this title or subsection (e)(1)(A) of this section or is waived pursuant to section 1903(g)(1) of this title.

(b) Blocking of assets

Except to the extent provided in regulations, orders, instructions, licenses, or directives issued pursuant to this chapter, and notwithstanding any contract entered into or any license or permit granted prior to the date on which the President submits the report required under subsection (b) or (h)(1) of section 1903 of this title, there are blocked as of such dates, and any date thereafter, all such property and interests in property within the United States, or within the possession or control of any United States person, which are owned or controlled by—

(1) any significant foreign narcotics trafficker publicly identified by the President in the report required under subsection (b) or (h)(1) of section 1903 of this title;

(2) any foreign person that the Secretary of the Treasury, in consultation with the Attorney General, the Director of the Central Intelligence, the Director of the Federal Bureau of

6

FNK-7782 0024

FNK 7782 0051

Investigation, the Administrator of the Drug Enforcement Administration, the Secretary of Defense, and the Secretary of State, designates as materially assisting in, or providing goods or financial or technological support for, or to, or providing goods or services in support of, the international narcotics trafficking activities of a significant foreign narcotics trafficker so identified in the report required under subsection (b) or (h)(1) of section 1903 of this title, or foreign persons designated by the Secretary of the Treasury pursuant to this subsection;

(3) any foreign person that the Secretary of the Treasury, in consultation with the Attorney General, the Director of Central Intelligence, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, the Secretary of Defense, and the Secretary of State, designates as owned, controlled, or directed by, or acting for or on behalf of, a significant foreign narcotics trafficker so identified in the report required under subsection (b) or (h)(1) of section 1903 of this title, or foreign persons designated by the Secretary of the Treasury pursuant to this subsection; and

(4) any foreign person that the Secretary of the Treasury, in consultation with the Attorney General, the Director of Central Intelligence, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, the Secretary of Defense, and the Secretary of State, designates as playing a significant role in international narcotics trafficking.

(c) Prohibited transactions

Except to the extent provided in regulations, orders, instructions, licenses, or directives issued pursuant to this chapter, and notwithstanding any contract entered into or any license or permit granted prior to the date on which the President submits the report required under subsection (b) or (h)(1) of section 1903 of this title, the following transactions are prohibited:

(1) Any transaction or dealing by a United States person, or within the United States, in property or interests in property of any significant foreign narcotics trafficker so identified in the report required pursuant to subsection (b) or (h)(1) of

FNK-7782 0025

EX 1

section 1903 of this title, and foreign persons designated by the Secretary of the Treasury pursuant to subsection (b) of this section.

(2) Any transaction or dealing by a United States person, or within the United States, that evades or avoids, or has the effect of evading or avoiding, and any endeavor, attempt, or conspiracy to violate, any of the prohibitions contained in this chapter.

(d) Law enforcement and intelligence activities not affected

Nothing in this chapter prohibits or otherwise limits the authorized law enforcement or intelligence activities of the United States, or the law enforcement activities of any State or subdivision thereof.

(e) Implementation

(1) The Secretary of the Treasury, in consultation with the Attorney General, the Director of Central Intelligence, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, the Secretary of Defense, and the Secretary of State, is authorized to take such actions as may be necessary to carry out this chapter, including—

(A) making those designations authorized by paragraphs (2), (3), and (4) of subsection (b) of this section and revocation thereof;

(B) promulgating rules and regulations permitted under this chapter; and

(C) employing all powers conferred on the Secretary of the Treasury under this chapter.

(2) Each agency of the United States shall take all appropriate measures within its authority to carry out the provisions of this chapter.

(3) Section 552 (a)(3) of title 5 shall not apply to any record or information obtained or created in the implementation of this chapter.

Exhibits Redacted in Full: 2, 4-5, 7-10
Non Responsive Exhibits: 6, 11
Unused Exhibit 3

FNK-7782 0027

Exhibit 12

FNK-7782 0028

FNK 7782 0055

EX 12

File   Edit   View   Favorites   Tools   Help

🔍 RUE—Registro Unico Empresarial "RUE - Consulta Reg..."

Live Search

**RUE**
Registro Único Empresarial
Cámaras de Comercio

INICIO

CONSULTAS

REGISTRARSE

Usuario: [          ]
Password: [          ]

[ Entrar ]

▸ Contáctenos

▸ Cámaras de Comercio

▸ Formatos DAE

▸ Modelos de Certificación RUP

Bienvenido:   Usuario Público

## "RUE - Consulta Registro Mercantil

### Información detallada del comerciante

Ver información del Establecimiento de Comercio, Agencia o Sucursal

| | Información Registro General |
|---|---|
| | LA GUAJIRA |
| CAMARA DE COMERCIO : | 31287 |
| INSCRIPCION PROPONENTE : | |
| MATRICULA MERCANTIL : | JOHAA KHORFAN ARGAN SAID |
| RAZON SOCIAL : | CEDULA DE CIUDADANIA |
| SIGLA : | 2-075950 |
| CLASE DE IDENTIFICACION : | |
| No DE IDENTIFICACION : | 2001 |
| DIGITO DE VERIFICACION : | 199881908 |
| ULTIMO AÑO RENOVADO : | |
| FECHA DE MATRICULA : | |
| FECHA DE VIGENCIA : | |
| FECHA DE CANCELACION : | |
| TIPO DE ORGANIZACION : | PERSONA NATURAL |
| TIPO DE SOCIEDAD : | 2 |
| CATEGORIA DE LA MATRICULA : | PERSONA NATURAL |
| AFILIADO : | N |
| ESTADO DE LA MATRICULA : | ACTIVA |

🌐 Internet                    100%

FNK 7782 0056

Exhibits Redacted in Full: 13-14, 17, 19-20, 22-23, 33, 38, 41, 44

Non-Responsive Exhibits: 15-16, 18, 30, 32, 36, 45-47, 49-50

Unused Exhibits: 21, 24-29, 31, 34-35, 37, 39-40, 42-43, 48

FNK-7782 0030

Exhibit 51

FNK-7782 0031

EX 51 – Registro Público De Panamá –

Records For ZONA LIBRE INTERNATIONAL MARKET S.A. – 8-10-09

| No. Ficha/Rollo | 306908 | No. Documento | |
|---|---|---|---|

Nombre de la Sociedad:
ZONA LIBRE INTERNATIONAL MARKET S.A.

Tomo:        0              Folio:   0              Asiento:        0
Fecha de Registro:       29-06-1999     Status:       VIGENTE
No. de Escritura:   1750              Fecha de Escritura:   16-06-1999
Notaria:     2              NOTARIA SEGUNDA DEL CIRCUITO
Provincia Notaria:   PANAMA
Duración:  PERPETUA               Domicilio:   PANAMA
Status de la Prenda:                 (DEF-DEFINITIVA, PRE-PRELIMINAR)

Boleta:  0                         Fecha de Pago:      00-00-0000
Agente Residente:       HONORIO QUESADA MARTINEZ

Tomo:   279                         Asiento:              4430

Rollo:   66161                       Imagen:                20

Moneda:       DOLARES AMERICANOS
Monto de Capital:       10,000.00
Capital
EL CAPITAL SERA DE DIEZ MIL DOLARES AMERICANOS DIVIDIDO EN DIEZ ACCIO-
NES DE UN VALOR DE MIL DOLARES CADA UNA.

Representante Legal
EL PRESIDENTE,EL SECRETARIO O EL TESORERO Y A LAS PERSONAS A LAS CUALES
SE LE OTROGUE PODER GENERAL DE LA SOCIEDAD. EL REPRESENTANTE LEGAL PODRA
OTORGAR PODER GENERAL O ESPECIAL A LAS PERSONAS QUE ESTIME CONVENIENTE,

SIN AUTORIZACION DE LA JUNTA GENERAL DE ACCIONISTAS EN NOMBRE Y REPRESEN
TACION DE LA SOCIEDAD,

Título del Dignatario        Nombre del Dignatario
PRESIDENTE                   AIMAN SAID JOMAA KHARFAN
TESORERO                     ISMAEL YOUSSEF ABDALLAH
SECRETARIO                   JALAL JOMHA KHARFAN

Nombre de los Directores
AIMAN SAID JOMAA KHARFAN
JALAL JOMHA KHARFAN
ISMAEL YOUSSEF ABDALLAH

Nombre de los Suscriptores
HONORIO QUESADA MARTINEZ
MARIANO MORENO GARRIDO

Datos del Oficio

Rollo:                       Imagen:

Fecha-Micro:

Tomo:                        Asiento:

Número:             Fecha:

Notaria:                     Provincia:

Tipo Acta:

2
FNK 6974 0031
FNK-7782 0033

FNK 7782 0060

*Ex 57*

 

# REPUBLICA DE PANAMA
## PROVINCIA DE COLÓN

## Notaría Primera del Circuito de Colón

### Licda. Ines M. España A.
#### NOTARÍA

TELEFONO: 441-3221 • CELULAR: 587-3709

## COPIA

Escritura Nº ......99...... de .....21..... de .....ENERO..... de 200.9.

Por la cual   no protocoliza ACTA DE SESIÓN EXTRAORDINARIA DE ACCIONISTAS DE LA

SOCIEDAD ANÓNIMA DENOMINADA ZONA LIBRE INTERNATIONAL PAREC, S.A.,

celebrada el día 19 de ENERO de 2009.--





FNK 5974 0032
FNK-7782 0034 *3*
FNK 7782 0061

EX 51.

acciones emitidas y en circulación de la sociedad ZONA LIBRE INTERNATIONAL MARKET, S.A., inscrita en el registro Público a ficha 363386, rollo 66161, imagen 20, sección mercantil con el objeto de celebrar una reunión extraordinaria y renunciando al aviso de convocatoria previo y a la publicación. Actúo como presidente y secretario su titular JHEZKIEL JACKIE LEVY.- PRIMERO: El presidente de la sociedad manifestó que el objeto de esta reunión es para nombrar una nueva junta directiva la cual quedará conformada de la siguiente manera: DIRECTOR PRESIDENTE: AIMAN SAID JONAA KHARFAN, con pasaporte personal No.C.C.84.075.050, y con domicilio en la Ciudad de Colón, República de Panamá.- DIRECTOR SECRETARIO: JALAL JOMNA KHARFAN, con pasaporte personal No.RC9467502, y con domicilio en la Ciudad de Colón, República de Panamá.- DIRECTOR TESORERO: ISMAEL YOUSSEF ABDALLAH, con pasaporte personal No.C.C.17.900.973, y con domicilio en la Ciudad de Colón, República de Panamá.- SEGUNDO: También el presidente manifestó que el objeto de la reunión es para reformar el punto DÉCIMO PRIMERO del PACTO SOCIAL, el cual quedará de la siguiente manera. La representación legal la ejercerá indistintamente el presidente, el secretario o el tesorero y a las personas ó las cuales se le otorgue poder general de la sociedad. El representante legal podrá otorgar poder general y especial a las personas que estima conveniente, sin autorización de la junta general de accionistas en nombre y representación de la sociedad. TERCERO: Los accionistas por unanimidad acuerdan que las cuentas bancarias serán firmadas indistintamente por cualquier miembro de la junta directiva y por la persona que designe cualquiera de los representantes legales de la sociedad.- Después de amplias discusiones y la moción debidamente sustentada, presentada y debatida, la proposición, fue aprobada por unanimidad por todos los accionistas de la sociedad.- Se autoriza al asesor jurídico de la sociedad al abogado RICARDO SÉMPERO, para que comparezca ante notario a notarizar la presente acta e inscribirla en el registro público.- Se deja constancia que esta acta es fiel copia de su original que reposa en el libro de actas de la sociedad ZONA LIBRE INTERNATIONAL MARKET, S.A.- No habiendo más asuntos que tratar en la reunión se dio por clausurada la misma a las 4:00 P.M., del mismo día en mención.- (FDO) JHEZKIEL JACKIE LEVY.- DIRECTOR PRESIDENTE Y SECRETARIO.- Se deja constancia que esta acta es fiel copia de su original que reposa en el libro de actas de la sociedad ZONA LIBRE INTERNATIONAL MARKET, S.A.- (FDO) JHEZKIEL JACKIE LEVY.- DIRECTOR

FNK 7782 0033

FNK 7782 0035

Exhibits Redacted in Full:  63, 75, 86, 90-91, 99
Non-Responsive Exhibits:  52-53, 55-62, 65, 69-74, 76-81, 83-85, 87-89, 92-98, 100
Unused Exhibits:  54, 64, 66-68, 82

Press Release and Chart

FNK-7782 0037

FNK 7782 0064

U.S. DEPARTMENT OF THE TREASURY

Press Center



Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network

1/26/2011
WASHINGTON – The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) today designated Lebanese narcotics trafficker Ayman Joumaa, as well as nine individuals and 19 entities connected to his drug trafficking and money laundering organization as Specially Designated Narcotics Traffickers (SDNTs) pursuant to the Foreign Narcotics Kingpin Designation Act (Kingpin Act).

Ayman Joumaa has coordinated the transportation, distribution, and sale of multi-ton shipments of cocaine from South America and has laundered the proceeds from the sale of cocaine in Europe and the Middle East, according to investigations led by the Drug Enforcement Administration (DEA). Operating in Lebanon, West Africa, Panama and Colombia, Joumaa and his organization launder proceeds from their illicit activities – as much as $200 million per month – through various channels, including bulk cash smuggling operations and Lebanese exchange houses. As a result of today's designations, U.S. persons are prohibited from conducting financial or commercial transactions with these individuals and entities and any assets the designees may have under U.S. jurisdiction are frozen.

"Ayman Joumaa runs a complex money laundering scheme moving hundreds of millions of dollars of illicitly derived proceeds through businesses operated by him and his associates," said OFAC Director Adam J. Szubin. "By exposing this international drug trafficking and money laundering organization, today's action will disrupt this network and obstruct their access to the international financial system."

Three Lebanon-based money exchanges used by Ayman Joumaa and his organization to launder illicit proceeds were also designated today: the Hassan Ayash Exchange Company, the Ellissa Exchange Company, and New Line Exchange Trust Co. OFAC also targeted Hassan Ayash, Hassan Mahmoud Ayache, Jamal Mohamad Kharroubi, Ali Mohammed Kharroubi, Ismael Mohammed Youssef, and Ziad Mohamad Youssef for their roles in these money exchanges. Ali Mohammed Kharroubi owns Ellissa Holding, which was designated today. Ellissa Holding controls nine companies in Lebanon, Benin and the Democratic Republic of Congo, including Ellissa Group SA, the subsidiary of Ellissa Holding in Benin involved in the sale of used cars in Africa.

Joumaa's brothers Akram Saleh Joumaa, Anwar Saleh Joumaa and Mohamad Saleh Joumaa were designated for their involvement in the drug trafficking or money laundering activities of the Joumaa organization. Akram Saleh Joumaa is the CEO and general manager of Caesar's Park Hotel, also designated today, which the organization uses as a location to broker drug trafficking and money laundering activities.

Lebanon-based company Phoenicia Shipping Offshore SARL, Panama-based companies Gold Electronics S.A. and Zona Libre International Market S.A., and Colombia-based companies Almacen Junior, Almacen Junior No. 2 and Commercial Planeta were all designated today for being owned or controlled by members of the Ayman Joumaa organization.

Today's action, supported by the DEA's investigation of the Joumaa organization, is part of ongoing efforts under the Kingpin Act to apply financial measures against significant foreign narcotics traffickers worldwide. Internationally, more than 950 businesses and individuals linked to 97 drug kingpins have been designated pursuant to the Kingpin Act since June 2000. Penalties for violations of the Kingpin Act range from civil penalties of up to $1,075 million per violation to more severe criminal penalties. Criminal penalties for corporate officers may include up to 30 years in prison and fines up to $5 million. Criminal fines for corporations may reach $10 million. Individuals face up to 10 years in prison and fines pursuant to Title 18 of the United States Code for criminal violations of the Kingpin Act.

To view a chart of the Joumaa Drug Trafficking & Money Laundering Organization, visit link 🔗



Exhibit 3

# Press Center

Home » Press Center » Press Releases » Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network

## Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network

1/26/2011

**WASHINGTON** – The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) today designated Lebanese narcotics trafficker Ayman Joumaa, as well as nine individuals and 19 entities connected to his drug trafficking and money laundering organization as Specially Designated Narcotics Traffickers (SDNTs) pursuant to the Foreign Narcotics Kingpin Designation Act (Kingpin Act).

Ayman Joumaa has coordinated the transportation, distribution, and sale of multi-ton shipments of cocaine from South America and has laundered the proceeds from the sale of cocaine in Europe and the Middle East, according to investigations led by the Drug Enforcement Administration (DEA).  Operating in Lebanon, West Africa, Panama and Colombia, Joumaa and his organization launder proceeds from their illicit activities – as much as $200 million per month – through various channels, including bulk cash smuggling operations and Lebanese exchange houses.  As a result of today's designations, U.S. persons are prohibited from conducting financial or commercial transactions with these individuals and entities and any assets the designees may have under U.S. jurisdiction are frozen.

"Ayman Joumaa runs a complex money laundering scheme moving hundreds of millions of dollars of illicitly derived proceeds through businesses operated by him and his associates," said OFAC Director Adam J. Szubin. "By exposing this international drug trafficking and money laundering organization, today's action will disrupt this network and obstruct their access to the international financial system."

Three Lebanon-based money exchanges used by Ayman Joumaa and his organization to launder illicit proceeds were also designated today:  the Hassan Ayash Exchange Company, the Ellissa Exchange Company, and New Line Exchange Trust Co. OFAC also targeted Hassan Ayash, Hassan Mahmoud Ayache, Jamal Mohamad Kharoubi, Ali Mohammed Kharroubi, Ismael Mohammed Youssef, and Ziad Mohamad Youssef for their roles in these money exchanges.   Ali Mohammed Kharroubi owns Ellissa Holding, which was designated today.  Ellissa Holding controls nine companies in Lebanon, Benin and the Democratic of Congo, including Ellissa Group SA, the subsidiary of Ellissa Holding in Benin involved in the sale of used cars in Africa.

Joumaa's brothers Akram Saied Joumaa, Anwar Saied Joumaa and Mohamad Said Joumma were designated for their involvement in the drug trafficking or money laundering activities of the Joumaa organization.  Akram Saied Joumaa is the CEO and general manager of Caesar's Park Hotel, also designated today, which the organization uses as a location to broker drug trafficking and money laundering activities.

Lebanon-based company Phenicia Shipping Offshore SARL, Panama-based companies Goldi Electronics S.A. and Zona Libre International Market S.A., and Colombia-based companies Almacen Junior, Almacen Junior No. 2 and Commercial Planeta were all designated today for being owned or controlled by members of the Ayman Joumaa organization.

Today's action, supported by the DEA's investigation of the Joumaa organization, is part of ongoing efforts under the Kingpin Act to apply financial measures against significant foreign narcotics traffickers worldwide.  Internationally, more than 950 businesses and individuals linked to 87 drug kingpins have been designated pursuant to the Kingpin Act since June 2000.  Penalties for violations of the Kingpin Act range from civil penalties of up to $1.075 million per violation to more severe criminal penalties.  Criminal penalties for corporate officers may include up to 30 years in

FNK 7782 0067

prison and fines up to $5 million.  Criminal fines for corporations may reach $10 million.  Individuals face up to 10 years in prison and fines pursuant to Title 18 of the United States Code for criminal violations of the Kingpin Act.

To view a chart of the Joumaa Drug Trafficking & Money Laundering Organization, visit link.

FNK 7782 0068

Exhibit 4

AO 91 (Rev. 01/09)  Criminal Complaint

UNDER SEAL

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

| | | | |
|---|---|---|---|
| United States of America | ) | | |
| v. | ) | | |
| AYMAN JOUMAA, | ) | Case No. | 1:11-mj- 467 |
| a/k/a Junior, and | ) | | |
| ALEJANDRO LOPEZ, | ) | | |
| a/k/a Angel. | ) | | |

F I L E D

[stamp] 17 2011

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date(s) of ___March 2010 - June 2011___ in the county of _____ in the ___Eastern___ District of ___Virginia___, the defendant(s) violated ___21___ U.S.C. § ___959 and 963___ an offense described as follows:

AYMAN JOUMAA, a/k/a Junior, and ALEJANDRO LOPEZ, a/k/a Angel, did conspire to distribute five kilograms or more of cocaine for the purpose of unlawful importation into the United States.

This criminal complaint is based on these facts:

See Attached Affidavit

☐ Continued on the attached sheet.

_____
*Complainant's signature*

DEA Special Agent R. Kevin Schreiber
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___06/17/2011___

City and state: ___Alexandria, Virginia___

/s/
_____
John F. Anderson
United States Magistrate  Judge

FNK 7782 0069

Exhibit 5

UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff | ) | **(Under Seal)** |
| | ) | |
| | ) | Criminal Case: 1:11-mj-467 |
| v. | ) | |
| | ) | |
| | ) | |
| AYMAN JOUMAA, | ) | |
| a/k/a Junior, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ALEJANDRO LOPEZ, | ) | |
| a/k/a Angel, | ) | |
| | ) | |
| Defendants | ) | |

F I L E D

17

CLERK, U.S. DISTRICT
ALEXANDRIA, VIRGINIA

## AFFIDAVIT IN SUPPORT OF AN ARREST WARRANT
## AND CRIMINAL COMPLAINT

I, R. Kevin Schreiber, Special Agent with the United States Drug Enforcement Administration, being duly sworn, depose and state as follows:

### BACKGROUND

1.     I am a Special Agent (SA) with the United States Drug Enforcement Administration (DEA), Washington Division Office (WDO). I am an investigative or law enforcement officer of the United States, in that I am empowered by law to conduct investigations of violations of the United States Code. I have been employed by the DEA for approximately 15 years. I received approximately 16 weeks training at the DEA Academy in Quantico, Virginia. I have received extensive training pertaining to narcotics investigations and the investigation of various crimes which arise from drug trafficking.

2.      I am familiar with the operations of illegal drug trafficking organizations

throughout the United States, Colombia, Mexico, and Central America. I have participated in

multiple investigations involving Court-ordered interception of wire and electronic

communications. I am familiar with the ways in which narcotic traffickers conduct their

business, including domestic and international methods of importing and distributing narcotics,

money laundering, the use of cellular telephones and digital paging devices to facilitate their

illegal acts, and the use of numerical codes and code words to conduct drug transactions. My

training and experience as a Special Agent of the DEA, and my conversations with other Special

Agents of the DEA, state and local investigators familiar with narcotics trafficking and money

laundering matters, form the basis of the opinions and conclusions set forth below, which I drew

from the facts set forth herein.

3.      Based on my training and experience, and by consulting with other DEA agents

who are familiar with Colombian cocaine trade, I know that Colombia is responsible for 90% of

the cocaine that is imported into the United States. The cocaine that leaves Colombia is sent

along the Central American corridor to Guatemala, Honduras, and Mexico, for eventual shipment

to the United States. I also know that there is no substantial domestic drug market in the Central

American countries and Mexico for cocaine, and that the price of cocaine increases at each step

in its journey north to the United States.

4.      Based on my training and experience, I know that the laundering of drug related

proceeds is a critical step in a conspiracy to distribute cocaine for unlawful importation into the

United States. The laundering of drug proceeds allows foreign drug traffickers to remain

undetected so that they can continue to distribute cocaine and other drugs for importation into the

United States. The laundered drug proceeds that are returned to the drug traffickers in Colombia

and other countries allow the drug trafficking conspiracy to continue by funding further drug production and distribution aimed at importing future drug shipments to the United States. Thus, the laundering of money is a necessary and crucial part in a drug trafficking conspiracy.

5.      This affidavit is submitted in support of a criminal complaint charging Ayman Joumaa, aka Junior, and Alejandro Lopez, aka Angel, with conspiracy to distribute greater than five kilograms of cocaine for the purpose of unlawful importation into the United States (Title 21 United States Code, Sections 959 and 963).

6.      The facts and information contained in this affidavit are based upon my personal knowledge of the investigation as well as the observations of other law enforcement officers involved in this investigation.  All observations that were not personally made by your affiant were related to me by the person(s) who made such observations.

7.      This affidavit  contains information necessary to support a finding of probable cause for the complaint and arrest warrant.  This affidavit is not intended to include each and every fact and matter observed by me or known to the government.

<u>INVESTIGATION</u>

8.      Since approximately March 2010, I have been involved in an investigation targeting Lebanon-based money launderer for cocaine traffickers, Ayman Joumaa, aka Junior, and his Colombia based partner, Alejandro Lopez, aka Angel.  Through extensive interviews with cooperating defendants and DEA confidential sources as well as undercover operations in Colombia, Denmark, and Germany, this investigation has revealed the following:

<u>Confidential Source 1</u>

9.      Confidential source #1, hereafter referred to as CS1, has pleaded guilty to federal narcotics trafficking offenses in United States District Court and is awaiting sentencing.  CS1's

plea acknowledges his/her participation in a conspiracy to import approximately 85,000

kilograms of cocaine into the United States from 2005 to 2007. CS1 advised that he/she

participated in a conspiracy to ship multi-thousand kilogram quantities of cocaine from

Colombia, to Guatemala, Honduras, and Mexico for sale to the Los Zetas trafficking organization

in Mexico. CS1 stated that the ultimate destination for these thousands of kilograms of cocaine

was the United States. CS1 is currently cooperating with law enforcement with the anticipation

of obtaining a reduction in his/her sentence.

     10.    CS1 began working with Ayman Joumaa in or about 2004. CS1 stated that

Joumaa, also known to CS1 as "Junior", would arrange for the laundering of drug related

proceeds from Mexico, Europe (predominantly Spain), and West Africa to Colombia. CS1

advised that he/she would contact Joumaa via email, Blackberry PIN, or telephone in order to

arrange for the delivery of drug related proceeds to members of Joumaa's organization. Joumaa

and members his organization would then launder these proceeds and return them in Colombia.

CS1 stated that Joumaa would charge a fee of approximately 13% for the laundering of these

proceeds. CS1 advised that the proceeds received by Joumaa and members of his organization

were in the form of United States currency. This United States currency was proceeds from the

sale of cocaine in the United States.

     11.    CS1 stated that he/she would arrange for the delivery of bulk United States

currency to Joumaa and members of his organization. These deliveries from the sale of cocaine

that was shipped to the United States were made in Mexico City, Mexico. CS1 advised that once

the drug proceeds were delivered to members of the Joumaa organization, the laundered proceeds

would be paid to CS1 or his/her representatives in Venezuela or Colombia. Payment in

Venezuela was in the form of Bolivars. Payment in Colombia was in the form of Colombian

pesos. CS1 advised that Joumaa would pay CS1 and CS1's representatives within one to five days from the date of delivery of the United States currency in Mexico. CS1 advised that Joumaa typically picked up between 2 to 4 million dollars at a time from CS1 in Mexico City. CS1 stated that Joumaa continued to launder drug related proceeds for CS1 until 2008.

### Confidential Source 2

12.     Confidential Source #2, hereafter referred to as CS2, is currently cooperating with law enforcement, including agents from United States Immigration and Customs Enforcement. CS2 was a member of the drug trafficking and money laundering organization and worked extensively with CS1. CS2 stated that he/she began working with Ayman Joumaa in or about 2004. CS2 advised that he/she also knew Joumaa by his alias Junior. CS2 advised that he/she, at the direction of CS1, would contact Joumaa via Blackberry, email, or telephone, and arrange for Joumaa and members of his organization, to pick up drug related proceeds in Mexico, Europe, and West Africa. CS2 stated that he/she would coordinate with Joumaa to arrange the pick up of United States currency in Mexico City, Mexico. Joumaa would then launder these proceeds and repay them in Colombia and Venezuela. CS2 advised that the United States currency laundered by Joumaa was the proceeds of the sale of cocaine shipped from Colombia to Guatemala, Honduras, and Mexico, for sale to the Los Zetas trafficking organization in Mexico. CS2 advised that the ultimate destination of the cocaine shipped to Los Zetas was the United States.

13.     CS2 stated that Joumaa would charge a fee of approximately 13% to launder the drug related proceeds from Mexico to Venezuela and Colombia. Payment in Venezuela was in the form of Bolivars. Payment in Colombia was in the form of Colombian pesos. CS2 stated

that he/she continued to utilize the laundering services of Joumaa until approximately 2008. CS2 stated that he/she, at the direction of Immigration and Customs Enforcement agents, continued contact with Joumaa until approximately October 2010.

### Confidential Source 3

14. Confidential Source #3, hereafter referred to as CS3 is currently cooperating with law enforcement with the anticipation of obtaining a reduction in his/her sentence from a pending guilty plea in United States District Court. CS3 has acknowledged his/her participation in a conspiracy to launder drug related proceeds from the United States, Mexico, Central America, and Europe from approximately 1997 through September 2010. CS3 has acknowledged that he/she laundered in excess of $250 million dollars during the course of this conspiracy.

15. CS3 stated that in or about 2007 or 2008 he/she was introduced to Alejandro Lopez, aka Angel. CS3 stated that at the time CS3 met Lopez, Lopez was already involved with the laundering of drug related proceeds from Mexico, Central America, and Europe to Colombia. CS3 stated that Lopez's partner was an individual known to CS3 as a Lebanese individual that went by the nickname "Junior." CS3 advised that Lopez introduced CS3 to Joumaa as Lopez's money laundering business partner.

16. CS3 stated that he/she and Lopez would coordinate their money laundering activities and provide money laundering services to each other. CS3 advised that he/she would contact Lopez to assist CS3 with the laundering of drug related proceeds from Europe to Colombia. CS3 stated that Lopez and CS3 would assist each other with the laundering of drug related proceeds from Mexico, Guatemala, and Honduras to Colombia and Panama.

17. CS3 stated that from approximately 2008 to September 2010 he/she laundered approximately 20 to 25 million dollars of drug related proceeds with the assistance of Lopez.

CS3 advised that the laundered proceeds derived from the shipment of cocaine to Honduras, Guatemala, and Mexico from Colombia. The ultimate destination of this cocaine was the United States. CS3 stated that he/she would arrange with Lopez for the pick-up of drug related proceeds in the above mentioned locations. CS3 advised that he/she would contact Lopez via email, Blackberry, telephone, and in person, to make arrangements for these operations. CS3 stated that Lopez would charge a fee of approximately 14% for the laundering of the drug related proceeds.

18.     CS3 provided agents with a detailed ledger of his/her money laundering activities with Lopez from July 7, 2010 until September 7, 2010. These ledgers reveal that during this time period Lopez and CS3 laundered approximately 4 million dollars in drug related proceeds from Guatemala, Honduras, and Mexico to Colombia.

CONCLUSION

19.     Based on the aforementioned facts, your affiant believes probable cause exists for a criminal complaint charging Ayman Joumaa, aka Junior, and Alejandro Lopez, aka Angel, with conspiracy to distribute five kilograms or more of cocaine for the purpose of unlawful importation to the United States.

R. Kevin Schreiber
Special Agent
Drug Enforcement Administration
Washington Field Office

Subscribed and sworn to before me this ⬦ day of June 2011.

_____/s/_____

John F. Anderson
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

```
FILED
IN OPEN COURT

NOV  3 2011

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA
```

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **(UNDER SEAL)** |
| | ) | |
| v. | ) | CRIMINAL NO. 1:11-CR-560 |
| | ) | |
| | ) | Count 1 -   21 U.S.C. §§ 959(a), 960, 963 |
| AYMAN JOUMAA, | ) |          (Conspiracy to Distribute Five |
|   also known as "Junior," | ) |          Kilograms or More of Cocaine |
| | ) |          Knowing and Intending that it |
|   Defendant. | ) |          will be Unlawfully Imported |
| | ) |          into the United States) |
| | ) | |
| | ) | Count 2 -   18 U.S.C. § 1956(h) |
| | ) |          (Conspiracy to Commit Money |
| | |          Laundering) |

Forfeiture -   18 USC § 853, 970
         (Criminal Forfeiture)

## INDICTMENT

NOVEMBER 2011 TERM - at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

### Background

At all times relevant to this Indictment:

1.      On or about January 26, 2011, the United States Department of the Treasury's

Office of Foreign Asset Control (OFAC) designated the defendant, along with other individuals

and entities, as Specially Designated Narcotics Traffickers pursuant to the Foreign Narcotics

Kingpin Designation Act.

2.      This designation by OFAC was based on, among other things, the defendant's

coordination of the transportation , distribution, and sale of multi-ton shipments of cocaine from

South America and the laundering of hundreds of millions of dollars of proceeds from the sale of cocaine in Europe and the Middle East.

3.      The defendant's coordination of money laundering activities occurred in the United States, Lebanon, Benin, Panama, Colombia, the Democratic of Congo, and elsewhere.

4.      Los Zetas Mexican drug cartel is a violent drug trafficking organization that controls drug smuggling corridors from Mexico to the United States, often through massacre attacks, including the 2011 massacre at the Monterey Casino in Nuevo Leon, Mexico.

5.      Colombia is responsible for the production of 90% of the cocaine that is imported into the United States.  The cocaine that leaves Colombia is sent along the Central American corridor to Guatemala, Honduras, and Mexico, for eventual shipment to the United States.

6.      The laundering of drug related proceeds is a critical step in a conspiracy to distribute cocaine for unlawful importation into the United States.  The laundering of drug proceeds allows foreign drug traffickers to remain undetected so that they can continue to distribute cocaine and other drugs for importation into the United States.  The laundered drug proceeds that are returned to the drug traffickers in Colombia and other countries allow the drug trafficking conspiracy to continue by funding further drug production and distribution aimed at importing future drug shipments to the United States.

2

## COUNT 1

(Conspiracy to Distribute Five Kilograms or More of Cocaine Knowing and Intending that it
would be Unlawfully Imported into the United States)

THE GRAND JURY FURTHER CHARGES THAT:

From in or about 2004 and continuing thereafter up to and including the date of the filing

of this Indictment, the exact dates being unknown to the Grand Jury, in Colombia, Lebanon,

Panama, and elsewhere, the defendant, AYMAN JOUMAA, also known as "Junior," and others

known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire,

confederate, and agree to commit the following offense against the United States: to knowingly

and intentionally distribute five kilograms or more of a mixture and substance containing a

detectable amount of cocaine, a Schedule II controlled substance, knowing and intending that

such substance would be unlawfully imported into the United States, in violation of Title 21,

United States Code, Section 959(a).

The allegations in paragraphs 1 through 6 of this Indictment are incorporated herein by

reference.

### Manners and Means of the Conspiracy

The defendant and his co-conspirators used the following manners and means, among

others, in furtherance of the conspiracy:

7.      It was part of the conspiracy that the defendant and his co-conspirators

coordinated the shipment of at least tens of thousands of kilograms of cocaine from Colombia,

through Central America and Mexico, to the United States, including but not limited to 85,000

kilograms of cocaine shipped from Colombia for sale to Los Zetas drug cartel from in and around

3

2005 through in and around 2007.

8.    It was further a part of the conspiracy that the defendant and his co-conspirators laundered at least hundreds of millions of dollars in proceeds of illegal drug sales in the United States and elsewhere, including but not limited to an amount in excess of $250 million in drug related proceeds representing cocaine sales in the United States, Mexico, Central America, and Europe, which the defendant laundered from in and around 1997 through in and around September 2010.

9.    It was further a part of the conspiracy that the defendant and others, known and unknown to the grand jury, coordinated the shipment of multi-thousand kilogram quantities of cocaine from Colombia to Guatemala, Honduras, and Mexico for sale to Los Zetas drug cartel in Mexico.  The ultimate destination for this cocaine was the United States.

10.    It was further part of the conspiracy that the defendant would arrange for the laundering of drug-related proceeds from Mexico, Europe (predominantly Spain), and West Africa to Colombia.  The defendant's co-conspirators would contact the defendant via email, Blackberry PIN, or telephone in order to arrange for the delivery of drug related proceeds to members of the defendant's organization.  The defendant and members of his organization would then launder these proceeds and return them to the cocaine suppliers in Colombia.  The defendant would charge a fee of between 8% and 14% for the laundering of these proceeds.  These drug proceeds received by the defendant and members of his organization were in the form of United States currency and represented proceeds from the sale of cocaine in the United States.

11.    It was further part of the conspiracy that the defendant and his co-conspirators

4

would receive bulk deliveries of United States currency. These deliveries of bulk cash, which represented proceeds of the sale of cocaine in the United States, were made in Mexico City, Mexico. Once the drug proceeds were delivered to the defendant and his co-conspirators, the laundered proceeds would be paid out in Venezuela or Colombia. Payment in Venezuela was in the form of Bolivars. Payment in Colombia was in the form of Colombian pesos. The defendant would launder these funds and make payment within 1 to 5 days from the date of delivery of the United States currency in Mexico. During the course of the conspiracy, the defendant typically picked up between $2 and 4 million at a time in Mexico City.

12.     It was further part of the conspiracy that the defendant and his co-conspirators would pick up drug-related proceeds in Mexico, Europe, and West Africa. Further, the defendant and his co-conspirators would pick up United States currency in Mexico City, Mexico. The defendant would then launder these proceeds and repay them to drug traffickers in Colombia and Venezuela. The United States currency laundered by the defendant represented the proceeds of the sale of cocaine shipped from Colombia to Guatemala, Honduras, and Mexico, for sale to the Los Zetas trafficking organization in Mexico. The ultimate destination of the cocaine shipped to Los Zetas drug cartel was the United States.

(In violation of Title 21, United States Code, Section 963).

5

COUNT 2

(Conspiracy to Commit Money Laundering)

THE GRAND JURY FURTHER CHARGES THAT:

From in or about 2004 and continuing thereafter up to and including the date of the filing of this Indictment, in the United States, Colombia, Lebanon, Panama, and elsewhere, the defendant, AYMAN JOUMAA, and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and agree to conduct financial transactions involving the proceeds of a specified unlawful activity, to wit, the manufacture, importation, sale, and distribution of a controlled substance, which financial transactions involving interstate and international commerce were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity, to wit, the manufacture, importation, sale, and distribution of a controlled substance, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(I).

The allegations in paragraphs 1 through 12 of this Indictment are incorporated herein by reference.

(In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and (h)).

6

FNK 7782 0082

## FORFEITURE NOTICE

The defendant, if convicted of the violation alleged in Count 1 of this Indictment, shall forfeit to the United States pursuant to Title 21, United States Code, Section 853(a), any property constituting, or derived from, any proceeds each defendant obtained, directly or indirectly, as the result of such violation; and any of the defendant's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation. This property includes, but is not limited to $850,000,000 in United States currency, representing proceeds that the defendant obtained in the course of the conspiracy alleged in Count 1 of this Indictment.

If convicted of the money laundering conspiracy charged in Count 2 of this Indictment, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property, including but not limited to $850,000,000 in United States currency, representing proceeds that the defendant obtained in the course of the conspiracy alleged in Count 2 of this Indictment.

(Pursuant to Title 21, United States Code, Section 853 and Title 18, United States Code, Section 982(a)(1)).

A TRUE BILL

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.

_____
Foreperson

Neil H. MacBride
United States Attorney

By: _____
Michael P. Ben'Ary
Assistant United States Attorney

7

FNK 7782 0083

CM/ECF - vaed

Page 1 of 3

Exhibit 7

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CRIMINAL DOCKET FOR CASE #: 1:11-cr-00560-TSE All Defendants

Case title: USA v. Joumaa

Date Filed: 11/23/2011

Assigned to: District Judge T. S. Ellis, III

### Defendant (1)

**Ayman Joumaa**
*also known as*
Junior

| Pending Counts | Disposition |
| --- | --- |
| 21:963 Conspiracy to Distribute Five Kilograms or More of Cocaine Knowing and Intending that it will be Unlawfully Imported into the United States (Ct 1: 2004) FORFEITURE (1) | |
| 18:1956(a)(1)(B)(i) and (h) Conspiracy to Commit Money Laundering (Ct 2: 2004) FORFEITURE (2) | |

**Highest Offense Level (Opening)**

Felony

| Terminated Counts | Disposition |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| Complaints | Disposition |
| --- | --- |
| 21:959 and 963 Conspiracy to Distribute at least 5 Kilograms of Cocaine (Sch. II) for Unlawful Importation into the United States | |

FNK 7782 0084

<u>Plaintiff</u>

USA

represented by **Michael Ben'Ary**
US Attorney's Office (Alexandria)
2100 Jamieson Avenue
Alexandria, VA 22314
**N/A**
703-299-3700
Email: michael.ben'ary2@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/17/2011 | 1 | SEALED COMPLAINT as to Ayman Joumaa (1), Alejandro Lopez (2). (rban, ) (jlan, ). [1:11-mj-00467-JFA *SEALED*] (Entered: 06/17/2011) |
| 06/17/2011 | 2 | Redacted Criminal Case Cover Sheet. (rban, ) (jlan, ). [1:11-mj-00467-JFA *SEALED*] (Entered: 06/17/2011) |
| 06/17/2011 | 3 | AFFIDAVIT by USA as to Ayman Joumaa, Alejandro Lopez 1 Complaint (Sealed). (rban, ) (jlan, ). [1:11-mj-00467-JFA *SEALED*] (Entered: 06/17/2011) |
| 06/17/2011 | 4 | Arrest Warrant Issued by Magistrate Judge John F. Anderson in case as to Ayman Joumaa, Alejandro Lopez. (rban, ) (jlan, ). [1:11-mj-00467-JFA *SEALED*] (Entered: 06/17/2011) |
| 06/17/2011 | 5 | MOTION to Seal by USA as to Ayman Joumaa, Alejandro Lopez. (rban, ) (jlan, ). [1:11-mj-00467-JFA *SEALED*] (Entered: 06/17/2011) |
| 06/17/2011 | 6 | ORDER granting 5 Motion to Seal as to Ayman Joumaa (1), Alejandro Lopez (2). ORDERED that, the complaint, arrest warrants, Motion to Seal, and this Order be Sealed until all defendants are arrested. Signed by Magistrate Judge John F. Anderson on 6/17/2011. (rban, ) (jlan, ). [1:11-mj-00467-JFA *SEALED*] (Entered: 06/17/2011) |
| 11/23/2011 | 1 | INDICTMENT as to Ayman Joumaa (1) count(s) 1, 2. (jlan) (Entered: 11/23/2011) |
| 11/23/2011 | 4 | MOTION to Seal by USA as to Ayman Joumaa. (jlan) (Entered: 11/23/2011) |
| 11/23/2011 | 5 | ORDER granting 2 Motion to Seal as to Ayman Joumaa (1). Signed by Magistrate Judge Ivan D. Davis on 11/23/2011. (jlan) (Entered: 11/23/2011) |
| 11/23/2011 | 3 | Redacted Criminal Case Cover Sheet (jlan) (Entered: 11/23/2011) |
| 12/12/2011 | 6 | MOTION to Unseal Case by USA as to Ayman Joumaa. (Attachments: # 1 Proposed Order)(jlan) (Entered: 12/12/2011) |
| 12/12/2011 | 7 | ORDER granting 6 Motion to Unseal Case as to Ayman Joumaa (1). Signed by Magistrate Judge Thomas Rawles Jones, Jr on 12/12/2011. (jlan) (Entered: 12/12/2011) |

FNK 7782 0085

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 02/02/2018 16:02:00 | | | |
| PACER Login: | ███████████ | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:11-cr-00560-TSE |
| Billable Pages: | 2 | Cost: | 0.20 |

FNK 7782 0086

Exhibit 8

 Ferrari & Associates, P.C.

1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004
Tel. 202-280-6370
Fax. 877-448-4885

May 18, 2016

**SENT VIA EMAIL AND FEDERAL EXPRESS: # 8079 8332 6646**

ATTN: Designation Reconsideration
Office of Global Targeting
Office of Foreign Assets Control
United States Department of the Treasury
1500 Pennsylvania Ave., NW
Treasury Annex
Washington, D.C. 20220

Re:   **Request for Administrative Reconsideration – Ayman Saied Joumaa**
      *Kingpin Act Designation Reconsideration – 31 C.F.R. § 501.807*

Dear Sir/Madam:

On January 26, 2011, acting pursuant to the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), the United States Department of the Treasury's Office of Foreign Assets Control (OFAC) designated Ayman Saied Joumaa ("Petitioner") for allegedly operating a "drug trafficking and money laundering organization."[1]   Through this request, Petitioner herein formally requests the administrative reconsideration of his designation pursuant to 31 C.F.R. § 501.807 and 31 C.F.R. § 598.101.

Petitioner contends that he does not play a role in narcotics trafficking activities.  As such, Petitioner disputes the factual basis underlying his continued designation and asserts that an insufficient basis exists for the designation.  Moreover, if Petitioner has engaged in certain conduct that gave rise to his designation under the Kingpin Act, he is prepared to work in good-faith with OFAC to exact a change in circumstances that would lead to rescission of his designation. Petitioner intends to supplement this request for administrative reconsideration with evidence and documentation supporting his contention that the factual allegations that underlie his Kingpin Act designation are erroneous and plans to propose remedial measures that should negate the basis for his designation.

---

[1] PRESS RELEASE, Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network, U.S. Dep't of the Treasury's Office of Foreign Assets Control, Jan. 26, 2011, *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1035.aspx.

I.    <u>Legal Authorities and Analysis</u>

On December 3, 1999, the President signed into law the Foreign Narcotics Kingpin Designation Act.  *See* 21 U.S.C. §§ 1901-1908 (1999).  The Kingpin Act was designed to "provide authority for the identification of, and application of sanctions on a worldwide basis to, significant foreign narcotics traffickers, their organizations, and the foreign persons who provide support to those significant foreign narcotics traffickers and their organizations, whose activities threaten the national security, foreign policy, and economy of the United States." 21 U.S.C. § 1902.

To accomplish this, the Kingpin Act mandates the President to submit an annual report to specific Congressional committees, "identifying publicly the foreign persons that the President determines are appropriate for sanctions...[and] detailing publicly the President's intent to impose sanctions upon these significant foreign narcotics traffickers..." 21 U.S.C. § 1903(b)(1)-(2).[2]  Pursuant to the Kingpin Act, the President is authorized to impose blocking sanctions on "any significant foreign narcotics trafficker publicly identified" in the President's annual report. 21 U.S.C. § 1904(b)(1) ("...there are blocked as of such date, and any date thereafter, all such property and interests in property within the United States, or within the possession or control of any United States person...").[3]

Moreover, the Kingpin Act provides additional authorities to the Secretary of the Treasury, acting in consultation with the heads of other federal agencies, to designate "any foreign persons...materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of a significant foreign narcotics trafficker"; "any foreign person...owned, controlled, or directed by, or acting for or on behalf of, a significant foreign narcotics trafficker"; and "any foreign person...playing a significant role in international narcotics trafficking." 21 U.S.C. § 1902(2)-(4).[4]  Foreign persons who are so designated pursuant to these authorities are likewise subject to blocking sanctions under the Kingpin Act. 21 U.S.C. § 1904(b).

---

[2] The President is authorized to supplement his mandatory report with additional designations "if at any time after the report required...the President finds that a foreign person is a significant foreign narcotics trafficker and such foreign person has not been publicly identified in [the] report..." 21 U.S.C. § 1903(h)(1)(A).

[3] Blocking sanctions are subject to exceptions "provided in regulations, orders, instructions, licenses, or directives issued pursuant to this chapter..." 21 U.S.C. § 1904(b).  Such exceptions fall under the discretion of the Secretary of the Treasury, who "is authorized to take such actions as may be necessary to carry out this chapter, including...promulgating rules and regulations permitted under this chapter." 21 U.S.C. § 1904(e)(1)(B).

[4] A significant foreign narcotics trafficker is defined as "any foreign person that plays a significant role in international narcotics trafficking, that the President has determined to be appropriate for sanctions pursuant to this chapter..." 21 U.S.C. § 1907(7).  Narcotics trafficking is itself defined broadly to include "any illicit activity to cultivate, produce, manufacture, distribute, sell, finance, or transport narcotic drugs, controlled substances, or listed chemicals, or otherwise endeavor or attempt to do so, or to assist, abet, conspire, or collude with others to do so." 21 U.S.C. § 1907(3).

FNK 7782 0088

Pursuant to regulations promulgated by OFAC – acting under a delegation of authority from the Secretary of the Treasury, who is authorized to prescribe such regulations as may be necessary "to carry out the purposes" of the Kingpin Act, including "regulations prescribing recordkeeping, reporting, and production of documents, definitions, licenses, instructions, or directions, as may be necessary..." – a foreign person designated under the Kingpin Act and thus placed on the Specially Designated Nationals and Blocked Persons List ("SDN List") maintained by OFAC "may seek administrative reconsideration of his, her, or its designation, or assert that the circumstances resulting in the designation no long apply, and thus seek to have the designation rescinded..." 31 C.F.R. § 501.807; *see also* 31 C.F.R. § 598.101 ("This part [Part 598] is separate from, and independent of, the other parts of this chapter...with the exception of part 501 of this chapter, the provisions of which apply to this part.").

In doing so, the foreign person "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation" and "may [also] propose remedial steps on the person's part...which the person believes would negate the basis for designation." 31 C.F.R. § 501.807(a). The regulations further prescribe that OFAC will review the information submitted and "may request clarifying, corroborating, or other additional information." 31 C.F.R. § 501.807(b). Following a "review of the request for reconsideration, [OFAC] will provide a written decision to the blocked person..." 31 C.F.R. § 501.807(d).

On January 26, 2011, OFAC designated Petitioner under the Kingpin Act for his alleged significant role in narcotics trafficking activities. Based on publicly-available documents, OFAC designated Petitioner via 21 U.S.C. § 1904(b)(4), which authorizes the Secretary of the Treasury to designate any foreign person playing a significant role in international narcotics trafficking.[5] It is undersigned counsel's understanding that persons designated pursuant to 21 U.S.C. § 1904(b)(4) are regarded as "Treasury-designated kingpins."[6] At the same time that Petitioner was designated, nine foreign individuals and twenty foreign entities were designated as derivative designations of Mr. Joumaa and his alleged organization. It is this designation that Petitioner is herein challenging via this request for administrative reconsideration.

## II.     Request for Questionnaire

Petitioner is prepared to provide any additional evidence and documentation that OFAC deems necessary to full consideration of this delisting petition. As Petitioner has retained undersigned counsel pursuant to 31 C.F.R. § 598.507(a) to represent him in the reconsideration

---

[5] Sanctions Pursuant to the Foreign Narcotics Kingpin Designation Act, U.S. Dep't of the Treasury, *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/narco_sanctions_kingpin.pdf (last updated May 9, 2016).

[6] *Id.*

3

process, Petitioner respectfully requests that – to the extent necessary – OFAC deliver undersigned counsel a questionnaire containing any and all inquiries or requests for information necessary to consider a rescission of Petitioner's designation.[7]

In addition to responding to any forthcoming questionnaire, Petitioner intends to supplement this initial filing with more substantive filings containing information relevant to Petitioner's request for reconsideration if and when such information is discovered. That said, the effective disposition of this matter would be facilitated by OFAC's cooperation in sending undersigned counsel specific inquiries and questions that address the factual basis underlying Petitioner's designation, so as not to inundate OFAC with information that may not be germane to its decision-making process.

III.   Conclusion

Undersigned counsel respectfully requests that OFAC reconsider Petitioner's Kingpin Act designation and issue a questionnaire seeking information to aid OFAC in its reconsideration process. Petitioner is eager to respond to any request OFAC may have and is prepared to engage the agency in good-faith to ensure that the reconsideration process moves forward in an expeditious manner.

Please forward all correspondence regarding this request for reconsideration to undersigned counsel at the following address:

Erich C. Ferrari Esq.
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004

Thank you for your consideration, and Petitioner looks forward to OFAC's response.

Sincerely,

Erich C. Ferrari

---

[7] *See* 31 C.F.R. § 501.807(b).

FNK 7782 0090

Exhibit 9

| | |
|---|---|
| From: | Erich Ferrari |
| To: | OFAC.Reconsideration |
| Cc: | Tyler Cullis |
| Subject: | Request for Reconsideration-Ayman Saied Joumaa |
| Date: | Wednesday, May 18, 2016 3:10:00 PM |
| Attachments: | Ayman Saied Joumaa Request for Administrative Reconsideration FINAL (by User 8285604).pdf |

Hello Mr. Samara,

Please find attached a request for the reconsideration of Ayman Saied Joumaa's designation under §805(b)(4) of the Foreign Narcotics Kingpin Designation Act.

We have a sent a hard copy out by Federal Express Tracking Number 8079 8332 6646 as well.

Thank you for your consideration and we look forward to your response.

--
Best,

Erich C. Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004
Phone:202.280.6370
Fax: 877.448.4885
email: ferrari@ferrariassociatespc.com
www.sanctionlaw.com
Twitter: https://twitter.com/FerrariLegal
LinkedIn: https://www.linkedin.com/pub/erich-ferrari/22/320/a06

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

Exhibit 10

 Ferrari & Associates, P.C.

1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004
Tel. 202-280-6370
Fax. 877-448-4885

May 18, 2016

<u>SENT VIA EMAIL AND FEDERAL EXPRESS:# 8079 8332 6635</u>

Attn: Mark Samara
Office of Global Targeting
Office of Foreign Assets Control
United States Department of the Treasury
1500 Pennsylvania Ave., NW
Treasury Annex
Washington, D.C. 20220

Re:     <u>Request for Administrative Record – Designation of Ayman Saied Joumaa</u>
         *Kingpin Act Designation Reconsideration – 31 C.F.R. § 501.807*

Dear Mr. Samara:

Ayman Saied Joumaa ("Petitioner"), acting by and through undersigned counsel, respectfully requests a copy of the administrative record underlying his designation by the United States Department of the Treasury's Office of Foreign Assets Control (OFAC). Petitioner was designated on January 26, 2011 under the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), 21 U.S.C. § 1901 *et. seq.*, for allegedly playing a significant role in international narcotics trafficking.[1]

On May 18, 2016, Petitioner submitted to OFAC a formal request for administrative reconsideration of his Kingpin Act designation. Petitioner contends that he does not play a role in any activities related to or in support of international narcotics trafficking; and, as such, OFAC should rescind his Kingpin Act designation and remove him from its Specially Designated Nationals and Blocked Persons List ("SDN List"). Further, Petitioner is respectfully requests OFAC to disclose any and all portions of the administrative record relied upon in the designation process, as well as any releasable exhibits attached to the administrative record.

Specifically, this request seeks:

---

[1] PRESS RELEASE, Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network, U.S. Dep't of the Treasury, Feb. 1, 2011, *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1035.aspx.

i.   Copies of SDN designation packets prepared by, or in the possession of, OFAC or OFAC's Office of Global Targeting ("OGT");

ii.  Copies of any documents, information, reports, memoranda, or summaries supporting the decision to designate Petitioner;

iii. Copies of cables, emails, letters, faxes, or other correspondence created, received, or in the possession of any component of OFAC, related to OFAC's decision to designate and/or maintain the designation of Petitioner; and

iv.  Copies of intelligence reports, documentary evidence, or factual summaries created, received, or in the possession of any component of OFAC, related to OFAC's decision to designate and/or maintain the designation of Petitioner.

It is undersigned counsel's belief that OFAC is in the best position to disclose this information. Furthermore, OFAC's disclosure of the above-requested administrative records would lead to a more expeditious and efficacious reconsideration process.

Undersigned counsel respectfully contends that the disclosure of such information will facilitate the disposition of the reconsideration case by permitting Petitioner to understand and to rebut the specific circumstances that serve as the factual basis underlying his Kingpin Act designation. As such, Petitioner will be afforded a meaningful opportunity to respond to OFAC and to effectively rebut the basis for his Kingpin Act designation. Moreover, by understanding the basis for his designation, Petitioner will be well-positioned to remediate any conduct that may have led to his designation.

As such, this request for the administrative record underlying Petitioner's designation is not merely intended to determine how to effectively rebut the factual allegations underlying Petitioner's designation, but is also intended to assist Petitioner in remediating any behavior that might have served as the basis for his designation. In providing Petitioner with a copy of the administrative record and related documents, OFAC is thus better able to meet the policy goals underlying the Kingpin Act.

I.   **Legal Basis for Request**

In light of judicial precedent, Petitioner respectfully requests that OFAC/OGT promptly provide Petitioner with the unclassified portions of the administrative record that served and continues to serve as a basis for his Kingpin Act designation. Furthermore, Petitioner requests that undersigned counsel be provided access to classified information that served and continues to serve as the basis for his designation to the extent that such a request does not implicate OFAC's reasonable national security concerns. In the event that OFAC deems such disclosure to

FNK 7782 0093

counsel as jeopardizing national security, Petitioner requests OFAC provide unclassified summaries of the classified or otherwise privileged portions of the administrative record. For reasons discussed below, due process mandates the disclosure of such information.

Judicial precedent requires OFAC to promptly provide to a designated party making such request the unclassified portions of the administrative record upon which OFAC relied in taking its blocking action.[2] Courts have held that, in order to comply with its due process requirements, OFAC should at the very least promptly provide the party challenging its blocking action with the unclassified administrative record. Without such a record, "OFAC's invitation to send a letter challenging the block [holds] out no hope that any challenge would be either comprehensive or successful."[3] As such, OFAC's mere provision of an uninformative unclassified record to petitioners has been held to be inadequate post-deprivation process.[4]

Petitioner respectfully contends that he should, at a minimum, promptly be provided the unclassified portions of the administrative record underlying his designation. Failure to do so would be in contravention of established due process rights for persons on the SDN List whose property and/or interests in property subject to U.S. jurisdiction have been blocked. In addition, such unclassified portions must be reasonably informative.

Further, Petitioner respectfully requests disclosure of any and all classified information that served and continues to serve as a basis for his designation to the fullest extent possible. This could involve unclassified summaries of the classified portions of the administrative record underlying Petitioner's Kingpin Act designation. Such a request is not without precedent. In *Al Haramain Islamic Foundation, Inc. v. U.S. Dep't of Treasury*—a case in which an entity on the SDN List challenged its OFAC designation—the Ninth Circuit reasoned that, although the disclosure of classified information may not always be possible, several avenues exist to disclose such information without implicating OFAC's legitimate national security concerns or causing an undue burden on the agency.[5] The court elaborated on such methods indicating that, "[t]o the extent that an unclassified summary could provide helpful information, such as the subject matter of the agency's concerns, and to the extent that it is feasible to permit a lawyer with a security clearance to view the classified information, the value of those methods seems undeniable."[6] The court suggested that, without disclosure of classified information, a designated entity could not possibly know how to effectively respond to OFAC's concerns.[7] The court further reasoned

---

[2] *Zevallas v. Obama*, 10 F.Supp.3d 111 (*citing Holy Land Foundation for Relief and Dev. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003); *Kindhearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F.Supp.2d 857, 905 (N.D. Ohio 2009)).

[3] *Kindhearts for Charitable Humanitarian Dev., Inc.*, 647 F.Supp.2d at 905.

[4] *Id.*

[5] 686 F.3d 965, 982-84 (9th Cir. 2011).

[6] *Id.* at 982-83.

[7] *Id.* at 982.

3

FNK 7782 0094

that, "[w]ithout knowledge of a charge, even simple factual errors may go uncorrected despite potentially easy, ready, and persuasive explanations."[8]

By providing access to classified information to the designated party, the Ninth Circuit noted "...the benefits from such disclosure could flow not only to the designated entity, which may be able to clear up errors, but also to OFAC, which may benefit from the resulting information provided by the entity."[9]   In other words, the disclosure of certain classified information would prove mutually beneficial to the agency and the designated party alike.   To deal with any persistent fear over disclosure of classified information, the court stated that the review of the classified information could be undertaken by counsel with appropriate security clearance, which would "not implicate national security when viewing the classified material because, by definition, he or she [would have] the appropriate security clearance."[10]   In light of the mutual benefits inherent in providing designated parties with access to certain classified information and the means to ensure that such classified information remains as such, Petitioner request undersigned counsel's access to such classified information to the fullest extent possible.

Thirdly, undersigned counsel respectfully requests access to any and all classified information pertaining to Petitioner's designation because of his legitimate "need-to-know."[11] This "need-to-know" arises from the performance of a "lawful and authorized governmental function," namely the exercise of OFAC's administrative due process obligations in the reconsideration context.[12] Executive Order 13256 anticipates that the "need-to-know" may exist "outside the executive branch."[13]   In such circumstances, the agency must ensure that the protection of information in a manner equivalent to that provided within the Executive branch.[14] Undersigned counsel contends that a reasonable interpretation of this Executive order enables his review of the classified information in OFAC's possession that is relied upon in maintaining Petitioner's Kingpin Act designation.

Consistent with the requirements of the Executive order, undersigned counsel has already executed the required non-disclosure agreements and has received the appropriate training on the proper safeguarding of classified information when he applied for, and was issued, an interim SECRET level clearance in a separate case involving classified information.[15]   Moreover, undersigned counsel would not disclose to his client any classified information to which he may be granted access.   Accordingly, undersigned counsel respectfully requests authorization to

---

[8] *Id.*

[9] *Id.* at 983.

[10] *Id.*

[11] *See* Executive Order 13256 §4.1(a)(3).

[12] *See* Executive Order 13256 §6.1(dd).

[13] *See* Executive Order 13256 §4.1(e).

[14] *Id.*

[15] *See* Executive Order 13256 §§ 4.1(a)(3) and 4.1(b).

FNK 7782 0095

review such information subject to any reasonable supervisory conditions that the agency deems prudent and necessary.

In light of undersigned counsel's SECRET level security clearance and the legitimate "need-to-know" the information relied upon for Petitioner's designation in order to provide Petitioner a meaningful opportunity to respond to such factual allegations, OFAC is respectfully requested to allow undersigned counsel an opportunity to review those portions of Petitioner's administrative record that are classified at the SECRET level or below. As noted above, the review of classified information by undersigned counsel "does not implicate national security when viewing the classified material because, by definition, [undersigned counsel] has the appropriate security clearance."[16]

In the alternative, however, undersigned counsel respectfully requests unclassified summaries of the classified portions of the administrative record underlying Petitioner's Kingpin Act designation. If OFAC were to elect this method of providing Petitioner with an unclassified summary of the administrative record serving as a basis for his designation, its national security concerns would be alleviated because "...an unclassified summary, by definition, does not implicate national security because it is unclassified."[17]

## II.    Policy Basis for Provision of Administrative Record

Undersigned counsel respectfully contends that the disclosure of such information to the fullest extent possible will facilitate the reconsideration process, as it will permit Petitioner to understand the factual allegations and their evidentiary support that OFAC is relying upon to maintain his designation. Developing such an understanding would afford Petitioner an opportunity to meaningfully respond to those allegations or remediate his conduct accordingly. In short, this request is not simply made to facilitate Petitioner's rebuttal of the factual bases underlying Petitioner's designation, but also to assist Petitioner in changing the behavior(s) that served and continue to serve as the basis for his Kingpin Act designation. As such, the provision of the unclassified and classified portions of the administrative record would serve to fulfill OFAC's policy mandate of ensuring that parties are not involved in narcotics trafficking activities deemed detrimental to U.S. national interests.

U.S. authorities have long acknowledged that "the primary goal for sanctions is behavioral change."[18]  Indeed, OFAC has publicly stated, "[s]anctions are a means to an end:

---

[16] *Al Haramain Islamic Foundation, Inc.*, 686 F.3d at 983.

[17] *Id.*

[18] *See* PRESS RELEASE, Treasury Lifts Sanctions on the Defunct Colombian Business Empire Led by the Rodriguez Orejuela Family, U.S. Dep't of the Treasury, June 19, 2014, *available at* http://www.treasury.gov/press-center/press-releases/Pages/jl2436.aspx.

FNK 7782 0096

[their] ultimate goal is behavioral change."[19]   Furthermore, OFAC has stressed that it has removed hundreds of persons and/or entities from the SDN List "upon a showing of behavioral change."[20]  In doing so, OFAC has shown that it "seeks to reward those who change behavior and motivate others to do so."[21]  In this manner, OFAC achieves its policy goals of eradicating activities that the U.S. government views as anathema to its foreign policy interests, while continuing to penalize those who fail to remediate their conduct accordingly.

Providing Petitioner a copy of the requested documents would serve to further U.S. policy goals insofar as it would allow him to do one of two things: (1) dispute the factual basis for his designation and provide information and documentation relevant to OFAC's consideration of whether an erroneous designation was made, or (2) remediate any behavior that may have served as the basis for the designation.  Petitioner is herein iterating his intent on cooperating in good-faith with OFAC to resolve the agency's concerns over whatever conduct may have given rise to his Kingpin Act designation, but states that he must know the specific facts being relied upon by OFAC in order to do so.  As such, the provision of the requested documents would serve not just to help Petitioner demonstrate to OFAC that a rescission of the designation is warranted, but would also advance U.S. foreign policy goals by ensuring that Petitioner is not engaged in any conduct that is anathema to U.S. interests.

### III.   Conclusion

In light of the foregoing, Petitioner respectfully requests OFAC to disclose any and all unclassified portions of the administrative record as soon as possible.  Furthermore, to the extent possible, disclosure of the classified portions of the administrative record, by the means described above, is also requested.  Please also forward all correspondence relating to this request to undersigned counsel's Washington, D.C. office:

Erich C. Ferrari, Esq.
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004

Undersigned counsel thanks you for your consideration and looks forward to your response.

---

[19] Adam Szubin, *Sanctions 101: Part II – Enforcement and Its Effects*, U.S. Dep't of the Treasury, June 2, 2014, *available at* http://www.treasury.gov/connect/blog/Pages/Sanctions-101-Pt-2-.aspx.

[20] *Id.*

[21] Treasury Dep't Explains Value, Effect of Sanctions, IIP Digital – U.S. Dep't of State, June 12, 2014, *available at* http://iipdigital.usembassy.gov/st/english/article/2014/06/20140611301159.html?CP.rss=true#axzz3g4tLBWkQ.

6

FNK 7782 0097

Sincerely,

Erich C. Ferrari

FNK 7782 0098

Exhibit 11

From:        OFAC Reconsideration
To:          "Erich Ferrari"
Subject:     OFAC Case ID: FNK-7782
Date:        Wednesday, May 18, 2016 4:25:00 PM

Re: Ayman Saied Joumaa
New Case ID: FNK-7782

Mr. Ferrari,

This acknowledges receipt of your correspondence dated May 18, 2016 to the Office of
Foreign Assets Control (OFAC), requesting both a copy of the administrative record and
reconsideration of your client's designation as a Specially Designated Narcotics Trafficker
(SDNT) pursuant to Section 805 of the Foreign Narcotics Kingpin Designation Act (Kingpin
Act), 21 U.S.C. § 1904(b).

Your requests are under review.  However, the review process can be lengthy, and it is likely
that OFAC will seek additional information from your client before a final determination is
made concerning your client's designation as an SDNT.

For the most immediate response, please direct all questions and correspondence regarding
your request to **OFAC.Reconsideration@treasury.gov**.  You may also respond via fax at
(202) 622-5390 or by mailing OFAC at the following address:

> U.S. Department of the Treasury
> Office of Foreign Assets Control
> ATTN: Office of Global Targeting
> 1500 Pennsylvania Avenue, N.W. (Annex)
> Washington, DC  20220

Please refer to FNK-7782 cited above in all future correspondence.  Also, please provide an
English translation of any documents or correspondence that are prepared in a language other
than English.

Thank you for your cooperation.

OFAC Reconsideration

Exhibit 12



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

Case ID FNK-7782

Erich C. Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Avenue, NW
Suite 400
Washington, DC 20004

JUL 2 7 2016

Re: Ayman Saied Joumaa

Dear Mr. Ferrari:

This letter responds to your request dated May 18, 2016, submitted to the Office of Foreign Assets
Control (OFAC) of the U.S. Department of the Treasury, for reconsideration of your client's
designation as a Specially Designated Narcotics Trafficker (SDNT) pursuant to Section 805 of the
Foreign Narcotics Kingpin Designation Act (Kingpin Act), 21 U.S.C. Section 1904(b).

In order to assist OFAC in evaluating your client's request for reconsideration, please have your
client provide detailed narrative responses to the following requests for information in a signed
original statement along with supporting documentation. For original statements and documents
prepared in Spanish, Arabic, or any other foreign language, please include English translations.

1.  Personal Identifying Data. Please provide or confirm the following, if applicable:

    a.  Alternate name(s) or alias(es)
    b.  Date and place of birth
    c.  Mailing address(es)
    d.  Passport number(s), place/date of issue, and expiration
    e.  U.S. visa number(s), type, place/date of issue, and expiration
    f.  U.S. resident alien number(s) or asylum document number(s)

2.  Relationship with SDNT and Other Individuals and Groups. Please describe the type of
    relationship, including but not limited to financial or business relationship(s), you currently
    have or previously had with the following individuals? If you have ended your relationship
    with any of the individuals listed below, please explain.

    a.  Hassan Mahmoud Ayache (a.k.a. Hassan Ayach; a.k.a. Hassan Mohamad Ayache;
        a.k.a. Hassan Ayash; a.k.a. Hassan Muhammad Ayash; a.k.a. Hassane Ayash)
    b.  Hassan Ayash (a.k.a. Mahmoud Hassan Ayache)
    c.  Jamal Mohamad Kharoubi
    d.  Ali Mohamed Kharroubi
    e.
    f.  Ismael Mohammed Youssef (a.k.a. Ismael Yoassef Abdallah; a.k.a. Ismail
        Mohammad Youssef)
    g.  Ziad Mohamad Youssef

1

FNK 7782 0100

h. Ali Mohamad Saleh
i. Ibrahim Chibli (a.k.a. Ibrahim Shibli Shibli)
j. Abbas Hussein Harb
k. Ali Houssein Harb
l. Kassem Mohamad Saleh
m. Kassem Rmeiti
n. Jorge Fadlallah Cheaitelly
o. Mohamad Zouheir El Khansa
p. Fatima Fadlallah Cheaitelly
q. Giusseppe Ali Cheaitelli Saheli
r. Jaime Fadlallah Cheaitelly
s. Ahmad El Khansa
t. Jaime Edery Crivosei
u. Benny Issa Fawaz
v. Faez Mohamad Rahali
w. Ivan Dario Arbelaez Velez
x. Isaac Perez Guberek Ravinoviez
y. Henry Guberek Grimberg
z. Felipe Guberek Grimberg
aa. Sara Guberek de Grimberg
bb. Jorge Eduardo Tovar Zuleta
cc. Miguel Arcangel Garzon Acosta
dd. Johanna Patricia Ceballos Bueno
ee. Pedro Claver Mejia Salazar
ff. Victor Gabriel Mejia Alzate
gg. Juan Carlos Mejia Alzate
hh. Andres Camilo Mejia Alzate
ii. Jesus Rodolfo Barco Mejia
jj. Jose Guillermo Barco Mejia
kk. Jose Albeiro Barco Mejia
ll. Rosalba Alzate Giraldo
mm. Jose Alejandro Mejia Alzate
nn. Maria Lievy Mejia Alzate
oo. Humberto Antonio Bedoya Espinosa
pp. Los Zetas
qq. Lebanese Hizballah
rr. Omar Treviño Morales
ss. Miguel Treviño Morales
tt. Juanita del Carmen Rios Hernandez
uu. Jose Odilon Ramirez Perales
vv. Ismael Lopez Guerrero
ww. Jose Evaristo Linares Castillo
xx. Merhi Ali Abou Merhi
yy. Atef Merhi Abou Merhi
zz. Hana Merhi Abou Merhi
aaa. Houeda Ahmad Nasreddine
bbb. Wajdi Youssef Nasr
ccc. Ahmad El Bizri

2

FNK 7782 0101

3. <u>Relationship with SDNT Entities</u>. Please describe the nature or title of each position, financial interest, or any other relationship you currently hold or previously had with the list of entities specified below, and any other companies owned, controlled or directed by or affiliated with SDNTs, or any other companies or individuals on the list of Specially Designated Nationals and Blocked Persons (SDN List). <u>A copy of the current SDN List can be found on OFAC's website at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.</u>

a. Agrophen (a.k.a. Agro-phen)
b. Almacen Junior
c. Almacen Junior No. 2
d. Comercial Planeta
e. Ellissa Exchange Company
f. Ellissa Group SA
g. Ellissa Holding SAL
h. Ellissa Megastore
i. Ellissa Parc Cotonou
j. Ellissa Shipping
k. Goldi Electronics SA
l. Hassan Ayash Exchange Company
m. New Line Exchange Trust Co.
n. Phenicia Shipping Offshore SAL
o. Societe Ellissa Group Congo
p. Solmar
q. Yamen Benin SARL
r. Zona Libre International market SA
s. Bodega Michigan
t. Importadora Silvania (Colombia)
u. Importadora Silvania CA (Venezuela)
v. Lebanese Canadian Bank SAL
w. Kassem Rmeiti & Co. for Exchange
x. Halawi Exchange Co.
y. Euro Exchange y Financial Commerce, Inc.
z. Eurocambio, S.A.
aa. General Commerce Overseas Inc
bb. Giorgiotelly, S.A.
cc. Giorgino Corporation of Panama, S.A.
dd. Giorgio Cheaitelly Investment, S.A.
ee. Producers Group Corp
ff. Silver House Inc.
gg. J.H. Exim International, S.A.
hh. Santa Maria International Trading Corp.
ii. III Millenium International
jj. Ocean Indie Overseas, S.A.
kk. Junior International S.A.
ll. Fedco Import & Export, S.A.
mm. Global Technology Import & Export, S.A.

3

FNK 7782 0102

nn.   Café de Líban, S.A.
oo.   Zedro Investment, S.A.
pp.   Almacen Electro Sony Star
qq.   Family Fedco
rr.   Micro Empresa Ashqui
ss.   Comercial Globanty
tt.   Almacen Baul, Comercial Estilo y Moda
uu.   Bodega Electro Giorgio
vv.   Agropecuaria La Perla Ltda
ww.   KPD S.A.
xx.   Farbe Comunicaciones Ltda
yy.   Polyton (Asia) Limited
zz.   SBT S.A.
aaa.   Indutex Ltda.
bbb.   Inversiones Gilfe S.A.
ccc.   C.I. Del Istmo SAS
ddd.   G&G Internacional SAS
eee.   Guberek Grimberg e Hijos y Cia S. en C.
fff.   Comercializadora Internacional Andina Limitada
ggg.   Avanti Joyeros E.U.
hhh.   Issa Empresa Unipersonal
iii.   Inversora Panacol S.A.
jjj.   Bracro S.A.
kkk.   Constructora Nacional de Panama S.A.
lll.   C.I. Caffee Valores S.A.
mmm.   I&S Holding Company, S.A.
nnn.   Chaps Investment Inc.
ooo.   Orbital Horizons Corp.
ppp.   Compania Real de Panama S.A.
qqq.   Fundacion Issara
rrr.   Grupo Empresarial Enkor Profesional S.A.S.
sss.   Tritcon S.A.S.
ttt.   Inversiones Meybar S.A.S.
uuu.   E-Profesional
vvv.   Hotel Sol Plaza
www.   Grupo Empresarial Ghema S.A.S
xxx.   Rosagro S.A.S.
yyy.   Promotora Turistica Sol Plaza S.A.
zzz.   Arenera El Cerrejon
aaaa.   Canteras Copacabana S.A
bbbb.   Mejia Alzate Asociados Y Cia. Ltda
cccc.   Almacen Guibar
dddd.   Variedades Jose Albeiro Barco M.
eeee.   Almequip S.A.S
ffff.   Asesoria Y Asistencia Agropecuaria Y Ambiental A4
gggg.   Abou Merhi Group
hhhh.   Abou Merhi Lines SAL
iiii.   Abou Merhi Cotonou

4

FNK 7782 0103

jjjj.    Abou Merhi Hamburg
kkkk.   Abou Merhi Nigeria
llll.    Abou Merhi Cruises SAL
mmmm.    Le Mall Saida
nnnn.    Lebanon Center
oooo.    Orient Queen Homes
pppp.    Queen Stations
qqqq.   Abou Merhi Charity Institution

If employed by or involved in other business relationships with additional SDNT companies or individuals, please provide the length of time and specific dates of employment and describe each position, your duties in each position, the salaries and other benefits (such as stock shares) received in each position, and the date and conditions of separation or retirement from each company. If you held a written employment contract, please provide a copy. If you had some other type of relationship with the SDNT companies or individuals, please provide an explanation of such relationship. If you ceased your employment and/or renounced financial interest(s), please provide official documentation.

4.    Seized Assets. Please explain if any assets in your name have been seized in Colombia, Lebanon, Panama, or elsewhere? If so, please describe the assets and the reason(s) for the seizure(s). Please also provide the current legal status of these assets. OFAC is aware of the restrictions placed on properties in many countries that have been seized pending forfeiture. Therefore, any attempts to divest your ownership interests in these assets may have to be coordinated with, and approved by, the relevant Attorney General's Office. In similar situations, SDNT individuals have demonstrated that they have severed their ties to these companies and assets by irrevocably renouncing all of their ownership rights and interests in the SDNT companies and assets in a notarized letter filed with the relevant Attorney General's Office. If you choose to do the same, please submit a copy of this renunciation letter to OFAC as well as a copy of official documentation from the Attorney General's Office acknowledging receipt of this renunciation letter.

5.    U.S. Accounts and Assets. Please detail any interest you currently hold in any financial accounts or real property in the United States, including names and addresses of financial institutions, types of accounts, and account numbers.

6.    Narcotics Trafficking and Related Money Laundering. Have you ever been involved in the cultivation, production, manufacture, distribution, selling, financing, or transport of narcotic drugs (e.g., cocaine, marijuana, heroin, hashish, opium, methaqualone, mandrax), or any other, controlled substance, or listed chemical (as those terms are defined in Section 102 of the Controlled Substances Act, 21 U.S.C. § 802) or endeavored or attempted to do so or assisted, abetted, conspired, or colluded with others to do so? In addition, have you participated in the laundering of drug proceeds and/or held assets in your name that were obtained with drug proceeds? If so, with whom?

7.    Legal Proceedings. Have you ever been, or are you currently the subject of any legal proceedings (including but not limited to civil and criminal investigations, indictments, arrests, warrants for arrests, or convictions) in any jurisdiction worldwide, including

5

FNK 7782 0104

Colombia, Panama, Lebanon, and the United States?  If so, please describe these legal proceedings and/or provide any supporting official documentation.

8.    Additional Information.  You may also provide any other information that could assist OFAC in the review of your request for reconsideration.

If OFAC does not receive a response from you within 90 days from the date of this letter, OFAC will assume that you do not wish to proceed with your request for reconsideration and your case will be administratively closed.  If you need an extension of time to respond to the questions listed in this letter, please notify OFAC, in writing, requesting how much additional time you will need.

Any false or misleading information provided by you may result in the delay and/or denial of the final determination of your request for reconsideration.  Further, knowingly and willfully making materially false, fictitious, or fraudulent statements or concealing a material fact in response to this letter may result in criminal penalties.  See 18 U.S.C. § 1001.

Please refer to Case ID FNK-7782 in all future correspondence.  And note that OFAC may pose additional questions and documentary requests.  For expediency purposes, please direct all questions and correspondence to OFAC via the following email: OFAC.Reconsideration@treasury.gov.  You may also write, call, or fax OFAC at the following:

U.S. Department of the Treasury
Office of Foreign Assets Control
ATTN:  Office of Global Targeting
1500 Pennsylvania Avenue, N.W. (Annex)
Washington, DC 20220

Telephone: 202-622-2420
Fax: 202-622-5390

Thank you for your cooperation.

Sincerely,

Mark Samara
Assistant Director
Crime/Narcotics & Western Hemisphere Division
Office of Foreign Assets Control

6

FNK 7782 0105

Exhibit 13

 Ferrari & Associates, P.C.

1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004
Tel. 202-280-6370
Fax. 877-448-4885

October 25, 2016

SENT VIA EMAIL AND FEDERAL EXPRESS: # 8088 6722 5390

Mark Samara
Assistant Director
Crime/Narcotics & Western Hemisphere Division
Office of Global Targeting
Office of Foreign Assets Control
United States Department of the Treasury
Treasury Annex
1500 Pennsylvania Ave., NW
Washington, D.C. 20220

Re:   SDN Reconsideration Petition Supplement—Section 805 of the Foreign Narcotics
      Kingpin Designation Act, 21 U.S.C. § 1903(b)
      *Ayman Saied Joumaa—FNK-7782*

Dear Mr. Samara:

On January 26, 2011, the United States Department of the Treasury's Office of Foreign Assets Control (OFAC) designated Ayman Saied Joumaa ("Respondent") as a significant foreign narcotics trafficker ("SDNT") pursuant to the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), 21 U.S.C. § 1901 *et. seq.*, for allegedly playing a significant role in international narcotics trafficking.[1]   On May 18, 2016, Respondent, acting by and through undersigned counsel, filed a formal request for reconsideration of his Kingpin Act designation. That reconsideration case has been assigned Case ID FNK-7782.

On July 27, 2016, OFAC sent undersigned counsel a questionnaire seeking information and/or documents responsive to a series of questions relevant to OFAC's consideration of Respondent's reconsideration request.  Below are responses to those inquiries, as well as analysis and additional considerations addressing why Respondent's designation should be rescinded.

Because this response contains business information and other information of a sensitive nature, undersigned counsel respectfully requests that OFAC treat this correspondence

---

[1] PRESS RELEASE, Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network, U.S. Dep't of the Treasury, January 26, 2011, *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1035.aspx.

confidentially.  If OFAC believes that it is required to release this document or any of the information contained within to the public pursuant to the Freedom of Information Act ("FOIA") or any other law, please notify undersigned counsel as soon as possible.  Undersigned counsel will promptly provide additional information in support of this request for confidentiality.

I.   Response to OFAC's July 27, 2016 Questionnaire

1.   Personal Identifying Data.  Please provide or confirm the following, if applicable:

a.   Alternate name(s) or alias(es)

RESPONSE: Junior

b.   Date and place of birth

RESPONSE: December 6, 1974 – Lala Village, West Bekaa, Lebanon

c.   Mailing address(es)

RESPONSE: Lala Village, West Bekaa, Lebanon.

d.   Passport number(s), place/date of issue, and expiration

RESPONSE: Respondent's passport information[2] is as follows:

(i)   Colombian Passport, No. 84.075.050, issued April 24, 1988, expired on April 24, 2008;

(ii)   Lebanese Passport, RL 0236074, issued Feb. 12, 2004, expired on Feb. 11, 2009;

(iii)   Colombian Passport, No. 84.075.050, issued Feb. 15, 2008; expires on Feb. 15, 2018;

(iv)   Venezuelan Passport, No. 039252274, issued Nov. 3, 2010, expired on Nov. 2, 2015.

e.   U.S. visa number(s), type, place/date of issue, and expiration

_____

[2] Exhibit A – Respondent's Passport Information.

2

**RESPONSE:** There is no information responsive to this request.

 f. U.S. resident alien number(s) or asylum document number(s)

**RESPONSE:** There is no information responsive to this request.

2. <u>Relationship with SDNT and Other Individuals and Groups.</u> Please describe the type of relationship, including but not limited to financial or business relationship(s), you currently have or previously had with the following individuals?  If you have ended your relationship with any of the individuals listed below, please explain.[3]

 a. Hassan Mahmoud Ayache (a.k.a. Hassan Ayach; a.k.a. Hassan Mohamad Ayache; a.k.a. Hassan Ayash; a.k.a. Hassan Muhammad Ayash; a.k.a. Hassane Ayash)

**RESPONSE:**  Please see the response below.

 b. Hassan Ayash (a.k.a. Mahmoud Hassan Ayache)

**RESPONSE:** Respondent knows that Hassan Ayash runs an exchange company called the Hassan Ayash Exchange Company.  Respondent formerly transacted with Mr. Ayash through this exchange company.  Specifically, the Hassan Ayash Exchange Company would sell U.S. dollars to Respondent's New Line Exchange Trust Co.

Hassan Ayache also introduced Respondent to an individual named Hassan Cheaitelly.  Respondent believes this to be the same person as Jorge Fadlallah Cheaitelly.

 c. Jamal Mohamad Kharoubi

---

[3] Responses to these questions are based on Respondent's own version of the facts and do not account for any allegations made by either OFAC or other agencies or departments of the U.S. government.  Thus, any response which indicates that Respondent does not have a particular relationship with a party whom the U.S. government has alleged he does have a relationship with should not be viewed as being deceitful, but rather is in line with Respondent's contesting such allegations.  In other words, Respondent does not restate the U.S. government's *allegations* regarding relationships with these individuals in his responses below.

3

FNK 7782 0108

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Jamal Mohamad Kharoubi.  Respondent does not know this individual.

d.   Ali Mohamed Kharroubi

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Ali Mohamed Kharroubi.  Respondent does not know this individual.

e.   ...[4]

**RESPONSE:** N/A

f.   Ismael Mohammed Youssef (a.k.a. Ismael Youssef Abdallah; a.k.a. Ismail Mohammad Youssef)

**RESPONSE:** Ismael Mohammed Youssef is Respondent's cousin.  Due to existing law in Lebanon, as well as Respondent's difficulties with the Central Bank of Lebanon, Ismael Mohammed Youssef's name was included as a founder of the New Line Exchange Trust Co.[5]  However, Ismael Mohammed Youssef has had no role in managing or otherwise engaging with the company.

g.   Ziad Mohamad Youssef

**RESPONSE:** Ziad Mohamad Youssef is Respondent's cousin.  Due to existing law in Lebanon, as well as Respondent's difficulties with the Central Bank of Lebanon, Ziad Mohamad Youssef's name was included as a founder of the New Line Exchange Trust Co. However, Zaid Mohamad Youssef had had no role in managing or otherwise engaging with the company.

h.   Ali Mohamed Saleh

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Ali Mohamed Saleh.

---

[4] Undersigned counsel notes that this particular question on OFAC's July 26 2016 Questionnaire did not identify any particular person and left blank. Thus, Respondent is unable to provide a response to this question.
[5] Under Lebanese law, a company needs three individuals to incorporate.  For this reason, Respondent's cousins were included as co-founders of the New Line Exchange Trust Co.

FNK 7782 0109

i.    Ibrahim Chibli (a.k.a. Ibrahim Shibli Shibli)

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Ibrahim Chibli. Instead, Abbas Hussein Harb or Ali Hussein Harb would purchase U.S. dollars from Respondent and would tell Respondent to provide the U.S. dollars to Ibrahim Chibli, who was the manager of Fenicia Bank at the time. However, Respondent did not have any direct connection or other interaction with Ibrahim Chibli.

j.    Abbas Hussein Harb

**RESPONSE:** Respondent knew Abbas Hussein Harb as a commercial dealer based in Maicao, Colombia. His store was named Bodega Michigan. Respondent would sometimes sell U.S. dollars to Abbas Hussein Harb.

k.    Ali Houssein Harb

**RESPONSE:** Respondent would sometimes sell U.S. dollars to Ali Houssein Harb and would send those U.S. dollars to third parties, as discussed above.

l.    Kassem Mohamad Saleh

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Kassem Mohamad Saleh.

m.    Kassem Rmeiti

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Kassem Rmeiti.

n.    Jorge Fadlallah Cheaitelly

**RESPONSE:** Respondent met Jorge Fadlallah Cheaitelly once in Maicao, Colombia. On one occasion, Hassan Ayash called Respondent and told him to pay Jorge Fadlallah Cheaitelly approximately $100,000. Respondent does not have documentation of this transaction, however.

FNK 7782 0110

Respondent has not dealt with Jorge Fadlallah Cheaitelly in any capacity otherwise.  Respondent regarded Jorge Fadlallah Cheaitelly as having a bad reputation and avoided engaging in any transactions with him.

o.      Mohamad Zouheir El Khansa

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Mohamad Zouheir El Khansa.

p.      Fatima Fadlallah Cheaitelly

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Fatima Fadlallah Cheaitelly.

q.      Giusseppe Ali Cheaitelli Saheli

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Giusseppe Ali Cheaitelli Saheli.

r.      Jaime Fadlallah Cheaitelly

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Jaime Fadlallah Cheaitelly.

s.      Ahmad El Khansa

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Ahmad El Khansa.

t.      Jaime Edery Crivosei

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Jaime Edery Crivosei.

u.      Benny Issa Fawaz

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Benny Issa Fawaz.

v.      Faez Mohamad Rahall

FNK 7782 0111

**RESPONSE:** Respondent is an acquaintance of Faez Mohamad Rahall, as both individuals are from the same village in Lebanon. However, Respondent does not have a business or financial relationship with Faez Mohamad Rahall, nor does he consider Mr. Rahall to be a friend.

w.     Ivan Dario Arbelaez Velez

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Ivan Dario Arbelaez Velez.

x.     Isaac Perez Guberek Ravinovicz

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Isaac Perez Guberek Ravinovicz.

y.     Henry Guberek Grimberg

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Henry Guberek Grimberg.

z.     Felipe Guberek Grimberg

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Felipe Guberek Grimberg.

aa.     Sara Guberek de Grimberg

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Sara Guberek de Grimberg.

bb.     Jorge Eduardo Tovar Zuleta

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Jorge Eduardo Tovar Zuleta.

cc.     Miguel Arcangel Garzon Acosta

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Miguel Arcangel Garzon Acosta.

7

dd.   Johanna Patricia Ceballos Bueno

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Johanna Patricia Ceballos Bueno.

ee.   Pedro Claver Mejia Salazar

**RESPONSE:** Respondent did have a business relationship with Pedro Claver Mejia Salazar and knew him fairly well. Mr. Mejia Salazar was a dealer in commercial goods based in Maicao, Colombia, and he was also the first person to begin selling Respondent U.S. dollars. Mr. Mejia Salazar is very well-known in Maicao, Colombia, and he used to provide Respondent with lots of credit in his own business activities.

ff.   Victor Gabriel Mejia Alzate

**RESPONSE:** Respondent intends to provide information regarding his relationship with Victor Gabriel Mejia Alzate in a future supplemental response to OFAC's Questionnaire.

gg.   Juan Carlos Mejia Alzate

**RESPONSE:** Respondent intends to provide information regarding his relationship with Juan Carlos Mejia Alzate in a future supplemental response to OFAC's Questionnaire.

hh.   Andres Camilo Mejia Alzate

**RESPONSE:** Respondent intends to provide information regarding his relationship with Andres Camilo Mejia Alzate in a future supplemental response to OFAC's Questionnaire.

ii.   Jesus Rodolfo Barco Mejia

**RESPONSE:** Respondent knows Jesus Rodolfo Barco Mejia as the nephew of Pedro Claver Mejia Salazar and the brother of Jose Guillermo

8

Barco Mejia. The two are acquaintances. However, Respondent does not have a business relationship with Jesus Rodolfo Barco Mejia.

jj.   Jose Guillermo Barco Mejia

**RESPONSE:** Respondent knows Jose Guillermo Barco Mejia as the nephew of Pedro Claver Mejia Salazar and the brother of Jesus Rodolfo Barco Mejia. However, Respondent does not have a business relationship with Jose Guillermo Barco Mejia.

kk.   Jose Albeiro Barco Mejia

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Jose Albeiro Barco Mejia.

ll.   Rosalba Alzate Giraldo

**RESPONSE:** Respondent knows that Rosalba Alzate Giraldo is the wife of Pedro Claver Mejia Salazar. However, Respondent does not have a relationship, business or otherwise, with Rosalba Alzate Giraldo.

mm.   Jose Alejandro Mejia Alzate

**RESPONSE:** Respondent knows that Jose Alejandro Mejia Alzate is the son of Pedro Claver Mejia Salazar. However, Respondent does not have = a relationship, business or otherwise, with Jose Alejandro Mejia Alzate.

nn.   Maria Lievy Mejia Alzate

**RESPONSE:** Respondent knows that Maria Lievy Mejia Alzate is the daughter of Pedro Claver Mejia Salazar. However, Respondent does not have a relationship, business or otherwise, with Maria Lievy Mejia Alzate.

oo.   Humberto Antonio Bedoya Espinosa

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Humberto Antonio Bedoya Espinosa.

pp.   Los Zetas

9

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Los Zetas.

qq.   Lebanese Hizballah

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Lebanese Hizballah.

rr.   Omar Trevino Morales

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Omar Trevino Morales.

ss.   Miguel Trevino Morales

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Miguel Trevino Morales.

tt.   Juanita del Carmen Rios Hernandez

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Juanita del Carmen Rios Hernandez.

uu.   Jose Odilon Ramirez Perales

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Jose Odilon Ramirez Perales.

vv.   Ismael Lopez Guerrero

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Ismael Lopez Guerrero.

ww.   Jose Evaristo Linares Castillo

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Jose Evaristo Linares Castillo.

xx.   Merhi Ali Abou Merhi

FNK 7782 0115

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Merhi Ali Abou Merhi.

yy.   Atef Merhi Abou Merhi

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Atef Merhi Abou Merhi.

zz.   Hana Merhi Abou Merhi

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Hana Merhi Abou Merhi.

aaa.   Houeda Ahmad Nasreddine

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Houeda Ahmad Nasreddine.

bbb.   Wajdi Youssef Nasr

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Wajdi Youssef Nasr.

ccc.   Ahmad El Bizri

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Ahmad El Bizri.

3.   Relationship with SDNT Entities.   Please describe the nature or title of each position, financial interest, or any other relationship you currently hold or previously had with the list of entities specified below, and any other companies owned, controlled or directed by or affiliated with SDNTs, or any other companies or individuals on the list of Specially Designated Nationals and Blocked Persons (SDN List). A copy of the current SDN List can be found on OFAC's website at: http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.[6]

---

[6] Responses to these questions are based on Respondent's own version of the facts, and do not account for any allegations made by either OFAC or other agencies or departments of the U.S. government. Thus, any response

11

a.      Agrophen

**RESPONSE:** Respondent intends to provide information regarding his relationship with Agrophen in a future supplemental response to OFAC's Questionnaire.

b.      Almacen Junior

**RESPONSE:** Almacen Junior was a clothing shop based in Maicao, Colombia, formerly owned by Respondent's brother, Akram Saied Joumaa. The shop was located at Street No. 13, Carrera Tracy, Store 11-24. Almacen Junior was engaged in the business of importing ready-to-wear clothes from Panama to be sold to local customers in Colombia.

Respondent started working in Almacen Junior when he first moved to Colombia in 1987. Almacen Junior was operational until around 2000, when Respondent and his brothers entered into a settlement agreement dividing up the assets of all their entities held in Latin America and Lebanon.

c.      Almacen Junior No. 2

**RESPONSE:** Respondent opened Almacen Junior No. 2 along with his brothers—Akram Saied Joumaa and Anwar Saied Joumaa. This shop was under Respondent's direct management, and operational up until around 2000, when Respondent and his brothers entered into a settlement agreement to divide up the assets of all their shared entities.

d.      Comercial Planeta

**RESPONSE:** Respondent knows that Comercial Planeta is owned and operated by Ismael Mohammed Youssef. Respondent intends to provide more detailed information on his relationship with Comercial Planeta in a future supplemental response.

---

which indicates that Respondent does not have a particular relationship with a party whom the U.S. government has alleged he does have a relationship with should not be viewed as being deceitful, but rather is in line with Respondent's contesting such allegations. In other words, Respondent does not restate the U.S. government's *allegations* regarding relationships with these individuals in his responses below.

FNK 7782 0117

e.   Ellissa Exchange Company

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Ellissa Exchange Company. Respondent's sole interaction with Ellissa Exchange Company is when he and its owners appeared before the Lebanese Ministry of Justice.

f.   Ellissa Group S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Ellissa Group S.A.

g.   Ellissa Holding SAL

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Ellissa Holding SAL.

h.   Ellissa Megastore

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Ellissa Megastore.

i.   Ellissa Parc Cotonou

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Ellissa Parc Cotonou.

j.   Ellissa Shipping

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Ellissa Shipping.

k.   Goldi Electronics SA

**RESPONSE:** Respondent started up Goldi Electronics SA in 2008 and operated the company up until his designation in 2011. Goldi Electronics was engaged in the business of selling washing machines and air conditions from China. Respondent is herein attaching as exhibits certain documents relating to Goldi Electronics, including corporation formation documents, bank statements for the account Goldi Electronics held at

13

Capital Bank in Panama, invoices and shipping documents, and certain SWIFT messages.[7]

l.      Hassan Ayash Exchange Company

**RESPONSE:** Respondent had a relationship with the Hassan Ayash Exchange Company via New Line Exchange Trust Co. Specifically, New Line Exchange Trust Co. would purchase U.S. dollars from individuals and/or exchange houses that had received them from the Hassan Ayash Exchange Company. Later, New Line Exchange Trust Co. would purchase U.S dollars directly from the Hassan Ayash Exchange Company.

m.      New Line Exchange Trust Co.

**RESPONSE:** Respondent is the founder and owner of the New Line Exchange Trust Co. While Ziad Youssef and Ismail Youssef, Respondent's cousins, are also listed as co-founders of the entity, they do not have a role in the management of the New Line Exchange Trust Co.

Respondent intends to provide a fuller description of his relationship with New Line Exchange Trust Co., as well as the company's dealings, in a future supplemental response. However, New Line Exchange Trust Co. was engaged in currency trading, and very few transactions were documented, as cash was constantly being exchanged and the law in Lebanon did not require such documentation.

n.      Phenicia Shipping Offshore SAL

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Phenicia Shipping Offshore SAL.

o.      Societe Ellissa Group Congo

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Societe Ellissa Group Congo.

p.      Solmar

---

[7] Exhibit B – Goldi Electronics Corporate Documents.

FNK 7782 0119

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Solmar.

q.    Yamen Benin SARL

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Yamen Benin SARL.

r.    Zona Libre International Market SA

**RESPONSE:** In 1999, Respondent founded Zona Libre International Market SA in Panama. However, Zona Libre International Market SA did not become truly operational and its proposed activities were later merged into Goldi Electronics.

s.    Bodega Michigan

**RESPONSE:** Respondent knows that Bodega Michigan is owned and operated by Abbas Hussein Harb. Respondent had a business relationship with Mr. Harb insofar as Respondent would sell Mr. Harb U.S. dollars.

t.    Importadora Silvania (Colombia)

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Importadora Silvania CA (Colombia).

u.    Importadora Silvania CA (Venezuela)

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Importadora Silvania CA (Venezuela).

v.    Lebanese Canadian Bank SAL

**RESPONSE:** Respondent held a personal bank account at Lebanese Canadian Bank. New Line Exchange Trust Co. also held an account at Lebanese Canadian Bank. Details as to this latter account will also be provided as part of a future supplemental response to OFAC's Questionnaire.

w.    Kassem Rmeiti & Co. for Exchange

15

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with the Kassem Rmeiti & Co. for Exchange. Respondent's sole interaction with Kassem Rmeiti & Co. for Exchange was when he and Kassem Rmeiti were brought before the Lebanese Ministry of Justice.

x.      Halawi Exchange Co.

**RESPONSE:** When Respondent started up New Line Exchange Trust Co., he dealt with Halawi Exchange Co. as well as with a variety of other money exchangers.

y.      Euro Exchange y Financial Commerce, Inc.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Euro Exchange y Financial Commerce, Inc.

z.      Eurocambio, S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Eurocambio, S.A.

aa.     General Commerce Overseas Inc.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with General Commerce Overseas Inc.

bb.     Giorgiotelly, S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Giorgiotelly, S.A.

cc.     Giorgino Corporation of Panama, S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Giorgino Corporation of Panama, S.A.

dd.     Giorgio Cheaitelly Investment, S.A.

FNK 7782 0121

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Giorgio Cheaitelly Investment, S.A.

ee.    Producers Group Corp.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Producers Group Corp.

ff.    Silver House Inc.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Silver House Inc.

gg.    J.H. Exim International, S.A.

**RESPONSE:** Respondent does not have nor has he had a relationship, business or otherwise, with J.H. Exim International, S.A.

hh.    Santa Maria International Trading Corp.

**RESPONSE:** Respondent does not have nor has he had a relationship, business or otherwise, with Santa Maria International Trading Corp.

ii.    III Millenium International

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with III Millenium International.

jj.    Ocean Indic Overseas, S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Ocean Indic Overseas S.A.

kk.    Junior International S.A.

**RESPONSE:** Respondent replaced Akram Hassan Shaitely as one of the joint owners of Junior International Co. in 1990. In this role, Respondent shared an ownership interest in the company with his brothers—Akram Saied Joumaa and Anwar Saied Joumaa.

17

In 1993, Junior International S.A. was sold to to Samir el-Joulani. Upon this sale, Respondent ended his relationship with Junior International S.A.

ll.  Fedco Import & Export, S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Fedco Import & Export S.A.

mm.  Global Technology Import & Export, S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Global Technology Import & Export S.A.

nn.  Café de Liban, S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Café de Liban, S.A.

oo.  Zedro Investment, S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Zedro Investment, S.A.

pp.  Almacen Electro Sony Star

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Almacen Electro Sony Star.

qq.  Fedco

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Fedco.

rr.  Micro Empresa Ashqui

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Micro Empresa Ashqui.

ss.  Comercial Globanty

FNK 7782 0123

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Comercial Globanty.

tt.      Almacen Batul, Comercial Estilo y Moda

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Almacen Batul, Comercial Estilo y Moda.

uu.      Bodego Electro Giorgio

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Bodego Electro Giorgio.

vv.      Agropecuaria La Perla Ltda.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Agropecuaria La Perla Ltda.

ww.   KPD S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with KPD S.A.

xx.      Farbe Comunicaciones Ltda.

**RESPONSE:** Respondent does not have nor has he had a relationship, business or otherwise, with Farbe Comunicaciones Ltda.

yy.      Polyton (Asia) Limited

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Polyton (Asia) Limited.

zz.      SBT S.A.

**RESPONSE:** Respondent does not have nor has he had a relationship, business or otherwise, with SBT S.A.

aaa.      Induitex Ltda.

19

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Induitex Ltda.

bbb.   Inversiones Gilfe S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Inversiones Gilfe S.A.

ccc.   C.I. Del Istmo SAS

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with C.I. Del Istmo SAS.

ddd.   G&G Internacional SAS

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with G&G Internacional SAS.

eee.   Guberek Grimberg e Hijos y Cia S. en C.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Guberek Grimberg e Hijos y Cia S. en C.

fff.   Comercializadora Internacional Andina Limitada

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Comercializadora Internacional Andina Limitada.

ggg.   Avanti Joyeros E.U.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Avanti Joyeros E.U.

hhh.   Issa Empresa Unipersonal

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Issa Empresa Unipersonal.

iii.   Inversora Panacol S.A.

FNK 7782 0125

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Inversora Panacol S.A.

jjj.    Bracro S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Bracro S.A.

kkk.    Constructora Nacional de Panama S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Constructora Nacional de Panama S.A.

lll.    C.I. Caffee Valores S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with C.I. Caffee Valores S.A.

mmm. I&S Holding Company, S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with I&S Holding Company S.A.

nnn.    Chaps Investment Inc.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Chaps Investment Inc.

ooo.    Orbital Horizons Corp.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Orbital Horizons Corp.

ppp.    Compania Real de Panama S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Compania Real de Panama S.A.

qqq.    Fundacion Issara

21

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Fundacion Issara.

rrr.   Grupo Empresarial Enkor Profesional S.A.S.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Grupo Empresarial Enkor Profesional S.A.S.

sss.   Tritcon S.A.S.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Tritcon S.A.S.

ttt.   Inversiones Meybar S.A.S.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Inversiones Meybar S.A.S.

uuu.   E-Profesional

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with E-Profesional.

vvv.   Hotel Sol Plaza

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Hotel Sol Plaza.

www.   Grupo Empresarial Ghema S.A.S.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Grupo Empresarial Ghema S.A.S.

xxx.   Rosagro S.A.S.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Rosagro S.A.S.

yyy.   Promotora Turistica Sol Plaza S.A.

FNK 7782 0127

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Promotora Turistica Sol Plaza S.A.

zzz.   Arenera El Cerrejon

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Arenera El Cerrejon.

aaaa.   Canteras Copacabana S.A.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with the Canteras Copacabana S.A.

bbbb.   Mejia Alzate Asociados Y Cia. Ltda.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with the Mejia Alzate Asociados Y Cia. Ltda.

cccc.   Almacen Guibar

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Almacen Guibar.

dddd.   Variedades Jose Albeiro Barco M.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Variedades Jose Albeiro Barco M.

eeee.   Almequip S.A.S.

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Almequip S.A.S.

ffff.   Asesoria Y Asistencia Agropecuaria Y Ambiental A4

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Asesoria Y Asistencia Agropecuaria Y Ambiental A4.

gggg.   Abou Merhi Group

FNK 7782 0128

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with the Abou Merhi Group.

hhhh.   Abou Merhi Lines SAL

**RESPONSE:** Respondent does not have relationship, business or otherwise, with Abou Merhi Lines SAL.

iiii.    Abou Merhi Cotonou

**RESPONSE:** Respondent does not a relationship, business or otherwise, with Abou Merhi Cotonou.

jjjj.    Abou Merhi Hamburg

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Abou Merhi Hamburg.

kkkk.   Abou Merhi Nigeria

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Abou Merhi Nigeria.

llll.    Abou Merhi Cruises SAL

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Abou Merhi Cruises SAL.

mmmm.      Le Mall Saida

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Le Mall Saida.

nnnn.  Lebanon Center

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with the Lebanon Center.

oooo.  Orient Queen Homes

FNK 7782 0129

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Orient Queen Homes.

pppp.  Queen Stations

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with Queen Stations.

qqqq.  Abou Merhi Charity Institution

**RESPONSE:** Respondent does not have a relationship, business or otherwise, with the Abou Merhi Charity Institution.

If employed by or involved in other business relationships with additional SDNT companies or individuals, please provide the length of time and specific dates of employment and describe each position, your duties in each position, the salaries and other benefits (such as stock shares) received in each position, and the date and conditions of separation or retirement from each company.  If you held a written employment contract, please provide a copy.  If you have some other type of relationship with the SDNT companies or individuals, please provide an explanation of such relationship.  If you ceased your employment and/or renounced financial interest(s), please provide official documentation.

**RESPONSE:** There is no information responsive to this request.

4.   Seized Assets.  Please explain if any assets in your name have been seized in Colombia, Lebanon, Panama, or elsewhere?  If so, please describe the assets and the reason(s) for the seizure(s).  Please also provide the current legal status of these assets.  OFAC is aware of the restrictions placed on properties in many countries that have been seized pending forfeiture. Therefore, any attempts to divest your ownership interests in these assets may have to be coordinated with, and approved by, the relevant Attorney General's Office.  In similar situations, SDNT individuals have demonstrated that they have severed ties to these companies and assets by irrevocably renouncing all of their ownership rights and interests in the SDNT companies and assets in a notarized letter filed with the relevant Attorney General's Office. If you choose to do the same, please submit a copy of this renunciation letter to OFAC as well as a copy of official

25

documentation from the Attorney General's Office acknowledging receipt of this renunciation letter.

**RESPONSE**: Yes, Respondent has had assets seized. These seizures followed Respondent's designation under the Kingpin Act. Respondent has indicated that he is willing to renounce certain interests in these seized assets, including any assets seized in the United States. Respondent will be providing additional documentation evidencing any renouncements in a future supplemental response to OFAC's questionnaire.

5.   U.S. Accounts and Assets. Please detail any interest you currently hold in any financial accounts or real property in the United States, including names and addresses of financial institutions, types of accounts, and account numbers.

**RESPONSE**: Respondent is still in the process of obtaining records responsive to this question and will provide them in a future supplemental response.

6.   Narcotics Trafficking and Related Money Laundering. Have you ever been involved in the cultivation, production, manufacture, distribution, selling, financing, or transport of narcotic drugs (e.g., cocaine, marijuana, heroin, hashish, opium, methaqualone, mandrax), or any other, controlled substance, or listed chemical (as those terms are defined in Section 102 of the Controlled Substances Act, 21 U.S.C. § 802) or endeavored or attempted to do so or assisted, abetted, conspired, or colluded with others to do so? In addition, have you participated in the laundering of drug proceeds and/or held assets in your name that were obtained with drug proceeds? If so, with whom?

**RESPONSE**: No, Respondent has not been involved in the cultivation, production, manufacture, distribution, selling, financing, or transport of narcotic drugs or any other controlled substances, nor has he ever attempted or conspired with others to do so. Respondent is also not aware of the laundering of drug proceeds or assets undertaken in his name.

7.   Legal Proceedings. Have you ever been, or are you currently the subject of any legal proceedings (including but not limited to civil and criminal investigations, indictments, arrests, warrants for arrests, or convictions) in any jurisdiction worldwide, including Colombia, Panama, Lebanon, and

26

the United States?  If so, please describe these legal proceedings and/or provide any supporting official documentation.

**RESPONSE:** On January 26, 2011, the U.S. Department of the Treasury designated Respondent as a specially designated narcotics trafficker pursuant to the Kingpin Act.[8]  On December 13, 2011, the U.S. Department of the Justice returned an Indictment against Respondent for conduct related to OFAC's allegations, as well as the Drug Enforcement Administration's investigations.[9]  That Indictment remains pending in the Eastern District of Virginia, Case No. 1:11-cr-00560.

8.   Additional Information.  You may also provide any other information that could assist OFAC in the review of your request for reconsideration.

**RESPONSE:** Please refer to the sections below.

II.   **Legal Analysis**

   A.   *Statutory Framework*

On December 3, 1999, the President signed into law the Foreign Narcotics Kingpin Designation Act.  *See* 21 U.S.C. §§ 1901-1908 (1999).  The Kingpin Act was designed to "provide authority for the identification of, and application of sanctions on a worldwide basis to, significant foreign narcotics traffickers, their organizations, and the foreign persons who provide support to those significant foreign narcotics traffickers and their organizations, whose activities threaten the national security, foreign policy, and economy of the United States." 21 U.S.C. § 1902.

To accomplish this, the Kingpin Act mandates the President to submit an annual report to specific Congressional committees, "identifying publicly the foreign persons that the President determines are appropriate for sanctions...[and] detailing publicly the President's intent to impose sanctions upon these significant foreign narcotics traffickers..." 21 U.S.C. § 1903(b)(1)-

---

[8] Press Release, Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network, U.S. Dep't of the Treasury, January 26, 2011, *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1035.aspx.

[9] Press Release, U.S. Charges Alleged Lebanese Drug Kingpin with Laundering Drug Proceeds for Mexican and Colombian Drug Cartels, U.S. Dep't of Justice, December 13, 2011, *available at* https://www.justice.gov/archive/usao/vae/news/2011/12/20111213joumaanr.html.

FNK 7782 0132

(2).[10]  Pursuant to the Kingpin Act, the President is authorized to impose blocking sanctions on "any significant foreign narcotics traffickers publicly identified" in the President's annual report. 21 U.S.C. § 1904(b)(1) ("...there are blocked as of such date, and any date thereafter, all such property and interests in property within the United States, or within the possession or control of any United States person...").[11]

Moreover, the Kingpin Act provides additional authorities to the Secretary of the Treasury, acting in consultation with the heads of several other federal agencies, to designate "any foreign person...materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of a significant foreign narcotics trafficker"; "any foreign person...owned, controlled, or directed by, or acting for or on behalf of, a significant foreign narcotics trafficker"; and "any foreign person...playing a significant role in international narcotics trafficking." 21 U.S.C. § 1902(2)-(4).[12]  Foreign persons who are designated pursuant to these authorities are likewise subject to blocking sanctions under the Kingpin Act. 21 U.S.C. § 1904(b).

Pursuant to regulations promulgated by OFAC—acting under a delegation of authority from the Secretary of the Treasury, who is authorized to prescribe such regulations as may be necessary "to carry out the purposes" of the Kingpin Act, including "regulations prescribing recordkeeping, reporting, and production of documents, definitions, licenses, instructions, or directions, as may be necessary..."—a foreign person designated under the Kingpin Act and thus placed on the Specially Designated Nationals and Blocked Persons List ("SDN List") maintained by OFAC "may seek administrative reconsideration of his, her, or its designation...or assert that the circumstances resulting in the designation no longer apply, and thus seek to have the designation rescinded..." 31 C.F.R. § 501.807; *see also* 31 C.F.R. § 598.101 ("This part [Part 598] is separate from, and independent of, the other parts of this chapter...with the exception of part 501 of this chapter, the provisions of which apply to this part.").  In doing so, the foreign person "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation" and "may [also] propose remedial steps on the person's

---

[10] The President is authorized to supplement his mandatory report with additional designations "if at any time after the report required...the President finds that a foreign person is a significant foreign narcotics trafficker and such foreign person has not been publicly identified in [the] report..." 21 U.S.C. § 1903(h)(1)(A).

[11] Blocking sanctions are subject to exceptions "provided in regulations, orders, instructions, licenses, or directives issued pursuant to this chapter..." 21 U.S.C. § 1904(b). Such exceptions fall under the discretion of the Secretary of the Treasury, who "is authorized to take such actions as may be necessary to carry out this chapter, including promulgating rules and regulations permitted under this chapter." 21 U.S.C. § 1904(e)(1)(B).

[12] A significant foreign narcotics trafficker is defined as "any foreign person that plays a significant role in international narcotics trafficking, that the President has determined to be appropriate for sanctions pursuant to this chapter..." 21 U.S.C. § 1907(7). Narcotics trafficking is itself defined broadly to include "any illicit activity to cultivate, produce, manufacture, distribute, sell, finance, or transport narcotic drugs, controlled substances, or listed chemicals, or otherwise endeavor or attempt to do so, or to assist, abet, conspire, or collude with others to do so." 21 U.S.C. § 1907(3).

FNK 7782 0133

part...which the person believes would negate the basis for designation." 31 C.F.R. § 501.807(a). The regulations further prescribe that OFAC will review the information submitted and "may request clarifying, corroborating, or other additional information." 31 C.F.R. § 501.807(b). Following a "review of the request for reconsideration, [OFAC] will provide a written decision to the blocked person..." 31 C.F.R. § 501.807(d).

      B.     *Case Law*

     It is a fundamental tenet of administrative law that interested parties must have an effective chance to respond to the facts upon which an agency's decision rests. *Nat'l Org. for Women v. Social Security Admin.*, 736 F.2d 727, 739 (D.C. Cir. 1984). Refusal to allow inspection of evidence critical to the administrative decision has been found to be constitutionally impermissible. *Ralpho v. Bell*, 569 F.2d 607, 628-29 (D.C. Cir. 1977). Due process prohibits "an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation." *Al Haramain Islamic Found. v. U.S. Dep't of Treasury*, 686 F.3d 965, 976 (9th Cir. 2011), citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 288 n.4 (1974). Rather, designated parties must be afforded at the very least the unclassified administrative record and must be permitted to respond in writing to rebut such evidence or negate the proposition that a designation is warranted. *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003); *see also Nat'l Org. for Women v. Social Security Admin.*, 736 F.2d 727, 739 (D.C. Cir. 1984) (acknowledging that "where governmental action seriously injures an individual, and the reasonableness of that action depends on fact finding, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue...at a meaningful time and in a meaningful manner."); *Kindhearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F.Supp. 2d 857, 905 (N.D. Ohio 2009).

     Courts have also found procedural due process violations where OFAC has been dilatory in its response time. *See Kindhearts*, 647 F.Supp.2d at 903-904 (holding that OFAC's delay of 15 months in providing plaintiff with an evidentiary memorandum and evidence supporting its designation of an organization a Specially Designated Global Terrorist violated the plaintiff's due process rights); *Al Haramain*, 686 F.3d at 985-986 (finding that a 7-month waiting period for a statement of reasons why the plaintiff had been designated, coupled with OFAC's release of only a single document over the course of 4 years that could be viewed as supplying reason for OFAC's investigation and designation decision, failed to provide meaningful notice). Courts have noted that "promptness is an important aspect of the due process right to be heard." *Kindhearts*, 647 F.Supp.2d at 906 (citing *Barry v. Barchi*, 443 U.S. 55, 64 (1979)). In *Zevallos v. Obama*, the court took notice of the fact that "other courts have held that extremely prolonged delays while considering [requests for reconsideration] can violate the Due Process Clause,"

FNK 7782 0134

especially where designees "never fully underst[and] why they have been designated..."
*Zevallos*, No. 14-5059, 16 (2015).

Courts have likewise held that "the Constitution [requires] that the government...follow
procedures reasonably designed to protect against erroneous deprivation of the private party's
interests." *Al Haramain*, 686 F.3d at 980. For instance, an agency should not render a decision
without providing notice of the decision-making standards and providing an opportunity to meet
such standards. *Nat'l Org. for Women v. Social Security Admin.*, 736 F.2d 727, 740-41 (D.C. Cir.
1984), relying upon *Am. Cyanamid Co. v. Food & Drug Admin.*, 606 F.2d 1307, 1313-1314
(D.C. Cir. 1979).

In sum, the agency's conduct must comport with general principles of due process,
particularly where governmental action seriously injures an individual and the reasoning of the
action depends upon findings of fact, and there must also be notice and opportunity of an
affected party to be able to present relevant evidence at a relevant time to responsible agency
officials. *Nat'l Org. for Women*, 736 F.2d at 739. Indeed, a continued designation is indefinite in
nature, fraught with reputational and personal consequences and thus more than just a "mere
inconvenience." *See Al Haramain*, 686 F.3d at 979-980.

Furthermore, and specific to the OFAC reconsideration process, in contesting a
designation, the designated party must argue "that whatever rationale led Treasury to designate
him under the appropriate statute....was never true or is no longer true." *Zevallos*, 793 F.3d at
110. Courts have traditionally reviewed such arguments, and OFAC's decisions in response
pursuant to the Administrative Procedure Act, and that Act's arbitrary and capricious standard.
In short, if OFAC's actions were not arbitrary and capricious, and based on substantial evidence,
then a court would uphold OFAC's decision. *Holy Land Found. for Relief & Dev.*, 333 F.3d at
162.

### C.    Legal Analysis

#### i.    Basis and Criteria for Designation

On January 26, 2011, OFAC designated Respondent as a specially designated narcotics
trafficker pursuant to the Kingpin Act for allegedly playing a significant role in international
narcotics trafficking.[13] Pursuant to a press release that OFAC issued at the time of Respondent's

---

[13] PRESS RELEASE, Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network, U.S.
Dep't of the Treasury, January 26, 2011, *available at* https://www.treasury.gov/press-center/press-
releases/Pages/tg1035.aspx. It is undersigned counsel's understanding that OFAC acted pursuant to 21 U.S.C. §
1902(4) in designating Respondent as a specially designated narcotics trafficker. On January 26, 2011, OFAC
designated 9 foreign individuals and 20 foreign entities as derivative designations of Respondent and/or the Joumaa

FNK 7782 0135

designation, OFAC alleged that Respondent "coordinated the transportation, distribution, and sale of multi-ton shipments of cocaine from South America and [] laundered the proceeds from the sale of cocaine in Europe and the Middle East, according to investigations led by the Drug Enforcement Administration (DEA)."[14]  Further, OFAC alleged that Respondent and his organization "launder[ed] proceeds from their illicit activities – as much as $200 million per month – through various channels, including bulk cash smuggling operations and Lebanese exchange houses."[15]  These exchange houses included, according to OFAC, "the Hassan Ayash Exchange Company, the Ellissa Exchange Company, and New Line Exchange Trust Co."[16]

In addition, OFAC has derivatively designated several individuals and entities for allegedly having ties with Respondent.  For example, on June 27, 2012, OFAC designated three individuals and four entities for their alleged involvement in laundering the proceeds of narcotics trafficking on behalf of Respondent.[17]  According to OFAC, "[t]he Joumaa network is a sophisticated multi-national money laundering ring, which launders the proceeds of drug trafficking for the benefit of criminals and the terrorist group Hizballah."  More specifically, OFAC alleged that Respondent had "moved over a million dollars into an account owned by [Abbas Hussein] Harb and managed by [Ibrahim] Chibli" in 2010—two individuals accused of helping Respondent move "millions of dollars of narcotics-related proceeds" through the Lebanese financial sector.  Soon thereafter, on April 23, 2013, the U.S. Department of the Treasury identified the Kassem Rmeiti & Co. for Exchange ("Rmeiti Exchange") and the Halawi Exchange Co. as financial institutions of primary money laundering concern.[18]  According to Treasury, the Joumaa narcotics network turned to Rmeiti Exchange and Halawi Exchange Co. to handle its money laundering needs after Treasury had moved against the Lebanese Canadian Bank.  Specifically, Treasury alleged that "[Respondent's] network moved illegal drugs from South America to Europe and the Middle East via West Africa and laundered hundreds of millions of dollars monthly through accounts held at the Lebanese Canadian Bank, as well as through trade-based money laundering involving consumer goods throughout the world, including used car dealerships in the United States."[19]

---

Money Laundering and Drug Trafficking Organization ("Joumaa MLO/DTO").[13]  OFAC has subsequently designated additional individuals and entities as derivative designations of Respondent and the Joumaa MLO/DTO.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] PRESS RELEASE, Treasury Targets Major Money Laundering Network Linked to Drug Trafficker Ayman Joumaa and a Key Hizballah Supporter in South America, U.S. Dep't of the Treasury, *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1624.aspx.

[18] PRESS RELEASE, Treasury Identifies Kassem Rmeiti & Co. for Exchange and Halawi Exchange Co. as Financial Institutions of 'Primary Money Laundering Concern, U.S Dep't of the Treasury, April 23, 2013, *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl1908.aspx.

[19] *Id.*

31

FNK 7782 0136

On July 9, 2013, the U.S. Department of the Treasury designated more than two dozen Colombian individuals and entities—including Issac Perez Guberek Ravinovicz and Henry Guberek Grimberg—alleged to have formed "a money laundering network responsible for laundering hundreds of millions of dollars in drug money connected to drug trafficking organizations," including that allegedly operated by Respondent.[20]   Ravinovicz and Grimberg were alleged to "primarily rely upon the use of ostensibly legitimate textile companies within Colombia to engage in trade-based money laundering."[21]

On July 1, 2014, the U.S. Department of the Treasury designated Pedro Claver Mejia Salazar and other individuals and entities involved in his money laundering network based in Medellin, Colombia.[22]   According to Treasury, Mejia Salazar "primarily launders narcotics proceeds on behalf of La Oficina de Envigado," a U.S.-designated entity.[23]   Mejia Salazar is also alleged to "work closely with [Respondent]."[24]   Finally, on October 1, 2015, OFAC designated Merhi Ali Abou Merhi and other individuals and entities for allegedly "provid[ing] support for narcotics trafficking and money laundering activities conducted by Lebanese-Colombian drug trafficker and money launderer Ayman Saied Joumaa..."[25]

Besides designation notices, other elements of the U.S. government have likewise been involved in targeting Respondent and have released certain statements regarding Respondent's alleged activities.  On December 15, 2011, the U.S. Attorney's Office for the Southern District of New York filed a civil suit seeking the forfeiture of more than $480 million from entities involved in a Hizballah-related money laundering scheme.  In the press notice announcing the suit, Respondent was alleged to have "launder[ed] as much as $200 million in proceeds per month through various channels, including bulk cash smuggling operations and Lebanese exchange houses."[26]   The U.S. Attorney's Office further claimed that Respondent's drug trafficking organization "use[d] Hizballah couriers to transport and launder narcotics proceeds and pa[id] fees to Hizballah operatives to facilitate the laundering of narcotics proceeds."[27]

---

[20] PRESS RELEASE, Treasury Targets Major Money Laundering Network Operating Out of Colombia, U.S. Dep't of the Treasury, July 9, 2013, *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl2002.aspx.
[21] *Id.*
[22] PRESS RELEASE, Treasury Designates a Medellin, Colombia-Based Drug Money Laundering Network with Ties to La Oficina de Envigado and Ayman Saied Joumaa, U.S. Dep't of the Treasury, July 1, 2014, *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl250.aspx.
[23] *Id.*
[24] *Id.*
[25] PRESS RELEASE, Treasury Sanctions Maritime Network Tied to Joumaa Criminal Organization, U.S. Dep't of the Treasury, Oct. 1, 2015, *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0196.aspx.
[26] PRESS RELEASE, Civil Suit Seeks More than $480 Million from Entities that Facilitated Hizballah-Related Money Laundering Scheme, U.S. Attorney's Office for Southern District of New York, Dec. 15, 2011, *available at* https://archives.fbi.gov/archives/newyork/press-releases/2011/civil-suit-seeks-more-than-480-million-from-entities-that-facilitated-hizballah-related-money-laundering-scheme.
[27] *Id.*

FNK 7782 0137

On December 13, 2011, the U.S. Department of Justice brought charges against Respondent in the Eastern District of Virginia for "coordinating multi-ton shipments of cocaine from Colombia to Los Zetas Mexican drug cartel destined for the United States and laundering hundreds of millions of dollars in these drug proceeds back to the Colombian suppliers."[28] More specifically, Respondent was alleged to have "conspired with others to coordinate shipments of tens of thousands of kilograms of cocaine from Colombia through Central America for sale to Los Zetas drug cartel" and to have "launder[ed] hundreds of millions of dollars in drug proceeds from Mexico, Europe, and West Africa to the cocaine suppliers in Colombia and Venezuela," "charg[ing] a fee between 8 and 14 percent for laundering the proceeds..."[29]

Based on an affidavit by a Special Agent with the U.S. Drug Enforcement Administration (DEA) involved in the DEA's investigation of Respondent "and his Colombia-based partner Alejandro Lopez", that investigation had been ongoing since at least 2010.[30] The information relied upon to charge Respondent originated from three confidential sources—at least two of whom appear to have been cooperating with U.S. government authorities in order to merit a reduction in their sentencing before a U.S. federal court.[31]

Despite these extensive public notices to the press, the factual allegations relayed within are formulaic and fail to communicate the evidence upon which OFAC decided to designate Respondent. Moreover, despite Respondent's request for the administrative record underlying his designation, a request that was first made on May 18, 2016, OFAC has yet to substantively respond with either the classified or unclassified versions of the administrative record supporting Respondent's designation. Delays in providing Respondent with such evidentiary record, as discussed above, have been found to trigger serious due process concerns, and undersigned counsel herein implores OFAC to expediently provide Respondent with such documents in order to aid Respondent in challenging the basis for his Kingpin Act designation.

ii.    Sufficiency of the Evidence

As a preliminary matter, it is difficult for undersigned counsel to assess the sufficiency of the evidence used to support Respondent's designation since OFAC has yet to provide copies of the administrative record underlying that designation. Absent the provision of the evidentiary record, Respondent and his counsel will be left in the dark as to the evidence that is being used to support Respondent's Kingpin Act designation, thereby triggering serious due process concerns.

---

[28] PRESS RELEASE, U.S. Charges Alleged Lebanese Drug Kingpin with Laundering Drug Proceeds for Mexican and Colombian Drug Cartels, U.S. Dep't of Justice, December 13, 2011, *available at* https://www.justice.gov/archive/usao/vae/news/2011/12/20111213joumaanr.html.

[29] *Id.*

[30]

[31] *Id.*

33

This is all the more the case as the limited evidence made publicly available is (1) conclusory in nature, (2) appears to be primarily reliant on confidential sources who were motivated to provide as much information as possible to U.S. government authorities, regardless of whether that information was true or not; and (3) is historical and thus not contemporary, as the Kingpin Act's statutory language mandates.

First, the evidence that has been made publicly available via U.S. government notices is conclusory in nature, stating as fact that Respondent is engaged in narcotics trafficking and money laundering activities rather than offering the underlying evidence to support those allegations. In multiple designation notices, OFAC alleges that Respondent operates a network constituting either a drug trafficking, money laundering, or criminal organization—depending on the facts wants to portray at the time it exercises its designation authorities in those matters. However, OFAC does not substantiate that allegation nor does it adequately explain Respondent's precise role in this alleged "network." Absent the provision of the administrative record underlying Respondent's designation, these conclusory allegations are entirely insufficient to provide Respondent adequate notice of the factual basis underlying his Kingpin Act designation.

Moreover, the publicly-available evidence appears to be primarily reliant on three confidential sources, at least two of whom were either pending trial or sentencing before a U.S. federal court. Due to the fact that their cooperation with U.S. government authorities was expected to and did indeed lead to reductions in their sentences, these sources were likely motivated to provide as much information as possible, regardless of whether that information proved to be true or not. At the very least, the fact that the cooperation of these sources was motivated by expected reductions in sentencing should render suspect the information provided, particularly if that information is not confirmed by other evidence in the possession of OFAC or other U.S. government authorities.

Finally, undersigned counsel notes that the evidence used to designate Respondent appears to be historical—i.e., that the conduct at issue is no longer ongoing. For instance, Respondent is no longer operating the New Line Exchange Trust Co. or Goldi Electronics S.A., and Respondent has had his assets seized. In no meaningful sense has it been and can it be alleged that Respondent is currently engaged in conduct that contributes to narcotics trafficking or money-laundering in support of narcotics trafficking. Considering the fact that Respondent was designated for allegedly "playing a significant role in narcotics trafficking", a phrase deliberately couched in the present tense, undersigned counsel doubts whether the criteria under which Respondent was initially designated can be used to maintain Respondent's designation to the present time. Unless OFAC has contemporary evidence tying Respondent to narcotics trafficking or money laundering activities, the Kingpin Act does not support the maintenance of Respondent's designation.

FNK 7782 0139

iii.    Respondent's Business History

In the spirit of transparency, Respondent has attached a series of documents relating to his business activities, personal and corporate tax records, property records, and financial records.  Respondent intends to supplement these initial filings with additional documents in the near-term future.  The provision of such materials is intended to demonstrate that Respondent is not and has not engaged in activities related to narcotics trafficking, but has been an active business person involved in multiple lines of work.

Documents attached as exhibits to this response include:[32]

- Goldi Electronics Corporate Formation Documents
- Goldi Electronics Bank Statements
- Goldi Electronics SWIFT Messages
- Goldi Electronics Invoices & Shipping Documents.

Respondent is also prepared to provide any other available documents relating to his personal or business activities upon request from OFAC.  It is Respondent's contention that such disclosure will evidence that Respondent is not and has not been involved in activities related to narcotics trafficking or money laundering in support of narcotics trafficking.

D.    Policy Considerations

i.    Danger of a Mistaken Designation

In undersigned counsel's view, the evidence that the U.S. government has collected regarding Respondent and his alleged ties to narcotics trafficking and money-laundering activities is reliant on confidential sources whose motivations included the need to provide information to U.S. government authorities, regardless of whether that information was accurate or not.  As such, there is a serious threat that the factual allegations underlying Respondent's Kingpin Act designation are erroneous, particularly absent any evidence confirming the information provided by confidential sources.

Mistaken designations are a threat to the confidence with which the public and private sector place in the integrity of OFAC's administration of U.S. sanctions programs.  In order for U.S. sanctions programs to command the respect and adherence of U.S. and foreign private sector parties, it is essential that all parties have confidence in the accuracy and integrity of OFAC's fact-finding process.  Any perception that OFAC designations are prone to error could

---

[32] Exhibit B – Goldi Electronics Documents.

35

undermine the basis for parties' compliance with U.S. sanctions and, as such, threaten the ultimate efficacy of economic sanctions as a tool of U.S. national security and foreign policymaking.

### ii.   Diversion of Limited Resources

As an agency of limited resources, it is imperative that OFAC have full faith and confidence in the evidence underlying its decision to designate and maintain the designation of individuals and/or entities.  Designations for which OFAC lacks such confidence have the potential to distract and divert resources away from more beneficial and efficacious uses, particularly if sanctioned parties challenge their designations.  This is a cost that is compounded the longer that a designation is challenged and upheld, as the administrative burden of maintaining and reviewing a designation accelerates over time.  As such, OFAC is incentivized to expeditiously review the factual basis underlying Respondent's designation so as to not continue expending resources on maintaining a designation that may be flawed, if not altogether compromised, from an evidentiary perspective.  At the very least, OFAC should work in good-faith with Respondent to pinpoint the conduct at issue and to detail how Respondent can take action to instill confidence in OFAC that Respondent is not engaged in activities related to narcotics trafficking.

### iii.   Value of Remedial Measures

Economic sanctions are a potent tool of U.S. national security policymaking, insofar as they favorably change the behavior of designated parties.  However, in order to properly incentivize designated parties to cease their engagement in illicit activities, OFAC must credibly promise to rescind the designation once its factual basis has been eviscerated.  For example, in the case of a foreign narcotics trafficker designated pursuant to the Kingpin Act, OFAC should be prepared to remove the designation once the designated individual has undertaken appropriate remedial measures to sufficiently address the factual basis of their Kingpin Act designation (i.e., to ensure that they will not be a participant in any activities connected to narcotics trafficking), or when such conduct has been ceased.

In order to aid parties in taking such remedial measures, OFAC must adequately inform the parties designated under the Kingpin Act as to the factual basis underlying their designation so that the parties can take appropriate remedial measures precisely tailored to address OFAC's concerns, or otherwise prove that the conduct which lead to their initial designation is not on-going.  Providing the evidentiary record used to support Respondent's designation and/or proposing remedial measures that Respondent could take to remove the basis for his designation would allow Respondent to address the U.S. government's concerns and ensure that neither he nor his businesses are engaged in narcotics trafficking activities.  This would fulfill OFAC's

FNK 7782 0141

policy goal of targeting alleged narcotics traffickers with sanctions in order to compel a change in behavior.

That said, failure to adequately provide Respondent with the evidentiary record underlying his designation or to propose remedial measures that Respondent can take to address OFAC's concerns will only guarantee that OFAC's concerns remain unaddressed and U.S. foreign policy goals unachieved. This is neither in the interest of the United States nor of Respondent himself.

IV.   Conclusion

In light of the foregoing, Respondent respectfully requests that OFAC take steps to review the factual basis underlying Respondent's Kingpin Act designation. In undersigned counsel's view, certain of the evidence upon which OFAC relied in making its decision to designate Respondent is clearly erroneous, rendering the sum of evidence suspect as well. Notwithstanding the foregoing, even assuming *arguendo* that OFAC's evidence is credible and sufficient, Respondent is not and has not been for some time involved in any transactions that could be deemed to fall under the Kingpin Act's definition of "narcotics trafficking," and as such, his continued designation is unwarranted.

Respondent will be submitting additional information and documents as a supplemental response to this questionnaire response to further buttress Respondent's contention his continued designation is erroneous. It is undersigned counsel's view that the responses contained herein and in this supplemental response should lead OFAC to begin working in good-faith with Respondent to determine whether a rescission of Respondent's designation is appropriate.

Please forward all correspondence concerning this matter to undersigned counsel's Washington, D.C. office:

Erich C. Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004

Thank you for your consideration, and Respondent looks forward to your response.

Sincerely,

Erich C. Ferrari

37



FNK 7782 0143

## OBSERVACIONES IMPORTANTES

*Ningún colombiano podrá ser portador de más de un pasaporte colombiano vigente, no importa la clase de documento. Quien para un pasaporte vigente y solicitare la expedición de uno nuevo de la misma o de otra clase, ocultando a la entidad expedidora (a) existencia de ese pasaporte, incurrirá en las sanciones penales a que haya lugar.*

*Los Funcionarios consulares prestarán asistencia a los connacionales, de conformidad con las Leyes Colombianas, los Tratados Públicos y el Derecho de Gentes.*

*ATENCION: Cuide el pasaporte. Su pérdida o deterioro puede causarle inconvenientes en el exterior.*

*El buen nombre de COLOMBIA en el mundo depende del respeto que usted dé a las Leyes y costumbres de las naciones que visita.*

P 013331

**Toda alteración en este pasaporte implica su invalidez.**
**Any alteration to this passport will render it invalid.**



REPUBLICA DE COLOMBIA

PASAPORTE

"El Gobierno de Colombia solicita a las autoridades nacionales y extranjeras dar al titular del presente pasaporte las facilidades para su normal tránsito y brindarle, en caso de necesidad, la ayuda y cooperación que puedan ser útiles.

The Government of Colombia requests all national and foreign authorities to allow the bearer of this passport to move freely and in case of need to afford such help and assistance as may be necessary.

Le Gouvernement de la Colombie demande aux autorités nationales et étrangères de donner au titulaire du présent passeport les facilités pour son déplacement normal et de lui procurer l'aide et la coopération qui peuvent lui être utiles, en cas de nécessité.

FNK 7782 0144



FNK 7782 0145

4

REPUBLICA DE VENEZUELA
Ministerio de Hacienda

H-95  0490812

5000
CINCO MIL
BOLIVARES

H-95  0490813

5000
CINCO MIL
BOLIVARES

H-95  0490814

5000
CINCO MIL
BOLIVARES

REPUBLICA DE VENEZUELA
MINISTERIO DE RELACIONES INTERIORES
DIRECCION DE EXTRANJERIA

D I E X

RECUENTO DE PASAPORTE
26 MAYO 1998

Fecha:
El titular del presente con

Cédula Nº

Ingresó por

fecha

en calidad TURISTA

TRANSEUNTE

Condición actual

Vence  05-03-1998

Firma Autorizada

Toda alteración en este pasaporte implica su invalidez.
Any alteration in this passport will render it invalid.

FNK 7782 0146



FNK 7782 0147