Privileged & Confidential
Joint Defense Information

    

REPÚBLICA DE PANAMÁ
PAPEL NOTARIAL

NOTARIA PRIMERA DEL CIRCUITO DE COLÓN

cuatro cuatro uno- siete cuatro seis uno (441-7461), para llevar a cabo cualquier acto que sea

necesario para protocolizar y registrar este acta de reunión de accionistas para proponer la

Fusión y llevar a cabo cualquier acto en relación con el mismo una vez haya sido ejecutado por

las partes interesadas. No habiendo otro asunto que tratar, se dio por clausurada la reunión. En

fe de lo cual se suscribe este Convenio de Fusión en Panamá, República de Panamá, hoy,

veintiuno (5) de enero de dos mil diez (2010) en tres ejemplares de igual tenor y efecto.   Por la

Sociedad Absorbente, (fdo.) **AIMAN SAID JOMAA KHARFAN**, PRESIDENTE; (fdo.) **JALAL**

**JOMHA KHARFAN**, SECRETARIO; (fdo.) **ISMAEL YOUSSEF ABADÍA**, TESORERO; **GOLDI**

**ELECTRONICS, S.A.** ------------------------------------------

Por las Sociedades Absorbidas. (fdo.) **AIMAN SAID JOMAA KHARFAN**, PRESIDENTE; (fdo.)

**JALAL JOMHA KHARFAN**, SECRETARIO; (fdo.) **ISMAEL YOUSSEF ABADÍA**, TESORERO;

**MONTE GRANDE INTERNACIONAL, S.A.** ------------------------------------------

(fdo.) **AIMAN SAID JOMAA KHARFAN**, PRESIDENTE; (fdo.) **JALAL JOMHA KHARFAN**,

SECRETARIO, (fdo.) **ISMAEL YOUSSEF ABADÍA**, TESORERO: **ZONA LIBRE INTERNATIONAL**

**MARKET, S.A.**   Convenio confeccionado y refrendado por el Abogado en ejercicio Licenciado

Ricardo Sempero, con cédula de identidad personal No. tres- sesenta y tres- cuatrocientos

veintiocho (3-63-428). ------------------------------------------

EL ACTA QUE SE INSERTA ES LA SIGUIENTE: ACTA DE LA REUNIÓN GENERAL DE ACCIONISTAS

DE LA SOCIEDAD GOLDI ELECTRONICS, S.A.--- El día cinco (5) de enero de dos mil diez (2010),

siendo las diez (10:00 a.m.) de la mañana, se llevó a cabo una reunión general de los

accionistas de **GOLDI ELECTRONICS, S.A.** sociedad organizada y existente de conformidad con

las leyes de la República de Panamá, en la sección de micropelículas (mercantil) del registro

público a Ficha seis cuatro dos nueve seis dos (**642962**), documento uno cuatro siete seis

cuatro dos dos (**1476422**). --- En dicha reunión estuvieron presentes y representadas la

totalidad de las acciones emitidas y en circulación de la sociedad con derecho a voto, quienes

renunciaron a la citación previa. El señor **AIMAN SAID JOMAA KHARFAN**, actuó como

presidente de la sociedad de la reunión y el señor **JALAL JOMHA KHARFAN**, actuó como

secretario de la reunión, quien levantó el acta. El Presidente expresó como objeto de la reunión

decidir sobre la aprobación o no del convenio de fusión por absorción entre las sociedades

**GOLDI ELECTRONICS, S.A.** y **MONTE GRANDE INTERNACIONAL, S.A.,** y **ZONA LIBRE**

FNK 7782 1352

Privileged & Confidential
Joint Defense Information



INTERNATIONAL MARKET, S.A., celebrado por los directores de estas sociedades con fecha cinco (5) de enero de dos mil diez (2010), del que resultaría como sociedad sobreviviente GOLDI ELECTRONICS, S.A.. Después de la debida deliberación, por moción debidamente presentada, apoyada y unánimemente aprobada, se adoptaron las siguientes resoluciones: 1 Aprobar el convenio de fusión por absorción entre; GOLDI ELECTRONICS, S.A. y MONTE GRANDE INTERNACIONAL, S.A., y ZONA LIBRE INTERNATIONAL MARKET, S.A, en el cual conforme a sus términos, es la sobreviviente GOLDI ELECTRONICS, S.A. y deja de existir MONTE GRANDE INTERNACIONAL, S.A., y ZONA LIBRE INTERNATIONAL MARKET, S.A. 2. Que la copia del referido convenio que se presentó y levó en la reunión, sea adherida a esta acta para que forme parte de la misma. 3. Autorizar y facultar a los Directores y/o Dignatarios de esta sociedad, señores AIMAN SAID JOMAA KHARFAN, JALAL JOMHA KHARFAN y ISMAEL YOUSSEF ABDALLAH, para firmar y/o ejecutar el Convenio de Fusión en su nombre, así como para ejecutar cualquier otro acto o documento en relación con lo anterior. 4 Autorizar al LIC. RICARDO SÉMPERO, abogado en ejercicio, con cédula de identidad personal No. 3-63-428, con domicilio en la Ciudad de Colón, en calle trece (13) y Ave. Central, Edificio Plaza Universal No. doce, uno ocho tres (12,183), oficina No. ocho (8), Segundo Alto, con teléfono 441-7960 y 441-7461, para llevar a cabo cualquier acto que sea necesario para protocolizar y registrar esta acta de reunión de accionistas para proponer la Fusión y llevar a cabo cualquier acto en relación con el mismo una vez haya sido ejecutado por las partes interesadas. No habiendo otro asunto que tratar, se dio por clausurada la reunión. (fdo.) AIMAN SAID JOMAA KHARFAN, PRESIDENTE; (fdo.) JALAL JOMHA KHARFAN, SECRETARIO. -----El suscrito JALAL JOMHA KHARFAN Secretario de la sociedad GOLDI ELECTRONICS, S.A., por este medio certifica que lo anterior es la fiel copia del Acta de la Junta de Accionistas de la sociedad celebrada el día cinco (5) de enero de dos mil diez (2010), en la cual se encontraban presente la mayoría de los Accionistas con derecho a voto. (fdo.) JALAL JOMHA KHARFAN, SECRETARIO EL ACTA QUE SE INSERTA ES LA SIGUIENTE: ACTA DE LA REUNIÓN GENERAL DE ACCIONISTAS DE LA SOCIEDAD MONTE GRANDE INTERNACIONAL, S.A.··· El día cinco (5) de enero de dos mil diez (2010), siendo las diez (10:00 a.m.) de la mañana, se llevo a cabo una reunión general de los accionistas de MONTE GRANDE INTERNACIONAL, S.A. sociedad organizada y existente de conformidad con las leyes de la República de Panamá, en la sección de micropelículas

NK 7782 1353

Privileged & Confidential
Joint Defense Information

   

## REPÚBLICA DE PANAMÁ
### PAPEL NOTARIAL

### NOTARÍA PRIMERA DEL CIRCUITO DE COLÓN

(mercantil) del registro público a ficha seis cuatro siete tres siete cinco (**647375**), documento una cuatro nueve nueve cinco uno dos (**1499512**).--- En dicha reunión estuvieron presentes y representadas la totalidad de las acciones emitidas y en circulación de la sociedad con derecho a voto, quienes renunciaron a la citación previa. El señor AIMAN SAID JOMAA KHARFAN, actuó como presidente de la sociedad de la reunión y el señor JALAL JOMHA KHARFAN, actuó como secretario de la reunión, quien levantó el acta. El Presidente expreso como objeto de la reunión, decidir sobre la aprobación o no del convenio de fusión por absorción entre las sociedades GOLDI ELECTRONICS, S.A. y MONTE GRANDE INTERNACIONAL, S.A., celebrado por los directores de estas sociedades con fecha cinco (5) de enero de dos mil diez (2010), del que resultaría como sociedad sobreviviente GOLDI ELECTRONICS, S.A. Después de la debida deliberación, por moción debidamente presentada, apoyada y unánimemente aprobada, se adoptaron las siguientes resoluciones: 1. Aprobar el convenio de fusión por absorción entre GOLDI ELECTRONICS, S.A. y MONTE GRANDE INTERNACIONAL, S.A., en el cual conforme a sus términos, es la sobreviviente GOLDI ELECTRONICS, S.A. y deja de existir MONTE GRANDE INTERNACIONAL, S.A.2. Que la copia del referido convenio que se presentó y leyó en la reunión, sea adherida a esta acta para que forme parte de la misma. 3. Autorizar y facultar a los Directores y/o Dignatarios, de esta sociedad, señores AIMAN SAID JOMAA KHARFAN, JALAL JOMHA KHARFAN y ISMAEL YOUSSEF ABDALLAH, para firmar y/o ejecutar el Convenio de Fusión en su nombre, así como para ejecutar cualquier otro acto o documento en relación con lo anterior. 4 Autorizar al LIC. RICARDO SÉMPERO, abogado en ejercicio, con cédula de identidad personal número tres- sesenta y tres- cuatrocientos veintiocho (3-63-428) con domicilio en la Ciudad de Colón, en calle trece (13) y Ave. Central, Edificio Plaza Universal No. doce, uno ocho tres (12,183), oficina No. ocho (8), Segundo Alto, con teléfono 441-7960 y 441-7461, para llevar a cabo cualquier acto que sea necesario para protocolizar y registrar este acta de reunión de accionistas para proponer la Fusión y llevar a cabo cualquier acto en relación con el mismo una vez haya sido ejecutado por las partes interesadas. No habiendo otro asunto que tratar, se dio por clausurada la reunión. (fdo.) AIMAN SAID JOMAA KHARFAN, PRESIDENTE, (fdo.) JALAL JOMHA KHARFAN, SECRETARIO. El suscrito, JALAL JOMHA KHARFAN Secretario de la sociedad MONTE GRANDE INTERNACIONAL, S.A., por este medio certifica que lo anterior es la fiel copia del Acta de la Junta de Accionistas de la sociedad

FNK 7782 1354

Privileged & Confidential
Joint Defense Information



celebrada el día cinco (5) de enero de dos mil diez (2010), en la cual se encontraban presente la

mayoría de los Accionistas con derecho a voto.   (fdo.) **JALAL JOMHA KHARFAN,**

**SECRETARIO.** Minuta Elaborada y Refrendada por el Licenciado (Fdo) RICARDO SEMPERO.------

ACTA DE LA REUNIÓN GENERAL DE ACCIONISTAS DE LA SOCIEDAD ZONA LIBRE

INTERNATIONAL MARKET, S.A.--- El día cinco (5) de enero de dos mil diez (2010), siendo las

10:00 a.m., se llevo a cabo una reunión general de los accionistas de **ZONA LIBRE**

**INTERNATIONAL MARKET,** S.A. sociedad organizada y existente de conformidad con las leyes

de la República de Panamá, en la sección de micropelículas (mercantil) del registro público a

ficha tres seis tres tres ocho seis (363386), rollo seis seis uno seis uno (66161), imagen dos

cero (20). --- En dicha reunión estuvieron presentes y representada la totalidad de las acciones

emitidas y en circulación de la sociedad con derecho a voto, quienes renunciaron a la citación

previa. El señor AIMAN SAID JOMAA KHARFAN, actuó como presidente de la sociedad de la

reunión y el señor JALAL JOMHA KHARFAN, actuó como secretario de la reunión, quien

levanto el acta. El Presidente expreso como objeto de la reunión, decidir sobre la aprobación o

no del convenio de fusión por absorción entre las sociedades, GOLDI ELECTRONICS, S.A. y

ZONA LIBRE INTERNATIONAL MARKET, S.A., celebrado por los directores de estas

sociedades con fecha cinco (5) de enero de dos mil diez (2010), del que resultaría como

sociedad sobreviviente GOLDI ELECTRONICS, S.A.. Después de la debida deliberación, con

moción debidamente presentada, apoyada y unánimemente aprobada, se adoptaron las

siguientes resoluciones: 1. Aprobar el convenio de fusión por absorción entre; GOLDI

ELECTRONICS, S.A. y ZONA LIBRE INTERNATIONAL MARKET, S.A., en el cual conforme a

sus términos, es la sobreviviente GOLDI ELECTRONICS, S.A. y deja de existir ZONA LIBRE

INTERNATIONAL MARKET, S.A.2. Que la copia del referido convenio que se presentó y leyó

en la reunión, sea adherida a esta acta para que forme parte de la misma. 3. Autorizar y facultar

a los Directores y/o Dignatarios, de esta sociedad, señores AIMAN SAID JOMAA KHARFAN,

JALAL JOMHA KHARFAN y ISMAEL YOUSSEF ABDALLAH, para firmar y/o ejecutar el

Convenio de Fusión en su nombre, así como para ejecutar cualquier otro acto o documento en

relación con lo anterior. 4 Autorizar al LIC. RICARDO SEMPERO, abogado en ejercicio, con

cédula de identidad personal número tres- sesenta y tres- cuatrocientos veintiocho (3-63-428),

con domicilio en la Ciudad de Colón, en calle trece (13) y Ave. Central, Edificio Plaza Universal

FNK 7782 1355

Privileged & Confidential
Joint Defense Information



**REPUBLICA DE PANAMA**
PAPEL NOTARIAL

 

**NOTARIA PRIMERA DEL CIRCUITO DE COLON**

No. doce, uno ocho tres (12,183), oficina No. ocho (8), Segundo Alto, con teléfono 441-7960 y

441-7461, para llevar a cabo cualquier acto que sea necesario para protocolizar y registrar este

acta de reunión de accionistas para proponer la Fusión y llevar a cabo cualquier acto en relación

con el mismo una vez haya sido ejecutada por las partes interesadas. No habiendo otro asunto

que tratar, se dio por clausurada la reunión.  (fdo.) **AIMAN SAID JOMAA KHARFAN**,

**PRESIDENTE; (fdo.) JALAL JOMHA KHARFAN, SECRETARIO.**   El suscrito, **JALAL JOMHA**

**KHARFAN** Secretario de la sociedad **ZONA LIBRE INTERNATIONAL MARKET, S.A.**, por este

medio certifica que lo anterior es la fiel copia del Acta de la Junta de Accionistas de la sociedad,

celebrada el día cinco (5) de enero de dos mil diez (2010), en la cual se encontraban presente la

mayoría de los Accionistas con derecho a voto. (fdo.)  **JALAL JOMHA KHARFAN, (fdo.)**

**SECRETARIO.**   Minuta Refrendada y Confeccionada por el Licenciado Ricardo Sempero.------

Concuerda con su original, ésta primera copia, que expido, firmo y sello hoy en Colón, República

de Panamá a seis (6) de enero de dos mil diez (2010).------

Lic. Nedelka Navas Reyes
NOTARIA PÚBLICA PRIMERA
DEL CIRCUITO DE COLON

Registro Público de Panamá
Departamento del Diario
Sección de Ingreso de Documentos

Lugar: *Colon*                    Fecha, Hora: *2/6/10    3:56*
Asiento: *3827*                   Tomo: *2010*
Presentado por: *Harry Simison*
Cédula No: *3-703-1963*
Liquidación No: *7010 02 4528*   Total de Derechos B/. *264.00*
Incluido por: _____

960                                           FNK 7782 1356

Privileged & Confidential
Joint Defense Information

Inscrito en el Sistema Tecnológico de Información
del Registro Público de Panamá

Sección _Mercantil_          Ficha No. _101 2962_

Documento Real No. _1708153_

Operación Realizada _Revisión_ (exc. Sobrevaloró)

Derechos de Registro B/. _10.00_

Derecho de Calificación B/. _25_

Lugar y Fecha de Inscripción _Colón 11/Enero 2010_

Registrador Jefe

Inscrito en el Sistema Tecnológico de Información
del Registro Público de Panamá

Sección _Mercantil_          Ficha No. _101 7375_

Documento Real No. _1708153_

Operación Realizada _Revisión_

Derechos de Registro B/. _10.00_

Derecho de Calificación B/. _25_

Lugar y Fecha de Inscripción _Colón 11 enero 2010_

Registrador Jefe

Inscrito en el Sistema Tecnológico de Información
del Registro Público de Panamá

Sección _Mercantil_          Ficha No. _3633.86_

Documento Real No. _1708153_

Operación Realizada _Revisión_

Derechos de Registro B/. _10.00_

Derecho de Calificación B/. _25.00_

Lugar y Fecha de Inscripción _Colón 11 enero 2010_

Registrador Jefe

## REGISTRO PÚBLICO DE PANAMÁ
## ARCHIVO NACIONAL DE PANAMÁ
## SECCIÓN DE TOMOS

### CERTIFICA

Que esta es fiel copia del documento inscrito
en esta institución que expido y firmo
en el día de hoy

10/Agosto/          Registrador Gabriel Pérez
FECHA                    FIRMA

Derecho Pagado B/.          _-55.-_

Liquidación No.          _1400974704_

# EXHIBIT

# Y

FNK 7782 1358

```
------------------- Instance Type and Transmission --------------
Notification (Transmission) of Original sent to SWIFT (ACK)
Network Delivery Status   : Network Ack
Priority/Delivery         : Normal
Message Input Reference   : 1712 110118CAPBPAPAAXXX0755013405
------------------------- Message Header -------------------------
Swift Input               : FIN 103 Single Customer Credt Transfer
Sender    : CAPBPAPAXXX
            CAPITAL BANK INC.
            PANAMA PA
Receiver  : PNBPUS3NNYC
            WELLS FARGO BANK, N.A.(FORMERLY KNOWN AS WACHOVIA)
            (NEW YORK INTERNATIONAL BRANCH)
            NEW YORK,NY US
MUR : LM
------------------------- Message Text --------------------------
  20: Sender's Reference
      TRE00211016430
23B: Bank Operation Code
      CRED
32A: Val Dte/Curr/Interbnk Settld Amt
      Date        : 18 January 2011
      Currency    : USD (US DOLLAR)
      Amount      :              $750,000.00
50K: Ordering Customer-Name & Address
      /02202000353
      GOLDI ELECTRONICS, S.A.
      ZONA LIBRE AVE 1ERA/CALLE 3ERA
      FRANCE FIELD, COLON REP. DE
      PANAMA
57A: Account With Institution - PI BIC
      SCBLHKHHXXX
      STANDARD CHARTERED BANK (HONG KONG) LIMITED
      HONG KONG  HK
  59: Beneficiary Customer-Name & Addr
      /44716842370
      TCL HOME APPLIANCES (HK) CO. LTD.
      13/F, TCL TOWER, 8 TAI CHUNG RD.,
      TSUEN WAN HONG KONG
  70: Remittance Information
      /RFB/PAGO A FACTURA POR COMPRA DE
      //MERCANCIA
71A: Details of Charges
      SHA
------------------------- Message Trailer -----------------------
(CHK:893A4929417A)
PKI Signature: MAC-Equivalent
------------------------- Interventions ------------------------
Category      : Network Report
Creation Time : 18/01/11 17:07:55
Application   : SWIFT Interface
Operator      : SYSTEM
Text
{1:F21CAPBPAPAAXXX0755013405}{4:{177:1101181712}{451:0}{108:LM}}
*End of Message
```

FNK 7782 1359

```
18/01/11-16:52:39                    CAPBENV-1353-012552                          1

------------------- Instance Type and Transmission -------------
Notification (Transmission) of Original sent to SWIFT (ACK)
Network Delivery Status    : Network Ack
Priority/Delivery          : Normal
Message Input Reference    : 1657 110118CAPBPAPAAXXX0755013395
--------------------------- Message Header ------------------------
Swift Input                  : FIN 103 Single Customer Credit Transfer
Sender   : CAPBPAPAXXX
           CAPITAL BANK INC.
           PANAMA PA
Receiver : PNBPUS3NNYC
           WELLS FARGO BANK, N.A.(FORMERLY KNOWN AS WACHOVIA)
           (NEW YORK INTERNATIONAL BRANCH)
           NEW YORK,NY US
MUR : LM
--------------------------- Message Text --------------------------
 20: Sender's Reference
     TRE00211016441
23B: Bank Operation Code
     CRED
32A: Val Dte/Curr/Interbnk Settld Amt
     Date         : 18 January 2011
     Currency     : USD (US DOLLAR)
     Amount       :              $150,000.00
50K: Ordering Customer-Name & Address
     /022020003553
     GOLDI ELECTRONICS, S.A.
     ZONA LIBRE AVE 1ERA/CALLE 3ERA
     FRANCE FIELD, COLON REP. DE
     PANAMA
57A: Account With Institution - FI BIC
     SGCLCNBJGAH
     SOCIETE GENERALE (CHINA) LIMITED
     (GUANGZHOU BRANCH)
     GUANGZHOU  CN
 59: Beneficiary Customer-Name & Addr
     /HRA 1605300810102
     TCL HOME APPLIANCES (HK) CO. LTD.
     102 NANTOU ROAD, NANTOU ZHONGSHAN
     GUANGDONG 528 427 P.R. CHINA
 70: Remittance Information
     /RFB/PAGO A FACTURA POR COMPRA DE
     //MERCANCIA
71A: Details of Charges
     SHA
--------------------------- Message Trailer -----------------------
     {CHK:B2A563C380A3}
     PKI Signature: MAC-Equivalent
--------------------------- Interventions -------------------------
Category      : Network Report
Creation Time : 18/01/11 16:52:15
Application   : SWIFT Interface
Operator      : SYSTEM
Text
{1:F21CAPBPAPAAXXX0755013395}{4:{177:1101181657}{451:0}{108:LM}}
*End of Message
```

FNK 7782 1360

17/01/11-18:31:23                          CAPDENV-1322-012519                                    1

```
                    ------------------ Instance Type and Transmission --------------
         Notification (Transmission) of Original sent to SWIFT (ACK)
         Network Delivery Status   : Network Ack
         Priority/Delivery         : Normal
         Message Input Reference   : 1836 110117CAPBPAPAAXXX0754013361
                    -------------------------- Message Header ----------------------
         Swift Input               : FIN 103 Single Customer Credt Transfer
         Sender   : CAPBPAPAXXX
                    CAPITAL BANK INC.
                    PANAMA PA
         Receiver : PNBPUS3NNYC
                    WELLS FARGO BANK, N.A.(FORMERLY KNOWN AS WACHOVIA)
                    (NEW YORK INTERNATIONAL BRANCH)
                    NEW YORK,NY US
         NUR : LM
                    -------------------------- Message Text ------------------------
           20: Sender's Reference
               TRE00211016341
           23B: Bank Operation Code
               CRED
           32A: Val Dte/Curr/Interbnk Settld Amt
               Date          : 18 January 2011
               Currency      : USD (US DOLLAR)
               Amount        : #150,000.00#
           50K: Ordering Customer-Name & Address
               /02202000353
               GOLDI ELECTRONICS, S.A.
               ZONA LIBRE AVE 1ERA/CALLE 3ERA
               FRANCE FIELD, COLON REP. DE
               PANAMA
           57A: Account With Institution - FI BIC
               HSBCSGSGXXX
               THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED, SINGAPORE
               SINGAPORE  SG
           59: Beneficiary Customer-Name & Addr
               /260136312178
               MIDEA ELECTRIC TRADING (SINGAPORE)
               CO PTE LTD
               10 ANSON ROAD 12-03 INTERNATIONAL
               PLAZA SINGAPORE 079903 SINGAPORE
           70: Remittance Information
               /RFB/PAGO DE FACTURA
           71A: Details of Charges
               SHA
                    -------------------------- Message Trailer ---------------------
         {CHK:0474680ABCF9}
         PKI Signature: MAC-Equivalent
                    -------------------------- Interventions -----------------------
         Category      : Network Report
         Creation Time : 17/01/11 18:31:09
         Application   : SWIFT Interface
         Operator      : SYSTEM
         Text
         {1:F21CAPBPAPAAXXX0754013361}{4:{177:1101171836}{451:0}{108:LM}}
         *End of Message
```

                                              FNK 7782 1361

# EXHIBIT

# Z

FNK 7782 1362



**ALINE E. SAWAYA**
Sworn Translator

Lebanon – Hazmieh – Mar Roukoz Street – Al Kuwaiti Building – Ground floor

Tel/Fax:+9615451785      Mobile: +96171399113      Email: sawaya.aline@gmail.com



# Judgment

Number 327
Judgment 106

The accusatory body in Beirut consisting of the judges: the delegated president Ferial DALLOUL and the two counselors Abir SAFA (delegated) and Bilal Adnan BADR

While verifying and reviewing,

After reviewing the appeal filed by the public prosecution of appeal in Beirut on February 16, 2016, appealing against the judgment issued on February 15, 2016 under number 42/2016 by the inquiry judge in Beirut stating contrary to the review to stop prosecuting the following defendants:

1- **Ayman Said JOUMAA**, his mother: Ekram, born in 1974, of Lebanese nationality.
2- **Mohamad Said JOUMAA**, his mother: Ekram, born in 1977, of Lebanese nationality.
3- **Akram Said JOUMAA**, his mother: Ekram, born in 1956, of Lebanese nationality.
4- **Anwar Said JOUMAA**, his mother: Ekram, born in 1961, of Lebanese nationality.

In terms of the felony of money laundering provided for in the third article of the law number 318/2001, first due to the invalidity/termination of the lawsuit of the public right due to the passage of the criminal period which is three years. Second, for lack of evidence.

And the following defendants:

5- **Sajed Akram JOUMAA**, his mother: Leila, born in 1987, of Lebanese nationality.
6- **Jalal Akram JOUMAA**, his mother Leila, born in 1987, of Lebanese nationality.

In terms of the said felony for the lack of available legal elements against them.

And the following defendants:

7- **Ziad Mohamad YOUSSEF**, his mother: Tawk, born in 1976, of Lebanese nationality.
8- **Ismail Mohamad YOUSSEF**, his mother: Tawk, born in 1978, of Lebanese nationality.
9- **New Line Exchange Trust Company S.A.L**
10- **Kassem Ali RMEITI**, his mother: Assia, born in 1974, of Lebanese nationality.
11- **Bilal Youssef HODROJ**, his mother: Badria, born in 1968, of Lebanese nationality.

True translation of the Arabic text herewith attached (original text) without any responsibility to be imposed on the veracity of the Arabic text.
The Sworn Translator

21 FEB 2017

In terms of the felony of money laundering provided for in the third article of the law number 318/2001, for lack of evidence.

Hereby requesting to accept its appeal in form since it was submitted within the legal term, to accept it in merits, to revoke the appealed judgment and to question the said defendants for the felony provided for in the third article of the law number 318/2001, and according to the article /210/ of sanctions law regarding the company, since the judgment was improperly and illegally rendered, whereas it appears from all the investigations especially the ones concluded by the special accusatory body and the public prosecution of cassation that the said defendants jointly committed illegal money laundering operations resulting from the drug trade and that these operations were done through accounts belonging to them.

After reviewing the indictment decision object of the above-mentioned appeal

After reviewing the review of the public prosecution of appeal regarding the merits conducted on January 28, 2016,

After reviewing all the papers of the file,

Therefore,

**First: In form:**

Whereas, it appears that the indictment decision was rendered on February 15, 2016 and that the public prosecution submitted its appeal on February 16, 2016, therefore its appeal is filed within the legal term fulfilling all its formal conditions which requires accepting it in form.

**Second: In Merits:**

**A- Facts:**

On January 26, 201, news reported on the internet webpage of the US Department of the Treasury stating that the office of foreign assets control of the US Department of the Treasury classified the defendant Ayman JOUMAA in addition to nine other persons and nineteen establishments under the "Kingpin act" due to their association with a drug trafficking and money laundering organization, and that the defendant Ayman JOUMAA has coordinated the operations of transferring, distributing and selling shipments of cocaine from South America as well he conducted money laundering operations for their proceeds in Europe and Middle East, he also worked with his group in each of Lebanon, West Africa, Panama and Colombia, and that his brothers are involved with him in drug trafficking and money laundering, one of them named Akram is the chairperson of the board of directors and the manger of the hotel Caesar's park hotel that is used by the organization as the headquarter in which it carries out its activity of drug trafficking and money laundering, and that Ayman JOUMAA uses three money exchange establishments in Lebanon for conducting

True translation of the Arabic text herewith attached (original text) without any responsibility to be imposed on us regarding the veracity of the Arabic text.
The Sworn Translator

968

21 FEB 2017

FNK 7782 1364

the operations of money laundering of the proceeds resulting from illegal actions. these establishments are Hassan Ayash Establishment for  Exchange, Elissa Establishment for Exchange and New Line Establishment for Exchange,

As well, it appeared that the Secretary of the special investigation commission of the Bank of Lebanon Abdul Hafiz MANSOOR on January 31, 2011 addressed a letter to the governor of Bank of Lebanon in his capacity as the head of the special investigation commission. no.49-11-case 1908, by virtue of which he advise the governor about the above-mentioned. and by virtue of this letter he added that the name of the defendant Ayman JOUMAA was mentioned in the case of Mokbel Group in terms of what it appeared that he benefited from a check amounting to one thousand American Dollars, as at that time the commission decided to freeze his account at Byblos Bank and that the public prosecutor of appeal decided to transfer the papers of this case to the public prosecution of appeal in South in order to do what is required according to the law no. /318/ and that on June 19, 2008, as well the letter of the Secretary of the special investigation commission included that the New Line Establishment for Exchange and Trust Company are owned by the defendants Ziad and Ismail YOUSSEF and the attorney at law Ziad HBEICH.

As well, it appeared that the governor of Bank of Lebanon in his capacity as the head of the special investigation commission assigned the Secretary of the commission to investigate in this case and to audit the accounts of all persons and companies mentioned in the report of the office of foreign assets control,

On November 3, 2011 appeared that an indictment decision has been rendered against the defendant Ayman JOUMAA by the jury in the district court of Virginia – Alexandria department, in the United State of America. deciding on transferring the said defendant for prosecution regarding the crimes of money laundering and drug trafficking.

As well, from the reports made by the Secretary of the special investigation commission regarding the results of the audit appeared the following:

1- As for the defendants JOUMAA Group (Ayman, Akram. Anwar and Mohamad) appeared that the movement of their open account in several Lebanese banks since 1998 did not show any transfers to and from abroad, and that these accounts, most of them, were being supplied with funds through checks and the treasury security bonds' dues in Lebanese pounds, and that the ongoing movement of deposits and withdrawals are ordinary,
In 2006, the two accounts of both defendants Ayman and Mohamad JOUMAA at the Lebanese Canadian Bank were supplied with 18 checks from Hassan Ayash Establishment for Exchange amounting to /5,308,000/ American Dollars. this company stated that it delivered these checks to two of its clients for purchasing foreign currencies

True translation of the Arabic text herewith attached (original text) without any responsibility to be imposed on us regarding the veracity of the Arabic text.
The Sworn Translator

969                                                              FNK 7782 1365

from it, since at that time it was unable to obtain cash from the Lebanese Canadian Bank, and that the two clients are Layal Company located in Chtoura and another client, as well it appeared that the movement of their accounts during 2006 until 2011 in different banks were mainly supplied with transfers among them and that the movement of the accounts did not show any transfers to and from abroad, and that the cash deposits and withdrawals as for the movement of the accounts is ordinary according to what was mentioned in the report no. 518-11

2- As for the two defendants Jalal and Sajed JOUMAA appeared that following the issuance of the report of the office of foreign assets control, their father the defendant Akram JOUMAA deposited his account balance at BLOM Bank in two accounts under the name of his two sons Jalal and Sajed, and when the said bank requested to withdraw his funds he withdrew them and deposited the same at Credit Libanais under his own name, and it did not appear form the personal account of each of them that any unusual deposit operation occurred to and from abroad,

3- As for the defendants Ziad and Ismail YOUSSEF and New Line Exchange trust Company S.A.L, it appeared that it was established in 2008 between the two defendants Ziad and Ismail YOUSSEF and the attorney at law Ziad HBEICH, and it was managed by the defendant Ziad who also has the right to sign on its behalf, its activity is about receiving cash funds in dollars and Euros from traders working in Venezuela and Ghana, and it sell cash funds to both Moktev and Ayash Exchange companies so these two companies transfer the equivalent value of the money to the company's accounts at the Lebanese Canadian Bank, and according to its clients' requests it transfers funds to companies, imports consumables goods most of them in the Far East and that through its accounts at the Lebanese Canadian Bank and Bank of Beirut and the Arab Countries, it sends the goods purchased by the money coming from the transfer to  Venezuela and Panama and that the funds are received from Venezuela in dollars due to the difference of the Venezuelan bolivar rate compared to the dollar, between the official rate and the black market; as well the report made by the Secretary of the special investigation commission mentioned that the total remittances abroad, the price of goods purchased to its clients, reached the amount /17/ million American dollars, while the report of the office of foreign assets control indicated that he amounts of money laundering is up to /200/ million American dollars,, and that this report remains incomplete regarding whether the commission is not being provided with the information available in this case at the office of foreign assets control, as well the movements of accounts did not show any transfers to and from abroad.

4- As for both defendants Bilal HODROJ and Kassem RMEITI, it appeared that the name of Bilal HODROJ was mentioned within the context of the notice received from the financial intelligence unit in Germany on October 29, 2009, as well it appeared that he is

True translation of the Arabic text herewith attached (original text) without any responsibility to be imposed on us regarding the veracity of the Arabic text.
The Sworn Translator

21 FEB 2017

FNK 7782 1366

the owner of Hodroj Exchange Company, and from the revision of the Lebanese Canadian Bank it appeared that there is two accounts one in the name of Hodroj Exchange Company and the other in the name of Bilal HODROJ, as well it appeared that there is two closed accounts at the said bank in the name of Kassem RMEITI and Rmeiti & CO. Exchange.

As well, it appeared that Hodroj Exchange Company was receiving cash money from Lebanese traders in Africa and depositing the same in its account at the Lebanese Canadian Bank, and then transfers the money to the US as the price of the cars that are being shipped from there to the dealers in Africa, also it appeared that Kassem Rmeiti Company received cash money like Hodroj Company and made the transfers through its accounts at the Lebanese Canadian Bank to the US, Germany and China as the price of the goods that are being imported for the dealers in Africa.

5-   It appeared that Ayash Company and Elissa Company both mentioned in the report of the office of foreign assets control, used to deal with the exchange trade and money transfer like New Line Company and both Hodroj and Rmeiti Companies, as well the special investigation commission concluded to draw their accounts and to put back the bank secrecy upon them.

Also, it appeared that the file made by the special investigation commission was transferred to the public prosecution of cassation where it was decided to conduct the necessary investigations, and despite the requests sent by the public prosecution of cassation to the American Authorities regarding providing it with the documents, papers, proofs and evidences that are kept with them concerning the Lebanese Canadian Bank and the indictment decision issued by the jury of Virginia County, the American authorities did not take the initiative to answer to the request of the public prosecution of cassation and in the reply of these authorities was mentioned that currently they cannot respond to the request of the Lebanese judicial authorities since the required evidences are related to cases that are still pending before the US judiciary.

During the interrogations,

It appeared that all the defendants denied what is attributed to them.

The defendant Ayman Said JOUMAA stated that he used to work with his brothers in Venezuela in clothing trade and that they were separated from each other in 2000, he started trading with electronics, he returned to Lebanon where he stayed until 2010 and in that year he traveled to Venezuela in order to obtain the nationality over there, as well he added that what was mentioned in the report of the office of foreign assets control issued by officers in the US Department of the Treasury and not by a judicial authority, as well he stated that he is familiar with the object of the lawsuit under which he is prosecuted before the court of California in 2011, and that while trying to obtain a visa to the united

True translation of the Arabic text herewith attached (original text) without any responsibility to be imposed on us regarding the veracity of the Arabic text.
The Sworn Translator

state of America in order to follow-up with this lawsuit his request was rejected, and that he and the defendant Ismail YOUSSEF managed to meet representatives from the US Drug Enforcement Administration in Panama and that they only asked him about his autobiography as well they told him that they knew that he has nothing to do with drug trafficking nor financing Hezbollah.

He continued that his brother in Lebanon Mohamad has sold his establishment in Venezuela and delivered the money to him, in return he gave his brother in Lebanon the equivalent value to what his brother handed him due to the difficulty of transferring the money from Venezuela, he added that Robert ELIAS owed him money so in return he gave him a check paid and endorsed to the order of Hussein MOKBEL, and that he deposited this check in his account and the balance entered this account, then few months later the bank frozen the value of this check on the grounds that it resulted from stolen money in Dubai, consequently he could not obtain a license to establish an exchange company as the bank of Lebanon rejected his request, therefore he funded his relative Ziad Ismail YOUSSEF in order to establish the New Line Company on the basis that when the issue of the check ended he become the chairman of the board of its directors, and he concluded by saying that his accounts and the accounts of his brothers were frozen only after about three months as of the date of publishing the report of the office of foreign assets control, and that if they have any bad intention, they would have withdrawn the funds from the banks, in case they resulted from illegal actions.

The defendant Mohamad Said JOUMAA, stated that he had an establishment in Venezuela but he sold it in 2006 due to the difficulty of Venezuelan currency exchange and gave his brother Ayman the equivalent of one million American dollars, who has requested to deliver this amount to one of his employees and in return his brother in Lebanon gave him what is equivalent to the value by virtue of a set of checks, he added that he had other previous accounts in Lebanese Banks equivalent to two million dollars, and that in 2009 he established a Rent A Car Company and began moving his accounts.

The defendants Akram Said JOUMAA denied what is attributed to him, he stated that he and his brother own commercial shops on the Venezuelan - Colombian borders, and that he returned to Lebanon in 1994 and in 2000, and that the shops were divided between him and his brothers, and he brought his share of money to Lebanon and deposited in an account at the BBAC Bank then he transferred it to the Lebanese Canadian Bank, also he stated that he owns and manages an hotel under the name of Ceacar's Hotel and that he handed over its management to his son the defendant Jalal until 2014, as he gave it to third party as an independent management.

He added that upon the issuance of the report of the office of foreign assets control, the administration of BLOM Bank asked him to come and to put the funds in the name of his

True translation of the Arabic text herewith attached (original text) without any responsibility to be imposed on us regarding the veracity of the Arabic text.
The Sworn Translator

21 FEB 2017

two sons Jalal and Sajed and then the administration asked him to withdraw the money, so he withdrew and deposited the same under his name at the Credit Libanais, without the name of both his sons,

The defendant Anwar Said JOUMAA stated that after dividing the shops in Colombia with his brothers, he brought his share of money to Lebanon and deposited it at the BML Bank (Bank Egypt Lebanon) then he transferred it to the Lebanese Canadian Bank and that he has spent half of the amount since he works in agriculture,

Both of the defendants Jalal and Sajed JOUMAA noted that they have nothing to do with the report of the office of foreign assets control and that their father upon request of the Bank deposited the funds in their names and then deposited the same in his personal name, Jalal added that he graduated from the university in Switzerland in 2007 and returned to Lebanon where his father Akram gave him the management of the hotel until 2014,

Both defendants Ziad YOUSSEF and Ismail YOUSSEF in his personal capacity and in his capacity as the representative of New Line Company what was attributed to them and to the company, and they stated that the capital of the company is funded by their relative Ayman JOUMAA since the bank of Lebanon rejected giving him a license in his name, as well they added that the company was receiving money from the traders in Venezuela due to the difficulty of transferring money to China and other countries, the company used to exchange the money through Moktev Exchange Company and Ayash Exchange Company and the amount is transferred to the company's account at the Lebanese Canadian Bank and then upon request of each trader the money is transferred to China and other countries in order to purchase goods that are being sent to the country as determined by the trader,

The defendant Ismail stated that he learned from friends about the report and that he tried with Ayman JOUMAA to obtain a visa to the United State of America but their request was rejected, and that they met in Panama representatives from the US Drug Enforcement Administration and that they only asked him about Ayman's autobiography,

As well in his turn the defendant Kassem RMEITI denied what was attributed to him, and he stated that he is the owner of an exchange company and that he was working according to the terms and conditions of bank of Lebanon, and that he was receiving the funds from his clients in order to transfer them abroad as the price of purchases and that he used to write on the document of the transfer all what is required such as the nature of the client's activity and the reason of transfer and that he transfer the money from his bank account at the Lebanese Canadian Bank or through other exchange company, as well he added that he has nothing to do with this case and that the bank of Lebanon

True translation of the Arabic text herewith attached (original text) without any responsibility to be imposed on us regarding the veracity of the Arabic text.
The Sworn Translator

informed him through the Lebanese Canadian Bank about freezing his funds knowing that his account and his company's account are closed for more than six months with no balance in them.

As well, the defendant Bilal HODROJ denied what was attributed to him stating that he is the owner of an exchange company and that he has an account at the Lebanese Canadian Bank, and that he was working according to the laws and the applicable provisions of bank of Lebanon, and he added that he was receiving his funds in cash or by virtue of money transfers from clients known by him in Africa and Europe, and that he was transferring these funds to companies located abroad in order to purchase cars for these traders, and that the transfers were made legally and in accordance with the regulations and as per the terms and conditions of Bank of Lebanon and by virtue of documents, as well he stated that he has nothing to do with the other defendants and he was not dealing with them,

It appeared that the defendant Ayman JOUMAA submitted a brief trough his attorney by which he attached a document according to judgment rendered by the inquiry judge deciding on assigning someone to translate the documents issued in English language concerning transferring the defendant to the court of Virginia,

As well, it appeared that the defendant Mohamad JOUMAA submitted documents showing establishing a company between him and the defendant Anwar JOUMAA in Venezuela in 2000, as well the defendant Akram JOUMAA submitted a copy of the income tax statement for companies and a copy of the royalties of Ceacar's Park Hotel for 2013, also the defendant Anwar JOUMAA submitted documents showing that he carried out agricultural works since 2001 and that he purchased in 2002 several agricultural equipment for this purpose,

On April 8, 2016, the defendants, their attorney – the attorney at law Rafic GHANEM, submitted a brief attached with three letters sent from the US Department of the Treasury to the defendants Akram, Mohamad and Anwar Said JOUMAA, which included that:

"According to the information currently available in the office of foreign assets control at the US department of the treasury according to determining the heads of foreign gangs of drug trafficking, you currently do not fulfill the criteria set for classifying you according to the said law, and we hereby inform you that as from this date, you are no longer classified as a drug dealer who is particularly defined, and therefore the seizure on all your assets and properties which were frozen due to classifying you as a drug dealer who is particularly defined, therefore you are allowed to get engaged in any legal transactions with American people,

True translation of the Arabic text herewith attached (original text) without any responsibility to be imposed on us regarding the veracity of the Arabic text,
The Sworn Translator

974

2 1 FEB 2017

(FNK-7782 1370

Soon, a notice will be published on the website of the US department of the Treasury regarding removing Akram Said JOUMAA from the list of the office of foreign assets control for persons and citizens who are particularly classified, as well this notice will be published in the Federal Register and in the official bulletin of the American government in the United State of America,

On June 22, 2016, the defendants, their attorney – the attorney at law Ramzi GHRAOUI, submitted a brief attached with the copy of the judgment issued on June 9, 2016 by the special investigation commission of the Bank of Lebanon number 1/25/12/2016, stating on drawing the accounts owned separately or jointly and directly at all the banks and financial establishments operating in Lebanon, and to put back the bank secrecy on them towards the competent judicial authorities, and to delete the expression "traceable" from the accounts of each of Akram, Anwar and Mohamad Said JOUMAA, and Jalal Akram JOUMAA, Sajed Akram JOUMAA and Afifa Mohamad Mahmoud JOUMAA, and which was based on the letter of the US financial intelligence unit number /262549/ dated May 16, 2016,

On October 19, 2016, a judgment was rendered by the commission stating on expanding the investigation and:

1- Assigning the head of the Central Drug Enforcement Administration to submit to the commission a copy of the previous minutes made against the defendants mentioned in the report issued by the DEA under number 3785/207 on September 14, 2015, addressed to the public prosecutor at the court of cassation, and a copy of any other minutes that may be made against any of the defendants, Ayman Said JOUMAA, Mohamad Said JOUMAA, Akram Said JOUMAA, Anwar Said JOUMAA, Sajed Akram JOUMAA, Jalal Akram JOUMAA, Ziad Mohamad YOUSSEF, Ismail Mohamad YOUSSEF, New Line Exchange Trust Company S.A.L., Kassem Ali RMEITI and Bilal Youssef GEORGES regarding money laundering and drug trafficking and smuggling,

2- Writing a letter to the special investigation commission in order to provide the commission a copy of the letter of the US financial intelligence unit number /262549/ dated May 16, 2016, mentioned in its decision number /25/12/2016/ dated June 9, 2016,

On October 29, 2016, copies of the previous minutes made against the defendants were received from the Central Drug Enforcement Administration,

On January 16, 2017, the reply of the general secretary of the special investigation commission was received through the public prosecution of cassation which included that

True translation of the Arabic text herewith attached (original text) without any responsibility to be imposed on us regarding the veracity of the Arabic text.
The Sworn Translator

2 1 FEB 2017

FNK 7782 1371

the US financial intelligence unit (FinCEN) stated that in order to obtain a copy of its letter no. /262549/ dated May 16, 2016 and to use the information therein mentioned in any judicial prosecution, it is required to write a rogatory letters (letters of judicial commissions) in this regard to the Office of International Affairs at the US Department of Justice,

B-  **Evidences:**

The following evidences confirmed the above-mentioned facts:

- A copy of the letter of the Secretary of the special investigation commission of the Bank of Lebanon Abdul Hafiz MANSOOR addressed on January 31, 2011 to the governor of Bank of Lebanon no.49-11-case 1908
- The result reached by the General Secretary of the special investigation commission of the Bank of Lebanon,
- The brief submitted by the defendants on April 8, 2016 and the documents attached to it, in particular the correspondence sent to the US Department of the Treasury.
- The copy of the decision issued on June 9, 2016 by the special investigation commission of the Bank of Lebanon, no. 1/25/12/2016.
- The overall course of the investigation and lawsuit,

C-  **In Law:**

Whereas, this commission sees the review of how this lawsuit evolved and the sequences of its events as the result to say whether there was enough evidence against the defendants in order to accuse and indict them with what was attributed to them.

Whereas, it appeared from referring to the facts that a news published on January 26, 2011 on the webpage of the US department of the Treasury, stating that the office of foreign assets control of the US department of the Treasury had classified the defendant Ayman JOUMAA in addition to nine other persons and nineteen establishments under the "Kingpin Act" due to their association with a drug trafficking and money laundering organization, came to the knowledge of the general secretary of the special investigation commission who immediately informed the Governor of Bank of Lebanon about it who assigned the general secretary to conduct the investigation in this case and to audit the accounts of all persons and companies mentioned in the report of the office of foreign assets control,

After the investigation and audit conducted by the general secretary of the said commission, he concluded that:

- The ongoing movement of deposits and withdrawals on the accounts of Ayman, Akram, Anwar and Mohamad JOUMAA which are open in several Lebanese Banks since 1998, is ordinary and no transfers from and to abroad appeared, as well these

True translation of the Arabic text herewith attached (original text) without any responsibility to be imposed on us regarding the veracity of the Arabic text.
The Sworn Translator

21 FEB 2017

accounts, most of them, were being supplied with funds through checks and the treasury security bonds' dues in Lebanese pounds. adding that their accounts during 2006 until 2011 in different banks were mainly supplied with transfers among them and that the movement of the accounts did not show any transfers to and from abroad. and that the cash deposits and withdrawals as for the movement of the accounts is ordinary according to what was mentioned in the report no. 518-11

- Following the issuance of the report of the office of foreign assets control the defendant Akram JOUMAA deposited his account balance at BLOM Bank in two accounts under the name of his two sons the defendants Jalal and Sajed. and when the said bank asked him to withdraw his funds he withdrew them and deposited the same at Credit Libanais under his own name; the general secretary of the commission concluded by saying that it did not appear form the personal account of each of them that any unusual deposit operation occurred to and from abroad,

- As for the defendants Ziad and Ismail YOUSSEF and New Line Exchange trust Company S.A.L, the general secretary of the commission noted that the report made by the Secretary of the special investigation commission mentioned that the total of the remittances to abroad as the price of goods purchased to its clients, reached the amount of /17/ million American dollars, while the report of the office of foreign assets control indicated that the amounts resulting of money laundering is up to /200/ million American dollars. and concluded that this report remains incomplete regarding whether the commission is not being provided with the information available in this case at the office of foreign assets control, as well the movements of accounts did not show any transfers to and from abroad.

- As for both defendants Bilal HODROJ and Kassem RMEITI. it appeared that the first one is the owner of Hodroj Exchange Company, and from the revision of the Lebanese Canadian Bank it appeared that there is two accounts one in the name of Hodroj Exchange Company and the other in the name of Bilal HODROJ, as well it appeared that there is two closed accounts at the said bank in the name of Kassem RMEITI and Rmeiti & CO. Exchange, also it appeared that Hodroj Exchange Company was receiving cash money from Lebanese traders in Africa and depositing the same in its account at the Lebanese Canadian Bank, and then transfers the money to the US as the price of the cars that are being shipped from there to the dealers in Africa, and it appeared that Kassem Rmeiti Company received cash money like Hodroj Company and made the transfers through its accounts at the Lebanese

True translation of the Arabic text herewith attached (original text) without any responsibility to be imposed on us regarding the veracity of the Arabic text.
The Sworn Translator

2 1 FEB 2017

977

ENK-7782-1373

Canadian Bank to the US, Germany and China as the price of the goods that are being imported for the dealers in Africa,

- As for Ayash Company and Elissa Company, both used to deal with the exchange trade and money transfer like New Line Company and both Hodroj and Rmeitl Companies, and that the special investigation commission concluded to draw their accounts and to put back the bank secrecy upon them,

- Whereas, it appeared form the conclusion reached by the general secretary of the special investigation commission that "the investigation and the audit" both conducting by him did not lead him to obtain any evidence that confirms the authenticity of the contents of the report of the office of foreign assets control, but on the contrary he reached an opposite conclusion stating that the movement of the accounts is ordinary and did not show any transfers from abroad as for the defendants Ayman, Akram, Anwar and Mohamad JOUMAA, and that the funds in the two accounts of both defendants Jalal and Sajed JOUMAA were returned to their father's account the defendant Akram JOUMAA, whereas it did not appear form the personal account of each of them that any unusual deposit operation occurred to and from abroad, also it did not appear from the accounts of the defendants Ziad and Ismail YOUSSEF and New Line Exchange trust Company S.A.L that any transfers occurred from and to abroad, the special investigation commission concluded to draw the accounts of Ayash company and Elissa company and to put back the bank secrecy upon them, and the funds that entered in the accounts of both of the defendants Bilal HODROJ and Kassem RMEITI and their companies resulted from receiving cash money from Lebanese Traders in Africa; the general secretary of the special investigation commission emphasizes on the necessity of providing the commission with the information available in this case at the office of foreign assets control.

Whereas, despite that the general secretary of the special investigation commission failed to find the evidences that confirms the content of the report of the office of foreign assets control and despite that his commission was not provided with the information provided at the office of foreign assets control, the special investigation commission decided on transferring the file to the public prosecution of cassation,

Whereas, it appeared that the public prosecution of cassation contacted the American Authorities requesting to provide it with the documents, papers, proofs and evidences that are kept with them concerning the Lebanese Canadian Bank and the indictment decision issued by the jury of Virginia County, however the American authorities did not take the initiative to answer to its request so it requested to transfer this case to the public

True translation of the Arabic text herewith attached (original text) without any responsibility to be imposed on us regarding the veracity of the Arabic text.
The Sworn Translator

21 FEB 2017

prosecution of appeal in Beirut which claimed before the inquiry judge by virtue of the request object of the present lawsuit,

Whereas, the inquiry judge listened to the defendants whose denied what was attributed to them,

Whereas, it appeared that the US department of the Treasury contacted the defendants informing them that both of Akram, Mohamad and Anwar Said JOUMAA were no longer classified as drug dealer defined in particular, and that it lifted the seizure on all their assets and properties which were frozen due to classifying them as a drug dealer who is defined in particular, and allowed them to get engaged in any legal transactions with American people,

Whereas, according to the above-mentioned, a judgment rendered by the inquiry judge stating to stop the prosecution against the defendants,

As well, it appeared that the public prosecution in Beirut challenged the judgment of the inquiry judge requesting to rescind the appealed judgment since it was improperly and illegally rendered, relying in its appeal that "it appears from all the investigations especially the ones concluded by the special investigation commission and the public prosecution of cassation that the said defendants jointly committed illegal money laundering operations resulting from the drug trade and that these operations were done through accounts belonging to them", without determining the evidences on which its rely in order to ask for annulling the judgment of the inquiry judge, or explaining how the investigations that it mentioned show that the defendants committed what was attributed to them,

Whereas it appeared later on, specifically on June 9, 2016, that the special investigation commission in the bank of Lebanon decided (decision number 1/25/12/2016) to draw the accounts owned separately or jointly and directly at all the banks and financial establishments operating in Lebanon, and to put back the bank secrecy on them towards the competent judicial authorities, and to delete the expression "traceable" from the accounts of each of Akram, Anwar and Mohamad Said JOUMAA, and Jalal Akram JOUMAA, Sajed Akram JOUMAA and Afifa Mohamad Mahmoud JOUMAA, relying in its decision on the letter of the US financial intelligence unit number /262549/ dated May 16, 2016,

Whereas it appeared that this commission, namely the accusatory body in Beirut, requested from the special investigation commission to provide it with the letter of the US financial intelligence unit number /262549/ dated May 16, 2016, which it is supposed to be seen and based on by the commission regarding drawing the accounts of the said defendants, however the investigation commission replied that in order to obtain a copy of this letter it is required

True translation of the Arabic text herewith attached (original text) without any responsibility to be imposed on us regarding the veracity of the Arabic text.
The Sworn Translator

979                    2 1 FEB 2017

to write a rogatory letters (letters of judicial commissions) in this regard to the Office of International Affairs at the US Department of Justice.

Whereas according to the above-mentioned and briefly, this lawsuit has arisen due to the news published on the website of the US Department of the Treasury, without obtaining the evidences on which this news relied on, or the evidences on which the Court of Virginia in the United State of America relied on, without the cooperation of the authorities of this latter with the Lebanese judicial authorities, and without providing the Lebanese judicial authorities with what they requested,

Whereas, in the absence of any evidence that would indicates that the defendants participated in committing what was attributed to them, and according to the conclusion reached by the general secretary of the special investigation commission and which is explained in details in the paragraph of the facts and briefly explained in the paragraph of the law, the correspondence with the US Department of the Treasury in respect of lifting the seizure on the defendants JOUMAA, and the decision of the special investigation commission regarding drawing the accounts of the defendants and putting back the bank secrecy upon them; the evidences obtained from the previous minutes of the investigation which were made against the defendants by the Lebanese judicial police  as well the news published on the website of the US Department of the Treasury are insufficient and inadequate regarding questioning and accusing the defendants in the context of the present case which requires stopping the prosecution against the defendants due to the lack of evidence, and consequently to ratify the judgment of the inquiry judge following the reasoning set out in this judgment,

Therefore,

The commission decides by agreement:

1- To accept the appeal in form, to reject it in merits and to ratify the appealed judgment stating on stopping the prosecution against the defendants due to the lack of evidence, following the reasoning set out in this judgment,
2- To preserve all fees and expenses
3- To preserve all papers,

A judgment rendered by the deliberation chamber in Beirut on January 31, 2017

The counselor Bilal Adnan BADR (Signature)

The delegated counselor Abir SAFA (Signature)

The delegated president Ferial DALLOUL (Signature)

True translation of the Arabic text herewith attached (original text) without any responsibility to be imposed on us regarding the veracity of the Arabic text.
The Sworn Translator

21 FEB 2017

FNK 7782 1376

True copy delivered in Beirut on February 1, 2017
The Head Clerk  (Signature and seal)

On February 10, 2017 the fees and expenses were paid by virtue of the financial receipt
number: 17-70-11108748/9739

Follows the seals and stamps of the Lebanese Republic
Ministry of Justice
The Accusatory Body in Beirut



True translation of the Arabic text herewith attached (original text) without any responsibility to the
veracity of the Arabic text.
The Sworn Translator

981                    21 FEB 2017

FNK 7782 1377

| قـــــرار | هامش |
|---|---|

إن الهيئة الاتهامية في بيروت المؤلفة من القضاة، الرئيسة المنتدبة فربال دلول

والمستشارين عبير صفا (منتدبة) وبلال عدنان بدر،

لدى التدقيق والمذاكرة،

بعد الاطلاع على الاستئناف المقدم من النيابة العامة الاستئنافية في بيروت بتاريخ ٢٠١٦/٢/١٦

طعنا القرار الصادر بتاريخ ٢٠١٦/٢/١٥ تحت الرقم ٢٠١٦/٤٢، عن قاضي التحقيق في بيروت والذي

قضى خلافاً للمطالعة بمنع المحاكمة عن المدعى عليهم:

١. أيمن سعيد جمعة، والدته أكرام، تولد العام ١٩٧٤، لبناني الجنسية،

٢. محمد سعيد جمعة، والدته إكرام، تولد العام ١٩٧٧، لبناني الجنسية،

٣. أكرم سعيد جمعة، والدته إكرام، تولد العام ١٩٥٦، لبناني الجنسية،

٤. أنور سعيد جمعة، والدته أكرام، تولد العام ١٩٦١، لبناني الجنسية،

لناحية جنحة تبييض الأموال المنصوص عليها في المادة الثالثة من القانون رقم

١/٣١٨، ٢٠٠١، أولاً، لسقوط دعوى الحق العام بمرور الزمن الجزائي الثلاثي، وثانياً،

لعدم كفاية الدليل،

والمدعى عليهما:

٥. ساجد أكرم جمعة، والدته ليلى، تولد العام ١٩٨٧، لبناني الجنسية،

٦. جلال أكرم جمعة، والدته ليلى، تولد العام ١٩٨٧، لبناني الجنسية،

لناحية الجنحة المذكورة لعدم توافر عناصرها القانونية بحقهما،

والمدعى عليهم:

٧. زياد محمد يوسف، والدته توق، تولد العام ١٩٧٦، لبناني الجنسية،

٨. إسماعيل محمد يوسف، والدته توق، تولد العام ١٩٧٨، لبناني الجنسية،

٩. شركة New Line Exchange trust Company S.A.l

١٠. قاسم علي رميتي، والدته آسيا، تولد العام ١٩٧٤، لبناني الجنسية،

١١. بلال يوسف حدرج، والدته بدرية، تولد العام ١٩٦٨، لبناني الجنسية،

لناحية جنحة تبييض الأموال المنصوص عليها في المادة الثالثة من القانون رقم

١/٣١٨، ٢٠٠١، لعدم كفاية الدليل

والذي يتطلب بموجبه قبول استئنافها شكلاً لوروده ضمن المهلة القانونية، وقبوله أساساً

وفسخ القرار المستأنف والظن بالمدعى عليهما المذكورين بالجنحة المنصوص عليها في المادة الثالثة من

القانون رقم ١/٣١٨، ٢٠٠١، معطوفة على المادة ٢١٠/ من قانون العقوبات فيما خص الشركة، لوقوع

القرار في غير موقعه القانوني الصحيح، لأنه يتبين من التحقيقات كافةً، لا سيما تلك المجراة من قبل

هيئة التحقيق الخاصة ومن جانب النيابة العامة التمييزية، أن المدعى عليهم المذكورين قد أقدموا

بالاشتراك على ارتكاب عمليات تبييض أموال غير مشروعة ناتجة عن تجارة المخدرات وأن هذه العمليات

صفحة ١ من ١١

الرئيسة المنتدبة فربال دلول      المستشارة المنتدبة عبير صفا      المستشار بلال بدر

982

FNK 7782 1378

| هامش | قد تمت عبر حسابات تعود لهم، |
|---|---|
| | وعلى القرار الظني موضوع الاستئناف المشار إليه آنفاً، |
| | وعلى مطالعة النيابة العامة الاستئنافية في الأساس تاريخ ٢٠١٦/١/٢٨، |
| | وعلى أوراق الملف كافة، |

**بنـــــــاءً عليـــه**

**أولاً: في الشكل:**

حيث يتبين أن القرار الظني قد صدر بتاريخ ٢٠١٦/٢/١٥ وقد تقدمت النيابة العامة باستئنافها بتاريخ ٢٠١٦/٢/١٦، فيكون استئنافها واردا ضمن المهلة القانونية ومستوفيا لسائر شروطه الشكلية الأمر الذي يوجب قبوله شكلاً،

**ثانياً: في الأساس:**

**أ: في الوقائع:**

بتاريخ ٢٠١١/١/٢٦ ورد على صفحة الانترنت العائدة لوزارة الخزانة الأميركية، خبر مفاده أن مكتب مراقبة الأصول الأجنبية (OFAC) التابع لوزارة الخزانة الأميركية قام بتصنيف المدعى عليه أيمن جمعة بالإضافة إلى تسعة أشخاص آخرين وتسعة عشرة مؤسسة تحت قانون 'kingpin act' لارتباطهم بمنظمة تهريب مخدرات وتبيض الأموال، وأن المدعى عليه أيمن جمعة قام بتنسيق عمليات نقل وتوزيع وبيع شحنات من الكوكايين من أميركا الجنوبية وعمل على غسل عائداتها في أوروبا والشرق الأوسط، كما عمل مع مجموعته في كل من لبنان وغرب إفريقيا وبنما وكولومبيا، وأن أشقاءه متورطون معه بتهريب المخدرات وتبيض الأموال ويشغل احدهم المدعو أكرم منصب رئيس مجلس إدارة ومدير فندق Caecar's park hotel الذي تستخدمه المنظمة كمقر للنشاطها في تهريب المخدرات وتبيض الأموال وأن المدعى عليه أيمن جمعة يستخدم ثلاث مؤسسات صيرفة في لبنان لتبيض العائدات الناتجة عن أعمال غير مشروعة وهذه المؤسسات هي مؤسسة حسان عياش للصيرفة ومؤسسة اليسا للصيرفة ومؤسسة نوبلاين للصيرفة،

وتبين أن أمين سر هيئة التحقيق الخاصة لدى مصرف لبنان عبد الحفيظ منصور وجه بتاريخ ٢٠١١/١/٣١ كتاباً إلى حاكم مصرف لبنان بصفته رئيس هيئة التحقيق الخاصة حمل الرقم ٤٩-ه-ت-١١ القضية ١٩٠٨، أعلم بموجبه الحاكم بما ورد أعلاه وأضاف بموجب هذا الكتاب أن اسم المدعى عليه أيمن جمعة ورد في قضية مجموعة مقبل لجهة أنه تبين أنه استفاد من شيك بقيمة مايه ألف دولار أميركي، وقررت الهيئة في حينه تجميد رصيده لدى بنك بيبلوس وان النائب العام الاستئنافي قرر إحالة أوراق هذه القضية إلى النيابة العامة الاستئنافية في الجنوب لإجراء المقتضى وفاقاً للقانون رقم /٣١٨/ وذلك بتاريخ ٢٠٠٨/٦/١٩، كما تضمن كتاب أمين سر هيئة التحقيق الخاصة أن شركة نيو لاين للصيرفة وتراست كومباني مملوكة من المدعى عليهما زياد وإسماعيل يوسف والمحامي زياد حبيش،

وتبين أن حاكم مصرف لبنان وبصفته رئيس هيئة التحقيق الخاصة كلف أمين سر الهيئة، التحقيق، في هذه القضية والتدقيق بحسابات الأشخاص والشركات كافةً، الوارد ذكرها في تقرير مكتب مراقبة الأصول الأجنبية (ofac)،

| الرئيسة المنتدبة فربال دلول | المستشارة المنتدبة عبير صفا | المستشار بلال بدر |
|---|---|---|
| | ٩٨٣ | FNK 7782 1379 |

وتبين انه بتاريخ ٢٠١١/١١/٣ صدر قرار اتهامي بحق المدعى عليه أيمن جمعة من هيئة المحلفين لدى محكمة مقاطعة فيرجينا، قسم الكسندريا، في الولايات المتحدة الأمريكية قضى بإحالة المدعى عليه المذكور للمحاكمة بجرائم تبييض الأموال والاتجار بالمخدرات.

وتبين من خلال التقارير المنظمة من قبل أمين سر هيئة التحقيق الخاصة وكذلك المتفق في حسابات المدعى عليهم ما يلي:

١. بالنسبة للمدعى عليهم مجموعة جمعة (أيمن وأكرم وأنور ومحمد) تبين أن حركة حساباتهم المفتوحة لدى عدد من المصارف اللبنانية منذ العام ١٩٩٨ لم تظهر أية تحويلات من والى الخارج وان هذه الحسابات تغذت بمعظمها بشيكات وباستحقاقات سندات خزينة بالليرة اللبنانية وبأن حركة الإيداعات والسحوبات التجارية عليها عادية، وانه عام ٢٠٠٦ تم تغذية حسابي المدعى عليهما أيمن ومحمد جمعة لدى البنك اللبناني الكندي ب "١٨" شيكاً من شركة حسان عياش للصيرفة بمجموع /٥,٣٠٨,٠٠٠/ دولار أمريكي، وقد أفادت هذه الشركة أنها سلمت هذه الشيكات لعميلين لديها لقاء شراء عملات أجنبية منها كونها في حينه لم تتمكن من الاستحصال على السيولة من البنك اللبناني الكندي، وان العميلين هما شركة لبال في شتورا وعميل آخر، كما تبين أيضا أن حساباتهم خلال السنوات ٢٠٠٦ لغاية ٢٠١١ تمت تغذيتها لدى المصارف المختلفة بشكل أساسي بتعاويل فيما بينها وانه لم يظهر من حركة الحسابات وجود أي تحويلات من والى الخارج وأن الإيداعات والسحوبات النقدية بالنسبة لحركة الحسابات عادية وفاقاً لما ورد في التقرير رقم ٥١٨-هـت-١١٠،

٢. بالنسبة للمدعى عليهما جلال وساجد جمعة تبين انه على أثر صدور تقرير (ofac) قام والدهما المدعى عليه أكرم جمعة بوضع رصيد أمواله لدى مصرف لبنان والمهجر بحسابين باسم ولديه جلال وساجد، وبعدما طلب منه المصرف المذكور سحب الأموال قام بسحبها وإيداعها لدى بنك الاعتماد اللبناني باسمه الخاص ولم يتبين من خلال حساب كل منهما الشخصي ورود حركة إيداعات غير عادية من والى الخارج،

٣. بالنسبة للمدعى عليهم زياد وإسماعيل يوسف وشركة New Line Exchange trust Company S.A.I تبين أنها أسست عام ٢٠٠٨ فيما بين المدعى عليهما زياد وإسماعيل يوسف والمحامي زياد حبيش وكان يديرها وبوقع عنها المدعى عليه زياد، ويتمحور نشاطها حول تلقيها أموالا نقدية بالدولار واليورو من تجار يعملون في فنزويلا وغانا وهي تقوم ببيع الأموال النقدية إلى شركتي مكتف وعياش للصيرفة فتحول لها الأخيرتين ما يوازي قيمة الأموال إلى حسابات الشركة لدى البنك اللبناني الكندي وتقوم بناء لطلبات زبائنها بتحويل الأموال إلى شركات، تورد سلع استهلاكية أغلبها في الشرق الأقصى وذلك عن طريق حساباتها لدى البنك اللبناني الكندي أو بنك بيروت والبلاد العربية وترسل البضائع المشتراة بأموال التحويل إلى فنزويلا وبنما وان الأموال تردها بالدولار من فنزويلا نظراً لفرق سعر البوليفار الفنزويلي بالنسبة للدولار فيما بين السعر الرسمي والسوق السوداء وقد

الرئيسة المنتدبة فربال دلول          المستشارة المنتدبة عبير صفا          المستشار بلال بدر

984

FNK 7782 1380

ورد في التقرير المنظم من قبل أمين سر هيئة التحقيق الخاصة أن موضوع التحويلات إلى الخارج ثمناً لبضائع مشتراة لزبائنها بلغ /١٧/ مليون د.أ في حين أن (ofac) ذكرت أن عمليات غسل أموال بحدود /٢٠٠/ مليون د.أ وان هذا التقرير ليس أخيراً إذا لم يتم تزويد الهيئة بالمعلومات المتوافرة في هذه القضية لدى (ofac) بالإضافة إلى أنه لم يظهر أن حركة الحسابات وجود أية تحويلات من وإلى الخارج،

٤.  بالنسبة للمدعى عليهما بلال حدرج وقاسم رميتي تبين أن اسم بلال حدرج ورد في سياق إبلاغ ورد من وحدة الإخبار المالي في ألمانيا بتاريخ ٢٠٠٩/١٠/٢٩ وتبين انه صاحب شركة حدرج للصيرفة ومن مراجعة البنك اللبناني الكندي تبين وجود حسابين احدهما باسم شركة حدرج للصيرفة والأخر باسم بلال حدرج، كما تبين وجود حسابين مقفلين لدى البنك المذكور باسم قاسم رميتي وشركة رميتي وشركاه للصيرفة،

كما تبين أن شركة حدرج كانت تتلقى أموالا نقدية من تجار لبنانيين في أفريقيا وتودعها في حسابها لدى البنك اللبناني الكندي وتقوم من ثم بتحويل الأموال إلى أميركا ثمناً لأموال يتم شحنها من هناك إلى التجار في إفريقيا، كما تبين أن شركة قاسم رميتي تلقت أموالا نقدية على غرار شركة حدرج وأجرت تحويلات عبر حسابها لدى البنك اللبناني الكندي إلى أميركا والمانيا والصين ثمناً لبضائع تم استيرادها لمصلحة تجار في إفريقيا،

٥.  تبين أن شركة عياش وشركة اليسا الوارد ذكرهما في تقرير (ofac) كانتا تعملان بتجارة الصيرفة وتحويل الأموال على غرار شركة نيو لاين وشركتي حدرج ورميتي وكانت هيئة التحقيق الخاصة قد خلصت إلى تحرير حساباتها وإعادة السرية المصرفية عليها،

وتبين أنه تمت إحالة الملف المنظم من قبل هيئة التحقيق الخاصة الى جانب النيابة العامة التمييزية حيث تقرر إجراء التحقيقات اللازمة وعلى الرغم من الطلبات المرسلة من النيابة العامة التمييزية الى السلطات الأميركية لتزويدها بالمستندات والوثائق والأدلة والقرائن المتجمعة لديها بالنسبة للبنك اللبناني الكندي وللقرار الاتهامي الصادر عن هيئة المحلفين في ولاية فرجينيا، لم تبادر السلطات الأميركية إلى إجابة طلب النيابة العامة التمييزية وقد ورد في جواب هذه السلطات انه يتعذر الاستجابة حالياً لطلب السلطات القضائية اللبنانية لان الأدلة المطلوبة متعلقة بقضايا ما زالت قيد النظر أمام القضاء الأميركي،

وخلال التحقيق الاستنطاقي،

تبين أن المدعى عليهم كافةً أنكروا ما اسند إلهم،

وأفاد المدعى عليه أيمن سعيد جمعة انه كان يعمل مع أشقائه في فنزويلا بتجارة الألبسة وقد انفصلوا عن بعضهم عام ٢٠٠٠ وبدأ العمل بتجارة الالكترونيات وانه عاد إلى لبنان ومكث حتى العام ٢٠١٠ وأنه في تلك السنة سافر إلى فنزويلا للاستحصال على الجنسية هناك وأضاف أن ما ورد في تقرير (ofac) صادر عن موظفين في وزارة الخزانة الأميركية وليس عن هيئة قضائية، وأنه علم بموضوع الدعوى الملاحق بموجبها أمام محكمة كاليفورنيا عام ٢٠١١ وأنه خلال الاستحصال على سمة دخول إلى الولايات المتحدة الأميركية لمتابعة هذه الدعوى رفض طلبه وانه تمكن والمدعى عليه إسماعيل يوسف

الرئيسة المنتدبة فريال دلول   المستشارة المنتدبة عبير صفا   المستشار بلال بدر

/ 985   FNK 7782 1381

من مقابلة مندوبين من مكتب مكافحة المخدرات الأميركي (DEA) في باناما ولم يسألوه سوى عن مسيرته الذاتية وقالوا له انهم على علم بأن لا علاقة له بتهريب المخدرات وتمويل حزب الله.

وتابع بأن شقيقه في لبنان محمد باع مؤسسته في فنزويلا وسلمه المال وبالمقابل أتمنى شقيقه في لبنان قيمة ما سلمه إليه نظراً لصعوبة تحويل الأموال من فنزويلا، وزاد بأن شقيقه كان والتقى بالمدعو زياد الياس الذي أعطاه بالمقابل شيكاً مسحوباً لأمر حسين مقبل ومجبر، وأنه قضى أياماً وتوكل على الله لتحصيل الرصيد هذا الحساب وبعد أشهر تم تجميد قيمته من المصرف على أساس انه ناتج عن أموال مشبوهة في دبي وانه نتيجة ذلك لم يتمكن من الاستحصال على ترخيص لتأسيس شركة صرافة لذا فرفض مصرف لبنان طلبه فقام بتمويل قريبه زياد إسماعيل يوسف لإنشاء شركة نيو لاين على أساس انه عندما ينتهي موضوع الشيك يستلم رئاسة مجلس إدارتها وخلص إلى القول بأن حساباته وحسابات أشقائه لم تجمد إلا بعد حوالي ثلاثة أشهر من تاريخ نشر تقرير (ofac) وانه لو كان لديهم سوء نية لكانوا سحبوا الأموال من المصارف، لو أنها كانت نتيجة أعمال غير شرعية.

وصرح المدعى عليه محمد سعيد جمعة بأنه كان يملك مؤسسة في فنزويلا وقد باعها عام ٢٠٠٦ نظراً لصعوبة صرف العملة الفنزويلية وأعطى شقيقه أيمن ما يوازي مليون دولار أميركي، الذي طلب تسليم المبلغ لأحد العاملين معه وبالمقابل أعطاه شقيقه في لبنان ما يوازي القيمة بموجب مجموعة شيكات، وأضاف بأنه كان لديه حسابات أخرى سابقة في مصارف لبنانية توازي مليوني دولار وانه عام ٢٠٠٩ أسس شركة تأجير سيارات وبدأ بتحريك حساباته.

وأنكر المدعى عليه أكرم سعيد جمعة بعد ما اسند إليه، وأفاد أنه كان يملك وأشقاؤه محلات تجارية على الحدود الفنزويلية الكولومبية، وانه عاد إلى لبنان في عام ١٩٩٤ وعام ٢٠٠٠ تقاسم مع أشقائه المحلات والمال الذي خرج بنصيبه أحضره إلى لبنان وأودعه في حساب لدى بنك بيروت والبلاد العربية ثم نقله الى البنك اللبناني الكندي وأنه كان يملك فندقاً باسم سيزار وبديره، وقد سلم إدارته لابنه المدعى عليه جلال حتى العام ٢٠١٤، إذ أعطاه للغير على سبيل الإدارة الحرة.

وأضاف انه عندما صدر تقرير (ofac) استدعي من قبل إدارة بنك لبنان والمهجر وقد طلب منه وضع الأموال باسم ولديه جلال وساجد وبعدها طلبت منه الإدارة سحب الأموال، فسحبها وأودعها باسمه لدى بنك الاعتماد اللبناني دون اسم ولديه،

وأدلى المدعى عليه أنور سعيد جمعة انه بعدما تقاسم مع أشقائه المحلات في كولومبيا، احضر نصيبه إلى لبنان وأودعه بنك مصر لبنان ثم نقله إلى البنك اللبناني الكندي وقد صرف نصف المبلغ كونه يعمل في مجال الزراعة،

وأشار المدعى عليهما جلال وساجد جمعة بأن لا علاقة لهما بتقرير (ofac) وأن والدهما بناء على طلب البنك أودع الأموال باسمهما ثم عاد وأودعها باسمه الشخصي وأضاف جلال أنه تخرج من جامعات سويسرا عام ٢٠٠٧ وعاد إلى لبنان حيث سلمه والده أكرم إدارة الفندق حتى عام ٢٠١٤،

وأنكر المدعى عليهما زياد يوسف وإسماعيل يوسف بصفته الشخصية، وبصفته ممثلاً لشركة نيو لاين ما نسب إليهما في الشركة، وأفادا أن رأسمال الشركة هو بتمويل من قريبهما أيمن جمعة كون مصرف لبنان رفض إعطاءه رخصة باسمه، وأضافا بأن الشركة كانت تتلقى أموالا من التجار في فنزويلا

الرئيسة المنتدبة فريال دلول

المستشارة المنتدبة عبير صفا

المستشار جلال بدر

986

FNK 7782 1382

نظراً لصعوبة تحويل الأموال إلى الصين وغيرها وكانت الشركة تصرف الأموال بيعاً للصرافة وشركة عياش للصرافة ويتم تحويل القيمة إلى حساب الشركة لدى البنك اللبناني الكندي ومن ثم يتم بناءً على طلب كل تاجر تحويل أموال إلى الصين وغيرها لشراء بضائع يتم إرسالها إلى الدولة التي حددها التاجر،

وأفاد المدعى عليه إسماعيل انه علم بموضوع التقرير من الأصدقاء وحاول مع أكثر من جمعة الاستحصال على سمة دخول إلى أميركا ورفض طلبهما وقابلا في باناما مندوبين عن مكتب مكافحة المخدرات في أميركا الذين لم يسألوه سوى عن السيرة الذاتية لأيمن،

وبدوره أنكر المدعى عليه قاسم رميمي ما نسب إليه، وأفاد انه صاحب شركة صيرفة وكان يعمل وفاقاً لشروط وتعليمات مصرف لبنان وانه كان يتلقى الأموال من زبائنه لتحويلها إلى الخارج ثمناً لمشتريات وكان يدون على وثيقة التحويل كل ما هو مطلوب عن نوع عمل الزبون وسبب التحويل ويقوم بتحويل المال من حسابه لدى البنك اللبناني الكندي أو عبر شركات صرافة أخرى وأضاف أن لا علاقة له بهذه القضية وان مصرف لبنان ابلغه عبر البنك اللبناني الكندي عن تجميد أمواله علماً أن حسابه وحساب شركته مقفلان من أكثر من ستة أشهر دون وجود رصيد،

وأنكر المدعى عليه بلال حدرج ما نسب إليه مدلياً بأنه صاحب شركة صيرفة ولديه حساب لدى البنك اللبناني الكندي وانه كان يعمل وفاقاً للقوانين وتعاميم مصرف لبنان وأضاف بأنه كان يتلقى أموالاً نقدية أو بموجب تحاويل من زبائنه المعروفين منه من إفريقيا وأوروبا وكان يحول هذه الأموال إلى شركات في الخارج لشراء سيارات لمصلحة هؤلاء التجار وان التحويلات كانت تتم بشكل قانوني ونظامي وفاقاً لتعليمات مصرف لبنان وبموجب مستندات، كما أفاد بان لا علاقة له بباقي المدعى عليهم ولم يكن يتعامل معهم،

وتبين أن المدعى عليه أيمن جمعة تقدم بواسطة وكيله بمذكرة أرفق بها مستنداً بناءً لتكليف قاضي التحقيق بترجمة المستند الصادر باللغة الانكليزية بموضوع إحالة المدعى عليه أمام محكمة فرجينيا،

وأن المدعى عليه محمد جمعة تقدم بمستندات تبين تأسيس شركة فيما بينه وبين المدعى عليه أنور جمعة في فنزويلا عام ٢٠٠٠، كما تقدم المدعى عليه أكرم جمعة بصورة عن تصريح ضريبة الدخل للمؤسسات، عن حقوق سيزار بارك اوتيل عن العام ٢٠١٣، كما تقدم المدعى عليه أنور جمعة بمستندات تبين قيامه بأعمال الزراعة منذ العام ٢٠٠١ وشرائه لعدة أغراض زراعية لهذه الغاية عام ٢٠٠٢،

وبتاريخ ٢٠١٦/٤/٨ أبرز المدعى عليهم، وكيلهم المحامي رفيق غانم، بثلاث مذكرة أرفقوها، رسائل موجهة من وزارة الخزينة الأميركية الى المدعى عليهم أكرم ومحمد وأنور سعيد جمعة، تضمنت أنه:

"بالاستناد الى المعلومات المتوافرة حالياً في مكتب مراقبة الأصول الأجنبية Office of Foreign Assets Control (OFAC)، في وزارة المالية الأميركية وفاقاً لقانون تحديد رؤساء العصابات الأجنبية المتاجرة بالمخدرات، لا تستوفون حالياً المعايير المحددة لتصنيفكم تبعاً للقانون المذكور، ونعلمكم

بموجب هذا الكتاب أنه اعتباراً من تاريخه، لن تعودوا مصنفين كتاجر مخدرات معيّن بصورة خاصة، وبالتالي يرفع الحظر عن ممتلكاتكم كافة ومصالحكم الملكية التي سبق وجمدت نتيجة تصنيفكم كتاجر مخدرات معيّن بصورة خاصة، ويسمح لكم بالتالي الانخراط في أي معاملات مشروعة مع أشخاص أمريكيين،

وأنه سيصدر قريباً على الموقع الإلكتروني لوزارة الخزانة الأمريكية، إشعاراً بإزالة أكرم سعيد جمعة عن قائمة مكتب مراقبة الأصول الأجنبية الخاصة بالأشخاص والمواطنين المصنفين بصورة خاصة، كما سينشر هذا الإعلان في السجل الاتحادي وفي النشرة الرسمية للحكومة الأمريكية في الولايات المتحدة الأمريكية،

وبتاريخ ٢٠١٦/٦/٢٢ أبرز المدعى عليهم، وكيلهم المحامي رمزي الغراوي، مذكرة، أرفقوها بصورة القرار الصادر بتاريخ ٢٠١٦/٦/٩ عن هيئة التحقيق الخاصة، في مصرف لبنان، رقم ٢٠١٦/١٢/٢٥/١، الذي يقرر تحرير الحسابات العائدة بالانفراد أو بالاشتراك وبصورة مباشرة لدى جميع المصارف والمؤسسات المالية العاملة في لبنان، وإعادة السرية المصرفية عليها تجاه المراجع القضائية المختصة، وشطب عبارة traceable عن حسابات كل من، أكرم وأنور ومحمد سعيد جمعة وجلال أكرم جمعة وساجد أكرم جمعة وعفيفة محمد محمود جمعة، والذي استند على كتاب وحدة الإخبار المالي في الولايات المتحدة الأمريكية رقم /٢٦٢٥٤٩/ تاريخ ٢٠١٦/٥/١٦،

وأنه بتاريخ ٢٠١٦/١٠/١٩ صدر عن الهيئة قرار قضى بالتوسع بالتحقيق و:

١.  تكليف رئيس مكتب مكافحة المخدرات المركزي بإيداع الهيئة صورة عن المحاضر السابقة المنظمة بحق المدعى عليهم، المذكورين في التقرير الصادر عنه تحت رقم عدد ٢٠٧/٢٢٨٥ تاريخ ٢٠١٥/٩/١٤، الموجه لحضرة النائب العام لدى محكمة التمييز، وأية محاضر أخرى قد تكون قد نظمت بحق أي من المدعى عليهم، أيمن سعيد جمعة، ومحمد سعيد جمعة، وأكرم سعيد جمعة، وأنور سعيد جمعة، وساجد أكرم جمعة، وجلال أكرم جمعة، وزياد محمد يوسف، وإسماعيل محمد يوسف، وبلال يوسف جورج، بجرائم تبييض الأموال وتجارة وتهريب المخدرات،

٢.  تسطير كتاب الى هيئة التحقيق الخاصة لإيداع الهيئة صورة عن كتاب وحدة الإخبار المالي في الولايات المتحدة الأمريكية رقم /٢٦٢٥٤٩/ تاريخ ٢٠١٦/٥/١٦، المذكور في قرارها رقم /٢٠١٦/١٢/٢٥ تاريخ ٢٠١٦/٦/٩،

وأنه بتاريخ ٢٠١٦/١٠/٢٩ ورد من مكتب مكافحة المخدرات المركزي صور عن المحاضر السابقة المنظمة بحق المدعى عليهم،

وأنه بتاريخ ٢٠١٧/١/١٦ ورد جواب أمين عام هيئة التحقيق الخاصة عبر النيابة العامة التمييزية، وتضمن بأن وحدة الإخبار المالي في الولايات المتحدة الأمريكية FinCEN أفادت أنه بغية الحصول على نسخة عن كتابها رقم /٢٦٢٥٤٩/ تاريخ ٢٠١٦/٥/١٦ واستعمال المعلومات الواردة فيه في أية ملاحقة قضائية، يقتضي تسطير استنابة قضائية بهذا الخصوص الى مكتب الشؤون الدولية لدى

الرئيسة المنتدبة فريال دلول

المستشارة المنتدبة عبير صفا

المستشار بلال بدر

988

FNK 7782 1384

وزارة العدل في الولايات المتحدة الأمريكية،

**ب. في الأدلة:**

تأيدت الوقائع المسرودة آنفاً بالأدلة التالية:

- بصورة كتاب أمين سر هيئة التحقيق الخاصة لدى مصرف لبنان عبد الله حسن معصوم الموجه بتاريخ ٢٠١١/١/٣١ إلى حاكم مصرف لبنان والذي حمل الرقم ٦٩ ت ٢ القضية ١٩٠٨،

- بالنتيجة التي توصل إليها أمين عام هيئة التحقق الخاصة في مصرف لبنان،

- بالمذكرة المبرزة من المدعى عليهم تاريخ ٢٠١٦/٤/٨ والمستندات المرفقة بها لا سيما مراسلة وزارة الخزينة الأمريكية،

- بصورة القرار الصادر بتاريخ ٢٠١٦/٦/٩ عن هيئة التحقيق الخاصة، في مصرف لبنان، رقم ٢٠١٦/١٢/٢٥/١،

- بمجمل التحقيق ومجريات الدعوى،

**ج. في القانون:**

وحيث إن هذه الهيئة ترى استعراض كيفية نشوء هذه الدعوى وتسلسل أحداثها توصلا للقول ما إذا كان هناك أدلة كافية بحق المدعى عليهم لاتهامهم والظن بهم بما نسب إليهم،

وحيث يتبين من العودة الى الوقائع أن خبرا نشر بتاريخ ٢٠١١/١/٢٦ على صفحة الانترنت العائدة لوزارة الخزانة الأمريكية، مفاده أن مكتب مراقبة الأصول الأجنبية (OFAC) التابع لوزارة الخزينة الأمريكية قام بتصليف المدعى عليه أيمن جمعة بالإضافة إلى تسعة أشخاص آخرين وتسعة عشرة مؤسسة تحت قانون 'kingpin act' لارتباطهم بمنظمة تهريب مخدرات وتبييض الأموال، اتصل الى علم أمين عام هيئة التحقيق الخاصة الذي بادر فورا الى إعلام حاكم مصرف لبنان بالأمر، الذي كلفه بإجراء التحقيق، في هذه القضية والتدقيق بحسابات الأشخاص والشركات كافة، الوارد ذكرها في تقرير مكتب مراقبة الأصول الأجنبية (ofac)،

وبعد التحقيق والتدقيق اللذين أجراهما أمين عام الهيئة المذكورة، خلص الى أن:

- حركة الإيداعات والسحوبات التجارية على حسابات أيمن وأكرم وأنور ومحمد جمعة المفتوحة لدى عدد من المصارف اللبنانية منذ العام ١٩٩٨، عادية، لم تظهر أية تحويلات من وإلى الخارج وان هذه الحسابات تغذت بمعظمها بشيكات وباستحقاقات سندات خزينة بالليرة اللبنانية، مضيفيا بأن حساباتهم خلال السنوات ٢٠٠٦ لغاية ٢٠١١ تمت تغذيها لدى المصارف المختلفة بشكل أساسي بتحاويل فيما بينها دون أن يظهر من حركة الحسابات وجود أية تحويلات من وإلى الخارج وأن الإيداعات والسحوبات النقدية بالنسبة لحركة الحسابات عادية وفاقاً لما ورد في التقرير رقم ٥١٨-هـ.ت-١١٠،

- المدعى عليه أكرم جمعة وبعد أن صدر تقرير (ofac) وضع رصيد أمواله لدى مصرف لبنان والمهجر بحسابين باسم ولديه المدعى عليهما جلال وساجد، وبعدما طلب منه المصرف المذكور سحب الأموال قام بسحبها وإيداعها لدى بنك الاعتماد اللبناني باسمه الخاص

وأنتهى أمين عام الهيئة الى القول أنه لم يتبين من خلال حساب كل منهما الشخصي ورود حركة إيداعات غيرعادية من وإلى الخارج،

بالنسبة للمدعى عليهم زياد وإسماعيل يوسف وشركة New Line Exchange trust Company S.A.I أشار أمين عام الهيئة الى أنه ورد التقرير المنظم من قبل أمين هيئة التحقيق الخاصة أن مجموع التحويلات إلى الخارج ثمناً لبضائع مختلفة تقدر بمبلغ /٢٠/ مليون د.أ في حين أن تقرير (ofac) أشار الى عمليات غسل أموال تقدر بـ /٢٠٠٠/ مليون د.أ، وأنتهى الى أن هذا التقرير يبقى ناقصاً فيما إذا لم يتم تزويد الهيئة بالمعلومات المتوفرة في هذه القضية لدى (ofac) إضافة إلى أنه لم يظهر من حركة الحسابات وجود أية تحويلات من وإلى الخارج،

- بالنسبة للمدعى عليهما بلال حدرج وقاسم رميتي تبين ان الأول هو صاحب شركة حدرج للصيرفة ومن مراجعة البنك اللبناني الكندي تبين وجود حسابين احدهما باسم شركة حدرج للصيرفة والأخر باسم بلال حدرج، كما تبين وجود حسابين مقفلين لدى البنك المذكور بإسم قاسم رميتي وشركة رميتي وشركاه للصيرفة، وتبين أن شركة حدرج كانت تتلقى أموالا نقدية من تجار لبنانيين في أفريقيا وتودعها في حسابها لدى البنك اللبناني الكندي وتقوم من ثم بتحويل الأموال إلى أميركا ثمناً لسيارات يتم شحنها من هناك إلى التجار في إفريقيا، كما تبين أن شركة قاسم رميتي تلقت أموالا نقدية على غرار شركة حدرج وأجرت تحويلات عبر حسابها لدى البنك اللبناني الكندي إلى أميركا والمانيا والصين ثمناً لبضائع تم استيرادها لمصلحة تجار في إفريقيا،

- بالنسبة الى شركة عياش وشركة اليسا كانتا تعملان بتجارة الصيرفة وتحويل الأموال على غرار شركة نيو لاين وشركتي حدرج ورميتي وأن هيئة التحقيق الخاصة كانت قد انتهت إلى تحرير حساباتها وإعادة السرية المصرفية عليها،

وحيث يتبين من النتيجة التي توصل إليها أمين عامة هيئة التحقيق الخاصة أن "التحقيق والتدقيق" اللذين أجراهما لم يؤديا به الى الاستحصال على أي دليل يؤكد على صحة ما تضمنه تقرير الـ (ofac)، لا بل على النقيض توصل الى نتيجة معاكسة مفادها أن حركة الحسابات عادية ولم تظهر أية تحويلات من الخارج بالنسبة للمدعى عليهم أيمن وأكرم وأنور ومحمد جمعة، وأن الأموال في حسابي المدعى عليهما جلال وساجد جمعة، أعيدت الى حساب والدهما المدعى عليه أكرم جمعة، دون أن يتبين من خلال حساب كل منهما الشخصي ورود حركة إيداعات غيرعادية من وإلى الخارج، وأنه لم يظهر من حركة حسابات للمدعى عليهم زياد وإسماعيل يوسف وشركة New Line Exchange trust Company S.A.I وجود أية تحويلات من وإلى الخارج، وأن هيئة التحقيق الخاصة قد خلصت إلى تحرير حسابات شركة عياش وشركة اليسا وإعادة السرية المصرفية عليها، وأن الأموال التي دخلت في حسابات المدعى عليهما بلال حدرج وقاسم رميتي وشركتيهما كانت نتيجة تلقيهما أموالا نقدية من تجار لبنانيين في أفريقيا، وهو وأن أمين عام هيئة التحقيق الخاصة قد أكد على وجوب تزويد الهيئة بالمعلومات المتوافرة في هذه القضية لدى (ofac)،

الرئيسة المنتدبة فريال دلول    المستشارة المنتدبة عبير صفا    المستشار بلال بدر

وحيث إنه وعلى الرغم من أن أمين عام هيئة التحقيق الخاصة لم يتوصل الى أدلة تؤكد ما تضمنه تقرير (ofac)، وعلى الرغم من عدم تزويد هيئته بالمعلومات المتوافرة لدى (ofac) إلا أن هيئة التحقيق الخاصة قررت إحالة الملف الى جانب النيابة العامة التمييزية،

وحيث إن النيابة العامة التمييزية راسلت السلطات الأمريكية طالبة تزويدها بالبيانات والوثائق والأدلة والقرائن المجتمعة لديها بالنسبة للبنك اللبناني الكندي وللقرار الأمريكي الصادر عن هيئة المحلفين في ولاية فرجينيا، إلا أن هذه السلطات لم تبادر إلى إجابة طلبها، قيامها بالإحالة الدعوى الى النيابة العامة الاستئنافية في بيروت التي ادعت بموجب ورقة الطلب ووفق القرائن الراهنة أمام قاضي التحقيق،

وحيث إن قاضي التحقيق قد استمع الى المدعى عليهم الذين نفوا ما نسب إليهم،

وحيث تبين أن وزارة الخزينة الأمريكية قد راسلت المدعى عليهم معلمة إياهم بأن كلا من أكرم ومحمد وأنور سعيد جمعة لم يعد مصنفاً كتاجر مخدرات محدد بصورة خاصة، وأنها رفعت الحظر عن ممتلكاتكم كافة ومصالحهم الملكية التي سبق وجمدت نتيجة تصنيفهم كتاجر مخدرات معين بصورة خاصة، وسمحت لهم الانخراط في أي معاملات مشروعة مع أشخاص أمريكيين،

وحيث استنادا الى ما سلف صدر قرار قاضي التحقيق الذي قضى بمنع المحاكمة عن المدعى عليهم،

وتبين أن النيابة العامة في بيروت استأنفت قرار قاضي التحقيق طالبة فسخ القرار المستأنف لوقوعه في غير موقعه القانوني الصحيح، مستندة في استئنافها الى أن "يتبين من التحقيقات كافة، لا سيما تلك المجراة من قبل هيئة التحقيق الخاصة ومن جانب النيابة العامة التمييزية، أن المدعى عليهم المذكورين قد أقدموا بالاشتراك على ارتكاب عمليات تبييض أموال غير مشروعة ناتجة عن تجارة المخدرات وأن هذه العمليات قد تمت عبر حسابات تعود لهم"، دون أن تحدد الأدلة التي تستند إليها للمطالبة بفسخ قرار قاضي التحقيق، أو توضح كيف أن التحقيقات التي ذكرتها تبين أن المدعى عليهم أقدموا على ارتكاب ما نسب إليهم،

وحيث تبين لاحقا وبالتحديد بتاريخ ٢٠١٦/٦/٩ أن هيئة التحقيق الخاصة في مصرف لبنان قررت (قرارها رقم ٢٠١٦/١٢/٢٥/١)، تحرير الحسابات العائدة بالانفراد أو بالاشتراك وبصورة مباشرة لدى جميع المصارف والمؤسسات المالية العاملة في لبنان، وإعادة السرية المصرفية عليها تجاه المراجع القضائية المختصة، وشطب عبارة traceable عن حسابات المدعى عليهم أكرم وأنور ومحمد سعيد جمعة وجلال أكرم جمعة وساجد أكرم جمعة وعفيفة محمد محمود جمعة، مستندة الى كتاب وحدة الإخبار المالي في الولايات المتحدة الأمريكية رقم ٢٦٢٥٤٩/ تاريخ ٢٠١٦/٥/١٦،

وحيث إن هذه الهيئة، أي الهيئة الاتهامية في بيروت، قد طلبت من هيئة التحقيق الخاصة تزويدها بصورة عن كتاب وحدة الإخبار المالي في الولايات المتحدة الأمريكية رقم ٢٦٢٥٤٩/ تاريخ ٢٠١٦/٥/١٦، الذي يفترض أنها أطلعت عليه واستندت إليه لتحرير حسابات المدعى عليهم المذكورين، إلا أن هيئة التحقيق أجابت أنه يفترض للحصول على صورة عن الكتاب، تسطير استنابة قضائية بهذا الخصوص الى مكتب الشؤون الدولية لدى وزارة العدل في الولايات المتحدة الأمريكية،

الرئيسة المنتدبة فريال دلول

المستشارة المنتدبة عبير صفا

المستشار بلال بدر

FNK 7782 1387



وحيث إنه بالاستناد الى كل ما سلف وبتعابير مختبرة، فإن هذه الدعوى قد نشأت نتيجة خبر منشور على موقع الانترنت العائدة لوزارة الخزانة الأمريكية، دون أن يتم الاستحصال على الأدلة التي استند إليها هذا الخبر أو الأدلة التي استندت إليها محكمة فرجينيا في الولايات المتحدة، وأودّ أن تتعاون سلطات الأخيرة مع السلطات القضائية اللبنانية وتزودها بالأدلة التي طلبتها،

وحيث في غياب أي دليل من شأنه أن يؤشر الى تورط المدعى عليهم في اقتراف ما هو منسوب إليهم، وفي ظل النتيجة التي توصل إليها أمين عام هيئة التحقيق الخاصة والمسؤول الفعلي في فقرة الوقائع واختصارا في فقرة القائون، والى مراسلة وزارة الخزانة الأمريكية لناحية رفع التعظير عن المدعى عليهم جمعة، وقرار هيئة التحقيق الخاصة بتحرير حسابات المدعى عليهم وإعادة السرية المصرفية إليها، لا تكون القرينة المستمدة من محاضر التحقيق السابقة المنظمة بحق بعض المدعى عليهم من قبل الضابطة العدلية اللبنانية كما الخبر المنشور على موقع وزارة الخزانة الأمريكية، كافيين للظن بهم في إطار الدعوى الراهنة، الأمر الذي يفضي الى منع المحاكمة عن جميع المدعى عليهم لعدم توافر الدليل، وتبعاً لتصديق قرار قاضي التحقيق بعد اعتماد التعليل الوارد في متن هذا القرار.

لـــــــذلـــــــك

تقرر الهيئة بالانفاق:

١.   قبول الاستئناف شكلاً، ورده أساساً، وتصديق القرار المستأنف المنتهي الى منع المحاكمة عن المدعى عليهم لعدم كفاية الدليل، بعد اعتماد التعليل الوارد في متن هذا القرار.

٢.   حفظ الرسوم والنفقات كافة

٣.   حفظ الأوراق

قراراً صدر في غرفة المذاكرة في بيروت بتاريخ ٢٠١٧/١/٣١

الرئيسة المنتدبة فرمال دلول          المستشارة المنتدبة عبير صفا          المستشار بلال عدنان بدر

صورة طبق الأصل
بيروت في ...........



**U.S. Embassy**
**BEIRUT**

Customer: MHD ELHOUT
Date: 2/27/2017 8:49:32 AM
Register:
Transaction: 15016981
Tender: U.S. Dollars

| Qty | Svc | Ctry | Visa | Price |
|-----|-----|------|------|-------|
| 1 | 44 | | | $50.00 |
| AUTHENTICATION | | | | 75,000.00 .J.J |

| | |
|---|---|
| Balance | $50.00 |
| Amount Paid | $50.00 |
| Change | $0.00 |

CUSTOMER COPY
ALL TRANSACTIONS ARE
FINAL - NO REFUNDS

Sensitive But Unclassified (SBU)

24522

993

FNK 7782 1389

REPÚBLICA DE PANAMÁ
MINISTERIO DE ECONOMÍA Y FINANZAS
DIRECCIÓN GENERAL DE INGRESOS
TASA ÚNICA ANUAL DE LAS SOCIEDADES ANÓNIMAS Y FUNDACIONES DE INTERÉS PRIVADO
INSTRUCTIVO PARA LLENAR LA HOJA DE TASA ÚNICA
(Art. 318-a DEL CÓDIGO FISCAL)

06

No. 2038519

Base Legal
Artículo 318-a del Código Fiscal, modificado por Ley 6 de 2 febrero de 2005.

SEÑOR CONTRIBUYENTE CON EL OBJETO DE PRESTARLE UN MEJOR SERVICIO LE RECOMENDAMOS
EN CUENTA LAS SIGUENTES RECOMENDACIONES ESPECIALES:

DOCUMENTO          ASIENTO          D.V.

99999   999 99999        1

- Llene el formulario a máquina o letra imprenta.

- No se efectúe enmendaduras ( no borre ni use líquido corrector) en el formulario.

Goldi Electronics SA

DECLARAMOS BAJO LA GRAVEDAD DEL JURAMENTO Y CON PLENO CONOCIMIENTO DE LAS SANCIONES QUE IMPONE EL ARTÍCULO 752 DEL CÓDIGO FISCAL QUE LOS DATOS...

- Una vez haya llenado el formulario debe presentarse en las entidades recaudadoras autorizadas y
  realizar el pago.

3-63-428

FIRMA DEL REPRESENTANTE LEGAL/O AGENTE RESIDENTE          CÉDULA o No. R.U.C.

- El formulario de TASA ÚNICA permite pagar un máximo de cinco (5) períodos por cada sociedad anónima o
  Fundación de interés privado.

Luis    21/Noviembre/2006

LUGAR          FECHA

Anote la siguiente información:
NOMBRE O RAZÓN SOCIAL de la Sociedad y el DV          04. CÉDULA No. o No. R.U.C.

Aiman Said Jonaa Khanfar          C.C 84.015.050

2. Nombre o Razón Social de la Sociedad.

NOMBRE DEL AGENTE RESIDENTE          06. CÉDULA No. o No. R.U.C.

Ricardo Espino          3-63-428

Nombre del Representante Legal.

4. Número de Cédula o RUC del Representante Legal.

CONSTITUIDA BAJO LAS LEYES DEL PAÍS          08. FECHA DE INSCRIPCIÓN EN EL REGISTRO PÚBLICO

PAÍS          DÍA   MES   AÑO

PANAMÁ          2

5. Nombre del Agente Residente.

6. Número de Cédula o RUC del Agente Residente.
PERÍODO QUE CUBRE EL PAGO

7. Indique bajo qué país se ha constituido la Sociedad.          PAGO VÁLIDO HASTA
                                                                 MES   DÍA   AÑO

| Períodos | Multa | Recargo | Tasa | Total | |
|---|---|---|---|---|---|
| 8. Fecha de inscripción en el Registro Público. | | | | 250 | 00 |
| Registre en esta sección: | PERÍODO QUE CUBRE EL PAGO | | | | |
| 9. El período (os) a pagar.. | | | | | |
| 10. El monto a pagar en concepto de multa, recargo (si los hubiere) y tasa por cada período. | | | | | |
| 11. Totalice en cada período indicado (multa + recargo + tasa). | | | | | |
| 12. Totalice el monto a pagar. | | 12. Total a pagar: | | 250 | 00 |

SELLO DE RECIBIDO DGI

Tenga en cuenta que los pagos realizados a la Dirección General de Ingresos (DGI) se aplicarán
al tributo y período indicado por el contribuyente, en el siguiente orden de imputación, intereses,
multa, recargo y deuda principal. Si el contribuyente no indicara tributo y período, la DGI los
aplicará en el mismo orden al más antiguo. Art. 984, 1072-B del Código Fiscal.

# *GOLDI ELECTRONIC. S.A.*

Colón, 12 de enero 2010

Por este medio, **Goldi Electronic, S.A.** certifica que los Aires Acondicionados, marca SAMSUNG comercializados en nuestra empresa son **NON-CFC.**

Significa que los Aires Acondicionados de **Goldi Electronic** no necesitan para su producción o funcionamiento, sustancia que causen daño o disminuyan la capa de ozono, de acuerdo con el protocolo de Montreal, con respecto a la sustancia que disminuye la capa de ozono.

MODELO:                      TODO LOS MODELOS
REFRIGERANTE:            R22
PRODUCTO:                  AIRE ACONDICIONADO
MARCA COMERCIAL:      GOLDI ELECTRONIC

Agradecemos de antemano la colaboración prestada a la presente.

Atentamente,

Israel Gazal
Gerente General

DILIGENCIA DE RECONOCIMIENTO No._____
En la ciudad de Colón, R. Panamá a los 13 días del mes de
Enero de 2010 compareció ante el Cónsul de Colombia, el
Señor(a) ISRAEL GAZAL FASKHA
Identificado (a) con N-14-949
expedido (a) en Panamá.
quién manifestó que asume el contenido del presente documento.
El Cónsul certifica que en su presencia el otorgante firmó y
estampó su huella.

Firma del Interesado

Valor Pagado $ 25

FIRMA DEL CONSUL

Carlos Alberto Sanabria Gómez
Encargado de Funciones Consulares
Colón, Rep. de Panamá

Índice Derecho

CONSULADO DE COLOMBIA · COLON, REP. PANAMA

FNK 7782 1391

18/01/11-16:52:39                    CAPBENV-1353-012552                              1

```
--------------------- Instance Type and Transmission ----------------
Notification (Transmission) of Original sent to SWIFT (ACK)
Network Delivery Status  : Network Ack
Priority/Delivery        : Normal
Message Input Reference  : 1657 110118CAPBPAPAAXXX0755013395
------------------------------ Message Header ------------------------
Swift Input              : FIN 103 Single Customer Credt Transfer
Sender  : CAPBPAPAXXX
          CAPITAL BANK INC.
          PANAMA PA
Receiver : PNBPUS3NNYC
          WELLS FARGO BANK, N.A.(FORMERLY KNOWN AS WACHOVIA)
          (NEW YORK INTERNATIONAL BRANCH)
          NEW YORK,NY US
MUR : LM
------------------------------ Message Text --------------------------
  20: Sender's Reference
      TRE00211016441
  23B: Bank Operation Code
      CRED
  32A: Val Dte/Curr/Interbnk Settld Amt
      Date        : 18 January 2011
      Currency    : USD (US DOLLAR)
      Amount      :           #150,000.00#
  50K: Ordering Customer-Name & Address
      /022020003553
      GOLDI ELECTRONICS, S.A.
      ZONA LIBRE AVE 1ERA/CALLE 3ERA
      FRANCE FIELD, COLON REP. DE
      PANAMA
  57A: Account With Institution - PI BIC
      SGCLCNBJGZH
      SOCIETE GENERALE (CHINA) LIMITED
      (GUANGZHOU BRANCH)
      GUANGZHOU  CN
  59: Beneficiary Customer-Name & Addr
      /HRA 1605300810102
      TCL HOME APPLIANCES (HK) CO. LTD.
      102 NANTOU ROAD, NANTOU ZHONGSHAN
      GUANGDONG 528 427 P.R. CHINA
  70: Remittance Information
      /RFB/PAGO A FACTURA POR COMPRA DE
      //MERCANCIA
  71A: Details of Charges
      SHA
------------------------------ Message Trailer -----------------------
  {CHK:B2A563C380A3}
  PKI Signature: MAC-Equivalent
------------------------------ Interventions -------------------------
  Category     : Network Report
  Creation Time : 18/01/11 16:52:15
  Application  : SWIFT Interface
  Operator     : SYSTEM
  Text
  {1:F21CAPBPAPAAXXX0755013395}{4:{177:1101181657}{451:0}{108:LM}}
*End of Message
```

17/01/11-18:31:23                    CAPBENV-1322-012519                          1

```
-------------------- Instance Type and Transmission --------------
Notification (Transmission) of Original sent to SWIFT (ACK)
Network Delivery Status  : Network Ack
Priority/Delivery        : Normal
Message Input Reference   : 1836 110117CAPBPAPAAXXX0754013361
-------------------------- Message Header -------------------------
Swift Input                      : FIN 103 Single Customer Credt Transfer
Sender   : CAPBPAPAXXX
            CAPITAL BANK INC.
            PANAMA PA
Receiver : PNBPUS3NNYC
            WELLS FARGO BANK, N.A.(FORMERLY KNOWN AS WACHOVIA)
            (NEW YORK INTERNATIONAL BRANCH)
            NEW YORK,NY US
MUR : LH
-------------------------- Message Text ---------------------------
  20: Sender's Reference
      TRE00211016341
  23B: Bank Operation Code
      CRED
  32A: Val Dte/Curr/Interbnk Settld Amt
      Date          : 18 January 2011
      Currency      : USD (US DOLLAR)
      Amount        : #150,000.00#
  50K: Ordering Customer-Name & Address
      /02202000353
      GOLDI ELECTRONICS, S.A.
      ZONA LIBRE AVE 1ERA/CALLE 3ERA
      FRANCE FIELD, COLON REP. DE
      PANAMA
  57A: Account With Institution - FI BIC
      HSDCSGSGXXX
      THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED, SINGAPORE
      SINGAPORE  SG
  59: Beneficiary Customer-Name & Addr
      /260136312178
      NIDEA ELECTRIC TRADING (SINGAPORE)
      CO PTE LTD
      10 ANSON ROAD 12-03 INTERNATIONAL
      PLAZA SINGAPORE 079903 SINGAPORE
  70: Remittance Information
      /RFB/PAGO DE FACTURA
  71A: Details of Charges
      SHA
-------------------------- Message Trailer ----------------------
  {CHK:0474680ABCF9}
  PKI Signature: MAC-Equivalent
-------------------------- Interventions -------------------------
  Category     : Network Report
  Creation Time : 17/01/11 18:31:09
  Application   : SWIFT Interface
  Operator      : SYSTEM
  Text
  {1:F21CAPBPAPAAXXX0754013361}{4:{177:1101171836}{451:0}{108:LH}}
*End of Message
```

FNK 7782 1393


**Ferrari & Associates, P.C.**

1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004
Tel. 202-280-6370
Fax. 877-448-4885

August 24, 2017

**SENT VIA EMAIL AND FEDERAL EXPRESS: # 8106 5197 5724**

Mark Samara
Assistant Director
Crime/Narcotics & Western Hemisphere Division
Office of Global Targeting
Office of Foreign Assets Control
United States Department of the Treasury
1500 Pennsylvania Ave., NW
Treasury Annex
Washington, D.C. 20220

Re:     **SDN Reconsideration Petition Supplemental Letter—Section 805 of the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. § 1903(b)**
*Ayman Saied Joumaa—FNK-7782*

Dear Mr. Samara:

On January 26, 2011, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Ayman Saied Joumaa ("Petitioner") as a Specially Designated Narcotics Trafficker ("SDNTK") pursuant to the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), 21 U.S.C. § 1901 *et seq.*, for allegedly playing a significant role in international narcotics trafficking.[1]  On May 18, 2016, Petitioner filed a formal request for reconsideration of that designation.  Petitioner's reconsideration case has been assigned Case ID FNK-7782 and has remained pending before OFAC for the past fifteen (15) months.

On November 16, 2016, following Petitioner's request for the administrative record underlying his designation, OFAC provided a copy of the redacted administrative record upon which Petitioner's designation was based, as well as a non-privileged and unclassified summary of otherwise privileged information contained within the administrative record.  Undersigned counsel has carefully reviewed the factual allegations detailed in this administrative record and the non-privileged and unclassified summary and has conducted an exhaustive review of Petitioner's current and historic activities to determine the factual basis for OFAC's decision to

---

[1] PRESS RELEASE, Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network, U.S. Dep't of the Treasury, January 26, 2011, *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1035.aspx.

designate Petitioner as a SDNTK. Following this review, it is undersigned counsel's view that OFAC lacks a factual and legal basis upon which to maintain Petitioner's designation, as the allegations leveled at Petitioner are historical in nature and lack connection to Petitioner's current activities.

The Kingpin Act demands—in order for the Secretary of the Treasury to maintain a designation under that authority—that Petitioner's narcotics trafficking activities be current and ongoing. Furthermore, OFAC's own regulations assert that a change in circumstances merits the rescission of a designation made under the Kingpin Act and the unblocking of such person.[2] As such, undersigned counsel respectfully requests that OFAC take immediate steps to rescind Petitioner's designation or, in the alternative, supply contemporary factual allegations that serve to support a legal basis to maintain Petitioner's current designation. In the absence of either of these steps, Petitioner will be forced to seek judicial redress as OFAC appears to be maintaining Petitioner's designation in excess of statutory authority and in contravention of its own regulations, while also unreasonably delaying a decision on Petitioner's reconsideration request.

## I.      **Factual Background**

As noted above, OFAC has provided a copy of the redacted administrative record upon which Petitioner's designation was based, as well as a non-privileged and unclassified summary of otherwise privileged information contained within the administrative record. According to OFAC, the factual allegations contained within those records "provide reason to believe that [Petitioner] plays a significant role in international narcotics trafficking and thus meets the criteria for designation under section 805(b)(4) of the Kingpin Act..."[3]

Unfortunately, however, the factual allegations contained in the administrative record provided to undersigned counsel are almost completely redacted, excluding a few headers. To the extent that undersigned counsel can infer the factual basis of designation from the un-redacted headers contained in this record, these headers suggest that OFAC believes Petitioner exerts "control over narcotics trafficking" and "narcotics traffickers" and engages in "bulk cash smuggling and control in the laundering of drug proceeds."[4] Nonetheless, the administrative record provided to undersigned counsel redacts all factual allegations used to substantiate the claims of these headers; and, as such, the precise factual basis under which OFAC designated Petitioner (and maintains Petitioner's designation to this day) remains unavailable to both Petitioner and his counsel.

---

[2] 31 C.F.R. § 501.807.

[3] Evidentiary Memorandum—Treasury-Led Kingpin Act Tier 1 Designation: Ayman Saied Joumaa Network, U.S. Dep't of Treasury Office of Foreign Assets Control, Jan. 21, 2011, at 1-2.

[4] *Id.* at 7-9.

2

OFAC's provision of a non-privileged and unclassified summary of the otherwise privileged information contained in the administrative record offers additional information relating to the basis for Petitioner's designation—albeit absent any clear and substantive factual particulars. According to OFAC, "[k]nown narcotics traffickers and money launderers worked with [Petitioner] to coordinate drug money laundering in Florida."[5] Moreover, OFAC's summary states that Petitioner "is the leader of the JOUMAA drug trafficking and money laundering organization," which "has moved hundreds of millions of dollars in narcotics proceeds from the United States to Lebanon" and has exported vehicles "from the United States to West Africa...to launder drug proceeds."[6]

Most of these specific allegations are duplicative of those contained in OFAC's press releases announcing the designation of members of the alleged JOUMAA Money Laundering and Drug Trafficking Organization ("JOUMAA MLO/DTO"), and thus are conclusory in nature and fail to adequately apprise Petitioner of the precise factual bases underlying his Kingpin Act designation. In undersigned counsel's view, OFAC has yet to fulfill its due process obligations to provide adequate notice as to the basis for the designation of Petitioner and OFAC's maintenance of that designation since January 26, 2011.

Lacking a clear understanding as to the factual basis for his Kingpin Act designation, Petitioner has been forced to rely on allegations made by other U.S. federal agencies, including the United States Department of Justice and the Drug Enforcement Administration. As OFAC is aware, a criminal indictment was returned in the Eastern District of Virginia on November 3, 2011 charging Petitioner with (1) conspiracy to distribute five (5) kilograms or more of cocaine with the knowledge and intent that such cocaine would be unlawfully imported in the United States; and (2) conspiracy to commit money laundering. Various factual allegations contained in that Indictment are relevant to this submission. Most notably, these factual allegations are based, in large part, on the Affidavit in Support of an Arrest Warrant and Criminal Complaint filed on June 17, 2011 in the United States District Court for the Eastern District of Virginia. This Affidavit is primarily, but not exclusively, reliant on three confidential sources ("CS-1, CS-2, and CS-3")—each of whom have either pled guilty to federal narcotics trafficking offenses or are

---

[5] Non-Privileged and Unclassified Summary of Otherwise Privileged Information—Ayman Saied Joumaa Network, U.S. Dep't of Treasury Office of Foreign Assets Control. Undersigned counsel notes that this same precise allegation was made in reference to Petitioner's brother, Mohammad Saied Joumaa, through information disclosed provided by OFAC during his reconsideration case. Such allegation did not bar OFAC from determining that Mohammad Saied Joumaa no longer met the criteria for designation under the Kingpin Act and rescinding his designation. To the extent that OFAC regards this allegation as true, its historical nature should not be a bar to taking steps to rescind Petitioner's designation, particularly insofar as OFAC lacks more contemporary evidence linking Petitioner to narcotics trafficking activities. Indeed, it is undersigned counsel's understanding that much of the evidence used to support Petitioner's designation was accumulated before or during 2009, when OFAC had made an apparent initial decision to target Petitioner and his brothers for sanctions.

[6] Id.

FNK 7782 1396

cooperating with U.S. law enforcement with the anticipation of obtaining a reduction in their sentence from a pending guilty plea in a U.S. district court.[7]

Most notably, however, these factual allegations indicate activities that occurred no later than 2008. None of the allegations made against Petitioner evidence involvement in narcotics trafficking activities beyond 2008. This is even more troubling given that one of the confidential sources (CS-2) maintained a personal relationship with Petitioner—at the behest of U.S. authorities—up until October 2010. The lack of any contemporary evidence linking Petitioner to narcotics trafficking activities—even at the time of OFAC's January 26, 2011 designation— renders OFAC's decision to continue Petitioner's designation as factually and legally suspect.

## II. Legal Analysis

### A. Legal Background

On December 3, 1999, the President signed into law the Foreign Narcotics Kingpin Designation Act. *See* 21 U.S.C. §§ 1901-1908 (1999). The Kingpin Act was designed to "provide authority for the identification of, and application of sanctions on a worldwide basis to, significant foreign narcotics traffickers, their organizations, and the foreign persons who provide support to those significant foreign narcotics traffickers and their organizations, whose activities threaten the national security, foreign policy, and economy of the United States." 21 U.S.C. § 1902.

To accomplish this, the Kingpin Act mandates the President submit an annual report to Congress "identifying publicly the foreign persons that the President determines are appropriate for sanctions...[and] detailing publicly the President's intent to impose sanctions upon those significant foreign narcotics traffickers..."[8] Pursuant to the Kingpin Act, the President is authorized to impose blocking sanctions on "any significant foreign narcotics traffickers publicly identified" in the President's annual report.[9] [10]

---

[7] For reasons discussed in an earlier submission, it is undersigned counsel's view that these confidential sources had a clear motive to provide information implicating Petitioner—even if that information was knowingly false or erroneous—in order to secure the Government's support for a sentencing reduction.

[8] The President is authorized to supplement his mandatory report with additional designations "if at any time after the report required...the President finds that a foreign person is a significant foreign narcotics trafficker and such foreign person has not been publicly identified in [the] report..." 21 U.S.C. § 1903(h)(1)(A); 21 U.S.C. § 1903(b)(1)-(2).

[9] 21 U.S.C. § 1904(b)(1) ("...there are blocked as of such date, and any date thereafter, all such property and interests in property within the United States, or within the possession or control of any United States person...").

[10] Blocking sanctions are subject to exceptions "provided in regulations, orders, instructions, licenses, or directives issued pursuant to this chapter..." 21 U.S.C. § 1904(b). Such exceptions fall under the discretion of the Secretary of the Treasury, who "is authorized to take such actions as may be necessary to carry out this chapter, including promulgating rules and regulations permitted under this chapter." 21 U.S.C. § 1904(e)(1)(B).

FNK 7782 1397

Moreover, the Kingpin Act provides additional authorities to the Secretary of the Treasury, acting in consultation with the heads of several other federal agencies, to designate "any foreign person…materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of a significant foreign narcotics trafficker"; "any foreign person…owned, controlled, or directed by, or acting for or on behalf of, a significant foreign narcotics trafficker;" and "any foreign person…playing a significant role in international narcotics trafficking."[11] Foreign persons who are designated pursuant to these authorities are likewise subject to blocking sanctions under the Kingpin Act.[12]

OFAC acts under a delegation of authority from the Secretary of the Treasury, who is authorized to prescribe such regulations as may be necessary "to carry out the purposes" of the Kingpin Act, including "regulations prescribing recordkeeping, reporting, and production of documents, definitions, licenses, instructions, or directions, as may be necessary…" Pursuant to its own regulations, OFAC may place a designated person on its Specially Designated Nationals and Blocked Persons List ("SDN List") and allow them to "seek administrative reconsideration of his, her, or its designation…or assert that the circumstances resulting in the designation no longer apply, and thus seek to have the designation rescinded…"[13] In doing so, the foreign person "may submit arguments or evidence that the person believes establishes that an insufficient basis exists for the designation" and "may [also] propose remedial steps on the person's part…which the person believes would negate the basis for designation."[14] The regulations further prescribe that OFAC will review the information submitted and "may request clarifying, corroborating, or other additional information."[15] Following a "review of the request for reconsideration, [OFAC] will provide a written decision to the blocked person…"[16]

---

[11] 21 U.S.C. § 1902(2)-(4). A significant foreign narcotics trafficker is defined as "any foreign person that plays a significant role in international narcotics trafficking, that the President has determined to be appropriate for sanctions pursuant to this chapter…" 21 U.S.C. § 1907(7). Narcotics trafficking is itself defined broadly to include "any illicit activity to cultivate, produce, manufacture, distribute, sell, finance, or transport narcotic drugs, controlled substances, or listed chemicals, or otherwise endeavor or attempt to do so, or to assist, abet, conspire, or collude with others to do so." 21 U.S.C. § 1907(3).

[12] 21 U.S.C. § 1904(b).

[13] 31 C.F.R. § 501.807; *see also* 31 C.F.R. § 598.101 ("This part [Part 598] is separate from, and independent of, the other parts of this chapter…with the exception of part 501 of this chapter, the provisions of which apply to this part.").

[14] 31 C.F.R. § 501.807(a).

[15] 31 C.F.R. § 501.807(b).

[16] 31 C.F.R. § 501.807(d).

5

FNK 7782 1398

B.    *Legal Analysis*

According to the administrative record disclosed in this case, OFAC designated Petitioner for allegedly "playing a significant role in international narcotics trafficking" pursuant to 21 U.S.C. § 1904(b)(4).[17]   In undersigned counsel's view, this statutory basis for designation requires OFAC to have current evidence linking Petitioner to present or on-going activities related to narcotics trafficking in order to maintain Petitioner's designation.[18]   Based on undersigned counsel's review of the evidentiary record, the Indictment discussed above and all documents related thereto, as well as Petitioner's current and historic activities, it appears that OFAC is impermissibly maintaining Petitioner's designation on the basis of historical evidence that is now at least a decade old, if not more.

Furthermore, OFAC's maintenance of Petitioner's designation contradicts its own regulatory scheme under which SDNs may assert that the specific circumstances that led to their designation are no longer applicable.  As discussed in further detail below, the circumstances giving rise to Petitioner's designation have not been present since at least 2011, if not 2008; and, as such, OFAC should take immediate steps to rescind Petitioner's designation or, in the alternative, supply contemporary factual allegations that could serve as a basis to maintain Petitioner's current designation.

i.    Evidentiary Record

As discussed above, the evidentiary record meant to supply the legal and factual basis for designating Petitioner is heavily redacted and contains few, if any, substantive claims regarding

---

[17] Evidentiary Memorandum—Treasury-Led Kingpin Act Tier 1 Designation: Ayman Saied Joumaa Network, U.S. Dep't of Treasury Office of Foreign Assets Control, Jan. 21, 2011, at 1-2.

[18] This appears to be the official United States Government's view as well, as evidenced by the United States Embassy in El Salvador's press release following OFAC's rescission of Jose Adan Salazar Umana's Kingpin Act designation:

> OFAC's key criteria to retain an individual on the SDN List is that the information of involvement in narcotics trafficking activity be ongoing.  In the course of its re-investigation, OFAC found that information currently available is insufficient to support the basis that he continues to play a *significant role* in international narcotics trafficking...

> This removal from the OFAC SDN List should not be viewed in the context of other possible criminal activity in which this individual may be, or may have been, involved.  It simply means that current information held by the Department of Treasury is insufficient to demonstrate a reason to believe that he continues to play a significant role at the highest levels of international narcotics trafficking.

*See* Press Release, OFAC Removes Jose Adan Salazar Umana from List of Drug Traffickers, U.S. Embassy in El Salvador, April 7, 2017, *available at* https://sv.usembassy.gov/removal-jose-adan-salazar-umana-ofacs-kingpin-list/.

6

Petitioner's activities outside of the section headers. These section headers suggest that OFAC believes Petitioner exerts "control over narcotics traffickers" and engages in "bulk cash smuggling and control in the laundering of drug proceeds."[19] In OFAC's view, the factual allegations contained in the evidentiary record "provide reason to believe that [Petitioner] plays a significant role in international narcotics trafficking and thus meets the criteria for designation under section 805(b)(4) of the Kingpin Act..."[20]

However, the information contained in OFAC's administrative record—if it is to be believed—is historical in nature. In other words, it merely repeats the factual allegations that serve as the basis for designating Petitioner, but does not include contemporary factual allegations in support of Petitioner's continued Kingpin Act designation. This is a critical distinction insofar as the administrative record lacks a factual basis to support the maintenance of Petitioner's designation. Even assuming *arguendo* that the factual allegations contained in the evidentiary record were true and accurate representations of Petitioner's historical activities, those allegations would be insufficient to support the maintenance of Petitioner's designation in 2017, absent any indicia that Petitioner remains or has recently been involved in narcotics trafficking-related activities. For reasons discussed herein, as well as in prior submissions, it is undersigned counsel's view that there is an inadequate factual basis to support a belief that Petitioner has been involved in narcotics trafficking activities since 2011 at the latest.

ii.      Indictment and Related Materials

As discussed above, the most substantive source of information available to Petitioner to understand the factual allegations leveled against him in support of OFAC's designation is the Indictment that was returned in the Eastern District of Virginia (Case No. 1-11-cr-00560) in 2011, and related documents filed in that case. Both the Indictment and the Affidavit in Support of an Arrest Warrant and Criminal Complaint contain specific factual allegations regarding Petitioner's activities that were likely used to support OFAC's decision to designate Petitioner.

However, those allegations are historical in nature and relate back to alleged activities having taken place prior to 2008. Furthermore, those factual allegations almost wholly consist of statements made by three confidential sources, each of whom has either pled guilty to federal narcotics trafficking offenses or is cooperating with U.S. law enforcement in anticipation of obtaining a reduction in their sentences.

These statements indicate that the sources' relationship with Petitioner did not post-date 2010; and furthermore, none of the sources had information evidencing Petitioner's involvement

---

[19] Evidentiary Memorandum—Treasury-Led Kingpin Act Tier 1 Designation: Ayman Saied Joumaa Network, U.S. Dep't of Treasury Office of Foreign Assets Control, Jan. 21, 2011, at 7-9.
[20] *Id.* at 1-2.

FNK 7782 1400

in narcotics trafficking-related activities post-2008.  As such, the most contemporary evidence related in the Indictment and the Affidavit in Support of an Arrest Warrant and Criminal Complaint is close to a decade old and could not reasonably sustain OFAC's continued maintenance of Petitioner's designation.

iii.    Review of Petitioner's Current and Historic Activities

To determine the specific circumstances that may have served or continue to serve as the factual basis for Petitioner's Kingpin Act designation, undersigned counsel has undertaken an extensive review of Petitioner's current and historic activities.  This review has evidenced the fact that—while Petitioner was engaged in the exchange of currencies and provided support for international payments during the period of 2002-2011—Petitioner has not been involved in such activities post-2011.  Indeed, Petitioner has not engaged in any commercial money-exchange transactions since in or around 2011 following the decision to shutter and liquidate the assets of New Line Exchange Trust Co.

Starting in 2008, Petitioner held effective control over New Line Money Exchange Trust Co., a Lebanese money exchange that provided currency exchange and international payment services to foreign entities.[21]  As indicated in Petitioner's previous submissions, New Line was the subject of extensive review by Lebanese authorities resulting from its business losses.  For instance, on June 17, 2009, Lebanon's Banking Control Commission assigned two controllers to conduct a study on the financial situation of New Line Exchange Trust Co.[22]  The BCC's report indicated that New Line's activities were "restricted to money exchange," and New Line "appear[ed] to comply with Lebanon's money laundering laws."[23]  Considering that the BCC had access to the books of New Line, including, but not limited to, New Line's balance sheets, profit and loss accounts, and asset and amortization statements, the BCC's report evidences that New Line conducted itself in compliance with relevant Lebanese anti-money laundering laws.  Moreover, following Petitioner's designation on January 26, 2011, New Line's board of directors decided to dissolve and liquidate New Line and its assets, a process that has been stymied by the fact that certain of New Line's assets held at Societe Generale de Banque du Liban S.A.L. remain blocked and thus cannot be liquidated as intended.  Notwithstanding that fact, New Line has been inactive since its board recommended dissolution on August 26, 2011.

---

[21] Petitioner has provided OFAC with extensive documents regarding New Line's activities, including sample sales contracts, purchase invoices, and payment orders, all of which are contained in his April 24, 2017 Supplemental Response to OFAC's July 27, 2016 Questionnaire.

[22] *See* Exhibit R to Petitioner's April 24, 2017 Supplemental Response to OFAC's July 27, 2016 Questionnaire.

[23] *See* Exhibit S to Petitioner's April 24, 2017 Supplemental Response to OFAC's July 27, 2016 Questionnaire.

8

Since that time, it is undersigned counsel's view that Petitioner has not been involved in any activities related to the exchange of currencies.[24]  If OFAC has contemporary information indicating that Petitioner has engaged in activities related to narcotics trafficking, much less activities related to the exchange of money, such information has not been shared with Petitioner and has not been integrated into OFAC's administrative record, its press releases announcing the designation of parties alleged to belong to the JOUMAA DTO/MLO, or the criminal charges and all documents related thereto filed in the Eastern District of Virginia.  It is undersigned counsel's view that OFAC lacks any contemporary evidence indicating Petitioner's involvement in such activities for the very simple reason that Petitioner has not been engaged in any such activities since the time of his OFAC designation, if not earlier.  For this reason, OFAC appears to lack a permissible legal basis under which to maintain Petitioner's designation.

III.    **Conclusion**

For the foregoing reasons, Petitioner respectfully requests that OFAC take immediate steps to rescind Petitioner's designation or, in the alternative, supply contemporary factual allegations that could serve as a legal basis to maintain Petitioner's current designation.  In undersigned counsel's view, OFAC lacks a permissible basis upon which to maintain Petitioner's designation, as there is no contemporary factual basis to believe that Petitioner continues to play a significant role in narcotics trafficking activities.  OFAC's failure to take one of the preceding steps may force Petitioner to take legal action demanding the immediate rescission of his designation and his removal from OFAC's SDN List.

Please forward all correspondence concerning this matter to undersigned counsel's Washington, D.C. office:

---

[24] On April 24, 2017, Petitioner filed a Supplemental Response to OFAC's July 27, 2017 Questionnaire.  In this response, Petitioner detailed the fact that a Lebanese tribunal affirmed the decision of a lower court finding a lack of evidence to support the indictment and prosecution of Ayman Saied Joumaa for the crime of money laundering under Lebanese law.  Following an extensive review of the evidence presented in the case, as well as the findings of the Special Investigation Commission at the Central Bank of Lebanon, the Lebanese tribunal found that bank accounts held by Petitioner and his brother in Lebanon since 1998 did not evidence transfers to and from abroad, but rather showed that the majority of deposits made into such individual accounts involved security bonds denominated in Lebanese pounds.  Moreover, in regards to New Line Exchange Trust Co., the tribunal indicated that New Line Exchange Trust Co. was engaged in the receipt of cash funds in U.S. dollars and Euro from traders located in Venezuela and Ghana and the sale of such funds to Meccatef Exchange Co. and Hassan Ayash Exchange Co.  These two exchange companies would transfer the equivalent value of funds to accounts held at Lebanese Canadian Bank in order to transfer funds abroad (e.g., to China) for the import of consumer goods.  In the tribunal's finding, the amount of goods purchased abroad by New Line Exchange Trust Co. totaled $17 million U.S. dollars.  The tribunal could find no evidence supporting OFAC's allegations and lamented the failure of the U.S. Government to turn over evidence to Lebanese authorities that might be in its possession.  *See* February 1, 2017 Lebanon Panel Ruling Re: Money Laundering.

FNK 7782 1402

Erich C. Ferrari, Esq.
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004

Thank you for your consideration, and Petitioner looks forward to your response.

Sincerely,

Erich C. Ferrari

FNK 7782 1403

Exhibit 17

 **Ferrari & Associates, P.C.**

1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004
Tel. 202-280-6370
Fax. 877-448-4885

August 29, 2017

<u>**SENT VIA EMAIL AND FEDERAL EXPRESS: # 8106 5197 5713**</u>

Mark Samara
Assistant Director
Crime/Narcotics & Western Hemisphere Division
Office of Global Targeting
Office of Foreign Assets Control
United States Department of the Treasury
Treasury Annex
1500 Pennsylvania Ave., NW
Washington, D.C. 20220

Re:   <u>**Request to Enter into an Agreement for Removal from OFAC's SDN List**</u>
      *Ayman Saied Joumaa—FNK-7782*

Dear Sir or Madam:

On January 26, 2011, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Ayman Saied Joumaa ("Petitioner") as a specially designated narcotics trafficker ("SDNTK") pursuant to the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), 21 U.S.C. § 1901 *et seq.*, for allegedly playing a significant role in international narcotics trafficking.[1]  On May 18, 2016, Respondent, acting by and through undersigned counsel, filed a formal request for reconsideration of his designation.   That reconsideration case has been assigned Case ID FNK-7782.

In a series of successive filings with OFAC—including a supplemental filing dated August 24, 2017—Petitioner has argued that even if the factual bases underlying OFAC's decision to designate Petitioner were true,[2] there has been a fundamental change of circumstances in the interim period that renders these factual bases outdated and unable to support OFAC's decision to maintain Petitioner's designation.   For this reason, Petitioner has

---

[1] Press Release, Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network, U.S. Dep't of Treasury, Jan. 26, 2011, available at http://www.treasury.gov/press-center/press-releases/Pages/tg1035.aspx.

[2] Petitioner does not make any representations herein suggesting OFAC's allegations regarding his activities are true.  Petitioner merely argues that even if we assumed those allegations to be true, their historical nature would render them incapable of supporting a lawful basis for designation under current conditions.

respectfully urged OFAC to take steps to rescind Petitioner's designation and remove his name from OFAC's Specially Designated Nationals and Blocked Persons List ("SDN List").

To mitigate any concerns OFAC may have regarding Petitioner, and to provide confidence regarding Petitioner's current and future activities, Petitioner is herein expressing his intent to enter into a Terms of Removal Agreement with OFAC that would govern the rescission of Petitioner's designation and removal of his name from OFAC's SDN List.[3]  Such a Terms of Removal Agreement would condition OFAC's rescission of Petitioner's Kingpin Act designation on a number of stipulations—not least of which is to refrain from any conduct linked to or otherwise associated with narcotics trafficking or money laundering in support of such narcotics trafficking.  As such, Petitioner herein respectfully requests to enter into discussions with OFAC concerning a proposed Terms of Removal Agreement.

## I.    Terms of Removal Agreements

A Terms of Removal Agreement governs the conduct of designated individuals and entities upon their removal from OFAC's SDN List.  It is undersigned counsel's understanding that OFAC does not adopt such Terms of Removal Agreements with de-listed parties as a matter of routine practice.[4]  However, undersigned counsel is aware that OFAC did enter into a Terms

---

[3] Such a Terms of Removal Agreement is not a precondition for rescission of Petitioner's Kingpin Act designation. Indeed, as Petitioner has argued in successive filings, OFAC lacks a contemporary factual basis under which to maintain Petitioner's designation; and, as a result, removal of Petitioner's name from OFAC's SDN List is legally mandated. Petitioner's current proposal to enter into a Terms of Removal Agreement is intended only to help reach a mutually satisfactory resolution to this reconsideration matter for all parties involved, including the U.S. government.

[4] If, on the other hand, OFAC does enter into Terms of Removal Agreements as a matter of routine practice, unbeknownst to undersigned counsel, OFAC's refusal to extend the same to Petitioner may represent agency action that is "arbitrary, capricious, [or] an abuse of discretion" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*  For instance, in the case of *I.N.S. v. Yeuh-Shaio Yang*, the Supreme Court held that:

> Though the agency's discretion is unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as "arbitrary, capricious, or an abuse of discretion" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

*I.N.S. v. Yeuh-Shaio Yang*, 519 U.S. 26, 31 (1996).

Furthermore, the Court has noted that, in cases involving an alleged change in agency interpretation of a statute, "[although] the mere fact that an agency interpretation contradicts a prior agency position is not fatal...[s]udden and unexplained change...or change that does not take account of legitimate reliance on prior interpretation...may be arbitrary, capricious, or an abuse of discretion." *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996). Finally, "[while] an agency has a well-settled right to modify or even overrule established precedent, it is equally settled that an agency must provide a reasonable explanation for any failure to adhere to its own precedents." *Grace*

2

of Removal Agreement on at least one prior occasion. That agreement was entered into with Deutsche Forfait—a German firm designated under Executive Order 13382—through which the formerly designated party agreed to the following conditions for its removal from OFAC's SDN List: (1) to refrain from business relations or other connections with SDN-listed parties; (2) to ensure that its shareholders do not and will not maintain business relations or other connections with certain designated parties and that none of its shareholders will be identified on OFAC's SDN List; and (3) to install and implement a rigorous U.S. sanctions compliance program and to train its employees to act in conformity with any such U.S. sanctions compliance program.[5] In return for Deutsche Forfait agreeing to these conditions, OFAC rescinded its designation pursuant to Executive Order 13382 and removed its name from OFAC's SDN List. As such, this Terms of Removal Agreement had the effect of satisfying the interests of all parties concerned, including the U.S. government's interest in ensuring that parties are not engaged in activities deemed anathema to U.S. national security and foreign policy interests.

Petitioner is prepared to enter into a similar Terms of Removal Agreement with OFAC in order to provide a measure of confidence to the agency meriting the rescission of his designation. However, Petitioner expresses his intent to enter into such a Terms of Removal Agreement as a gesture of good-faith to highlight to OFAC that Petitioner is prepared to conduct himself in a manner conforming to U.S. interests (i.e., to refrain from relationships with or associations to persons involved in narcotics trafficking or money laundering activities). Petitioner is willing to discuss with OFAC any proposed conditions deemed necessary to warrant immediate rescission of his designation and removal of his name from OFAC's SDN List.

Undersigned counsel believes that such a Terms of Removal Agreement will serve to illustrate how U.S. sanctions can achieve important U.S. foreign policy interests by changing the behavior of targeted individuals and entities. Pursuant to 31 C.F.R. § 501.807, U.S.-designated individuals can seek reconsideration of their designation or assert that the circumstances resulting in the designation no longer apply and thus request the rescission of their designation. The effective purpose of this regulatory provision is to permit designated parties an opportunity to rebut the factual basis of their designation or take remedial actions to remove the basis for such designation—all of which is intended to redound to the interests of the U.S. government. Underlying this provision is OFAC's view that "the primary goal for sanctions is behavioral change."[6] Targeted sanctions are designed to isolate perceived bad actors from the U.S. financial

---

*Petroleum Corp. v. F.E.R.C*, 812 F.2d 589, 591 (10th Cir. 1987) (citing *Hatch v. F.E.R.C.*, 654 F.2d 825, 834 (D.C. Cir. 1981)).

[5] DF Deutsche Forfait AG, DF Deutsche Forfait AG Removed from OFAC Sanctions List Without Having to Pay a Fine (Oct. 17, 2014), http://www.dfag.de/en/df-deutsche-forfait-ag-removed-from-ofac-sanctions-list-without-having-to-pay-a-fine/.

[6] *See* PRESS RELEASE, Treasury Lifts Sanctions on the Defunct Columbian Business Empire Led by the Rodriguez Orejuela Family, U.S. Dep't of Treasury (June 19, 2014), http://www.treasury.gov/press-center/press-releases/Pages/jl2436.aspx.

3

system and convince them that only a credible change in behavior will lead to sanctions lifting. As OFAC itself has stated, "[s]anctions are a means to an end; [their] ultimate goal...is behavioral change."[7]  In doing so, OFAC has further noted that it "seeks to reward those who change behavior and motivate others to do the same."[8]  While Petitioner maintains that OFAC lacks a current legal basis under which to maintain his Kingpin Act designation, his proposal to enter into a Terms of Removal Agreement will buttress prevailing U.S. sanctions policy and herald policy success for OFAC by explicitly conditioning Petitioner's de-listing on his agreement to refrain from engagement in activities or relationships with persons related to narcotics trafficking or money laundering.  As such, a Terms of Removal Agreement would lead to a satisfactory outcome for OFAC, as it gains confidence not only that Petitioner is no longer engaged in activities deemed anathema to U.S. interests but also that Petitioner will refrain from any such conduct in the future as well.

## II.   Conclusion

For the foregoing reasons, Petitioner expresses his intent to enter into a Terms of Removal Agreement under which OFAC would condition the rescission of Petitioner's designation on Petitioner conforming his conduct to certain agreed-upon terms.  Petitioner respectfully requests that OFAC review Petitioner's proposal to enter into a Terms of Removal Agreement and enter into discussions with Petitioner regarding it.  If OFAC refuses to enter into discussions regarding such proposed agreement, Petitioner requests that OFAC provide a reasoned explanation for its refusal to do so.  As discussed above, it is undersigned counsel's view that Petitioner's willingness to enter into a Terms of Removal Agreement signals his good-faith in seeking a mutually satisfactory solution to this administrative reconsideration matter.

Please forward all correspondence relating to this and Petitioner's request for administrative reconsideration to undersigned counsel's Washington D.C. office:

Erich C. Ferrari, Esq.
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004

Thank you for your consideration, and we look forward to your response.

---

[7] Adam Szubin, *Sanctions 101: Part II – Enforcement and Its Effects*, U.S. Dep't of the Treasury (June 2, 2014), http://www.treasury.gov/connect/blog/Pages/Sanctions-101-Pt-2-.aspx.

[8] Treasury Department Explains Value, Effect of Sanctions, IIP Digital, U.S. Dep't of State (June 12, 2014), https://geneva.usmission.gov/2014/06/13/treasury-department-explains-value-effect-of-sanctions/.

4

Sincerely,

Erich C. Ferrari

FNK 7782 1408

Exhibit 25



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

Case ID: FNK-7782

Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004

OCT 1 6 2017

Re: Ayman Saied Joumaa

Dear Mr. Ferrari:

This letter acknowledges receipt of your correspondence dated September 27, 2017 to the Office of Foreign Assets Control (OFAC), requesting a status update of your client's reconsideration request.

Your request for reconsideration of your client's designation as a Specially Designated Narcotics Trafficker (SDNT) pursuant to Section 805 of the Foreign Narcotics Kingpin Designation Act (Kingpin Act), 21 U.S.C. § 1904(b), is under review. We must independently verify whether your client no longer meets the criteria for designation, and this determination includes careful review of the documents you have thus far submitted on behalf of your client.

As you are aware, OFAC has many persons who have requested reconsideration. The quantity of reconsideration cases and the complexity of these cases can make this a lengthy process. Furthermore, please note that the reconsideration decision for all such requests requires U.S. federal government inter-agency consultation and legal review. This is a necessary part of our reconsideration process, and it has delayed our response time.

We understand that this matter is a priority for your client, and we hope to reach a final decision in the near future.

For the most expedient communications, please direct all questions and correspondence regarding your requests to **OFAC.Reconsideration@treasury.gov**. You may also communicate via telephone at (202) 622-2420, fax at (202) 622-5390, or mailing OFAC at the following address:

> U.S. Department of the Treasury
> Office of Foreign Assets Control
> ATTN: Office of Global Targeting
> 1500 Pennsylvania Avenue, N.W. (Freedman's Bank Building)
> Washington, DC 20220

1

Please refer to case ID FNK-7782 cited above in all future correspondence.

Thank you for your cooperation.

Sincerely,

Mark Samara
Assistant Director
Crime/Narcotics and Western Hemisphere Division
Office of Foreign Assets Control

2

The secret backstory of how Obama let Hezbollah off the hook



# The secret backstory of how Obama let Hezbollah off the

ADVERTISEMENT

KEEP READING ✕
Take me back to
where I left off



*expansion.*

In its determination to secure a nuclear deal with Iran, the Obama administration derailed an ambitious law enforcement campaign targeting drug trafficking by the Iranian-backed terrorist group Hezbollah, even as it was funneling cocaine into the United States, according to a POLITICO investigation.

The campaign, dubbed Project Cassandra, was launched in 2008 after the Drug Enforcement Administration amassed evidence that Hezbollah had transformed itself from a Middle East-focused military and political organization into an international crime syndicate that some investigators believed was collecting $1 billion a year from drug and weapons trafficking, money laundering and other criminal activities.

Over the next eight years, agents working out of a top-secret DEA facility in Chantilly, Virginia, used wiretaps, undercover operations and informants to map Hezbollah's illicit networks, with the help of 30 U.S. and foreign security agencies.

They followed cocaine shipments, some from Latin America to West Africa and on to Europe and the Middle East, and others through Venezuela and Mexico to the United States. They tracked the river of dirty cash as it was laundered by, among other tactics, buying American used cars and shipping them to Africa. And with the help of some key cooperating witnesses, the agents traced the conspiracy, they believed, to the innermost circle of Hezbollah and its state sponsors in Iran.

**They followed cocaine shipments, tracked a river of dirty cash, and traced what they believed to be the innermost circle of Hezbollah and its state sponsors in Iran.**

The secret backstory of how Obama let Hezbollah off the hook

 (http://www.politico.com)   Project Cassandra   Part I  |  Part II  |  Part III

But as Project Cassandra reached higher into the hierarchy of the conspiracy, Obama administration officials threw an increasingly insurmountable series of roadblocks in its way, according to interviews with dozens of participants who in many cases spoke for the first time about events shrouded in secrecy, and a review of government documents and court records. When Project Cassandra leaders sought approval for some significant investigations, prosecutions, arrests and financial sanctions, officials at the Justice and Treasury departments delayed, hindered or rejected their requests.

The Justice Department declined requests by Project Cassandra and other authorities to file criminal charges against major players such as Hezbollah's high-profile envoy to Iran, a Lebanese bank that allegedly laundered billions in alleged drug profits, and a central player in a U.S.-based cell of the Iranian paramilitary Quds force. And the State Department rejected requests to lure high-value targets to countries where they could be arrested.

December 15, 2011

### Hezbollah is linked to a $483,142,568 laundering scheme

The money, allegedly laundered through the Lebanese Canadian Bank and two exchange houses, involved approximately 30 U.S. car buyers.

FNK 7782 1434   3/56

The secret backstory of how Obama let Hezbollah off the hook

 (http://www.politico.com)   Project Cassandra   Part I  |  Part II  |  Part III

🐦                    ()

Read the document
(https://www.documentcloud.org/documents/4325664-Hezbollah-
Money-Laundering.html)

"This was a policy decision, it was a systematic decision," said David
Asher, who helped establish and oversee Project Cassandra as a
Defense Department illicit finance analyst. "They serially ripped
apart this entire effort that was very well supported and resourced,
and it was done from the top down."

**David Asher**
Veteran U.S. illicit finance
expert
(https://youtu.be/kctJ0Vao
9L70) sent from Pentagon
to Project Cassandra to
attack the alleged
Hezbollah
(http://docs.house.gov/me
etings/FA/FA00/2017060
8/106094/HHRG-115-
FA00-Wstate-AsherD-
20170608.PDF) criminal
enterprise.

ADVERTISEMENT

The untold story of Project Cassandra illustrates the immense
difficulty in mapping and countering illicit networks in an age where
global terrorism, drug trafficking and organized crime have merged,
but also the extent to which competing agendas among government
agencies — and shifting priorities at the highest levels — can set
back years of progress.

And while the pursuit may be shadowed in secrecy, from Latin
American luxury hotels to car parks in Africa to the banks and
battlefields of the Middle East, the impact is not: In this case, multi-
ton loads of cocaine entering the United States, and hundreds of
millions of dollars going to a U.S.-designated terrorist organization
with vast reach.

Obama had entered office in 2009 promising to improve relations
with Iran as part of a broader rapprochement with the Muslim world.
On the campaign trail, he had asserted repeatedly that the Bush
administration's policy of pressuring Iran to stop its illicit nuclear
program wasn't working, and that he would reach out to Tehran to
reduce tensions.

The man who would become Obama's top counterterrorism adviser
and then CIA director, John Brennan, went further. He
recommended in a policy paper
(http://journals.sagepub.com/doi/abs/10.1177/0002716208316732)
that "the next president has the opportunity to set a new course for

**John Brennan**
Obama's White House
counterterrorism adviser,
who became CIA director in
2013.

FNK 7782 1435 4/56

P (http://www.politico.com)

The secret backstory of how Obama let Hezbollah off the hook

Project Cassandra    Part I  |  Part II  |  Part III

relations between the two countries" through not only a direct dialogue, but "greater assimilation of Hezbollah into Lebanon's political system."



Barack Obama  John Brennan
Former U.S. president  CIA directc

By May 2010, Brennan, then assistant to the president for homeland security and counterterrorism, confirmed in a speech that the administration was looking for ways to build up "moderate elements" within Hezbollah.

"Hezbollah is a very interesting organization," Brennan told a Washington conference, saying it had evolved from "purely a terrorist organization" to a militia and, ultimately, a political party with representatives in the Lebanese Parliament and Cabinet, according to a Reuters report (https://www.reuters.com/article/us-lebanon-usa-hezbollah/u-s-wants-to-build-up-hezbollah-moderates-adviser-idUSTRE64IoUM20100519?type=politicsNews).

"There is certainly the elements of Hezbollah that are truly a concern to us what they're doing," Brennan said. "And what we need to do is to find ways to diminish their influence within the organization and to try to build up the more moderate elements."

In practice, the administration's willingness to envision a new role for Hezbollah in the Middle East, combined with its desire for a negotiated settlement to Iran's nuclear program, translated into a reluctance to move aggressively against the top Hezbollah operatives, according to Project Cassandra members and others.

Lebanese arms dealer Ali Fayad , a suspected top Hezbollah operative whom agents believed reported to Russian President Vladimir Putin as a key supplier of weapons to Syria and Iraq, was arrested in Prague in the spring of 2014. But for the nearly two years Fayad was in custody, top Obama administration officials declined to apply serious pressure on the Czech government to extradite him to the United States, even as Putin was lobbying aggressively against it.

Fayad, who had been indicted in U.S. courts on charges of planning the murders of U.S. government employees, attempting to provide material support to a terrorist organization and attempting to acquire, transfer and use anti-aircraft missiles, was ultimately sent to Beirut. He is now believed by U.S. officials to be back in business, and helping to arm militants in Syria and elsewhere with Russian heavy weapons.

**Ali Fayad**

(aka Fayad). Ukraine-based arms merchant (https://www.justice.gov/us ao-sdny/pr/ivorian-man-pleads-guilty-manhattan-federal-court-conspiring-provide-material-support) suspected of being a Hezbollah operative (http://docs.house.gov/me etings/FA/FA00/2017060 8/106094/HHRG-115-FA00-Wstate-LevittM-20170608.pdf) moving large amounts of weapons to Syria.

The secret backstory of how Obama let Hezbollah off the hook

March 26, 2014

### Indictment of Ali Fayad

The indictment alleges Fayad, along with his co-conspirators, agreed to
provide the FARC with weapons to kill U.S. and Colombian officials.

Read the document

(https://www.documentcloud.org/documents/4325666-Ali-Fayad-
Farouzi-Indictment.html)

Project Cassandra members say administration officials also blocked
or undermined their efforts to go after other top Hezbollah
operatives including one nicknamed the 'Ghost," allowing them to
remain active despite being under sealed U.S. indictment for years.
People familiar with his case say the Ghost has been one of the
world's biggest cocaine traffickers, including to the U.S., as well as a
major supplier of conventional and chemical weapons
(https://www.treasury.gov/press-center/press-
releases/Pages/sm0056.aspx) for use by Syrian President Bashar
Assad against his people.

**The Ghost**

One of the most mysterious
alleged associates of
Safieddine, secretly
indicted by the U.S., linked
to multi-ton U.S.-bound
cocaine loads and weapons
shipments to Middle East.

FNK 7782 1437   6/56



(http://www.politico.com)

The secret backstory of how Obama let Hezbollah off the hook

Project Cassandra    Part I  |  Part II  |  Part III

And when Project Cassandra agents and other investigators sought repeatedly to investigate and prosecute Abdallah Safieddine, Hezbollah's longtime envoy to Iran, whom they considered the linchpin of Hezbollah's criminal network, the Justice Department refused, according to four former officials with direct knowledge of the cases.

The administration also rejected repeated efforts by Project Cassandra members to charge Hezbollah's military wing as an ongoing criminal enterprise under a federal Mafia-style racketeering statute, task force members say. And they allege that administration officials declined to designate Hezbollah a "significant transnational criminal organization" and blocked other strategic initiatives that would have given the task force additional legal tools, money and manpower to fight it.

Former Obama administration officials declined to comment on individual cases, but noted that the State Department condemned the Czech decision not to hand over Fayad. Several of them, speaking on condition of anonymity, said they were guided by broader policy objectives, including de-escalating the conflict with Iran, curbing its nuclear weapons program and freeing at least four American prisoners held by Tehran, and that some law enforcement efforts were undoubtedly constrained by those concerns.

But the former officials denied that they derailed any actions against Hezbollah or its Iranian allies for political reasons.

"There has been a consistent pattern of actions taken against Hezbollah, both through tough sanctions and law enforcement actions before and after the Iran deal," said Kevin Lewis, an Obama spokesman who worked at both the White House and Justice Department in the administration.

Lewis, speaking for the Obama administration, provided a list of eight arrests and prosecutions as proof. He made special note of a February 2016 operation in which European authorities arrested an undisclosed number of alleged members of a special Hezbollah business affairs unit that the DEA says oversees its drug trafficking and other criminal money-making enterprises.

**Abdallah Safieddine** ()
Hezbollah's longtime envoy to Iran who allegedly (https://www.dea.gov/divisions/hq/2016/hq020116.s html) oversaw the group's "Business Affairs Component" involved in international drug trafficking.

ADVERTISEMENT



Project Cassandra officials, however, noted that the European arrests occurred after the negotiations with Iran were over, and said the task force initiated the multinational partnerships on its own, after years of seeing their cases shot down by the Justice and State departments and other U.S. agencies.

The Justice Department, they pointed out, never filed corresponding U.S. criminal charges against the suspects arrested in Europe, including one prominent Lebanese businessman formally designated by the Treasury Department for using his "direct ties to Hezbollah commercial and terrorist elements" to launder bulk shipments of illicit cash for the organization throughout Asia, Europe and the Middle East.

A former senior national security official of the Obama administration, who played a role in the Iran nuclear negotiations, suggested that Project Cassandra members were merely speculating that their cases were being blocked for political reasons. Other factors, including a lack of evidence or concerns about interfering with intelligence operations could have been in play.

"What if the CIA or the Mossad had an intelligence operation ongoing inside Hezbollah and they were trying to pursue someone . . . against whom we had impeccable [intelligence] collection and the DEA is not going to know that?" the official said. "I get the feeling people who don't know what's going on in the broader universe are grasping at straws."

The official added: "The world is a lot more complicated than viewed through the narrow lens of drug trafficking. So you're not going to let CIA rule the roost, but you're also certainly not going to let DEA do it either. Your approach to anything as complicated as Hezbollah is going to have to involve the interagency [process], because the State Department has a piece of the pie, the intelligence community does, Treasury does, DOD does."

Nonetheless, other sources independent of Project Cassandra confirmed many of the allegations in interviews with POLITICO, and in some cases, in public comments.

One Obama-era Treasury official, Katherine Bauer, in little-noticed written testimony presented last February to the House Committee on Foreign Affairs, acknowledged that "under the Obama administration ... these [Hezbollah-related] investigations were tamped down for fear of rocking the boat with Iran and jeopardizing the nuclear deal."

FNK 7782 1439

The secret backstory of how Obama let Hezbollah off the hook

P (http://www.politico.com)

February 16, 2017

Project Cassandra      Part I  |  Part II  |  Part III

**Katherine Bauer testimony to the House Committee on Foreign Affairs**

Former Treasury official criticizes the Obama administration.

Read the document

(https://www.documentcloud.org/documents/4329058-Katherine-Bauer-testimony-to-the-House-Committee.html)

As a result, some Hezbollah operatives were not pursued via arrests, indictments, or Treasury designations that would have blocked their access to U.S. financial markets, according to Bauer, a career Treasury official, who served briefly in its Office of Terrorist Financing as a senior policy adviser for Iran before leaving in late 2015. And other "Hezbollah facilitators" (http://www.washingtoninstitute.org/uploads/Documents/pubs/PolicyNote38-Bauer.pdf) arrested in France, Colombia, Lithuania have not been extradited — or indicted — in the U.S., she wrote.

Bauer, in an interview, declined to elaborate on her testimony.

FNK 7782 1440 9/56

The secret backstory of how Obama let Hezbollah off the hook

(http://www.politico.com) Project Cassandra   Part I  |  Part II  |  Part III

Asher, for one, said Obama administration officials expressed concerns to him about alienating Tehran before, during and after the Iran nuclear deal negotiations. This was, he said, part of an effort to "defang, defund and undermine the investigations that were involving Iran and Hezbollah," he said.

"The closer we got to the [Iran deal], the more these activities went away," Asher said. "So much of the capability, whether it was special operations, whether it was law enforcement, whether it was [Treasury] designations — even the capacity, the personnel assigned to this mission — it was assiduously drained, almost to the last drop, by the end of the Obama administration."

With much fanfare, Obama announced the final agreement on implementation of the Iran deal on Jan. 17, 2016, in which Tehran promised to shelve efforts to build a nuclear weapons program in exchange for being released from crippling international economic sanctions.

Within months, task force officials said, Project Cassandra was all but dead. Some of its most senior officials, including Jack Kelly, the veteran DEA supervisory agent who created and led the task force, were transferred to other assignments. And Asher himself left the task force long before that, after the Defense Department said his contract would not be renewed.

As a result, the U.S. government lost insight into not only drug trafficking and other criminal activity worldwide, but also into Hezbollah's illicit conspiracies with top officials in the Iranian, Syrian, Venezuelan and Russian governments — all the way up to presidents Nicolas Maduro, Assad and Putin, according to former task force members and other current and former U.S. officials.

The derailment of Project Cassandra also has undermined U.S. efforts to determine how much cocaine from the various Hezbollah-affiliated networks is coming into the United States, especially from Venezuela, where dozens of top civilian and military officials have been under investigation for more than a decade. Recently, the Trump administration designated the country's vice president, a close ally of Hezbollah and of Lebanese-Syrian descent, as a global narcotics kingpin.

**David Asher**  ()

Veteran U.S. illicit finance expert (https://youtu.be/kcU0Vao 9L70) sent from Pentagon to Project Cassandra to attack the alleged Hezbollah (http://docs.house.gov/me etings/FA/FA00/2017060 8/106094/HHRG-115-FA00-Wstate-AsherD-20170606.PDF) criminal enterprise.

**John "Jack" Kelly**

DEA agent overseeing Hezbollah cases at Special Operations Division, who named task force Project Cassandra after clashes with other U.S. agencies about Hezbollah drug-terror links.



(http://www.politico.com)   Project Cassandra   Part I  |  Part II  |  Part III

Meanwhile, Hezbollah — in league with Iran — continues to undermine U.S. interests in Iraq, Syria and throughout wide swaths of Latin America and Africa, including providing weapons and training to anti-American Shiite militias. And Safieddine, the Ghost and other associates continue to play central roles in the trafficking of drugs and weapons, current and former U.S. officials believe.

"They were a paramilitary organization with strategic importance in the Middle East, and we watched them become an international criminal conglomerate generating billions of dollars for the world's most dangerous activities, including chemical and nuclear weapons programs and armies that believe America is their sworn enemy," said Kelly, the supervisory DEA agent and lead coordinator of its Hezbollah cases.

"If they are violating U.S. statutes," he asked, "why can't we bring them to justice?"

May, 31, 2017
### Indictment of Samer El Debek
From roughly 2008 to 2015, Debek allegedly received military training from training in surveillance, explosives and firearms.

The secret backstory of how Obama let Hezbollah off the hook

 (http://www.politico.com)   Project Cassandra   Part I  |  Part II  |  Part III

🖤        O

Read the document
(https://www.documentcloud.org/documents/4325660-Debek.html)

Kelly and Asher are among the officials involved in Project Cassandra who have been quietly contacted by the Trump administration and congressional Republicans, who said a special POLITICO report April 24 on Barack Obama's hidden Iran deal concessions raised urgent questions about the need to resurrect key law enforcement programs to counter Iran.

That won't be easy, according to former Project Cassandra members, even with President Donald Trump's recent vow to crack down on Iran and Hezbollah. They said they tried to keep the project on life support, in hopes that it would be revived by the next administration, but the loss of key personnel, budget cuts and dropped investigations are only a few of many challenges made worse by the passage of nearly a year since Trump took office.

"You can't let these things disintegrate," said Kelly. "Sources evaporate. Who knows if we can find all of the people willing to testify?"

Derek Maltz, who oversaw Project Cassandra as the head of the DEA's Special Operations Division for nine years ending in July 2014, put it this way: "Certainly there are targets that people feel that could have been indicted and weren't. There is certainly an argument to be made that if tomorrow all the agencies were ordered to come together and sit in a room and put all the evidence on the table against all these bad guys, that there could be a hell of a lot of indictments."

**Derek Maltz**

Senior DEA official who as head of Special Operations Division lobbied for support for Project Cassandra (http://docs.house.gov/me etings/FA/FA00/2017060 8/106094/HHRG-115-FA00-Wstate-MaltzD-20170608.pdf) and its investigations.

But Maltz said the damage wrought by years of political interference will be hard to repair.

"There's no doubt in my mind now that the focus was this Iran deal and our initiative was kind of like a fly in the soup (http://docs.house.gov/meetings/FA/FA00/20170608/106094/HHR G-115-FA00-Wstate-MaltzD-20170608.pdf)," Maltz said. "We were the train that went off the tracks."

Project Cassandra had its origins in a series of investigations launched in the years after the 9/11 attacks which all led, via their own twisted paths, to Hezbollah as a suspected global criminal enterprise.

FNK 7782 144312/56

The secret backstory of how Obama let Hezbollah off the hook

P (http://www.politico.com)

Project Cassandra   Part I  |  Part II  |  Part III

Operation Titan, in which the DEA worked with Colombian authorities to explore a global alliance between Lebanese money launderers and Colombian drug trafficking conglomerates, was one. Operation Perseus, targeting Venezuelan syndicates, was another. At the same time, DEA agents in West Africa were investigating the suspicious flow of thousands of used cars from U.S. dealerships to car parks in Benin.

Meanwhile, in Iraq, the U.S. military was probing the role of Iran in outfitting Shiite militias with high-tech improvised explosive devices known as Explosively Formed Penetrators, or EFPs, that had already killed hundreds of U.S. soldiers.

All of these paths eventually converged on Hezbollah.

This wasn't entirely a surprise, agents say. For decades, Hezbollah — in close cooperation with Iranian intelligence and Revolutionary Guard — had worked with supporters in Lebanese communities around the world to create a web of businesses that were long suspected of being fronts for black-market trading. Along the same routes that carried frozen chicken and consumer electronics, these businesses moved weapons, laundered money and even procured parts for Iran's illicit nuclear and ballistic missile programs.

As they pursued their investigations, the DEA agents found that Hezbollah was redoubling all of these efforts, working urgently to raise cash, and lots of it, to rebuild its south Lebanon stronghold after a 2006 war with Israel had reduced it to rubble.

Dating back to its inception in the early 1980s, Hezbollah, which translates to "Party of God," had also engaged in "narcoterrorism," collecting a tariff from drug dealers and other black-market suppliers who operated in territory it controlled in Lebanon and elsewhere. Now, based on the DEA's extensive network of informants, undercover operatives and wiretaps, it looked like Hezbollah had shifted tactics, and gotten directly involved in the global cocaine trade, according to interviews and documents, including a confidential DEA assessment.

"It was like they flipped a switch," Kelly told POLITICO. "All of a sudden, they reversed the flow of all of the black-market activity they had been taxing for years, and took control of the operation."

**Operation Titan** ()
A joint investigation (http://docs.house.gov/meetings/FA/FA00/20170608/106094/HHRG-115-FA00-Wstate-MalizD-20170608.pdf) with Colombian authorities into a global money-laundering and drug-trafficking alliance between Latin American traffickers and Lebanese operatives.


(http://www.politico.com)

The secret backstory of how Obama let Hezbollah off the hook

Project Cassandra    Part I  |  Part II  |  Part III

🐦    0

Operating like an organized crime family, Hezbollah operatives would identify businesses that might be profitable and useful as covers for cocaine trafficking and buy financial stakes in them, Kelly and others said. "And if the business was successful and suited their current needs," Kelly said, "they went from partial owners to majority owners to full partnership or takeover."

Hezbollah even created a special financial unit that, translated into English, means "Business Affairs Component," to oversee the sprawling criminal operation, and it was run by the world's most wanted terrorist after Osama bin Laden, a notoriously vicious (https://ipfs.io/ipfs/QmXoypizjW3WknFiJnKLwHCnL7zvedxjQkDDP 1mXWo6uco/wiki/FBI_Most_Wanted_Terrorists.html) Hezbollah military commander named Imad Mughniyeh, according to DEA interviews and documents.

Mughniyeh had for decades been the public face of terrorism for Americans, orchestrating the infamous attack that killed 241 U.S. Marines in 1983 in their barracks in Lebanon, and dozens more Americans in attacks on the U.S. Embassy in Beirut that year and an annex the year after. When President Ronald Reagan (https://history.state.gov/milestones/1981-1988/lebanon) responded to the attacks by withdrawing peacekeeping troops from Lebanon, Hezbollah claimed a major victory and vaulted to the forefront of the Islamist resistance movement against the West.

Over the next 25 years, Iran's financial and military support (https://www.state.gov/j/ct/list/c14151.htm) for Hezbollah enabled it to amass an army with tens of thousands of foot soldiers, more heavy armaments than most nation-states and approximately 120,000 rockets and ballistic missiles that could strike Israel and U.S. interests in the region with devastating precision.

Hezbollah became an expert in soft power, as well. It provided food, medical care and other social services for starving refugees in war-torn Lebanon, winning credibility on the ground. It then evolved further into a powerful political (https://en.wikipedia.org/wiki/Loyalty_to_the_Resistance_Bloc) party, casting itself as the defender of poor, mostly Shiite Lebanese against Christian and Sunni Muslim elites. But even as Hezbollah was moving into the mainstream of Lebanese politics, Mughniyeh was overseeing a secret expansion of its terrorist wing, the Islamic Jihad Organization. Working with Iranian intelligence agents, Islamic Jihad continued to attack (https://www.state.gov/r/pa/prs/ps/2017/07/272649.htm) Western, Israeli and Jewish targets around the world, and to conduct surveillance on others — including in the United States (http://bit.ly/2ytDRPO) — in preparation for future attacks.

**Imad Mughniyeh**

A Hezbollah mastermind (https://www.dea.gov/divisions/hq/2016/hq020116.shtml) who oversaw its international operations and, the DEA says, its drug trafficking, as head of its military wing, the Islamic Jihad Organization.



(http://www.politico.com)   Project Cassandra   Part I  |  Part II  |  Part III

Hezbollah mostly left the United States alone, in what was clearly a strategic decision to avoid U.S. retaliation. But by 2008, the Bush administration came to believe that Islamic Jihad was the most dangerous terrorist organization in the world, capable of launching instantaneous attacks, possibly with chemical, biological or low-grade nuclear weapons, that would dwarf those on 9/11.

ADVERTISEMENT

By funding terrorism and military operations through global drug trafficking and organized crime, Mughniyeh's business affairs unit within Islamic Jihad had become the embodiment of the kind of threat the United States was struggling to address in the post-9/11 world.

The DEA believed that it was the logical U.S. national security agency to lead the interagency effort to go after Mughniyeh's drug trafficking networks. But within the multipronged U.S. national security apparatus, this was both a questionable and problematic assertion.

Established by President Richard Nixon in 1973 (https://www.dea.gov/about/history.shtml) to bring together the various anti-drug programs under the Department of Justice, the DEA was among the youngest of the U.S. national security agencies.

And while the DEA had quickly proven itself adept at working on the global stage — especially in partnerships with drug-infested countries desperate for U.S. help like Colombia — few people within the U.S. government thought of it as a legitimate counterterrorism force.

In the final years of the Bush administration, though, the DEA had won the support of top officials for taking down two major international arms dealers, a Syrian named Monzer al-Kassar (https://www.justice.gov/archive/usao/nys/pressreleases/June07/ka ssaretalarrest%20PR.pdf) and the Russian "Lord of War (https://www.justice.gov/archive/opa/pr/2008/March/bout-complaint.pdf)," Viktor Bout. And thanks to supportive Republicans in Congress, it had become the beneficiary of a new federal law (https://www.deadiversion.usdoj.gov/21cfr/21usc/960a.htm) that empowered its globe-trotting cadre of assault-weapon-toting Special Operations agents.

**Viktor Anatolyevich Bout**

Vladimir Putin's arms dealer, known as the "Lord of War." Convicted of conspiracy to sell millions of dollars worth of weapons to Colombian narcoterrorists.

P (http://www.politico.com)

The secret backstory of how Obama let Hezbollah off the hook

Project Cassandra    Part I  |  Part II  |  Part III

The statute allowed DEA agents to operate virtually anywhere, without permission required from other U.S. agencies. All they needed to do was connect drug suspects to terrorism, and they could arrest them, haul them back to the United States and flip them in an effort to penetrate "the highest levels of the world's most significant and notorious criminal organizations," as then-Special Operations chief Maltz told Congress (https://www.gpo.gov/fdsys/pkg/CHRG-112hhrg71265/html/CHRG-112hhrg71265.htm) in November 2011.

As they crunched the massive amounts of intel streaming into the DEA's Counter Narco-Terrorism Operations Center (https://ndiastorage.blob.core.usgovcloudapi.net/ndia/2010/homel and/Dodd.pdf) in Chantilly, Virginia, the agents on Operation Titan, Perseus and the other cases began to connect the dots and map the contours of one overarching criminal enterprise.

**Derek Maltz** 0

Senior DEA official who as head of Special Operations Division lobbied for support for Project Cassandra (http://docs.house.gov/me etings/FA/FA00/2017060 8/106094/HHRG-115-FA00-Wstate-MaltzD-20170608.pdf) and its investigations.

**Operation Titan**

A joint investigation (http://docs.house.gov/me etings/FA/FA00/2017060 8/106094/HHRG-115-FA00-Wstate-MaltzD-20170608.pdf) with Colombian authorities into a global money-laundering and drug-trafficking alliance between Latin American traffickers and Lebanese operatives.

f          0 🐦          0

PART II

# Everywhere and Nowhere

*From its headquarters in the Middle East, Hezbollah extends its criminal reach to Latin America, Africa and the United States.*