

"He is one of the very few people who could describe for us the workings of the operation at the highest levels," Kelly said. "And the administration didn't lift a finger to get him back here."

One senior Obama administration official familiar with the case said it would be a stretch to link the Fayad case to the Iran deal, even if the administration didn't lobby aggressively enough to have Fayad extradited to the United States.

"I guess it's possible that they [the White House] didn't want to try hard because of the Iran deal but I don't have memories of it," said the former official. "Clearly there were things that the Obama administration did to keep the negotiations alive, prudent negotiating tactics to keep the Iranians at the table. But to be fair, there was a lot of shit we did during the Iran deal negotiations that pissed the Iranians off."

Afterward, Czech President Milos Zeman told local media he had freed Fayad at the personal request of Putin, a close ally of both the Czech Republic and Iran, who had lobbied hard for his release in a series of phone calls like the ones Project Cassandra officials were hoping Obama would make.

A week later, European authorities, working with the DEA and U.S. Customs and Border Patrol, arrested an undisclosed number of Hezbollah-related suspects in France and neighboring countries on charges of using drug trafficking money to procure weapons for use in Syria.

In announcing the arrests, the DEA and the Justice Department disclosed for the first time the existence of Project Cassandra, as well as its target, the drug-and weapons-trafficking unit known as Hezbollah's Business Affairs Component. In a news release, DEA also said the business entity "currently operates under the control of Abdallah Safieddine" and Tabaja.

**Ali Fayad**

(aka Fayyad), Ukraine-based arms merchant (https://www.justice.gov/us ao-sdny/pr/ivorian-man-pleads-guilty-manhattan-federal-court-conspiring-provide-material-support) suspected of being a Hezbollah operative (http://docs.house.gov/me etings/FA/FA00/2017060 8/106094/HHRG-115-FA00-Wstate-LevittM-20170608.pdf) moving large amounts of weapons to Syria.

**Adham Tabaja**

Lebanese businessman, alleged co-leader (https://www.treasury.gov/ press-center/press-releases/Pages/jl0069.asp x) of Hezbollah Business Affairs Component and key figure directly tying Hezbollah's commercial and terrorist activities.

Feb. 1, 2016

### DEA reveals "massive" Hezbollah scheme

This DEA press release is the first mention of Project Cassandra, and pinpoints seven countries involved in disrupting the flow of drug money to promote terrorist operations.

The secret backstory of how Obama let Hezbollah off the hook

 (http://www.politico.com)   Project Cassandra   Part I  |  Part II  |  Part III

Read the document

(https://www.documentcloud.org/documents/4329070-DEA-
reveals-massive-Hezbollah-scheme.html)

Jack Riley, the DEA's acting deputy administrator, said in the news
release that Hezbollah's criminal operations "provide a revenue and
weapons stream for an international terrorist organization
responsible for devastating terror attacks around the world."

**Jack Riley**
Top DEA special agent who
helped run the drug agency
during the Obama
administration's tenure.

Riley described the operation as "ongoing," saying "DEA and our
partners will continue to dismantle networks who exploit the nexus
between drugs and terror using all available law enforcement
mechanisms."

But Kelly and some other agents had already come to believe that the
arrests would be a last hurrah for the task force, as it was crumbling
under pressure from U.S. officials eager to keep the newly
implemented Iran deal intact. That's why Project Cassandra
members insisted on including Safieddine's name in the media
releases. They wanted it in the public record, in case they had no
further opportunity to expose the massive conspiracy they believed
he had been overseeing.

**Abdallah Safieddine**
Hezbollah's longtime envoy
to Iran who allegedly
(https://www.dea.gov/divisi
ons/hq/2016/hq020116.s
html) oversaw the group's
"Business Affairs
Component" involved in
international drug
trafficking.

## A LAST HURRAH

The secret backstory of how Obama let Hezbollah off the hook

**P** (http://www.politico.com)   Project Cassandra    Part I    |    Part II    |    Part III

The news release caused a stir. The CIA was furious that Project Cassandra went public with details of Hezbollah's business operations. And the French government called off a joint news conference planned to announce the arrests. Kelly, who was already in Paris awaiting the news conference, said European authorities told him the French didn't want to offend Iran, which just 11 days after the nuclear deal implementation had agreed to buy 118 French Airbus aircraft worth about $25 billion.

Two weeks later, after firing off another angry email or two, Kelly said he was told by his superiors that he was being transferred against his wishes to a gang unit at DEA headquarters. He retired months later on the first day he was eligible.

Several other key agents and analysts also transferred out on their own accord, in some cases in order to receive promotions, or after being told by DEA leaders that they had been at the Special Operations Division for too long, according to Kelly, Asher, Maltz and others.

Meanwhile, the administration was resisting demands that it produce a long-overdue intelligence assessment that Congress had requested as a way of finally resolving the interagency dispute over Hezbollah's role in drug trafficking and organized crime.

It wasn't just a bureaucratic exercise. More than a year earlier, Congress – concerned that the administration was whitewashing the threat posed by Hezbollah – passed the Hizballah International Financing Prevention Act. That measure required the White House to lay out in writing its plans for designating Hezbollah a "significant transnational criminal organization."

The White House delegated responsibility for the report to the office of the director of National Intelligence, prompting immediate accusations by the task force and its allies that the administration was stacking the deck against such a determination, and against Project Cassandra, given the intelligence community's doubts about the DEA's conclusions about Hezbollah's drug-running.

"Given the group's ever-lengthening criminal rap sheet around the world, designating it as a TCO [Transnational Criminal Organization] has become an open-and-shut case," said Matthew Levitt, a former senior Treasury official, said of Hezbollah in an April 2016 policy paper for a Washington think tank.

Agents from Project Cassandra and other law enforcement agencies "investigate criminal activities as a matter of course and are therefore best positioned to judge whether a group has engaged in

**John "Jack" Kelly**    0

DEA agent overseeing Hezbollah cases at Special Operations Division, who named task force Project Cassandra after clashes with other U.S. agencies about Hezbollah drug-terror links.

**Matthew Levitt**

Former top Treasury financial intelligence official, FBI analyst whose book (https://www.amazon.com/ Hezbollah-Global-Footprint-Lebanons-Party/dp/1626162018) on Hezbollah and its global activities (http://www.washingtoninst itute.org/policy-analysis/view/hezbollahs-

The secret backstory of how Obama let Hezbollah off the hook

P (http://www.politico.com)

Project Cassandra    Part I  |  Part II  |  Part III

transnational organized crime," wrote Levitt, who is also a former FBI analyst and author of a respected book on Hezbollah. "Intelligence agencies are at a disadvantage in this regard, so the DNI's forthcoming report should reflect the repeated findings of law enforcement, criminal courts, and Treasury designations."

As expected, the administration's final report, which remains classified, significantly downplayed Hezbollah's operational links to drug trafficking, which in turn further marginalized the DEA's role in fighting it, according to a former Justice Department official and others familiar with the report.

Once the Obama administration left office, in January 2017, the logjam of task force cases appeared to break, and several task force members said it wasn't a coincidence.

An alleged top Hezbollah financier, Kassim Tajideen, was arrested in Morocco — seven years after Treasury officials blacklisted him as a sponsor of terror — and flown to Washington to stand trial. Asher said task force agents had kept his case under wraps, hoping for a better outcome in whatever administration succeeded Obama's.

The Trump administration also designated Venezuelan Vice President Tareck Aissami as a global narcotics kingpin, almost a decade after DEA agents became convinced he was Hezbollah's point man within the Chavez, and then Maduro, regimes.

Feb. 1, 2017.

**Trump administration blacklists Venezuelan vice president as drug kingpin**

Task force agents say they were frustrated that they couldn't go after Tareck El Aissami and many other Venezuelan officials under Obama administration.

transnational-organized-crime] sounded early alarms about its drug trafficking.

**Kassim Tajideen**

An alleged top financier (https://www.treasury.gov/press-center/press-releases/Pages/tg997.asp x) for Hezbollah, whose global business empire allegedly acted as a key source of funds (https://www.justice.gov/o pa/pr/lebanese-businessman-lied-about-involvement-hezbollah) for its global network.

**Tareck El Aissami**

A Venezuelan vice president (https://www.treasury.gov/press-center/press-releases/Pages/as0005.as px) and fake passport provider (https://www.treasury.gov/r esource-center/sanctions/Programs/Documents/20170213_el_aissami_lopez_bello_network.pdf) between Caracas government, Hezbollah and Iran.

The secret backstory of how Obama let Hezbollah off the hook



(http://www.politico.com)   Project Cassandra   Part I  |  Part II  |  Part III

Read the document.

(https://www.treasury.gov/press-center/press-
releases/Pages/as0005.aspx)

Ironically, many senior career intelligence officials now freely
acknowledge that the task force was right all along about Hezbollah's
operational involvement in drug trafficking. "It dates back many
years," said one senior Directorate of National Intelligence official.

Meanwhile, Hezbollah — in league with Iran, Russia and the Assad
regime — has all but overwhelmed the opposition groups in Syria,
including those backed by the United States. Hezbollah continues to
help train Shiite militants in other hotspots and to undermine U.S.
efforts in Iraq, according to U.S. officials. It also continues its
expansion in Latin America and, DEA officials said, its role in
trafficking cocaine and other drugs into the United States. And it is
believed to be the biggest trafficker of the powerful stimulant drug
Captagon that is being used by fighters in Syria on all sides.

Progress has been made on other investigations and prosecutions,
current and former officials said. But after an initial flurry of interest
in resurrecting Project Cassandra, the Trump administration has
been silent on the matter. In all of the Trump administration's public
condemnations of Hezbollah and Iran, the subject of drug trafficking
hasn't come up.

In West Africa, satellite imagery has documented that the Hezbollah
used-car money-laundering operation is bigger than ever, Asher told
lawmakers in recent testimony before the House Foreign Affairs
Committee.

Source: Google Earth

The secret backstory of how Obama let Hezbollah off the hook

 (http://www.politico.com)   Project Cassandra    Part I  |  Part II  |  Part III

And Hezbollah continues to scout potential U.S. targets for attack if it decides Washington has crossed some red line against it or Iran. On June 1, federal authorities arrested two alleged Hezbollah operatives who were conducting "pre-operational surveillance" on possible targets for attack, including the FBI headquarters in New York and the U.S. and Israeli embassies in Panama.

June 2017

## Working under pseudonyms, Hezbollah operatives carried out pre-operational surveillance in the U.S.

From at least 2009, Ali Mohamad Kourani aka "Jacob Lewis" and "Daniel," allegedly staked out New York City airports to support anticipated terrorist attacks.

Read the document

(https://www.documentcloud.org/documents/4329072-Working-under-pseudonyms-Hezbollah-operatives.html)

FNK 7782 1478 7/56



The secret backstory of how Obama let Hezbollah off the hook

(http://www.politico.com) Project Cassandra   Part I   Part II   Part III

"They are a global threat, particularly if the Trump relationships turn sour" with Iran, Syria and Russia, said Magnus Ranstorp, one of the world's foremost Hezbollah experts.

The June arrests "bring into sharp focus that the Iranians are making contingency plans for when the U.S. turns up the heat on Iran," said Ranstorp, research director of the Center for Asymmetric Threat Studies at the Swedish National Defence College, who is in frequent contact with U.S. intelligence officials. "If they think it requires some military or terrorist response, they have been casing targets in the U.S. since the late 1990s."

Ranstorp said U.S. intelligence officials believe that Hezbollah's U.S.-based surveillance is far more extensive than has been publicly disclosed, and that they are particularly concerned about the battle-hardened operatives who have spent years on the ground in Syria.

"The U.S. intel community is very concerned about this," Ranstorp said. Hezbollah's agents "have become extremely sophisticated and good at fighting."

Maltz, the longtime head of DEA Special Operations, who retired two months after the Tampa summit in 2014, has lobbied since then for better interagency cooperation on Hezbollah, to tackle both the terrorist threat and the criminal enterprise that underwrites it.

Turf battles, especially the institutional conflict between law enforcement and intelligence agencies, contributed to the demise of Project Cassandra, Maltz said. But many Project Cassandra agents insist the main reason was a political choice to prioritize the Iranian nuclear agreement over efforts to crack down on Hezbollah.

"They will believe until death that we were shut down because of the Iran deal," Maltz said. "My gut feeling? My instinct as a guy doing this for 28 years is that it certainly contributed to why we got pushed aside and picked apart. There is no doubt in my mind."

**Derek Maltz**

Senior DEA official who as head of Special Operations Division lobbied for support for Project Cassandra (http://docs.house.gov/meetings/FA/FA00/2017060 8/106094/HHRG-115-FA00-Wstate-MaltzD-20170608.pdf) and its investigations.

Design and development by Tyler Fisher (https://twitter.com/tylrfishr/), Jeremy C.F. Lin (https://twitter.com/Jeremy_CF_Lin), Janet Michaud (https://twitter.com/JanetMichaud) and Lily Mihalik. (https://twitter.com/mazet) Photos of world leaders via Getty.

Exhibit 38



Zoomed in Map of Lebanon

FNK 7782 1517

Press Center

Exhibit 42

## Treasury Designates A Medellín, Colombia-based Drug Money Laundering Network With Ties To La Oficina De Envigado And Ayman Saied Joumaa

7/1/2014

WASHINGTON – The U.S. Department of the Treasury today designated drug launderer Pedro Claver Mejia Salazar (Mejia Salazar) and his narcotics money laundering network based in Medellín, Colombia pursuant to the Foreign Narcotics Kingpin Designation Act (Kingpin Act). Treasury also designated Colombian national Fredy Alonso Mira Perez (alias Fredy Colas), an important underboss in the criminal organization known as La Oficina de Envigado, as well as 10 additional individuals, and 14 entities, all based in Colombia. As a result of today's actions, all assets that are based in the United States or in control by U.S. persons in which the individuals and entities designated today have an interest in are frozen, and U.S. persons are generally prohibited from engaging in transactions with them.

Mejia Salazar, often acting under the authority and direction of Fredy Colas, primarily launders narcotics proceeds on behalf of La Oficina de Envigado, a group which Treasury designated pursuant to the Kingpin Act on June 26, 2014. As part of his global drug money laundering operations, Mejia Salazar and his network work closely with Lebanese-Colombian drug money launderer Ayman Saied Joumaa, also a Specially Designated Narcotics Trafficker.

"Operatives of La Oficina de Envigado have tapped into Ayman Joumaa's international networks and successfully moved drug proceeds back to traffickers in Colombia from locations around the world, posing a major threat to U.S. interests," said Director of Treasury's Office of Foreign Assets Control Director Adam Szubin. "Treasury will continue to aggressively expose and disrupt the activities of these illicit networks, wherever they may be operating."

Mejia Salazar relies on a network of trusted family members to carry out his money laundering transactions, including his sons – Juan Carlos, Victor Gabriel, Andres Camilo, and Jose Alejandro Mejia Alzate – and his nephews – Jesus Rodolfo, Jose Albeiro, and Jose Guillermo Barco Mejia. Several entities designated today, which are owned by Mejia Salazar and his family, are also directly involved in these illicit transactions, including Grupo Empresarial Enkor Profesional S.A.S., a well-known beauty products company based in Medellín.

Today's action was made possible by a lengthy investigation led by the Financial Investigations Team of the Drug Enforcement Administration's (DEA) New England Field Division.

"The success of this investigation was a direct result of the hard work and dedication of the DEA New England Field Division's Financial Investigation Team and our law enforcement partners," said DEA Acting Special Agent in Charge Michael J. Ferguson. "The DEA New England Field Division is committed to targeting large-scale criminal organizations, using all our enforcement resources."

Since June 2000, more than 1,600 individuals and entities have been named pursuant to the Kingpin Act for their role in international narcotics trafficking. Penalties for violations of the Kingpin Act range from civil penalties of up to $1.075 million per violation to more severe criminal penalties. Criminal penalties for corporate officers may include up to 30 years in prison and fines up to $5 million. Criminal fines for corporations may reach $10 million. Other individuals could face up to 10 years in prison and fines pursuant to Title 18 of the United States Code for criminal violations of the Kingpin Act.

For a chart relating to today's actions click _here_.
For a complete listing of designations pursuant to the Kingpin Act, click _here_.

Exhibit 43



United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE
DISTRICT of MASSACHUSETTS

U.S. Attorneys » District of Massachusetts » News

Department of Justice

U.S. Attorney's Office

District of Massachusetts

FOR IMMEDIATE RELEASE                                    Friday, May 5, 2017

# Colombian National Pleads Guilty to International Money Laundering

BOSTON – A Colombian National pleaded guilty yesterday in federal court in Boston for his role in a conspiracy to launder money from various international locations back to Colombia.

Pedro Mejia Salazar, 73, of Medellin, Colombia, was charged with one count of conspiracy to launder money. Mejia arrived in Boston from Colombia on May 3, 2017, and appeared in U.S. District Court in Boston yesterday to plead guilty to the charge against him.  Mejia's sentencing was set for July 27, 2017.

According to court documents, Mejia used a family business, which he ran, to launder drug proceeds for and on behalf of the criminal syndicate La Oficina de Envigado, based in Medellin, Colombia. Between May 2009 and June 2012, Mejia laundered at least $768,586 in drug proceeds at the direction of Colombian-based money brokers working for La Oficina.

Mejia controlled a series of bank accounts, which he used to launder drug proceeds and deliver them for the benefit of Colombian-based drug trafficking organizations.  Mejia's criminal activity was uncovered with the help of a cooperating source and an undercover federal agent who posed as a money broker. The undercover agent agreed to receive bulk cash from money couriers working for Colombian-based drug trafficking organizations and then send the money through Mejia's business accounts.  The ultimate recipients of the funds were the Colombian narco-traffickers and the money brokers that work for them.  Once the undercover agent received bulk cash from money couriers, the agent would call Mejia, who directed the agent to transfer the cash to a series of accounts Mejia controlled. After the wire transfers were completed, Mejia withdrew the money from the accounts he controlled and distributed it in Colombia to whomever originally arranged the pick-up, either drug trafficking organizations or money brokers.

The charge of conspiracy to launder money provides for a sentence of up to 20 years in prison, a minimum of three years and up to a lifetime of supervised release, and a fine of up to $500,000 or

FNK 7782 1538

twice the value of the property involved in the offense. Actual sentences for federal crimes are typically less than the maximum penalties. Sentences are imposed by a federal district court judge based on the U.S. Sentencing Guidelines and other statutory factors.

This case is part of Operation Powerplay, an international undercover investigation targeting Colombia-based money brokers who launder drug proceeds for international drug trafficking organizations. The investigation targeted drug traffickers who import drugs into the United States and money launderers who use the international financial system and the Black Market Peso Exchange to return drug proceeds collected in the United States and other countries to Colombia. To date, the investigation has resulted in the seizure of approximately $15.2 million, 3,967 kilograms of cocaine, 32,000 doses of MDMA, nine kilograms of methamphetamine, 1,183 kilograms of marijuana, and 7.8 kilograms of heroin.

Acting United States Attorney William D. Weinreb; Joel P. Garland, Special Agent in Charge of the Internal Revenue Service's Criminal Investigation, Boston Field Division; and Michael J. Ferguson, Special Agent in Charge of the Drug Enforcement Administration, New England Field Division, made the announcement today. Assistant United States Attorneys Leah B. Foley and Nathaniel R. Mendell of Weinreb's Narcotics and Money Laundering Unit are prosecuting the case.

---

**Topic(s):**
Drug Trafficking

**Component(s):**
USAO - Massachusetts

Updated May 5, 2017

Colombian man who laundered cash for crime ring linked to Pablo Escobar sentenced in Boston - The Boston Globe

𝕭 | Metro

# Man who laundered cash for crime ring linked to Pablo Escobar sentenced in Boston

By Travis Andersen

GLOBE STAFF  SEPTEMBER 07, 2017

A Colombian national in his 70s received a 50-month prison term on Wednesday in Boston for laundering more than $760,000 for a feared crime syndicate with ties to the late Pablo Escobar, the notorious Colombian drug trafficker.

Pedro Mejia Salazar of Medellin, Colombia, was sentenced in US District Court in Boston, after pleading guilty in May to a charge of conspiracy to launder money, according to legal filings and the office of Acting US Attorney William D. Weinreb.

Prosecutors said Salazar washed at least $768,586 in drug proceeds in Boston and elsewhere over a three-year period at the direction of La Oficina de Envigado, a crime syndicate based in Medellin.

Escobar formed the group more than three decades ago, and last year it boasted several thousand armed members in Medellin alone, many of them minors, according to Colombia Reports.

Salazar laundered drug money though a family business, and his case was part of Operation Powerplay, a global undercover probe targeting suspects in Colombia who launder cash for drug rings, Weinreb's office said.

"The investigation targeted drug traffickers who import drugs into the United States and money launderers who use the international financial system and the Black Market Peso

FNK 7782 1540

Exchange to return drug proceeds collected in the United States and other countries to Colombia," Weinreb's office said in a statement.

According to the US Drug Enforcement Administration, the peso exchange works when a broker such as Salazar arranges for US drug proceeds to be transferred to a vendor selling legitimate goods. Once those goods are shipped to Colombia and sold by a business owner there for local currency, that currency is turned over to Salazar, who pays the original drug

© 2018 Boston Globe Media Partners, LLC

FNK 7782 1541

LEGAL STATUS

# Additional Designations, Foreign Narcotics Kingpin Designation Act

A Notice by the Foreign Assets Control Office on 07/14/2014

## DOCUMENT DETAILS

**Printed version:**
PDF (https://www.gpo.gov/fdsys/pkg/FR-2014-07-14/pdf/2014-16392.pdf)

**Publication Date:**
07/14/2014 (/documents/2014/07/14)

**Agencies:**
Office of Foreign Assets Control (https://www.federalregister.gov/agencies/foreign-assets-control-office)

**Dates:**
The designation by the Director of OFAC of the 12 individuals and 14 entities identified in this notice pursuant to section 805(b) of the Kingpin Act is effective on July 1, 2014.

**Effective Date:**
07/01/2014

**Document Type:**
Notice

**Document Citation:**
79 FR 40839

**Page:**
40839-40841 (3 pages)

**Document Number:**
2014-16392

DOCUMENT DETAILS

PUBLISHED DOCUMENT

## AGENCY:

Office of Foreign Assets Control, Treasury.

## ACTION:

Notice.

## SUMMARY:

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) is publishing the names of 12 individuals and 14 entities whose property and interests in property have been blocked pursuant to the Foreign Narcotics Kingpin Designation Act (Kingpin Act) (21 U.S.C. 1901 (https://api.fdsys.gov/link?

collection=uscode&title=21&year=mostrecent&section=1901&type=usc&link-type=html)-1908, 8 U.S.C. 1182 (https://api.fdsys.gov/link? collection=uscode&title=8&year=mostrecent&section=1182&type=usc&link-type=html)).

## DATES:

The designation by the Director of OFAC of the 12 individuals and 14 entities identified in this notice pursuant to section 805(b) of the Kingpin Act is effective on July 1, 2014.

## FOR FURTHER INFORMATION CONTACT:

Assistant Director, Sanctions Compliance & Evaluation, Office of Foreign Assets Control, U.S. Department of the Treasury, Washington, DC 20220, Tel: (202) 622-2490.

## SUPPLEMENTARY INFORMATION:

### Electronic and Facsimile Availability

This document and additional information concerning OFAC are available on OFAC's Web site at *http://www.treasury.gov/ofac (http://www.treasury.gov/ofac)* or via facsimile through a 24-hour fax-on-demand service at (202) 622-0077.

### Background

The Kingpin Act became law on December 3, 1999. The Kingpin Act establishes a program targeting the activities of significant foreign narcotics traffickers and their organizations on a worldwide basis. It provides a statutory framework for the imposition of sanctions against significant foreign narcotics traffickers and their organizations on a worldwide basis, with the objective of denying their businesses and agents access to the U.S. financial system and the benefits of trade and transactions involving U.S. companies and individuals.

The Kingpin Act blocks all property and interests in property, subject to U.S. jurisdiction, owned or controlled by significant foreign narcotics traffickers as identified by the President. In addition, the Secretary of the Treasury, in consultation with the Attorney General, the Director of the Central Intelligence Agency, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, the Secretary of ⬜ Defense, the Secretary of State, and the Secretary of Homeland Security may designate and block the property and interests in property, subject to U.S. jurisdiction, of persons who are found to be: (1) Materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of a person designated pursuant to the Kingpin Act; (2) owned, controlled, or directed by, or acting for or on behalf of, a person designated pursuant to the Kingpin Act; or (3) playing a significant role in international narcotics trafficking.

⬜ Start Printed
Page 40840

On July 1, 2014, the Director of OFAC designated the following 12 individuals and 14 entities whose property and interests in property are blocked pursuant to section 805(b) of the Kingpin Act.

#### Individuals

    1. ALZATE GIRALDO, Rosalba; DOB 13 Sep 1956; POB Santuario, Antioquia, Colombia; citizen Colombia; Cedula No. 22082396 (Colombia) (individual) [SDNTK] (Linked To: MEJIA ALZATE ASOCIADOS Y CIA. LTDA.; Linked To: PROMOTORA TURISTICA SOL PLAZA S.A.; Linked To:

CANTERAS COPACABANA S.A.; Linked To: ALMEQUIP S.A.S.; Linked To: ROSAGRO S.A.S.).

2. BARCO MEJIA, Jose Guillermo; DOB 03 Aug 1976; POB Santuario, Antioquia, Colombia; citizen Colombia; Cedula No. 94486900 (Colombia) (individual) [SDNTK] (Linked To: GRUPO EMPRESARIAL ENKOR PROFESIONAL S.A.S.; Linked To: GRUPO EMPRESARIAL GHEMA S.A.S.; Linked To: ALMACEN GUIBAR; Linked To: E-PROFESIONAL).

3. BARCO MEJIA, Jose Albeiro; DOB 23 May 1965; POB Santuario, Antioquia, Colombia; citizen Colombia; Cedula No. 70691995 (Colombia) (individual) [SDNTK] (Linked To: INVERSIONES MEYBAR S.A.S.; Linked To: GRUPO EMPRESARIAL ENKOR PROFESIONAL S.A.S.).

4. BARCO MEJIA, Jesus Rodolfo; DOB 19 Mar 1967; POB Santuario, Antioquia, Colombia; citizen Colombia; Cedula No. 70692776 (Colombia) (individual) [SDNTK] (Linked To: GRUPO EMPRESARIAL GHEMA S.A.S.).

5. BEDOYA ESPINOSA, Humberto Antonio; DOB 14 Jan 1949; POB Jerico, Antioquia, Colombia; citizen Colombia; Cedula No. 8293921 (Colombia) (individual) [SDNTK] (Linked To: PROMOTORA TURISTICA SOL PLAZA S.A.; Linked To: CANTERAS COPACABANA S.A.).

6. MEJIA ALZATE, Maria Leivy; DOB 28 Jul 1981; POB Medellin, Colombia; citizen Colombia; Cedula No. 43276113 (Colombia) (individual) [SDNTK] (Linked To: CANTERAS COPACABANA S.A.; Linked To: PROMOTORA TURISTICA SOL PLAZA S.A.; Linked To: ASESORIA Y ASISTENCIA AGROPECUARIA Y AMBIENTAL A4).

7. MEJIA ALZATE, Jose Alejandro; DOB 30 May 1984; POB Medellin, Colombia; citizen Colombia; Cedula No. 8126905 (Colombia) (individual) [SDNTK] (Linked To: CANTERAS COPACABANA S.A.; Linked To: PROMOTORA TURISTICA SOL PLAZA S.A.; Linked To: ALMEQUIP S.A.S.).

8. MEJIA ALZATE, Juan Carlos; DOB 17 Jul 1980; POB Medellin, Colombia; citizen Colombia; Cedula No. 71313043 (Colombia) (individual) [SDNTK] (Linked To: PROMOTORA TURISTICA SOL PLAZA S.A.; Linked To: TRITCON S.A.S.).

9. MEJIA ALZATE, Andres Camilo; DOB 15 Aug 1987; POB Medellin, Colombia; citizen Colombia; Cedula No. 1128270678 (Colombia) (individual) [SDNTK] (Linked To: CANTERAS COPACABANA S.A.; Linked To: PROMOTORA TURISTICA SOL PLAZA S.A.; Linked To: TRITCON S.A.S.).

10. MEJIA ALZATE, Victor Gabriel; DOB 05 Oct 1985; POB Medellin, Colombia; citizen Colombia; Cedula No. 98772126 (Colombia) (individual) [SDNTK] (Linked To: CANTERAS COPACABANA S.A.; Linked To: PROMOTORA TURISTICA SOL PLAZA S.A.; Linked To: TRITCON S.A.S.).

11. MEJIA SALAZAR, Pedro Claver; DOB 19 May 1943; POB Granada, Antioquia, Colombia; citizen Colombia; Cedula No. 3606361 (Colombia) (individual) [SDNTK] (Linked To: ARENERA EL CERREJON; Linked To: PROMOTORA TURISTICA SOL PLAZA S.A.; Linked To: INVERSIONES MEYBAR S.A.S.; Linked To: MEJIA ALZATE ASOCIADOS Y CIA. LTDA.).

12. MIRA PEREZ, Fredy Alonso (a.k.a. "FREDY COLAS"); DOB 02 Jul 1966; POB Bogota, Colombia; citizen Colombia; Cedula No. 71683988 (Colombia) (individual) [SDNTK].

**Entities**

1. ALMACEN GUIBAR, Cali, Colombia; Matricula Mercantil No 441336 (Cali) [SDNTK].

2. ALMEQUIP S.A.S., Circular 73B No. 39B 115 Of. 9901, Medellin, Colombia; NIT #900314383-9 (Colombia) [SDNTK].

3. ARENERA EL CERREJON, Km. 2 via Aguadas, Aguadas, Caldas, Colombia; Matricula Mercantil No 121398 (Manizales) [SDNTK].

4. ASESORIA Y ASISTENCIA AGROPECUARIA Y AMBIENTAL A4, Manizales, Caldas, Colombia; Matricula Mercantil No 125828 (Manizales) [SDNTK].

5. CANTERAS COPACABANA S.A. (a.k.a. TRAMCO S.A.), Circular 73B No. 39B 15 Of. 9901, Medellin, Colombia; NIT #811035366-3 (Colombia) [SDNTK].

6. E-PROFESIONAL, Calle 6 50-166, Medellin, Colombia; Matricula Mercantil No 42525602 (Medellin) [SDNTK].

7. GRUPO EMPRESARIAL ENKOR PROFESIONAL S.A.S. (a.k.a. ENKOR PROFESIONAL), Calle 6 No. 50-154, Sector Coltabaco, Medellin, Colombia; Carrera 80 No. 49A-118, Medellin, Colombia; NIT #900440725-3 (Colombia) [SDNTK].

8. GRUPO EMPRESARIAL GHEMA S.A.S. (a.k.a. GHEMA), Carrera 80 No. 49A-118, Medellin, Colombia; Calle 10 No. 21-08, Ofc. 405, Bogota, Colombia; NIT #900441675-8 (Colombia) [SDNTK].

9. INVERSIONES MEYBAR S.A.S., Calle 48 No. 53-62 Int. 902, Medellin, Colombia; NIT #811004754-5 (Colombia) [SDNTK].

10. MEJIA ALZATE ASOCIADOS Y CIA. LTDA., Circular 73B 39 115-106, Copacabana, Antioquia, Colombia; Medellin, Colombia; NIT #800246606-1 (Colombia) [SDNTK].

11. PROMOTORA TURISTICA SOL PLAZA S.A. (a.k.a. HOTEL SOL PLAZA), Circular 73B No. 39B 115 Of. 9901, Medellin, Colombia; Carrera 32 No. 35B 44, La Pintada, Antioquia, Colombia; NIT #811035697-6 (Colombia); Matricula Mercantil No 30401904 (Medellin); alt. Matricula Mercantil No 37062402 (Medellin) [SDNTK].

12. ROSAGRO S.A.S., Circular 73B No. 39B-115, Of. 9901, Medellin, Colombia; NIT #900314092-0 (Colombia) [SDNTK].

13. TRITCON S.A.S., Circular 73B 39B 115 Of. 9901, Medellin, Colombia; NIT #900315365-0 (Colombia) [SDNTK]. ⬚

⬚ Start Printed Page 40841

14. VARIEDADES JOSE ALBEIRO BARCO M., Calle 48 53 62 Bod. 1202, Medellin, Colombia; Matricula Mercantil No 30517002 (Medellin) [SDNTK].

Dated: July 1, 2014.

Barbara C. Hammerle,

Acting Director, Office of Foreign Assets Control.

[FR Doc. 2014-16392 (/a/2014-16392) Filed 7-11-14; 8:45 am]

BILLING CODE 4810-AL-P

PUBLISHED DOCUMENT

LEGAL STATUS

# Additional Designations, Foreign Narcotics Kingpin Designation Act

A Notice by the Foreign Assets Control Office on 10/06/2015

---

## DOCUMENT DETAILS

**Printed version:**
PDF (https://www.gpo.gov/fdsys/pkg/FR-2015-10-06/pdf/2015-25365.pdf)

**Publication Date:**
10/06/2015 (/documents/2015/10/06)

**Agencies:**
Office of Foreign Assets Control (https://www.federalregister.gov/agencies/foreign-assets-control-office)

**Dates:**
OFAC's actions described in this notice are effective on October 1, 2015, as further specified below.

**Effective Date:**
10/01/2015

**Document Type:**
Notice

**Document Citation:**
80 FR 60436

**Page:**
60436-60437 (2 pages)

**Document Number:**
2015-25365

DOCUMENT DETAILS

---

PUBLISHED DOCUMENT

## AGENCY:

Office of Foreign Assets Control, Treasury.

## ACTION:

Notice.

## SUMMARY:

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) is publishing the names of six individuals and 11 entities whose property and interests in property have been blocked pursuant to the Foreign Narcotics Kingpin Designation Act (Kingpin Act) (21 U.S.C. 1901 (https://api.fdsys.gov/link?collection=uscode&title=21&year=mostrecent&section=1901&type=usc&link-type=html)-1908, 8 U.S.C.

1182 (https://api.fdsys.gov/link?
collection=uscode&title=8&year=mostrecent&section=1182&type=usc&link-type=html)) and five vessels in
which one individual and two entities have an interest.

## DATES:

OFAC's actions described in this notice are effective on October 1, 2015, as further specified below.

## FOR FURTHER INFORMATION CONTACT:

Assistant Director, Sanctions Compliance & Evaluation, Office of Foreign Assets Control, U.S. Department of
the Treasury, Washington, DC 20220, Tel: (202) 622-2490.

## SUPPLEMENTARY INFORMATION:

### Electronic and Facsimile Availability

This document and additional information concerning OFAC are available on OFAC's Web site at
*http://www.treasury.gov/ofac (http://www.treasury.gov/ofac)* or via facsimile through a 24-hour fax-on-
demand service at (202) 622-0077.

### Background

The Kingpin Act became law on December 3, 1999. The Kingpin Act establishes a program targeting the
activities of significant foreign narcotics traffickers and their organizations on a worldwide basis. It provides
a statutory framework for the imposition of sanctions against significant foreign narcotics traffickers and
their organizations on a worldwide basis, with the objective of denying their businesses and agents access to
the U.S. financial system and the benefits of trade and transactions involving U.S. companies and
individuals.

The Kingpin Act blocks all property and interests in property, subject to U.S. jurisdiction, owned or
controlled by significant foreign narcotics traffickers as identified by the President. In addition, the Secretary
of the Treasury, in consultation with the Attorney General, the Director of the Central Intelligence Agency,
the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement
Administration, the Secretary of Defense, the Secretary of State, and the Secretary of Homeland Security,
may designate and block the property and interests in property, subject to U.S. jurisdiction, of persons who
are found to be: (1) Materially assisting in, or providing financial or technological support for or to, or
providing goods or services in support of, the international narcotics trafficking activities of a person
designated pursuant to the Kingpin Act; (2) owned, controlled, or directed by, or acting for or on behalf of, a
person designated pursuant to the Kingpin Act; or (3) playing a significant role in international narcotics
trafficking.

On October 1, 2015, the Acting Director of OFAC designated the following six individuals and 11 entities
whose property and interests in property are blocked pursuant to section 805(b) of the Kingpin Act.

### Individuals

1. MERHI, Merhi Ali Abou (a.k.a. ABOU MERHI, Merhi; a.k.a. MERHI, Merhi Abou); DOB 05 Jul 1964; POB
Hilalie, Lebanon; citizen Lebanon; Passport RL0575682 (Lebanon) (individual) [SDNTK] (Linked To: ABOU
MERHI GROUP; Linked To: ABOU-MERHI LINES SAL; Linked To: ABOU-MERHI CRUISES (AMC) SAL;
Linked To: LE MALL-SAIDA; Linked To: QUEEN STATIONS; Linked To: ORIENT QUEEN HOMES; Linked

To: ABOU MERHI COTONOU; Linked To: ABOU MERHI NIGERIA; Linked To: ABOU MERHI HAMBURG; Linked To: LEBANON CENTER; Linked To: ABOU MERHI CHARITY INSTITUTION). Designated for materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of the JOUMAA Money Laundering Organization/Drug Trafficking Organization and/or Hassan AYASH, and/or being owned, controlled, or directed by, or acting for or on behalf of, the JOUMAA Money Laundering Organization/Drug Trafficking Organization and/or Hassan AYASH.

2. EL BEZRI, Ahmad (a.k.a. EL BIZRI, Ahmad); DOB 09 Feb 1989; POB Saida, Lebanon; citizen Lebanon; Passport RL2452947 (Lebanon) (individual) [SDNTK] (Linked To: ABOU MERHI COTONOU; Linked To: ABOU MERHI NIGERIA). Designated for acting for or on behalf of Merhi Ali Abou MERHI.

3. MERHI, Atef Merhi Abou (a.k.a. ABOU-MERHI, Atef Merhi; a.k.a. MERHI, Atef Abou; a.k.a. MERHI, Atif Merhi Abou); DOB 06 Aug 1989; POB Saida, Lebanon; citizen Germany; Passport C1TRT3WNJ (Germany) (individual) [SDNTK] (Linked To: ABOU-MERHI LINES SAL; Linked To: ABOU MERHI CHARITY INSTITUTION; Linked To: ORIENT QUEEN HOMES). Designated for acting for or on behalf of Merhi Ali Abou MERHI.

4. MERHI, Hana Merhi Abou (a.k.a. MERHI, Hana Abou); DOB 31 Mar 1987; POB Germany; citizen Germany; Passport 332501999 (Germany) (individual) [SDNTK] (Linked To: ABOU-MERHI CRUISES (AMC) SAL; Linked To: ABOU-MERHI LINES SAL; Linked To: ABOU MERHI CHARITY INSTITUTION; Linked To: ORIENT QUEEN HOMES). Designated for acting for or on behalf of Merhi Ali Abou MERHI.

5. NASR, Wajdi Youssef; DOB 25 Sep 1974; POB Lebanon; citizen Lebanon; Passport 2243913 (Lebanon) (individual) [SDNTK] (Linked To: ABOU MERHI HAMBURG). Designated for acting for or on behalf of Merhi Ali Abou MERHI.

6. NASREDDINE, Houeda Ahmad (a.k.a. ABOU MERHI, Houeida; a.k.a. ABOU MERHI, Huweid; a.k.a. ABOU MERHI, Huweida; a.k.a. NASREDDINE, Houeida Ahmad); DOB 14 Aug 1965; POB Kfarhatta, Lebanon; citizen Lebanon; Passport RL0022792 (Lebanon) (individual) [SDNTK] (Linked To: ABOU-MERHI CRUISES (AMC) SAL; Linked To: ABOU-MERHI LINES SAL; Linked To: ABOU MERHI CHARITY INSTITUTION; Linked To: ORIENT QUEEN HOMES). Designated for acting for or on behalf of Merhi Ali Abou MERHI.

☐ Start Printed
Page 60437

## Entities

1. ABOU MERHI GROUP, Weygand Street, Atrium Building, Central District, Beirut, Lebanon [SDNTK] (Linked To: MERHI, Merhi Ali Abou). Designated for being owned, controlled, or directed by, or acting for or on behalf of, Merhi Ali Abou MERHI.

2. ABOU MERHI CHARITY INSTITUTION, Merhi Abou Merhi Street, Hilaliye, Saida, Lebanon; Abou Merhi Street, Hilaliyah Area, Saida 175016, Lebanon [SDNTK] (Linked To: MERHI, Merhi Ali Abou; Linked To: ABOU MERHI GROUP). Designated for being owned, controlled, or directed by, or acting for or on behalf of, Merhi Ali Abou MERHI.

3. ABOU MERHI COTONOU, Commune De Semepkodji Quartier Djeffa 01B7885, Cotonou, Benin [SDNTK] (Linked To: MERHI, Merhi Ali Abou; Linked To: ABOU MERHI GROUP). Designated for being owned, controlled, or directed by, or acting for or on behalf of, Merhi Ali Abou MERHI and/or ABOU MERHI GROUP.

4. ABOU MERHI HAMBURG (a.k.a. ABOU MERHI LINIENAGENTUR GMBH), Borstelmannsweg 145 D, Hamburg 20537, Germany; Hermann-Blohm-Strasse 3, Hamburg 20457, Germany [SDNTK] (Linked To: MERHI, Merhi Ali Abou; Linked To: ABOU MERHI GROUP). Designated for being owned, controlled, or directed by, or acting for or on behalf of, Merhi Ali Abou MERHI, ABOU MERHI GROUP, and/or Atef Merhi Abou MERHI.

5. ABOU MERHI NIGERIA (a.k.a. ABOU MERHI NIGERIA LIMITED), Grimaldi Port Complex Tin Can Island Port, Lagos, Nigeria [SDNTK] (Linked To: MERHI, Merhi Ali Abou; Linked To: ABOU MERHI GROUP). Designated for being owned, controlled, or directed by, or acting for or on behalf of, Merhi Ali Abou MERHI and/or ABOU MERHI GROUP.

6. ABOU-MERHI CRUISES SAL, The Atrium Building, Property Number 1455/26, Weygand Street, Beirut Central District Area, Nejmeh Sector, Beirut, Lebanon [SDNTK] (Linked To: MERHI, Merhi Ali Abou; Linked To: ABOU MERHI GROUP). Designated for being owned, controlled, or directed by, or acting for or on behalf of, Merhi Ali Abou MERHI and/or ABOU MERHI GROUP.

7. ABOU-MERHI LINES SAL (a.k.a. ABOU MERHI LINES; a.k.a. ABOU MERHI LINES SAL; a.k.a. ABOU MERHI LINES SAL OFF-SHORE), Atrium Building, Mosquee Al-Omari Street, Nejmeh Area, Marfaa Sector, Beirut, Lebanon.; Atrium Building, Weygand Street, Central District, Nejmeh Sector, Beirut, Lebanon [SDNTK] (Linked To: MERHI, Merhi Ali Abou; Linked To: ABOU MERHI GROUP). Designated for being owned, controlled, or directed by, or acting for or on behalf of, Merhi Ali Abou MERHI and/or ABOU MERHI GROUP.

8. LE MALL-SAIDA (a.k.a. LE MALL SAIDA), Saida, Al Janub, Lebanon [SDNTK] (Linked To: MERHI, Merhi Ali Abou; Linked To: ABOU MERHI GROUP). Designated for being owned, controlled, or directed by, or acting for or on behalf of, Merhi Ali Abou MERHI and/or ABOU MERHI GROUP.

9. LEBANON CENTER, 176 Wasfi Tall Street, The Gardens, Amman, Jordan [SDNTK] (Linked To: MERHI, Merhi Ali Abou; Linked To: ABOU MERHI GROUP). Designated for being owned, controlled, or directed by, or acting for or on behalf of, Merhi Ali Abou MERHI and/or ABOU MERHI GROUP. Designated for being owned, controlled, or directed by, or acting for or on behalf of, Merhi Ali Abou MERHI and/or ABOU MERHI GROUP.

10. ORIENT QUEEN HOMES (a.k.a. ABOU MERHI HOSPITALITY SAL), John Kennedy Street 56526, Beirut, Lebanon [SDNTK] (Linked To: MERHI, Merhi Ali Abou; Linked To: ABOU MERHI GROUP). Designated for being owned, controlled, or directed by, or acting for or on behalf of, Merhi Ali Abou MERHI and/or ABOU MERHI GROUP.

11. QUEEN STATIONS, Merhi Abou-Merhi Street, Saida, Lebanon [SDNTK] (Linked To: ABOU MERHI GROUP). Designated for being owned, controlled, or directed by, or acting for or on behalf of, Merhi Ali Abou MERHI and/or ABOU MERHI GROUP.

In addition, on October 1, 2015, the Acting Director of OFAC identified the following five vessels as property in which Merhi Ali Abou MERHI, ABOU MERHI GROUP, and ABOU MERHI LINES SAL, an individual and two entities whose property and interest in property are blocked pursuant to the Kingpin Act, have an interest.

**Vessels**

1. ORIENT QUEEN II (3FDJ9) Panama flag; Vessel Registration Identification IMO 8701193; MMSI 373703000 (vessel) [SDNTK] (Linked To: MERHI, Merhi Ali Abou; Linked To: ABOU-MERHI LINES SAL). Designated for being owned or controlled by Merhi Ali Abou MERHI, ABOU MERHI GROUP, and/or ABOU MERHI LINES SAL.

2. CITY OF ANTWERP (3FRY8) Panama flag; Vessel Registration Identification IMO 8709133; MMSI 356459000 (vessel) [SDNTK] (Linked To: MERHI, Merhi Ali Abou; Linked To: ABOU-MERHI LINES SAL). Designated for being owned or controlled by Merhi Ali Abou MERHI, ABOU MERHI GROUP, and/or ABOU MERHI LINES SAL.

3. CITY OF LUTECE (9HRJ6) Malta flag; Vessel Registration Identification IMO 8017970; MMSI 248781000 (vessel) [SDNTK] (Linked To: MERHI, Merhi Ali Abou; Linked To: ABOU-MERHI LINES SAL). Designated for being owned or controlled by Merhi Ali Abou MERHI, ABOU MERHI GROUP, and/or ABOU MERHI LINES SAL.

4. CITY OF MISURATA (3EMY5) Panama flag; Vessel Registration Identification IMO 7920857; MMSI 354134000 (vessel) [SDNTK] (Linked To: MERHI, Merhi Ali Abou; Linked To: ABOU-MERHI LINES SAL). Designated for being owned or controlled by Merhi Ali Abou MERHI, ABOU MERHI GROUP, and/or ABOU MERHI LINES SAL.

5. CITY OF TOKYO (D5GK6) Liberia flag; Vessel Registration Identification IMO 8709145; MMSI 636016488 (vessel) [SDNTK] (Linked To: MERHI, Merhi Ali Abou; Linked To: ABOU-MERHI LINES SAL). Designated for being owned or controlled by Merhi Ali Abou MERHI, ABOU MERHI GROUP, and/or ABOU MERHI LINES SAL.

Dated: October 1, 2015.

John E. Smith,

Acting Director, Office of Foreign Assets Control.

[FR Doc. 2015-25365 (/a/2015-25365) Filed 10-5-15; 8:45 am]

BILLING CODE 4810-AL-P

PUBLISHED DOCUMENT



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

Case ID FNK-7782

Ferrari & Associates, P.C.
1455 Pennsylvania Ave., N.W.          MAR 0 2 2018
Suite 400
Washington, DC 20004

Re: Ayman Joumaa

Dear Mr. Ferrari:

As you are aware, on January 26, 2011, the Office of Foreign Assets Control designated Ayman Joumaa as a Specially Designated Narcotics Trafficker (SDNT) pursuant to Section 805 of the Foreign Narcotics Kingpin Designation Act (Kingpin Act), 21 U.S.C. § 1904(b).

Pursuant to 31 C.F.R. § 501.807, a person may seek administrative reconsideration by OFAC of a designation by submitting "arguments or evidence that the person believes establishes that insufficient basis exists for the designation." The person may also "propose remedial steps …, such as corporate reorganization, resignation of persons from positions in a blocked entity, or similar steps, which the person believes would negate the basis for designation." *Id.*

In a letter dated May 18, 2016, you filed a request seeking reconsideration of Mr. Joumaa's designation as an SDNT. After reviewing all of the evidence before OFAC, including the information that you provided, and law enforcement sensitive, classified, and open source information, OFAC does not find credible Mr. Joumaa's claims, as stated in your letter dated October 25, 2016, that he is not "currently engaged in conduct that contributes to narcotics trafficking or money-laundering in support of narcotics trafficking." Accordingly, Mr. Joumaa's request for reconsideration of his designation is denied because he continues to meet the criteria under the Kingpin Act.

Mr. Joumaa's designation was based on reliable and corroborated information that he led a drug trafficking and money laundering organization moving hundreds of millions of dollars in narcotics proceeds from the United States to Lebanon. In addition, in 2011 Mr. Joumaa was indicted for such illicit activities in the U.S. District Court for the Eastern District of Virginia. The indictment charges in part that Mr. Joumaa and his co-conspirators "coordinated the shipment of at least tens of thousands of kilograms of cocaine from Colombia, through Central America and Mexico, to the United States." The indictment further specifies that Mr. Joumaa received bulk deliveries of United States currency, and charged fees for the laundering of proceeds, which were from the sale of cocaine in the United States. These details are also laid out in a 2011 affidavit in support of his arrest warrant and criminal complaint. As of March 2018, Mr. Joumaa has not faced the charges against him in the U.S. District Court for the Eastern District of Virginia, nor has he notified OFAC of his intent or willingness to return to the United States to face those charges.

Mr. Joumaa has denied working with several SDNTs in the laundering of narcotics proceeds, including Pedro Mejia Salazar and his sons, Victor Gabriel and Juan Carlos Mejia Alzate, who were all designated on July 1, 2014. These denials lack credibility. Pedro Mejia Salazar, who pleaded guilty in the U.S. District Court for the District of Massachusetts in 2017 for laundering approximately $800,000 between May 2009 and June 2012, worked with Mr. Joumaa as part of his global drug money laundering operations.

In addition, Mr. Joumaa's reconsideration request is not supported by credible evidence to establish that there was an insufficient basis for the January 26, 2011 designation, or that circumstances resulting in the designation no longer apply such that removal from the List of Specially Designated Nationals and Blocked Persons (SDN List) is warranted. As part of his correspondence to OFAC, Mr. Joumaa submitted numerous exhibits as attachments to his responses, which consisted of approximately over 1,250 pages. OFAC has considered both Mr. Joumaa's correspondence and the exhibits he has submitted, much of which concerns the Lebanon-based entities the Hassan Ayash Exchange Company and the New Line Exchange Trust Co., as well as the Panama-based entity Goldi Electronics S.A.[1]

The arguments made and documents submitted do not rebut OFAC's evidence that Mr. Joumaa used such entities as the Hassan Ayash Exchange Company and the New Line Exchange Trust Co. in connection with his money laundering activities. Further, the documents do not address the other aspects of Mr. Joumaa's drug trafficking and money laundering network that served as the basis for his designation, such as the Ellissa Exchange Company. In addition, Mr. Joumaa used channels outside of Lebanon, including by means that did not involve business entities, to launder funds. Moreover, while the documents submitted included invoices that show examples of specific apparent transactions and a report by the Banking Control Commission, which noted that the New Line Exchange Trust Co. appeared to comply with certain provision to fight money laundering, Mr. Joumaa did not submit an independent audit of the Hassan Ayash Exchange Company or the Ellissa Exchange Company.

OFAC has also considered Mr. Joumaa's remaining arguments and finds them insufficient to warrant removal from the SDN List. In your letter dated October 25, 2016, Mr. Joumaa argues that "mistaken designations are a threat to the confidence with which the public and private sector place in the integrity of OFAC's administration of U.S. sanctions programs" and that "it is essential that all parties have confidence in the accuracy and integrity of OFAC's fact-finding process." But Mr. Joumaa has provided no evidence to indicate that his designation was due to mistaken identity. Nor has he provided any information to impugn the accuracy and integrity of OFAC's fact-finding process.

Finally, the August 29, 2017 request that Mr. Joumaa enter into a Terms of Removal Agreement with OFAC is insufficient to warrant the removal of Mr. Joumaa from the SDN List in light of all the evidence before OFAC.

---

[1] OFAC accepts, for purposes of deciding Mr. Joumaa's request for reconsideration, his claims that the operations of, or his relationship to, SDN entities Goldi Electronics S.A., the Hassan Ayash Exchange Company, and the New Line Exchange Trust Co. ceased after his designation.

FNK 7782 1613

As noted above, OFAC's decision is based in part on law enforcement sensitive and classified information.  OFAC will provide a copy of the unclassified, non-privileged portions of the administrative record upon which OFAC relied to deny Mr. Joumaa's request under separate cover shortly.  Providing this information requires multiple levels of internal review by interagency partners in order to comply with OFAC's obligations to protect classified, privileged, and otherwise protected information, which may delay the release of such information.

For the most direct response, please submit any follow up questions and correspondence to OFAC via the following email address:  OFAC.Reconsideration@treasury.gov.

You may also contact OFAC at the following mailing address:

> U.S. Department of the Treasury
> Office of Foreign Assets Control
> ATTN: Office of Global Targeting
> 1500 Pennsylvania Avenue, N.W. (Freedman's Bank Building)
> Washington, DC 20220

Or you may contact OFAC via telephone, 202-622-2420, or fax, 202-622-5390.

Sincerely,

Andrea Gacki
Deputy Director
Office of Foreign Assets Control

3



## DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C. 20220

Case ID FNK-7782

Ferrari & Associates, P.C.
1455 Pennsylvania Ave., N.W.
Suite 400
Washington, DC 20004

Re:  Ayman Joumaa

Dear Mr. Ferrari:

This letter follows up to our letter of March 2, 2018 regarding Mr. Joumaa's May 18, 2016, request for reconsideration of his designation as a Specially Designated Narcotics Trafficker (SDNT) pursuant to Section 805 of the Foreign Narcotics Kingpin Designation Act (Kingpin Act), 21 U.S.C. § 1904(b).

As noted in our prior letter, after reviewing all of the evidence before OFAC, including the information that you provided,[1] and law enforcement sensitive, classified, and open source information, OFAC does not find credible Mr. Joumaa's claims, as stated in your letter dated October 25, 2016, that he is not "currently engaged in conduct that contributes to narcotics trafficking or money-laundering in support of narcotics trafficking." Accordingly, Mr. Joumaa's request for reconsideration of his designation was denied because he continues to meet the criteria under the Kingpin Act.

OFAC previously indicated that it would provide a copy of the unclassified, non-privileged portions of the administrative record upon which OFAC relied to deny Mr. Joumaa's request. Accordingly, enclosed please find bates stamped pages FNK 7782: 01-1611. Please note that classified and privileged information, as well as information unrelated to Mr. Joumaa's delisting petition, have been redacted. Providing this information requires multiple levels of internal review by OFAC and by our interagency partners in order to comply with OFAC's obligations to protect classified, privileged, and otherwise protected information, which delays the release of such information.

---

[1] The questionnaire provided by OFAC stated that, for information submitted by Mr. Joumaa, original documents prepared in a foreign language should include English translations. OFAC notes that Mr. Joumaa submitted translations of some foreign-language documents, specifically certain documents in Arabic. However, Mr. Joumaa submitted other untranslated documents in Arabic, Chinese, and Spanish. Documents submitted in Spanish were read by an OFAC investigator who is a native Spanish speaker and has been translating documents since approximately 2010 for OFAC. OFAC's review of other foreign-language documents was based on the context of the information and any English on the document.

Additionally, please find a non-privileged and unclassified summary of otherwise privileged information attached regarding the basis for Mr. Joumaa's original listing and the March 2, 2018 delisting denial.

For the most direct response, please submit any follow up questions and correspondence to OFAC via the following email address:  OFAC.Reconsideration@treasury.gov.

You may also contact OFAC at the following mailing address:

> U.S. Department of the Treasury
> Office of Foreign Assets Control
> ATTN: Office of Global Targeting
> 1500 Pennsylvania Avenue, N.W. (Freedman's Bank Building)
> Washington, DC 20220

Or you may contact OFAC via telephone, 202-622-2420, or fax, 202-622-5390.

Sincerely,

MAR. 0 9 2018

Mark Samara
Assistant Director
Global Crime & Narcotics Division
Office of Foreign Assets Control

2

FNK 7782 1616

## <u>Non-Privileged and Unclassified Summary of Otherwise Privileged Information</u>

<u>2011 Designation</u>

Ayman JOUMAA leveraged several associates to coordinate money laundering pickup operations.  Ayman JOUMAA and the JOUMAA DTO used JOUMAA's company to launder currency from the U.S. and Canada to Colombia and Lebanon, as well as transferred money from Europe to Lebanon via West Africa.  Ayman JOUMAA worked with various associates to traffic cocaine to the Middle East and launder money for a drug trafficking organization in South America.  Ayman JOUMAA directed bulk currency pickups and trade based money laundering via HASSAN AYASH EXCHANGE COMPANY and ELLISSA EXCHANGE COMPANY. JOUMAA used these entities to transfer funds derived from the proceeds of drug trafficking to the United States through various used car dealerships.  Vehicles are subsequently purchased and shipped to the Middle East.  The proceeds from these activities are later reinvested in criminal activities. Ayman JOUMAA is a contact for Black Market Peso Exchange (BMPE) broker Pedro Clavel Mejia-Salazar in laundering drug proceeds.  For example, one transaction was in or about 2007 in which JOUMAA was involved in a pickup of 100,000 euros in France, which were ultimately seized by French authorities.  Ayman JOUMAA created NEW LINE EXCHANGE to further conceal his money laundering operations.  Funds from NEW LINE EXCHANGE were transferred to HASSAN AYASH EXCHANGE before being wired to various international companies and individuals.  In 2008, Ayman JOUMAA explored options to launder 4.5 million euros from Spain to China.  Ayman JOUMAA was involved in laundering drug proceeds by smuggling cashier's checks into Lebanon.  The checks were payments for loads of cocaine smuggled into Lebanon.  The drugs were traced back to Maicao, Colombia.

<u>2018 Denial</u>

As of July 2011, a Colombian individual was laundering drug proceeds for Ayman JOUMAA. JOUMAA stated to several individuals that his money laundering business had been negatively affected by his OFAC designation.  As of March 2013, a Colombian money launderer, later designated as an SDNT by OFAC, uses Ayman JOUMAA to launder money in Europe. As of 2013, Ayman JOUMAA facilitates money pick-ups in Europe for a Colombian money launderer, later designated as an SDNT by OFAC.  As of 2014, Ayman JOUMAA is associated with a designated SDNT individual in the pick up of bulk drug proceeds in Europe to launder to Colombia.  As of 2016, Ayman JOUMAA oversees money laundering operations between Lebanon, Colombia, and Venezuela.  As of June 2016, Ayman JOUMAA is noted to currently be the leader of a group of money launderers.  As of November 2016, Ayman JOUMAA utilized a shipping company associated with a previously OFAC designated individual to move money. Ayman JOUMAA is moving large sums of money across different continents and is noted to allegedly move $200 million dollars a month on behalf of a designated entity.  JOUMAA discussed a business partnership with previously designated individuals to move cars from the U.S. to Europe and Africa and deliberated on a trade-based money laundering tactic.  JOUMAA also shipped arms and currency in containers through Europe.