# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AYMAN SAIED JOUMAA,

  *Plaintiff*,

v.

STEVEN MNUCHIN *et al.*,

  *Defendants*.

Civil Action No. 17-2780 (TJK)

## MEMORANDUM OPINION

The Treasury Department designated Ayman Saied Joumaa, a Lebanese and Colombian national, as a specially designated narcotics trafficker (SDNT) under the Kingpin Act in 2011. As a result of that designation, any assets Joumaa may have had in the United States were frozen, and he was barred from conducting certain commercial and financial transactions with U.S. persons. Later that year, Joumaa was indicted in the Eastern District of Virginia for, among other things, coordinating large shipments of cocaine from Colombia to the United States for a Mexican drug cartel and laundering hundreds of millions of dollars in drug proceeds. In 2018, Treasury denied Joumaa's petition to rescind his designation after determining that he continued to qualify as an SDNT. Joumaa has challenged that denial by suing Secretary Steven Mnuchin and Treasury's Office of Foreign Assets Control (collectively, "Defendants"), and the parties have cross-moved for summary judgment. For the reasons explained below, the Court will grant Defendants' motion to dismiss or, in the alternative, for summary judgment, and deny Joumaa's motion for summary judgment.[1]

---

[1] In reaching its conclusion, the Court considered all relevant filings, including, but not limited to, the following: Joumaa's Amended Complaint ("Am. Comp."), ECF No. 9; Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Def. Mot."), ECF No.

# I. Background

## A. The Foreign Narcotics Kingpin Designation Act

The Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), 21 U.S.C. § 1901 *et seq.*, allows the President to designate and freeze the assets of persons involved in international narcotics trafficking. *Id.* §§ 1903, 1904. Narcotics trafficking is broadly defined as "any illicit activity to cultivate, produce, manufacture, distribute, sell, finance, or transport narcotic drugs, controlled substances, or listed chemicals, or otherwise endeavor or attempt to do so, or to assist, abet, conspire, or collude with others to do so." *Id.* § 1907(3). The authority to designate persons under the Kingpin Act has been delegated to the Treasury Department's Office of Foreign Assets Control (OFAC). 31 C.F.R. § 598.803. OFAC calls such persons "specially designated narcotics traffickers" and publishes their names on its Specially Designated Nationals and Blocked Persons List ("SDN List"). *Id.* § 598.314. SDNTs include persons who "play[] a significant role in international narcotics trafficking"[2] and "[m]aterially assist[] in, or provid[e] financial or technological support for or to, or provid[e] goods or services in support of, the

---

10; Joumaa's Consolidated Response to Defendants' Motion and Cross-Motion for Summary Judgment ("Pl. Mot."), ECF No. 12; Defendants' Memorandum in Opposition to Joumaa's Cross-Motion for Summary Judgment and Reply ("Def. Opp."), ECF No. 15; Joumaa's Reply in Support of His Cross-Motion for Summary Judgment ("Pl. Reply"), ECF No. 16; Defendants' Motion for Leave to File a Sur-Reply, ECF No. 17; Notice of Classified and Privileged Lodging, ECF No. 18; Memorandum in Opposition to Defendants' Motion for Leave to File a Sur-Reply, ECF No. 20; Defendants' Reply in Support of Its Motion for Leave to File a Sur-Reply, ECF No. 21; and the Joint Appendix ("AR"), ECF No. 22.

[2] *See* 21 U.S.C. § 1907(7); 31 C.F.R. § 598.314(a), (b)(3).

international narcotics trafficking activities of [an SDNT],"[3] as well as individuals or entities that are "[o]wned, controlled, or directed by, or acting for or on behalf of, [an SDNT]."[4]

OFAC's designation of a person as an SDNT freezes his assets in the United States and bars him from conducting certain commercial and financial transactions with U.S. persons. 21 U.S.C. § 1904(b), (c). SDNTs may petition for their removal from the SDN List, often called "delisting," through an administrative process conducted by OFAC. 31 C.F.R. § 501.807. Through that process, SDNTs may "submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation" and "propose remedial steps on the person's part, such as corporate reorganization, resignation of persons from positions in a blocked entity, or similar steps, which the person believes would negate the basis for designation." *Id.* § 501.807(a).

## B. Factual Background

### 1. OFAC's Designation of Joumaa as an SDNT

OFAC designated Joumaa, as well as the "Joumaa Money Laundering Organization/Drug Trafficking Organization" (the "Organization") as SDNTs in January 2011.[5] AR 2, 23–24, 67. According to OFAC, its designation was supported by an investigation conducted by the Drug Enforcement Administration (DEA), which developed evidence that Joumaa had "coordinated the transportation, distribution, and sale of multi-ton shipments of cocaine from South America

---

[3] *See* 31 C.F.R. § 598.314(b)(1).

[4] *See id.* § 598.314(b)(2).

[5] OFAC also designated other individuals and entities it determined participated in Joumaa's money-laundering operation, including various money exchanges, holding companies, and a hotel. *Id.* at 23–25, 67. Although OFAC later delisted several of these individuals and entities, Joumaa and the Organization have remained designated.

and [had] laundered the proceeds from the sale of cocaine in Europe and the Middle East." AR 67. Moreover, according to OFAC and the DEA, Joumaa and the Organization, operating "in Lebanon, West Africa, Panama and Colombia . . . [continued to] launder proceeds from their illicit activities—as much as $200 million per month—through various channels, including bulk cash smuggling operations and Lebanese exchange houses." *Id.*

## 2. Joumaa's Indictment in the Eastern District of Virginia

The same DEA investigation that led to Joumaa's designation as an SDNT also produced a criminal case against him. In November 2011, a grand jury in the Eastern District of Virginia returned a sealed indictment charging him with one count of conspiracy to distribute five kilograms or more of cocaine knowing and intending that it would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960, and 963, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). AR 77–83.

According to the indictment, Joumaa and his alleged co-conspirators: (1) "coordinated the shipment of at least tens of thousands of kilograms of cocaine from Colombia, through Central America and Mexico, to the United States, including but not limited to 85,000 kilograms of cocaine shipped from Colombia for sale to Los Zetas drug cartel from in and around 2005 through in and around 2007"; (2) "laundered . . . hundreds of millions of dollars in proceeds of illegal drug sales in the United States and elsewhere, including but not limited to [more than] $250 million in drug related proceeds representing cocaine sales in the United States, Mexico, Central America, and Europe, which [they] laundered from in and around 1997 through in and around September 2010"; and (3) "coordinated the shipment of multi-thousand kilogram quantities of cocaine from Colombia to Guatemala, Honduras, and Mexico for sale to Los Zetas drug cartel in Mexico" for ultimate sale in the United States. AR 79–80.

The indictment also detailed how Joumaa and his co-conspirators allegedly laundered drug proceeds. Joumaa, it alleged, "would arrange for the laundering of drug-related proceeds from Mexico, Europe (predominantly Spain), and West Africa to Colombia. [His] co-conspirators would contact [him] via email, Blackberry PIN, or telephone in order to arrange for the delivery of drug related proceeds to members of [his] organization." AR 80. Joumaa "would then launder these proceeds and return them to the cocaine suppliers in Colombia," charging "a fee of between 8% and 14%." *Id.* These drug proceeds "represented proceeds from the sale of cocaine in the United States." *Id.* Joumaa and his co-conspirators would also receive bulk deliveries of United States currency as part of their laundering scheme. AR 81. "These deliveries of bulk cash, which represented proceeds of the sale of cocaine in the United States, were made in Mexico City, Mexico." *Id.* "Once the drug proceeds were delivered to [Joumaa] and his co-conspirators, the laundered proceeds would be paid out in Venezuela or Colombia." *Id.* Joumaa "would launder these funds and make payment within 1 to 5 days from the date of delivery of the United States currency in Mexico. During the course of the conspiracy, [Joumaa] typically picked up between $2 and 4 million at a time in Mexico City." *Id.* Joumaa and his co-conspirators would also "pick up drug-related proceeds in Mexico, Europe, and West Africa . . . [and] pick up United States currency in Mexico City, Mexico." *Id.* Joumaa "would then launder these proceeds and repay them to drug traffickers in Colombia and Venezuela." *Id.* The U.S. currency Joumaa laundered allegedly "represented the proceeds of the sale of cocaine shipped from Colombia to Guatemala, Honduras, and Mexico, for sale to the Los Zetas trafficking organization in Mexico." *Id.*

The indictment was preceded by a sealed criminal complaint filed against Joumaa in June 2011. AR 69–76. According to an affidavit executed by a DEA Special Agent in support of the

complaint, the DEA's investigation into Joumaa's alleged activities involved at least three confidential sources who participated in those activities, two of which had pled guilty to unspecified federal charges. *Id.* The affidavit also supported a sealed arrest warrant for Joumaa, which the docket reflects was issued in June 2011. AR 85. In December 2011, the entire case, including the indictment, was unsealed. *Id.*

### 3. Joumaa's Petition for Delisting

In May 2016, Joumaa petitioned for his removal from the SDN List. AR 87–90. He asserted "that he does not play a role in narcotics trafficking activities," but even if he had "engaged in certain conduct that gave rise to his designation under the Kingpin Act, he [was] prepared to work in good-faith with OFAC to exact a change in circumstances that would lead to rescission of his designation." AR 87. He requested that OFAC provide him a questionnaire with "any and all inquiries or requests for information necessary to consider a rescission of [his] designation." AR 90.

Joumaa's petition for delisting led to a lengthy dialogue with OFAC. At OFAC's request, Joumaa submitted information about his relationships with 55 individuals and 95 entities on the SDN List. AR 100–05. He also submitted extensive documentation, mainly about his business activities and his relationship with three entities designated along with him in 2011: New Line Exchange Trust Company, Hassan Ayash Exchange Company, and Goldi Electronics S.A. *See* AR 106–1392.

In November 2016, OFAC provided Joumaa a redacted version of the administrative record relating to his designation. The record included OFAC's evidentiary memorandum in support of the designation. AR 26–66. OFAC heavily redacted the portions of the memorandum

related to Joumaa.[6]  AR 28–41.  OFAC did, however, provide him a non-privileged and unclassified summary of the information in the administrative record that it had redacted.  The summary read, in its entirety:

> The JOUMAA drug trafficking and money laundering organization has moved hundreds of millions of dollars in narcotics proceeds from the United States to Lebanon.  Known narcotics traffickers and money launderers worked with Ayman JOUMAA to coordinate drug money laundering in Florida.  The export of vehicles from the United States to West Africa was a method used by the JOUMAA drug trafficking and money laundering organization to launder drug proceeds.  Ayman JOUMAA is the leader of the JOUMAA drug trafficking and money laundering organization.

AR 27.

In August 2017, Joumaa sent a letter to OFAC, arguing that it lacked a basis to maintain his designation.  AR 1394–1403.  Joumaa's counsel added that, at least in his view, Joumaa had "not been involved in any activities related to the exchange of currencies" since his 2011 designation.  AR 1402.  Later that month, Joumaa suggested a "Terms of Removal Agreement" through which he would agree to take certain steps in exchange for his delisting.  AR 1404–08.

### 4.      OFAC's Denial of Joumaa's Petition

In March 2018, OFAC denied Joumaa's petition for delisting.  AR 1612.  A week later, OFAC also provided him a partially redacted evidentiary memorandum in support of its decision, as well as a "non-privileged and unclassified summary of the otherwise privileged information" in the memorandum that supported both its original designation and its denial of his petition for delisting.  AR 1615–17.

In OFAC's denial letter, it concluded that "[a]fter reviewing all of the evidence . . . including the information [Joumaa] provided, and law enforcement sensitive, classified, and

---

[6] OFAC also redacted some portions of the memorandum because they related to other SDNTs' designations.  *See* AR 41.

open source information," it did not find credible his claim "that he is not 'currently engaged in conduct that contributes to narcotics trafficking or money-laundering in support of narcotics trafficking.'" AR 1612. As a result, it denied his petition because "he continue[d] to meet the criteria under the Kingpin Act." *Id.* OFAC also cited the allegations in the indictment, noting that Joumaa had "not faced the charges against him . . . nor [had] he notified OFAC of his intent or willingness to return to the United States to face those charges." *Id.* And OFAC asserted that although Joumaa "denied working with several SDNTs in the laundering of narcotics proceeds, including Pedro Mejia Salazar," OFAC had evidence that Salazar had "worked with [Joumaa] as part of his global drug money laundering operations." AR 1613. Moreover, Salazar had "pleaded guilty in the U.S. District Court for the District of Massachusetts in 2017 for laundering approximately $800,000 between May 2009 and June 2012." *Id.*

OFAC also asserted that Joumaa's "reconsideration request [was] not supported by credible evidence to establish that there was an insufficient basis for [the original] designation, or that circumstances resulting in the designation no longer apply such that removal from the List of Specially Designated Nationals and Blocked Persons (SDN List) [was] warranted." *Id.* Specifically, OFAC stated that Joumaa's "arguments . . . and documents submitted do not rebut OFAC's evidence that [he] used such entities as the Hassan Ayash Exchange Company and the New Line Exchange Trust Co. in connection with his money laundering activities." *Id.* Additionally, "the documents do not address the other aspects of [his] drug trafficking and money laundering network that served as the basis for his designation," such as his use of other companies and channels outside Lebanon, including non-business entities, to launder funds. *Id.* OFAC also determined that Joumaa's proposed remedial steps did not warrant his removal from the SDN List in light of OFAC's evidence. *Id.*

This time around, OFAC's evidentiary memorandum contained far fewer redactions and provided Joumaa more information than the one provided to him after his initial designation. *See* AR 1–17. In it, as summarized below, OFAC addressed the information that Joumaa had provided about his business activities and relationships with other SDNTs and explained in detail why, based on its own information, it concluded that he remained involved in international narcotics trafficking. AR 4–16.

First, OFAC concluded that Joumaa "unpersuasively denie[d] that he was involved in narcotics trafficking activities at any time." AR 4. OFAC stated that its 2011 designation "was based upon reliable and corroborated information that he led a drug trafficking and money laundering organization moving hundreds of millions of dollars in narcotics proceeds from the United States to Lebanon." AR 5. OFAC also cited the allegations in the 2011 indictment as reflecting additional such information. AR 5–7. Second, OFAC determined that Joumaa "continue[d] to be involved in money laundering activities, and his claims to the contrary [were] not credible," AR 7, although it redacted the evidence on which this determination rested, AR 7–9. Third, OFAC adjudged that Joumaa's "claims about his relationships, business or otherwise, with previously designated individuals [were] not credible." AR 9. For example, the memorandum stated that Joumaa admitted knowing Pedro Mejia Salazar well but denied engaging in illicit activity with him. AR 9–10. But—as OFAC also noted in its denial letter—OFAC's evidence tied Salazar to Joumaa's money laundering activity and Salazar pled guilty in May 2017 "for his role in a conspiracy to launder drug proceeds." AR 10.

Fourth, OFAC concluded that its own information was reliable. AR 12. Joumaa had argued in his petition that the three confidential sources relied on by OFAC were unreliable, because at least two appeared to be motivated by expected reductions in their sentences. *Id.* But

OFAC asserted in response that the DEA had managed its confidential sources in accordance with applicable Justice Department guidelines, which required that the sources be vetted for reliability. AR 12–13. And of course, OFAC noted, the DEA routinely uses "confidential sources or informants," as well as an array of other sources of information—seized documents, undercover operations, intercepted phone calls, and other methods—to investigate and prosecute drug trafficking organizations. AR 13. Fifth, OFAC determined that Lebanese legal proceedings cited by Joumaa, which had found evidence of money laundering against him lacking, were irrelevant. *Id.* As Joumaa himself had noted, the Lebanese court did not possess OFAC's evidence and had even "lamented the failure of the U.S. government to turn over evidence" to Lebanese authorities. *Id.* Sixth, OFAC found that Joumaa's "remaining arguments [were] without merit," including his contention that the information supporting his designation that he had been provided was conclusory or otherwise insufficient. *Id.* And finally, OFAC addressed the documentation submitted by Joumaa, concluding that it did not show that delisting was warranted. AR 14–16.

OFAC also provided Joumaa a non-privileged and unclassified summary of information that it had redacted from the administrative record, both as part of his original designation and OFAC's denial of his petition for delisting:

2011 Designation

Ayman JOUMAA leveraged several associates to coordinate money laundering pickup operations. Ayman JOUMAA and the JOUMAA DTO used JOUMAA's company to launder currency from the U.S. and Canada to Colombia and Lebanon, as well as transferred money from Europe to Lebanon via West Africa. Ayman JOUMAA worked with various associates to traffic cocaine to the Middle East and launder money for a drug trafficking organization in South America. Ayman JOUMAA directed bulk currency pickups and trade based money laundering via HASSAN AYASH EXCHANGE COMPANY and ELLISSA EXCHANGE COMPANY. JOUMAA used these entities to transfer funds derived from the proceeds of drug trafficking to the United States through various used car

dealerships. Vehicles are subsequently purchased and shipped to the Middle East. The proceeds from these activities are later reinvested in criminal activities. Ayman JOUMAA is a contact for Black Market Peso Exchange (BMPE) broker Pedro Clavel Mejia-Salazar in laundering drug proceeds. For example, one transaction was in or about 2007 in which JOUMAA was involved in a pickup of 100,000 euros in France, which were ultimately seized by French authorities. Ayman JOUMAA created NEW LINE EXCHANGE to further conceal his money laundering operations. Funds from NEW LINE EXCHANGE were transferred to HASSAN AYASH EXCHANGE before being wired to various international companies and individuals. In 2008, Ayman JOUMAA explored options to launder 4.5 million euros from Spain to China. Ayman JOUMAA was involved in laundering drug proceeds by smuggling cashier's checks into Lebanon. The checks were payments for loads of cocaine smuggled into Lebanon. The drugs were traced back to Maicao, Colombia.

2018 Denial

As of July 2011, a Colombian individual was laundering drug proceeds for Ayman JOUMAA. JOUMAA stated to several individuals that his money laundering business had been negatively affected by his OFAC designation. As of March 2013, a Colombian money launderer, later designated as an SDNT by OFAC, uses Ayman JOUMAA to launder money in Europe. As of 2013, Ayman JOUMAA facilitates money pick-ups in Europe for a Colombian money launderer, later designated as an SDNT by OFAC. As of 2014, Ayman JOUMAA is associated with a designated SDNT individual in the pick up of bulk drug proceeds in Europe to launder to Colombia. As of 2016, Ayman JOUMAA oversees money laundering operations between Lebanon, Colombia, and Venezuela. As of June 2016, Ayman JOUMAA is noted to currently be the leader of a group of money launderers. As of November 2016, Ayman JOUMAA utilized a shipping company associated with a previously OFAC designated individual to move money. Ayman JOUMAA is moving large sums of money across different continents and is noted to allegedly move $200 million dollars a month on behalf of a designated entity. JOUMAA discussed a business partnership with previously designated individuals to move cars from the U.S. to Europe and Africa and deliberated on a trade-based money laundering tactic. JOUMAA also shipped arms and currency in containers through Europe.

AR 1617.

## C.    This Action

Joumaa filed this lawsuit in December 2017. ECF No. 1. After OFAC denied his

petition for delisting in March 2018, Joumaa amended his complaint. In it, he asserts that (1)

OFAC's denial of his petition was arbitrary and capricious under the Administrative Procedure

Act (APA), 5 U.S.C. § 701 *et seq.*; (2) OFAC's determination that he continued to meet the SDNT designation criteria was also arbitrary and capricious; (3) OFAC exceeded its statutory authority in reaching its determination; and (4) OFAC's failure to adequately disclose the evidentiary basis for its determinations and failure "to identify how the information contained in OFAC's non-privileged and unclassified summary . . . correspond[ed] to the redacted portions of the administrative record" violated his Fifth Amendment due process rights. Am. Compl. at 12–17.

Defendants moved to dismiss or, in the alternative, for summary judgment, arguing that OFAC did not violate the APA and that Joumaa, as a foreign national with insufficient connections to the United States, could not bring a Fifth Amendment due process claim. Joumaa filed a consolidated opposition and cross-motion for summary judgment. After briefing was completed, Defendants moved for leave to file a sur-reply, asserting that Joumaa had made new arguments about his U.S. ties in his reply in support of his cross-motion. For the reasons explained below, the Court will grant Defendants' motion to dismiss or, in the alternative, for summary judgment, and deny Joumaa's motion for summary judgment. The Court will also deny as moot Defendants' motion for leave to file a sur-reply, because Joumaa conceded Defendants' arguments about why he may not assert a Fifth Amendment due process claim.

## II.    Legal Standard

Summary judgment is appropriate when a party is entitled to judgment as a matter of law. *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007). In considering a summary judgment motion, courts must "view[] the evidence in the light most favorable to the non-movants and draw[] all reasonable inferences accordingly." *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016). In the APA context, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the

agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012). This requires "the district judge [to] sit[] as an appellate tribunal" and treat "[t]he 'entire case' on review [as] a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote omitted).

## III. Analysis

Joumaa asserts that OFAC's denial of his delisting petition (1) was arbitrary and capricious under the APA (Counts I and II)[7]; (2) exceeded its statutory authority under the Kingpin Act (Count III); and (3) violated his due process rights under Fifth Amendment. The Court addresses each argument in turn.

### A. Whether OFAC's Denial of Joumaa's Petition for Delisting Was Arbitrary and Capricious under the APA

Under the APA's "highly deferential standard of review," courts may "set aside OFAC's action only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Islamic Am. Relief Agency*, 477 F.3d at 732 (quoting 5 U.S.C. § 706(2)(A)). This standard does not permit the Court to substitute its judgment for OFAC's; instead it requires only that OFAC have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). "[W]hen we evaluate agency action, 'we do not ask whether record evidence could support the petitioner's

---

[7] In Count I, Joumaa asserted that OFAC's conclusion that he continued to qualify as an SDNT was arbitrary and capricious; in Count II he asserted that its denial of his delisting petition was similarly flawed. These claims are virtually identical, and so the Court, like the parties in their briefing, considers them together.

view of the issue, but whether it supports the [agency's] ultimate decision.'" *Zevallos v. Obama*, 793 F.3d 106, 114 (D.C. Cir. 2015) (second alteration in original) (quoting *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010)).  A review of a decision made by OFAC is "extremely deferential" because it operates "in an area at the intersection of national security, foreign policy, and administrative law."  *Islamic Am. Relief Agency*, 477 F.3d at 734.

The Court easily concludes that neither OFAC's determination that Joumaa continued to qualify as an SDNT nor its denial of his petition on those grounds was arbitrary or capricious. As Defendants argue, the record reflects substantial evidence of Joumaa's significant role in international narcotics trafficking, and in particular, his role in financing and supporting such trafficking through money laundering.  AR 1–21, 1612–14, 1617.  And in reaching its decision to deny the petition, OFAC reviewed hundreds of pages of documents about Joumaa's business relationships, evaluated his answers about his contacts with other SDNTs, and responded to his arguments in support of his petition.  AR 4–7, 9–16, 139–40, 1612–13, 1617.  OFAC also considered privileged and classified evidence of Joumaa's continuing involvement in narcotics trafficking, for which it provided Joumaa a non-privileged and unclassified summary.  AR 1612, 1617.  On this record, and given the Court's deferential standard of review, there is no basis for it to set aside OFAC's conclusion that Joumaa "continue[d] to meet the criteria for designation under the Kingpin Act."  AR 1612; *see also* AR 17.

Joumaa fails to show how OFAC's decisions were arbitrary and capricious.  First, he argues at length that what he describes as evidence of "historical conduct"—that is, evidence about his conduct that allegedly occurred before his initial designation in 2011—cannot support OFAC's denial of his delisting petition because his petition concerned whether he *continued* to meet the designation criteria after 2011.  Pl. Mot. 16–17.  Without this historical evidence, he

asserts, the record evidence was insufficient to support OFAC's decision. *Id.* The problem for Joumaa is that, to the contrary, the record contains ample evidence of his involvement in narcotics trafficking well after his 2011 designation. For example, as reflected in the non-privileged and unclassified summary of information redacted from the administrative record, OFAC relied on evidence that:

> As of July 2011, a Colombian individual was laundering drug proceeds for Ayman JOUMAA. . . . As of 2014, Ayman JOUMAA is associated with a designated SDNT individual in the pick up of bulk drug proceeds in Europe to launder to Colombia. As of 2016, Ayman JOUMAA oversees money laundering operations between Lebanon, Colombia, and Venezuela. As of June 2016, Ayman JOUMAA is noted to currently be the leader of a group of money launderers. As of November 2016, Ayman JOUMAA utilized a shipping company associated with a previously OFAC designated individual to move money.

AR 1617. The privileged and classified portions of the administrative record contain even more detail about this evidence of Joumaa's conduct well after 2011.[8]

Joumaa also appears to argue that even if OFAC had post-2011 evidence supporting his continued designation, it was still improper for OFAC to consider historical evidence when it considered his petition. But there is no reason why this should be so. OFAC may rationally consider evidence of Joumaa's pre-2011 illicit activities, networks, and capabilities to help it assess, and provide context for, evidence of his more recent conduct—both its own evidence and any purportedly exculpatory evidence provided by Joumaa. *See Holy Land Found. for Relief and Development v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003) ("HLF also argues that Treasury was arbitrary and capricious in relying on information that predated the 1995 designation of Hamas as a terrorist organization. However, as the district court noted, it was clearly rational for

---

[8] As this non-privileged and unclassified summary reflects, Joumaa's concern that the classified and privileged portions of the record bear only on "alleged historical activities," Pl. Mot. at 22 n.7, rather than his more recent conduct, is unfounded.

Treasury to consider HLF's genesis and history, which closely connect it with Hamas." (citation omitted)).

Second, Joumaa argues that OFAC's evidence was insufficient because it failed to connect his alleged money laundering to narcotics trafficking, as required by the Kingpin Act. Pl. Mot. at 18. But again, the record includes substantial evidence of such a connection. For example, the non-privileged and unclassified summary referenced above refers to evidence that "a Colombian individual was laundering drug proceeds for Ayman JOUMAA," and that "Ayman JOUMAA is associated with a designated SDNT individual in the pick up of bulk drug proceeds in Europe to launder to Colombia." AR 1617. And once again, the privileged and classified portions of the record provide even more detail about this evidence.[9]

Lastly, Joumaa argues that OFAC erred because, in his view, it based its denial solely on its finding that *his* claims and evidence were not credible, as opposed to evidence that proved that he continued to meet the criteria for Kingpin Act designation. As Joumaa puts it, OFAC "relied solely upon Plaintiff's credibility in order to determine that he [met] the criteria for designation under the Kingpin Act, and . . . Plaintiff's credibility—standing alone—is not a factor that Congress intended to be considered in making such determinations." Pl. Reply at 3. But the record, as described above, strongly belies this characterization of OFAC's process and conclusions. To be sure, OFAC did not find credible Joumaa's claim that he had not engaged in illicit activities, either before or after his 2011 designation. But it denied Joumaa's petition because it concluded that he "continue[d] to meet the criteria under the Kingpin Act." AR 1612.

---

[9] Joumaa also argues that OFAC's determination was arbitrary and capricious because the agency asked about his relationship to 150 SDNTs but "selectively reference[d]" only six in its denial of his delisting petition. *See* Pl. Mot. at 16. But Joumaa need not have engaged in illicit conduct with all 150 SDNTs to meet the criteria for designation.

And it reached that conclusion, in its words, only "[a]fter reviewing all of the evidence . . .

including the information [Joumaa] provided, and law enforcement sensitive, classified, and

open source information." *Id.* Indeed, part of OFAC's evidentiary memorandum described

information that supported its conclusion that he "continue[d] to be involved in money

laundering activities."[10] AR 7. And the non-privileged and unclassified summary of information

redacted from the administrative record reflects such evidence. AR 1617.

For these reasons, the Court will grant summary judgment for Defendants on Counts I

and II of the amended complaint.

### B.    Whether OFAC Acted Beyond Its Statutory Authority

Joumaa also argues that OFAC, in relying on evidence he characterizes as outdated and

unrelated to narcotics trafficking, acted outside its statutory authority. Pl. Mot. at 24. The Court

must, of course, set aside OFAC's action if it was "in excess of statutory jurisdiction, authority,

or limitations." 5 U.S.C. § 706(2)(C). But Joumaa relies on the same arguments on which he

based his arbitrary-and-capricious claims, Pl. Mot. at 25–28, and they get him no further here.

As Joumaa put it, "[b]y determining that Plaintiff meets the criteria for designation on the basis

of either historical conduct or conduct unrelated to narcotics trafficking, Defendants acted

beyond the scope of § 1904(b)(4) and thus in excess of their statutory authority under the

_____

[10] On various occasions, Joumaa also appears to argue that credibility is not a "factor" that
OFAC may consider at all, because it is not specifically mentioned in the Kingpin Act. *See* Pl.
Mot. at 16. This version of his argument fares no better. Agencies routinely receive deference
for their credibility determinations from reviewing courts. *Wilmina Shipping AS v. DHS*, 75
F. Supp. 3d 163, 183 (D.D.C. 2014) (collecting cases in this Circuit where courts showed such
deference). And in particular, the D.C. Circuit has affirmed a district court's deference to
OFAC's credibility determinations in the Kingpin Act context. *See Zevallos v. Obama*, 10
F. Supp. 3d 111, 123 n.9 (D.D.C. 2014) ("Mr. Zevallos made these arguments to OFAC, and
OFAC concluded that the evidence before it was credible, as it explained in its 2013 Evidentiary
Memorandum. It is not the province of this Court to reweigh the evidence and reconsider Mr.
Zevallos's arguments on appeal." (citations and emphasis omitted)), *aff'd*, 793 F.3d 106 (D.C.
Cir. 2015).

Kingpin Act." Pl. Mot. at 25. And he appears to advance his "credibility" argument in support of his statutory authority claim as well. *Id.* at 27; Pl. Reply at 10. But for all the reasons explained above that OFAC's denial was not arbitrary and capricious, it was also not contrary to OFAC's statutory authority. Thus, the Court will grant summary judgment for Defendants on Count III of the amended complaint.

### C. Whether OFAC Deprived Joumaa of Due Process under the Fifth Amendment

Finally, Joumaa argues that OFAC deprived him of due process in violation of the Fifth Amendment.[11] Pl. Mot. at 30. To begin with, the parties disagree over whether Joumaa had sufficient connections to the United States to assert this constitutional claim. Defendants contend that the amended complaint lacks facts that establish the kind of "substantial connections," *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990), or "overt presence," *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 201 (D.C. Cir. 2001), required for a foreign national to bring such a claim. Def. Mot. at 24–25.

Joumaa did not respond to this argument in his consolidated opposition to Defendants' motion and his cross-motion for summary judgment. Only in his reply in support of his cross-motion did he argue that he may bring such a claim because he holds an unspecified "interest" in certain blocked funds. Pl. Reply at 18–20. But "[i]t is well-established in this Circuit that 'when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, the court may treat those arguments that the plaintiff failed to address as

---

[11] In Joumaa's cross-motion for summary judgment, he also asserts that OFAC violated the APA's notice requirement, codified at 5 U.S.C. § 555(e). *See* Pl. Mot. at 37–38. But as Defendants point out, Joumaa did not assert an APA notice claim in his amended complaint. Def. Opp. at 23. Thus, the Court need not address whether OFAC satisfied the notice requirement under the APA. *See District of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263–64 (D.D.C. 2010) ("It is well established that a party may not amend its complaint or broaden its claims through summary judgment briefing.").

conceded.'" *Shaw v. District of Columbia*, 825 F. Supp. 2d 173, 177 (D.D.C. 2011) (quoting *Buggs v. Powell*, 293 F. Supp. 2d 135, 141 (D.D.C. 2003)). And "[t]he decision to treat a claim as conceded . . . is highly discretionary." *Hampton v. Gov't of D.C.*, 764 F. Supp. 2d 147, 149 n.2 (D.D.C. 2011). Here, Joumaa was on notice of Defendants' argument that he lacked sufficient ties to the United States to bring a Fifth Amendment due process claim, he failed to address that argument in his consolidated opposition to Defendant's motion and cross-motion, and he did so only when Defendants had no opportunity to respond as of right.[12] The Court therefore treats the argument as conceded.

Even if Joumaa had not conceded this argument, however, Defendants would still be entitled to summary judgment.[13] That is so because OFAC afforded him all the process he would have been due, even assuming he could assert a Fifth Amendment due process claim. "[D]ue process is flexible and calls for such procedural protections as the particular situation

---

[12] *Cf. Lewis v. District of Columbia*, 791 F. Supp. 2d 136, 139 n.4 (D.D.C. 2011) ("[I]t is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief.") (quoting *Aleutian Pribilof Islands Ass'n, Inc. v. Kempthorne*, 537 F. Supp. 2d 1, 12 n.5 (D.D.C. 2008)).

[13] Defendants have moved to dismiss Count IV, arguing that because Joumaa does not have the requisite connections to the United States, he lacks "standing," and therefore the Court does not have subject-matter jurisdiction over his claim. Def. Mot. at 25. But in *Jifry v. FAA*, 370 F.3d 1174, 1183 (D.C. Cir. 2004), the D.C. Circuit found that it "need not decide whether or not [foreign plaintiffs] are entitled to constitutional protections because even assuming that they are, they have received all the process that they are due under our precedent." Therefore, the Court understands the Circuit to have concluded—contrary to Defendants' position here—that the question of whether a foreign plaintiff may bring a Fifth Amendment due process claim is not a jurisdictional question; if it were, the Circuit's approach in *Jifry* would be inconsistent with the Supreme Court's admonition that a court may not assume jurisdiction for purposes of resolving the merits of a claim. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). The Court therefore resolves the matter on summary judgment. *See also Fares v. Smith*, 249 F. Supp. 3d 115, 122 (D.D.C. 2017), *aff'd*, 901 F.3d 315 (D.C. Cir. 2018) (affirming grant of summary judgment on Fifth Amendment due process claim without resolving sufficiency of plaintiff's U.S. connections).

demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). In the Kingpin Act context, the Due Process Clause requires that a designee receive post-deprivation "notice and a meaningful opportunity to be heard." *Zevallos*, 793 F.3d at 116.

Joumaa argues that he received neither notice nor an opportunity to be heard. Pl. Mot. at 31. But his amended complaint focuses entirely on the alleged inadequacy of his notice, and he brings "no claim regarding OFAC's hearing procedures or implementation of those procedures in this case." *Fares*, 249 F. Supp. 3d at 125. Moreover, the D.C. Circuit has determined that those procedures satisfy due process. *Zevallos*, 793 F.3d at 115. Properly understood, his claim turns on whether he received adequate notice of the basis for his designation, such that he could meaningfully avail himself of OFAC's process to challenge it. *See Fares*, 249 F. Supp. 3d at 125. The Court concludes that even if Joumaa had a right to such notice, he received it. None of his arguments show otherwise.

First, Joumaa argues that the unredacted evidence which OFAC relied on, including the non-privileged and unclassified summary, was too conclusory to provide him adequate notice. Pl. Mot. at 33–34. The Court disagrees. The three-page letter denying his petition, the summary of the privileged and classified information, and the evidentiary memorandum all provided him specifics about his alleged money laundering activities; the entities, amounts of money, types of narcotics, time frames, and locations allegedly involved; and his alleged associations with other SDNTs. Am. Comp. Ex. 1 at 1–2; AR 26–66, 1617. This information was sufficiently detailed to provide Joumaa with adequate notice.[14] *See Fares*, 249 F. Supp. 3d at 128 ("Plaintiffs are said

---

[14] At times in Joumaa's amended complaint and in his cross-motion for summary judgment, he appears to assert that he should have been provided the classified and law-enforcement privileged portions of the administrative record, or at least that OFAC redacted more information from the record than was proper. Am. Comp. 17–18; Pl. Mot. at 29–30 ("Plaintiff respectfully

to be directly involved in the management of Panama's largest money laundering organization. That organization is further alleged to have ties with some of the world's largest and most heinous narcotics trafficking organizations. . . . [G]iven the nature of the allegations against them, Plaintiffs are not, in the Court's view, for want of opportunities to present evidence to rebut those allegations.").

Second, Joumaa argues that his notice was insufficient because the information he received in connection with his initial designation in 2011 was misleading. Specifically, he argues that because he thought OFAC based his initial designation on information relating to three Lebanese money exchange houses, he focused his attention on refuting that information. *See* Pl. Mot. at 35. Then, he argues, OFAC denied his petition for failing to rebut other evidence unrelated to those exchange houses. *Id.* at 35–36. But this argument comes up short as well. Even at the time of his initial designation, Joumaa was on notice that OFAC based his designation on information far broader than that concerning the three Lebanese money exchange houses. AR 67. For example, OFAC accused Joumaa of coordinating "the transportation, distribution, and sale of multi-ton shipments of cocaine from South America." *Id.* It later informed Joumaa of its evidence that he had "coordinate[d] drug money laundering in Florida" and that he laundered money through the "export of vehicles from the United States to West

---

requests the Court grant summary judgment as to Count IV and order Defendants to disclose the evidence underlying Defendants' findings in order to provide Plaintiff with a meaningful opportunity to respond to such evidence. . . ."). But Joumaa retreated from these arguments in his reply, clarifying that he "does not dispute 'the government's national security classifications and privilege assertions.'" Pl. Reply at 23. And an SDNT has no right to classified evidence that OFAC relies on for his designation, nor to law-enforcement privileged evidence OFAC relies on when he fails to assert any distinction between the two. *See Fares v. Smith*, 901 F.3d 315, 323–24 (D.C. Cir. 2018).

Africa." AR 27. And Joumaa's 2011 indictment included many allegations without an obvious link to the Lebanese money exchange houses.[15] AR 77–83.

Lastly, Joumaa argues that OFAC failed to provide him sufficient notice when it refused to explain, in its summary of the privileged and classified evidence, how each piece of information in the summary "corresponds" or "relates" to redacted portions of the administrative record. Pl. Mot. at 36. As a result, he says, he "is unable to understand the manner in which OFAC is utilizing this information to support its findings or its ultimate conclusion." *Id.* He cites no authority in support of this argument. And the Court struggles to see how Joumaa could fail to understand the connection between the specific information about his alleged laundering of drug proceeds in the summary, AR 1617, and OFAC's conclusion that "he continue[d] to meet the criteria under the Kingpin Act." AR 1612. In short, there is no basis for the Court to conclude that Joumaa was denied adequate notice on this ground.

For these reasons, the Court will grant summary judgment for Defendants on Count IV of the amended complaint.

## IV. Conclusion

For all the above reasons, the Court will grant Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 10) and deny Joumaa's Cross-Motion for

---

[15] In addition, OFAC has now provided Joumaa with more notice about the basis for his designation than he had before he filed his petition and identified the information it asserts he failed to rebut. Armed with this information in the three-page letter denying his petition, the summary of the privileged and classified information, and the evidentiary memorandum, Joumaa "remains free now to continue contesting his designation by filing new delisting requests, meaning that he can make any new arguments that occur to him and reiterate and expand any arguments he felt received short shrift on [OFAC's] last review." *Zevallos*, 793 F.3d at 117. But he has not yet done so.

Summary Judgment (ECF No. 12).  The Court will also deny as moot Defendants' Motion for

Leave to File a Sur-Reply (ECF No. 17).  A separate order will issue.


/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: April 10, 2019